No. 2015-1947

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

INTELLECTUAL VENTURES I LLC,

*Appellant*,

v.

ERICSSON INC.,

*Appellee*.

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, IPR2014-00527.

## BRIEF OF APPELLANT INTELLECTUAL VENTURES

Jonathan M. Strang
Byron L. Pickard
Lori A. Gordon
STERNE, KESSLER, GOLDSTEIN & FOX,
P.L.L.C.
1100 New York Avenue, N.W.
Washington, D.C. 20005
(202) 772-8893

*Counsel for Appellant Intellectual
Ventures I LLC*

Dated: November 24, 2015

## CERTIFICATE OF INTEREST

Counsel for the Appellant, Jonathan M. Strang certifies the following:

1.    The full name of every party or amicus represented by me is:

Intellectual Ventures I LLC.

2.    The name of the real party in interest represented by me is:

None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are:

None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

**Sterne Kessler Goldstein & Fox PLLC**: Jonathan M. Strang, Byron L. Pickard, and Lori A. Gordon.

**McAndews, Held & Malloy, Ltd.**: Herbert D. Hart, III, Jonathan R. Sick, and Steven J. Hampton.

**Intellectual Ventures Management**: James R. Hietala and Tim R. Seeley.

Dated: November 24, 2015          /s/ Jonathan M. Strang

Jonathan M. Strang
**Sterne Kessler Goldstein & Fox PLLC**
1100 New York Ave., N.W.
Washington, DC 20005
202.371.2600

*Counsel for Appellant,*
*Intellectual Ventures I LLC*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ..................................................1

STATEMENT OF JURISDICTION..................................................1

STATEMENT OF THE ISSUES..........................................................1

STATEMENT OF FACTS ................................................................4

I.      The patented invention allows the secure transmission of data packets over a telecommunications network with wired and wireless sub-networks.....................................................................................4

II.     The *Inter Partes* Review..................................................................8

        A.      The Stadler grounds of unpatentability. ................................8

                1.      The parties disputed whether Stadler discloses applying the second protocol to the first packet. ............................................9

                2.      The Board erroneously found anticipation, stating that Intellectual Ventures did not show how Stadler was "patentability distinct" from the '674 patent. ...........................11

        B.      The Rai grounds of unpatentability...................................14

SUMMARY OF ARGUMENT .........................................................15

ARGUMENT ..................................................................................17

I.      Standard of Review.......................................................................17

II.     This Court should reverse the Board's finding that the claims are unpatentable on the Stadler grounds.............................................19

        A.      The Board erred as a matter of law in finding that Stadler anticipated the '674 patent. ...............................................21

                1.      The Board erred as a matter of law by requiring Intellectual Ventures to prove that Stadler is "patentably distinct" from the claims in an anticipation analysis. ......................................21

　　　　2.　　The Board erred as a matter of law because it unlawfully shifted the burden of proof from Ericsson to Intellectual Ventures. ...................................................................................23

　　B.　　The Board should not have considered Stadler as a prior-art printed publication...............................................................24

　　　　1.　　This Court should reverse because, as a matter of law, a copyright date is insufficient to establish the date of public availability.................................................................25

　　　　2.　　The Board erred by admitting the hearsay copyright date........27

　　C.　　Even if this Court affirms anticipation with respect to the independent claims, this Court should reverse the Board's finding that Stadler anticipates claims 3, 15, and 20. .....................................39

III.　This Court should reverse the Board's decision that claims 1-22 are obvious over Rai and Davison.....................................................................41

　　A.　　The Court should reverse the Board's finding that the determining step is inherently performed by Rai's base stations because it is not supported by any evidence and is contrary to basic logic.............42

　　B.　　This Court should reverse the Board's *sua sponte* finding that Rai's system entails using an 802.11-compliant MAC-layer protocol with WEP enabled...............................................................44

　　　　1.　　No substantial evidence supports the Board's finding that Rai actually uses (or must use) a MAC-layer protocol that follows the 802.11 standard with the optional WEP security enabled. ...................................................................................46

　　　　2.　　Using the proper scope of Rai, there is no evidence that one of skill would have combined Rai and Davison with the 802.11 standard. .......................................................................51

　　C.　　Even if this Court affirms as to the independent claims over Rai and Davison, it should reverse as to claims 3, 15, and 20 because the Board impermissibly shifted the burden to Intellectual Ventures to controvert a position never taken by Ericsson.................52

1.      Ericsson argued that Rai's MAC-layer protocol is different
        than Rai's XTunnel protocol.......................................................53

2.      The Board erred because it faulted Intellectual Ventures for
        not showing that Rai's MAC-layer protocol uses different
        encryption that Davison's IPsec. ..............................................54

CONCLUSION .........................................................................................................55

# TABLE OF AUTHORITIES

<u>Cases:</u>

*American Prairie Const. Co. v. Hoich*,
560 F.3d 780 (8th Cir. 2009) ...........................................................................32, 33

*Apple v. DSS Technology Management, Inc.*,
IPR2015-00369, Paper 9 (June 25, 2015)....................................................26, 35, 38

*Bianco v. Globus Medical, Inc.*,
No. 2:12-cv-00147, 2014 U.S. Dist. LEXIS 3430 (E.D. Tex. Jan. 12, 2014) .........28

*Brand v. Miller*,
487 F.3d 862 (Fed. Cir. 2007)...................................................................................18

*Chen v. Bouchard*,
347 F.3d 1299 (Fed. Cir. 2003)................................................................................19

*Coach Services, Inc. v. Triumph Learning LLC*,
668 F.3d 1356 (Fed. Cir. 2012)................................................................................18

*Conoco Inc. v. DOE*,
99 F.3d 387 (Fed. Cir. 1996)........................................................................28, 31, 34

*Crane v. Crest Tankers, Inc.*,
47 F.3d 292 (8th Cir. 1995) ......................................................................................31

*Crash Dummy Movie, LLC v. Mattel, Inc.*,
601 F.3d 1387 (Fed. Cir. 2010).................................................................................17

*Dynamic Drinkware v. National Graphics*,
800 F.3d 1375 (Fed. Cir. 2015)...........................................................................23, 24

*General Foods v. Studiengesellschaft Kohle mbH*,
972 F.2d 1272 (Fed. Cir. 1992)...........................................................................21, 22

*Hennessy v. Penril Datacomm Networks, Inc.*,
69 F.3d 1344 (7th Cir. 1995) ....................................................................................32

iv

# TABLE OF AUTHORITIES
## (Continued)

*In re Aoyama*,
656 F.3d 1293 (Fed. Cir. 2011)...............................................................18

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000)........................................................17, 18

*In re Hall*,
781 F.2d 897 (Fed. Cir. 1986)...........................................25, 29, 37, 51

*In re Huai-Hung Kao*,
639 F.3d 1057 (Fed. Cir. 2011)...............................................................18

*In re Lister*,
583 F.3d 1307 (Fed. Cir. 2008).......................................................*passim*

*In re Longi*,
759 F.2d 887 (Fed. Cir. 1985).......................................................21, 22

*In re Mouttet*,
686 F.3d 1322 (Fed Cir. 2012) ...............................................................18

*InTouch Techs. v. VGO Commc'ns*,
751 F.3d 1327 (Fed. Cir. 2014)...............................................................52

*Liberty Mutual Ins. Co. v. Progressive Casualty Ins. Co.*,
CBM2012-00003, Order Denying Grounds, Paper 8 (Oct. 25, 2012)....................51

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed Cir 2008)...........................................21, 22, 39, 40

*Par Pharm. v. TWi Pharms.*,
773 F.3d 1186 (Fed. Cir. 2014).......................................................43, 47

*Perfect Web Technologies, Inc. v. InfoUSA*,
587 F.3d 1324 (Fed. Cir. 2009)...............................................................44

v

# TABLE OF AUTHORITIES
## (Continued)

*Pozen Inc. v. Par Pharmaceutical, Inc.*,
696 F.3d 1151 (Fed. Cir. 2012)..............................................................34

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015)................................................................18

*ResQNet.com v. Lansa*,
594 F.3d 860 (Fed. Cir. 2010)..........................................................39, 41

*Rivers v. United States*,
777 F.3d 1306 (11th Cir. 2015) ............................................................36

*SDI Techs. v. Bose Corp*,
IPR2013-00350, Paper 36 (November 7, 2014) ...............................35, 37

*ServiceNow, Inc. v. Hewlett-Packard Co.*,
IPR2015-00707, Paper 12 (August 26, 2015)...................................26, 38

*Square, Inc. v. Unwired Planet*,
CBM2014-00156, Paper 22 (February 26, 2015) ...................................26

*Standard Innovation Corp. v. Lelo, Inc.*,
IPR2014-00148, Paper 41 (April 23, 2015)......................................26, 38

*Sykes v. Apfel*,
228 F.3d 259 (3rd Cir. 2000) ................................................................33

*Under Armour, Inc., v. Adidas AG*,
IPR2015-00698, Paper 9 (August 14, 2015).........................................26

*United States v. Masferrer*,
514 F.3d 1158 (11th Cir. 2008) ....................................................... 30-31

*United States v. Woods*,
321 F.3d 361 (3d Cir. 2003)............................................................ 28-29

# TABLE OF AUTHORITIES
## (Concluded)

*United Technologies Corp. v. Mazer*,
556 F.3d 1260 (11th Cir. 2009) ................................................................ 34, 37-38

*Voter Verified, Inc. v. Premier Election Solutions*,
698 F.3d 1374 (Fed. Cir. 2012)...........................................................29, 37

*Wade v. Dept. of Navy*,
829 F.2d 1106 (Fed. Cir. 1987)...............................................................47

*Wright Medical Technology, Inc., v. Biomedical Enterprises, Inc.*,
IPR2015-00786, Paper 7 (August 10, 2015)...........................................26

*Yuni v. Merit Sys. Protection Board*,
784 F.2d 381 (Fed. Cir. 1986)...............................................................44

Regulations:
37 C.F.R. § 42.1 ...................................................................................38, 51
37 C.F.R. § 42.20 ......................................................................................23
37 C.F.R. § 42.22 ......................................................................................51
37 C.F.R. § 42.62 .................................................................................32, 38
37 C.F.R. § 42.64 .................................................................................27, 36

Statutes:
5 U.S.C. § 556................................................................................................33
28 U.S.C. § 1295............................................................................................1
35 U.S.C. § 311 .............................................................................................1
35 U.S.C. § 316 ...........................................................................23, 24, 38, 52
35 U.S.C. § 319.............................................................................................1

Other Authority:
Fed. R. Evid. 201 ....................................................................................32, 33
Fed. R. Evid. 803 ....................................................................................28, 30
Fed. R. Evid. 807 ........................................................................................34

## STATEMENT OF RELATED CASES

There have been no other appeals to this Court from the same proceeding before the Patent Trial and Appeal Board.

Four other cases may directly affect, or be directly affected by, this Court's decision because they involve the patent at issue, U.S. Patent No. 7,496,674: *Intellectual Ventures I v. AT&T Mobility*, No. 12-cv-193 (D. Del.); *Intellectual Ventures I v. Nextel Operation*s, No. 13-cv-1634 (D. Del.); *Intellectual Ventures I v. TMobile USA*, No. 13-cv-1632 (D. Del.); and *Intellectual Ventures I v. United States Cellular Corp.*, No. 13-cv-1636 (D. Del.).

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 319. The Board conducted this IPR pursuant to 35 U.S.C. § 311 *et seq.*, issuing its final written decision on May 18, 2015. Intellectual Ventures filed its timely notice of appeal on July 16, 2015. A725-29.

## STATEMENT OF THE ISSUES

1a.    All of the claims, which are directed to securely sending packets on wired and wireless subnetworks, recite applying a second security protocol to the first packet. Ericsson asserted that Stadler discloses applying the protocol to the first packet, and Intellectual Ventures responded that Stadler does not because it terminates the TCP connection (and the first packet no longer exists) before it applies the protocol. Nevertheless, the Board found that Stadler anticipated claims

1-6 and 10-22 because Intellectual Ventures did not show how Stadler was "patentably distinct" from the '674 patent. Did the Board err in applying a "patentably distinct" standard in its anticipation analysis and in shifting the burden to Intellectual Ventures to prove patentability?

1b.     To meet its burden to show that the Stadler reference is a prior-art printed publication against the '674 patent, Ericsson proffered the copyright notice printed on Stadler's first page. The law is clear that a copyright date alone is insufficient to demonstrate public availability. *In re Lister*, 583 F.3d 1307, 1317 (Fed. Cir. 2008). The Board nevertheless relied on the hearsay copyright date as the sole proof of public availability by applying two narrow hearsay exceptions— the exception for market reports and other compilations and the residual exception, which is reserved for exceptional cases. Did the Board err in finding that Stadler was publicly available prior art based solely on its hearsay printed copyright date?

1c.     Dependent claims 3, 15, and 20 further recite using two different encryption algorithms. Ericsson did not identify where Stadler discloses using two different encryption algorithms. The Board did not find that Stadler expressly or inherently discloses using two encryption algorithms, but instead concluded that Stadler is "not restricted" from using two encryption algorithms. Did the Board err in finding claims expressly reciting using two different encryption algorithms

anticipated by prior art that does not disclose using two different encryption algorithms?

2a.    There is no evidence that Rai expressly or inherently discloses the determining step required by all claims of the '674 patent. The Board found that Rai's base station inherently performs the claimed determining step based solely on a single-sentence attorney argument in Ericsson's reply brief. Did the Board err in finding all claims obvious over Rai and Davison without any evidence supporting its conclusion that Rai must necessarily perform the determining step?

2b.    Ericsson admitted that Rai does not teach using an 802.11-compliant protocol with the standard's optional WEP security implemented. Did the Board err in finding, without any supporting evidence, that Rai teaches using an 802.11-compliant protocol with the standard's optional WEP security implemented?

2c.    Claims 3, 15, and 20 recite using two different encryption algorithms. Ericsson pointed to Rai's MAC-layer protocol and XTunnel as having the two encryption algorithms. The Board agreed with Intellectual Ventures that Rai's XTunnel does not include encryption. But the Board found these claims obvious on new grounds, reasoning that Intellectual Ventures did not show that Rai's MAC-layer protocol uses a different encryption algorithm than Davison's IPsec. Did the Board err in finding these claims obvious on the new grounds never presented by Ericsson?

3

## STATEMENT OF FACTS

**I.    The patented invention allows the secure transmission of data packets over a telecommunications network with wired and wireless sub-networks.**

In the mid-1990s, inventor Jacob Jorgensen recognized that existing wireless networks typically used circuit-switched connections to provide acceptable quality of service for voice calls while wired networks traditionally used packet switching to more efficiently use available bandwidth. A90 at col. 3. To improve the capabilities of networks with both wired and wireless components, Jorgensen conceived of and developed a packet-centric system that delivered a high quality of service. A90 at col. 3, 4; A129 at claim 1. In doing so, he invented a base station that bridges between the wired and wireless portions of the network, sending packets from one side to the other, employing different security protocols on each side, while maintaining each packet's integrity. *Id.* This invention is disclosed and claimed in the '674 patent at issue here.

Figure 17 from the '674 patent shows an example of how the '674 patented invention accomplished Jorgensen's goal. The patent describes a wireless connection between a host workstation (in the example, the website's host server) on a wired network and a subscriber workstation on a wired network (in the example, the end user accessing the website). Website data passes from the wired

network through a wireless network to the end user, with the data passing through

various protocol stacks as shown in annotated Figure 17:



A87 (annotations added). The blue arrows illustrate communications between

layers, which is implemented by data flow up and down the protocol stacks shown

by the red arrows.

As the transmitted data flow down from the TCP layer and then back up

through each protocol in the stacks (red arrows), information is added and then

removed from the packet to conform to the next layer's protocol while maintaining

the packet's integrity. For example, a TCP packet is encapsulated into an IP packet

(also called a datagram) on the way down at the host workstation, and the IP

5

packet's header is removed to reveal the TCP packet on the way back up when received at the subscriber.

The protocols below each layer are transparent to that layer: the application layer at the host "talks" to the application layer at the subscriber (blue arrows), unconcerned with how the TCP/UDP, IP, and so forth layers below it perform their functions. The same is true for the TCP layer beneath it: the TCP layer at the host "talks" to the TCP layer at the subscriber, and does not concern itself with how the underlying layers actually get the TCP packets to and from each location.

At the application layer, which interacts directly with a user's software applications, data is not in the form of a packet. A2435. To send data to the subscriber's application layer, the host's application layer passes the data to its own TCP layer, which creates TCP segments, which become the TCP packets' payloads. A2437-38. In the claimed invention, the subscriber workstation's TCP layer receives the exact same packets—with identical payloads as those transmitted—after they have traversed through the protocol stacks of the intervening network elements. A487; A2086-87.

Although the intervening layers may encapsulate or fragment the TCP packets at some point below the TCP layer, they do not destroy the TCP packets, which the subscriber workstation receives unchanged. A487; A2086-87. For example, if the IP packets would be too large for the underlying technology, the IP

6

packets can be sent in separate fragments, which are reassembled in the correct order when received. A2437-38.

To improve security, the base station uses different security protocols (and may use different encryption algorithms) on the wired and wireless networks. Thus, when the transmitted TCP packets travel up and down the protocol stacks at the base station, the base station processes the received packet according to the security protocol on that network (*e.g.*, the wired network) and applies a second security protocol before transmitting on the other network (*e.g.*, the wireless network). This is reflected in claim 1, which recites:

> A method comprising:
>
> receiving a first packet from a wired data network in a wireless base station that is coupled to the wired data network,
>
> wherein the first packet is protected according to a first security protocol on the wired data network, and
>
> wherein a target device of the first packet communicates with a source of the first packet, at least in part, over a wireless network on which the wireless base station communicates;
>
> processing the first packet in the wireless base station according to the first security protocol;
>
> determining that the first packet is targeted at the target device, wherein the determining is performed by the wireless base station, and wherein the first packet comprises a header coded with address information identifying the target device; and
>
> applying a second security protocol employed on the wireless network to the first packet, wherein the second security protocol is different

from the first security protocol, and wherein the applying is performed in the wireless base station.

A129. Dependent claims 3, 15, and 20 are also at issue on this appeal, and they further recite that the two security protocols use different encryption algorithms. A129-30.

## II.    The *Inter Partes* Review.

Ericsson requested *Inter Partes* Review of the '674 patent on a number of grounds, including asserting claims 1-6 and 10-22 were anticipated by Stadler, claims 7-9 were obvious over Stadler and Davison, claims 1, 10-13, 17, 18, and 22 were obvious over Rai alone, and claims 2-9, 14-16, and 19-21 were obvious over Rai and Davison. A223. After considering the petition and Intellectual Ventures' preliminary response, the Board instituted on these grounds. A359-60.

### A.    The Stadler grounds of unpatentability.

The Board found that Stadler, an article from an IEEE conference proceeding, anticipated claims 1-6 and 10-22 and rendered obvious claims 7-9 when combined with Davison. Relevant to this appeal is the claim element, recited in all claims, that requires applying a second security protocol to the first packet. This element is not taught by Stadler.

Claim 1 is representative for the purposes of this appeal. It recites in the relevant part:

> *receiving a first packet* from a wired data network . . . wherein the first packet is protected according to a first security protocol . . . ;

8

processing the first packet in the wireless base station according to the first security protocol;

determining that the first packet is targeted at the target device, . . . wherein the first packet comprises a header coded with address information identifying the target device; and

*applying a second security protocol* employed on the wireless network *to the first packet*, wherein the second security protocol is different from the first security protocol . . . ."

A129 (emphasis added).

Ultimately, the Board erroneously found that Stadler anticipated the claims because Intellectual Ventures did not show how Stadler was "patentably distinct" from the '674 patent specification's description of wirelessly transmitting packets using a time division multiplexing technique. A16-21; A538.[1]

### 1.    The parties disputed whether Stadler discloses applying the second protocol to the first packet.

Rather than clearly identifying what in Stadler corresponds to the first packet and the second protocol, Ericsson proffered hodgepodge unexplained quotations and citations, of which only the last one, "See also Ex. 1013 ¶¶ 51 and 52 [A1483-84]," ended up being applicable. A243, A248. There, Ericsson's expert, Dr. Makowski, asserted that Stadler's "WISE protocol" corresponds to the claimed second protocol. A1483.

---

[1] For the purposes of this appeal, Intellectual Ventures assumes that the claims encompass using the described time division multiplexing embodiment.

Intellectual Ventures responded that Stadler does not disclose applying the second protocol to the first packet because the first packet ceases to exist when Stadler terminates the TCP connection. A483-87; A2007-15. Stadler therefore applies its second protocol to new packets formed by fragmenting the received and reassembled data that was carried in pieces by the TCP packets. A483-87. That is, Stadler reassembles the TCP packets' payloads into the application-level data, and then fragments that data to form new WLP packets. A2009-10. This fragmentation "decouples" the received packets from the transmitted packets; as a result, Stadler's "WLP packets do not have the same payloads as received TCP packets." A486. Thus, Stadler does not apply its second protocol to the received TCP packets or their payloads but instead to its WLP packets, which have different payloads. A483-87; A2007-15.

Ericsson replied that Intellectual Ventures' "arguments regarding fragmentation are irrelevant and contradicted by the '674 patent specification," arguing that the '674 patent "describes dividing the data into data slots when it is transmitted over the wireless link" and that Intellectual Ventures' expert, Dr. Newman "failed to show that the '674 patent specification describes doing anything differently" than Stadler's fragmentation. A536 (Reply citing to Ex. 1022, 39:19 to 41:9 (A2439-41), 43:21 to 44:3 (A2443-44) and '674 patent (A115)

53:21-54:15). Ericsson did not proffer any expert testimony of its own on this point.

Intellectual Ventures also contended that Ericsson failed to prove that Stadler was even prior art and that the hearsay copyright date should be excluded. A565-67. Although Ericsson had the opportunity to file supplemental evidence, it chose not to, instead arguing that the hearsay copyright date was sufficient. A596-602.

> ### 2.    The Board erroneously found anticipation, stating that Intellectual Ventures did not show how Stadler was "patentability distinct" from the '674 patent.

In its final decision, the Board observed that Ericsson had replied that Stadler's fragmentation technique is no different than the time division multiplexing technique disclosed in the '674 patent, an argument that Ericsson did not raise in its Petition. A17 (citing '674 patent, cols. 53-54 (A115)). The Board concluded that Stadler anticipated because Intellectual Ventures did not show that Stadler's fragmentation technique "differed, in any patentably distinct manner" from the time division multiplexing described in the '674 patent. A18, A21.

The Board reasoned that "[t]he better interpretation of Stadler is that after a first packet is received from the client at gateway 1, the first packet, including the header thereof, merely undergoes a transformation of form to facilitate its transmission over the wireless segment of the communication system." A16, A20.

The Board concluded: "Because Stadler's first packet is merely transformed, but not destroyed, at the wireless base station, Stadler applies a second protocol to the first packet as opposed to a different and newly created packet." A20.

The Board did not find that Ericsson proved by a preponderance of evidence that Stadler, including this "transformation of form" of its packets, anticipates the claims. Rather, the Board found that Stadler's transformation in form "is *not patentably distinct* from the transformation in form that a first packet undergoes during transmission in accordance with the '674 patent." A20-21 (emphasis added).

The Board thus shifted the burden of proof to Intellectual Ventures, basing its finding not on evidence proffered by Ericsson, but on Intellectual Ventures' purported failure to show nonobviousness, stating: "On cross-examination, Intellectual Ventures' expert, Dr. Newman, was unable to explain how the fragmentation technique in Stadler differed*, in any patentably distinct manner*, from the time division multiplexing technique taught in the '674 patent." A17-18 (emphasis added, citing Newman cross-examination at A2437-44, and referring to columns 53 and 54 of the '674 patent (A115), which describes transmitting IP packets over TDMA air frames).

The Board faulted Dr. Newman for failing to explain why the patent claims were patentably distinct from time division multiplexing even though he was never

asked to explain how the fragmentation technique in Stadler differed from the time division multiplexing technique taught in the '674 patent. Had he been asked, he likely would have explained that the Board focused on the wrong part of the protocol stack. The issue is not how the '674 patent's packets may be fragmented down in the MAC layer, after the security protocol has been applied, but before the packets are actually transmitted. A115 at col. 53 ("TDMA MAC Air frame").The issue is what happens higher up the protocol stack, when Stadler's base station terminates its TCP connection. A759; A484-91. That is, when Stadler's base station receives TCP packets from the wired network, the packets travel up the protocol stack, up past the IP and TCP layers, to the application layer. A758 (TCP packets "pass all the way up the protocol stack" and "the TCP connection [is] terminated."). At this point, Stadler's TCP and IP packets are gone—the headers are discarded and the payloads have been reassembled into the original data—and therefore Stadler does not apply a second protocol to received TCP packets, *i.e.*, the "first packets." A2009-14; A484-91.

The Board also found that Stadler was publicly available in 1998 based on the copyright date printed on the bottom of its first page, finding that the hearsay copyright date fell under the market-report exception of Rule 803(17), or in the alternative, under the residual exception of Rule 807. A10-12.

13

**B.      The Rai grounds of unpatentability.**

The Board found that all claims were obvious over Rai and Davison. Two claim elements are relevant to this appeal: "determining that the first packet is targeted" and "applying a second security protocol."

The Board found that Rai inherently teaches the first claim element, the determining step, based on a single sentence of attorney argument. Ericsson provided a handful of unexplained Rai quotations in its petition and later argued without any supporting evidence that its first Rai quote (which states that the base station relays frames over the air link to the end system) "makes it clear that the base station must" perform the determining step. A258; A545-46. The Board agreed without further elaboration. A33-34 (agreeing that "the base station *must* make a determination that the packet is targeted at the end system in order to send the packet to the end system." (citing Reply at A545-46) (emphasis added)).

With respect to "applying a second security protocol" element, Ericsson and its expert stated that Rai does *not* use an 802.11-compliant protocol, but the Board found that Rai "entails" using an 802.11-compliant protocol with WEP enabled. Specifically, Ericsson and its expert initially stated that "[i]t would have been understood by a person of ordinary skill in the art that the use of the MAC layer for a wireless LAN as shown in Rai followed the 802.11 standard and enabled wireless encryption." A256-57; A1489-90. Intellectual Ventures then demonstrated that the

14

802.11 standard would not be suitable for Rai's base stations, which have a range of around 1 kilometer or more. A505-06; A2021-22.

In reply, Ericsson clarified that it was *not* contending that Rai's system actually disclosed or followed the 802.11 standard, but rather that "it would have been *obvious* to have a security protocol applied to the wireless link in Rai in view of the teaching of the 802.11 standard" and that the 802.11 standard is merely evidence "that it was well known at the time of the filing of the '674 patent to employ wireless encryption at the MAC layer over a wireless link." A544 (emphasis added); *see also* A2093-95.

Even though Ericsson did not argue it, and the evidence did not show it, the Board concluded that Rai "entails" using an 802.11-compliant with its optional WEP security enabled. A32-33, A35.

## SUMMARY OF ARGUMENT

This Court should reverse the Board's decision of unpatentability. The Board repeatedly applied the wrong legal standards—such as "patentably distinct" for anticipation and finding that art anticipated as long as it was "not restricted" from being configured to have all of the recited claim elements—and went beyond the parties' briefings and arguments to find new grounds of invalidity.

The Board erred in finding that Stadler anticipated the disputed claims. The Board applied the wrong legal standard and unlawfully shifted the burden to

15

Intellectual Ventures, requiring it to prove that Stadler is "patentably distinct" from the '674 patent. A17-18, A20-21. The Board further erred in finding anticipation of claims 3, 15, and 20 because it found that Stadler was "not restricted" from being configured as required by the claims rather than finding Stadler discloses each element arranged as in the claims. A21-22.

The Board also erred in finding that Stadler is prior art. It erred as a matter of law by relying on Stadler's copyright date to determine public availability and abused its discretion by admitting the hearsay copyright date into evidence under the market report exception or the narrow residual exception. A10-12.

With respect to Rai, the Board committed two errors. First, it found, without any evidence, that Rai inherently performs the determining step, which requires the base station to determine that a packet is "targeted" to a particular device, basing its finding solely on a single-sentence attorney argument. A33-34; A545-546. The Board did not point to any evidence supporting this determination (A33-34) and simple logic dictates it is flawed: the base station may simply rebroadcast everything it receives without checking the address, leaving it to the receiving stations to determine if each packet is addressed to them.

Second, the Board erred when it found *sua sponte* that Rai's system "entails" using an 802.11-compliant MAC-layer protocol with the optional WEP security implemented, despite an absence of evidence showing that Rai actually uses (or

must use) such a protocol, with or without WEP. Rai does not mention the 802.11 standard and Ericsson did not assert that Rai uses an 802.11-compliant protocol. A544-45; A2093-94; A505; A32-33.

The Board also erred in finding dependent claims 3, 15, and 20 obvious because it improperly shifted the burden to Intellectual Ventures to disprove an argument that Ericsson never made. A21-23. The claims require using two different encryption algorithms, which Ericsson contended were Rai's MAC-layer and XTunnel protocols. A249, A251, A253. The Board agreed with Intellectual Ventures that XTunnel does not include encryption (A30-31), but faulted Intellectual Ventures for not showing that Rai's MAC protocol uses a different encryption algorithm than Davison's IPsec, which was not Ericsson's contention. A34-35.

## ARGUMENT

### I.    Standard of Review.

This Court reviews the Board's legal conclusions *de novo*, its factual findings for substantial evidence, and its evidentiary rulings for abuse of discretion. *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000); *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1390 (Fed. Cir. 2010).

Obviousness is a legal question with underlying findings of fact, such as the scope and content of the prior art. *Gartside*, 203 F.3d at 1319. Likewise, whether a

17

reference is a prior-art publication is also a question of law reviewed with underlying facts. *Lister*, 583 F.3d at 1311-12.

Anticipation is a question of fact reviewed for substantial evidence. *In re Aoyama*, 656 F.3d 1293, 1296 (Fed. Cir. 2011). But whether the Board applied the correct legal standard is a question of law reviewed *de novo*. *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 964 (Fed. Cir. 2015).

Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion; it is more than a scintilla, but less than the weight of the evidence. *In re Mouttet*, 686 F.3d 1322, 1331 (Fed Cir. 2012). This Court must "tak[e] into account evidence that both justifies and detracts from an agency's decision." *Gartside*, 203 F.3d at 1312. Where the PTAB "relie[s] on erroneous reasoning in making the factual determinations," those factual findings are not supported by substantial evidence. *In re Huai-Hung Kao*, 639 F.3d 1057, 1065 (Fed. Cir. 2011).

And "it is particularly important that the agency's decision on issues of fact be limited to the written record made before the agency." *Brand v. Miller*, 487 F.3d 862 (Fed. Cir. 2007). "[A]gency expertise cannot substitute for record evidence." *Id.* at 868-69.

The Board's evidentiary rulings, such as whether the copyright date falls within a hearsay exception, are reviewed for abuse of discretion. *Coach Services,*

*Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1363 (Fed. Cir. 2012); *Chen v.*

*Bouchard*, 347 F.3d 1299, 1307 (Fed. Cir. 2003). This Court will reverse if the

Board's evidentiary ruling was: "(1) clearly unreasonable, arbitrary, or fanciful; (2)

based on an erroneous conclusion of law; (3) premised on clearly erroneous

findings of fact; or (4) the record contains no evidence on which the Board could

rationally base its decision." *Coach*, 668 F.3d at 1363 (internal quotations omitted).

## II.    This Court should reverse the Board's finding that the claims are unpatentable on the Stadler grounds.

The Board found that claims 1-6 and 10-22 were anticipated by Stadler and

that claims 7-9 were rendered obvious by Stadler and Davison.

Beginning with the anticipation grounds, the Board's determination that

Stadler anticipated claims 1-6 and 10-22 is predicated on the wrong test: the Board

required Intellectual Ventures to show that Stadler is "patentably distinct," finding

that "Intellectual Ventures' expert, Dr. Newman, was unable to explain how the

fragmentation technique [of the allegedly anticipatory reference] differed, in any

*patentably distinct* manner, from the time division multiplexing technique taught in

the '674 patent." A17-18 (emphasis added); *see also* A20-21. Thus, the Board

improperly imported obviousness into its anticipation analysis by applying the

"patentably distinct" test. The Board also improperly placed the burden on the

patent owner to show patentability.

The Board further erred in finding that Stadler anticipated dependent claims 3, 15, and 20 because it applied an obviousness-like standard when it found that Stadler was "not restricted" from being configured as required by the claims. A22-23.

The Board also erred in finding that Stadler is a prior-art printed publication. The Board relied solely on Stadler's printed copyright date, which is insufficient to establish public availability as a matter of law. *Lister*, 583 F.3d at 1317. This is also the rare case where the Board abused its discretion in an evidentiary matter, admitting the hearsay copyright date under the market report exception and the narrow residual exception in the alternative when those exceptions plainly do not apply. A10-12.

As for the grounds that dependent claims 7-9 are unpatentable over Stadler and Davison, the Board's finding fails for essentially the same reasons. Although the "patentably distinct" standard would have been permissible in an obviousness analysis, there was no evidence of a rationale to modify Stadler. The remaining reasons still apply because the Board relies on its conclusion that Stadler discloses applying the second protocol to the first packet. Ericsson did not argue, and the Board did not conclude, that Davison adds anything to the analysis of this claim element. A23-29; A254-56.

**A.    The Board erred as a matter of law in finding that Stadler anticipated the '674 patent.**

The Board committed two independent errors in finding that Stadler anticipated. The Board required Intellectual Ventures to prove that its claims are "patently distinct" from the prior art, thus (i) applying the wrong legal standard and (ii) impermissibly shifting the burden to Intellectual Ventures to show patentability.

**1.    The Board erred as a matter of law by requiring Intellectual Ventures to prove that Stadler is "patentably distinct" from the claims in an anticipation analysis.**

The Board's application of the "patentably distinct" standard in its anticipation analysis was legal error because anticipation requires the invention to be identically disclosed in the prior-art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed Cir. 2008). To anticipate, a reference must disclose all of the claim elements "arranged as in the claim." *Id*. at 1369-70. But to patentably distinct, a standard used in the obviousness analysis, a claim must be "more than an obvious variation." *General Foods v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1278 (Fed. Cir. 1992); *In re Longi*, 759 F.2d 887, 892-93 (Fed. Cir. 1985).

Although the Board stated that "claims 1-6 and 10-22 of [the '674 patent] have been shown to be unpatentable as anticipated by Stadler," it did *not* find that Ericsson showed by a preponderance of evidence that Stadler disclosed all of the

21

claim elements arranged as in the claim. Instead, it concluded that Intellectual Ventures failed to show that Stadler "is not patentably distinct" from the '674 patent. A20-21; *see also* A17-18. This is legal error.

In *Net MoneyIN*, this Court found that "there may be only slight differences between the protocols disclosed in the iKP reference and the system of claim 23. But differences between the prior art reference and a claimed invention, however slight, invoke the question of obviousness, not anticipation." *Net MoneyIN*, 545 F.3d at 1371.

The same is true here. The Board did not find that Stadler is identical to the claims, as would have been necessary to support a conclusion of anticipation. Instead, the Board invoked the question of obviousness by finding that Stadler and the claims were "not patentably distinct." *General Foods v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1278 (Fed. Cir. 1992) ("If the rejected claim defines *more* than an obvious variation, it is *patentably distinct*." (Emphasis in original)); *Longi,* 759 F.2d at 892-93. The Board made its obviousness finding without the requisite arguments and evidence, such as why one of ordinary skill would have modified Stadler as the Board implicitly proposed.

The Board therefore applied the wrong legal standard for anticipation. The Board should have required Ericsson to show that Stadler discloses applying the second security protocol to the first packet. Ericsson did not do so and no evidence

22

of record supports the Board's finding of anticipation. This Court should reverse, or at least vacate and remand for application of the proper legal standard.

> **2.    The Board erred as a matter of law because it unlawfully shifted the burden of proof from Ericsson to Intellectual Ventures.**

Congress placed the burden squarely on Ericsson to show that prior art anticipates the claims. 35 U.S.C. § 316(e) ("the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence"); 37 C.F.R. § 42.20; *Dynamic Drinkware v. National Graphics*, 800 F.3d 1375, 1379 (Fed. Cir. 2015) (Section 316(e) "places the burden of persuasion on the petitioner to prove unpatentability").

Ericsson had argued that Stadler disclosed applying a second security protocol to the packet's payload after discarding the headers. A241, A243; A535-36, A538; A1482-83; A635-37; A2086. Intellectual Ventures responded that Stadler does nothing of the sort; before applying the second protocol, Stadler terminates the TCP connection and the TCP/IP packets no longer exist. A484, 486; A758; A2007-11.

The Board, however, departed from Ericsson's arguments and evidence, basing its decision on its finding that Intellectual Ventures' expert, "Dr. Newman, was unable to explain" how Stadler was patentably distinct from the '674 patent. A17-18 (citing Newman Tr., A2437-44 at 37:3-44:24). The Board's analysis was

in error because Intellectual Ventures did not bear the burden of showing patentability. Congress placed the burden squarely on Ericsson to show that prior art anticipates the claims. 35 U.S.C. § 316(e); *Dynamic Drinkware*, 800 F.3d at 1379.

And, contrary to the Board's and Ericsson's insinuations, Ericsson did *not* ask Dr. Newman during the cited section of his cross-examination to explain how Stadler and the '674 patent differed. A2437-44 at 37:3-44:24. But even if Ericsson had done so, it was not Dr. Newman's job to explain why the claims are not anticipated; Congress gave Ericsson the task of proving that they are.[2]

There is no evidence of record showing that the fragmentation technique in Stadler is the same as the time division multiplexing technique taught in the '674 patent. Ericsson could have submitted such evidence with its petition. It did not. A243 (citing A1483-84).

## B. The Board should not have considered Stadler as a prior-art printed publication.

The Board erred as a matter of law in relying on Stadler's printed copyright date to show public availability before the '674 patent's critical date because a copyright date is insufficient as a matter of law to establish Stadler's public

---

[2] Further, had Dr. Newman been asked, he could have explained the differences as outlined in the fact section above. Intellectual Ventures does not appeal this fact-bound issue, however, because the Board's legal errors are dispositive.

availability. A10-12; *Lister*, 583 F.3d at 1317. *Lister* definitively held that a

copyright date alone is insufficient to establish a date of public availability; the

Board, however adopted the exact opposite view. Thus, even if the date were not

inadmissible hearsay (which it is), it would be insufficient to establish the key fact

that allowed Stadler to serve as prior art in this proceeding.

### 1.    This Court should reverse because, as a matter of law, a copyright date is insufficient to establish the date of public availability.

It is well-settled that, even during *ex parte* prosecution, "[t]he proponent of

the publication bar must show that prior to the critical date the reference was

sufficiently accessible, at least to the public interested in the art." *In re Hall*, 781

F.2d 897, 899 (Fed. Cir. 1986).

A copyright date printed on a document by itself does not show when a

document was first publicly accessible. For example, this Court held in *Lister* that

a registered copyright did not *prima facie* show public availability, even though the

document itself was available for inspection at the Copyright Office and searchable

by title and name. *Lister*, 583 F.3d at 1317. Lister's document was available for

inspection by anyone, and could be searched by name, title, and author name in the

Copyright Office's database. But there was no proof of when the document was

put into the Dialog and Westlaw databases, which could be searched by subject

matter keywords. This Court, therefore, held that there was no basis to conclude that the document was publicly available before the critical date. *Id.*

Further, other Board panels have correctly recognized that, when used to show public availability, a copyright date is inadmissible hearsay, and even if admissible, it is legally insufficient to show public availability. *Standard Innovation Corp. v. Lelo, Inc.*, IPR2014-00148, Paper 41 at 13-18 (Apr. 23, 2015) (hearsay and not proof) A2687-715; *ServiceNow, Inc. v. Hewlett-Packard Co.*, IPR2015-00707, Paper 12 at 15-17 (Aug. 26, 2015) (hearsay and not proof) A2649-75; *Apple v. DSS Technology Management, Inc.*, IPR2015-00369, Paper 9 at 11-12 (June 25, 2015) (hearsay and not proof) A2578-99; *Under Armour, Inc., v. Adidas AG*, IPR2015-00698, Paper 9 at 16-17 (Aug. 14, 2015) (not proof) A2716-34; *Wright Medical Technology, Inc., v. Biomedical Enterprises, Inc.*, IPR2015-00786, Paper 7 at 9-10 (Aug. 10, 2015) (not proof) A2735-45; *Square, Inc. v. Unwired Planet*, CBM2014-00156, Paper 22 at 6-7 (Feb. 26, 2015) (copyright date and ISBN not proof) A2676-86.

Here, the Board erred as a matter of law because there is even less evidence of public availability than there was in *Lister*. There is no evidence that Stadler's copyright was registered or that Stadler was publicly available in any library or database before the critical date. The Board relied solely on Stadler's copyright date, and as this Court held in *Lister* and the Board has recognized many other

26

times, that is not enough. *Lister*, 583 F.3d at 1317. The Board pointed to no reason justifying its arbitrary treatment of Intellectual Ventures when it has repeatedly and routinely rejected the use of a copyright date as evidence of public availability in numerous other matters.

Because Stadler's copyright date is insufficient to show public availability, and there is no actual evidence of record tending to show that Stadler was publicly available before the critical date, this Court should reverse the Board's findings with respect to Stadler.

### 2.    The Board erred by admitting the hearsay copyright date.

Even if a copyright date is sufficient evidence of public availability, it is undisputedly hearsay when offered to prove the date on which a reference was made publicly available. The Board erred in ruling that Stadler's copyright date was admissible hearsay because it fell within the market-report exception of Rule 803(17) and in the narrow residual exception of Rule 807.

Intellectual Ventures' timely objections put Ericsson on notice that it had provided "no admissible evidence establishing the date of publication" and gave Ericsson ten business days to supplement its evidence. 37 C.F.R. § 42.64 (ten business days to supplement); A2467-68. Ericsson chose not to supplement its inadmissible and insufficient evidence.

The Board's decision with respect to Stadler should, therefore, be reversed.

### a. The Board erred in ruling that the Stadler's copyright notice is admissible hearsay under the market-report exception.

For Rule 803(17)'s market-report exception to apply, two conditions must be met. First, the thing to be admitted must be a market report, list, directory or other compilation. Fed. R. Evid. 803(17) ("Market quotations, lists, directories, or other compilations . . . ."). Second, the item in question must be relied on by the public or particular occupations. *Id.* (". . . that are generally relied on by the public or by persons in particular occupations."). Typical exceptions include stock-market data, currency-exchange rates, bank-interest rates, Bloomberg-market-price quotes, telephone directories, tabulations of real-estate sales, used-car valuations, and the like. *Id.* ("Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations."); *Conoco Inc. v. DOE*, 99 F.3d 387, 393 (Fed. Cir. 1996); *Bianco v. Globus Medical, Inc.*, No. 2:12-cv-00147, 2014 U.S. Dist. LEXIS 3430 at *1-4 (E.D. Tex. Jan. 12, 2014) (collecting cases and showing that the courts have consistently taken a "narrow view of the scope of" this exception) (Bryson, J., sitting by designation).

This exception to the rule against hearsay is justified because such compilations are reliable and "the task of finding every person who had a hand in making the report would be impossible." *United States v. Woods*, 321 F.3d 361, 364 (3d Cir. 2003) (quoting 5 Weinstein's Federal Evidence § 803.19[1] (Matthew

Bender 2002)). This situation is distinct from showing public availability, where the typical non-hearsay evidence is readily available from the publisher or a library. *Hall*, 781 F.2d at 899-900 (librarian); *Voter Verified, Inc. v. Premier Election Solutions*, 698 F.3d 1374, 1380 (Fed. Cir. 2012) (publisher).

The Board erred in admitting Stadler's hearsay copyright date under the market-report exception as evidence of the reference's public availability date. First, Stadler's copyright date is not a published compilation as required by Rule 803(17). Second, there is no evidence that Stadler's copyright date is relied upon by the public or particular occupations as required by the exception. The Board also legally erred when it took Official Notice that people "rely on the information published on the copyright line of IEEE publications" to determine the date of public availability and no evidence supports the Board's conclusion that ISSN and ISBN codes denote date of public availability. For this reason, the Board's decision to apply this exception should be reversed.

### i.    Stadler's copyright date is not a published compilation as required by Rule 803(17).

Stadler's copyright date is just a designation appearing on the reference's first page. The copyright date is not a published compilation and thus not covered by Rule 803(17). Unlike the narrow categories recognized by this rule, it was not necessary to rely on Stadler's unreliable copyright date here instead of the typical non-hearsay evidence from a publisher or a library.

29

In determining that the market-report exception applied, the Board skipped over a necessary part of the inquiry: is Stadler, or its printed copyright date, a market report, list, directory, or other compilation covered by Rule 803(17)? Instead, the Board concluded, "[t]he information published on the copyright line of Stadler thus falls under an exception to the hearsay *rule as lists, etc.*, . . . ." A11. But there can be no reasonable assertion that Stadler (a research paper summarizing a prototype networking software program) or its copyright line are any kind of market report, list, directory, or other compilation. Each of these items are a collection of information. Under the principle of *ejusdem generis*—a general phrase following a list of specifics should be interpreted to include one of the same type—"other compilation" must be in the nature of the market reports, lists, and directories. Stadler's copyright line is just a particular designation on a particular document, it is not a compilation and it is not in such a compilation.

For this reason, the Board's decision to apply this exception was contrary to law and should be reversed.

> ii.     **There is no evidence that Stadler's copyright date is relied upon by the public or particular occupations as required by Rule 803(17).**

For the market-report exception to apply, Ericsson must also provide evidence that Stadler's copyright date is relied upon by the public or particular occupations. Fed. R. Evid. 803(17); *United States v. Masferrer*, 514 F.3d 1158,

1162 (11th Cir. 2008) (Bloomberg financial information admissible because there was evidence that it was "universally relied upon" by individuals in financial markets); *Conoco*, 99 F.3d at 393 (exception did not apply because no evidence of reliability); *Crane v. Crest Tankers, Inc.*, 47 F.3d 292, 296 (8th Cir. 1995) (same). No such evidence exists here.

Lacking evidence that the public or anyone in any occupation relies on the copyright notice in IEEE publications to determine public availability, the Board purported to take "Official Notice that members in the scientific and technical communities who both publish and engage in research rely on the information published on the copyright line of IEEE publications" to conclude that the copyright line "falls under an exception to the hearsay rule as lists, etc., generally relied on by the public or by persons in particular occupations." A11. But a copyright date is not the kind of thing anticipated by the rule that must be generally relied on by the public or by persons in particular occupations. Quite the opposite, because as this Court held in *Lister*, a bare copyright date is not sufficient to show public availability as a matter of law.

In a footnote to its finding, the Board also concluded, again without evidence, that the "ISSN or ISBN code by a publisher furnishes a circumstantial guarantee of trustworthiness." A11 & n.10. But there is no evidence of record supporting the Board's conclusion that a hearsay ISSN or ISBN code establishes

31

any guarantee of trustworthiness. Like the copyright date, these codes are hearsay.[3]

Further, they do not contain any information regarding public availability.[4]

The Board also did not follow the requirements of Rule 201 of the Federal

Rules of Evidence, which controls judicial notice. 37 C.F.R. § 42.62 (Federal

Rules of Evidence apply to Board proceedings, with a modification of terminology

that "[j]udicial notice means official notice."). Under Rule 201, the Board may take

judicial notice only of "a fact that is not subject to reasonable dispute because it:

(1) is generally known within the trial court's territorial jurisdiction; or (2) can be

accurately and readily determined from sources whose accuracy cannot reasonably

be questioned." Fed. R. Evid. 201. That is, the Board may take judicial notice only

of indisputable facts. *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344,

---

[3] Because the code in Stadler's copyright line ("0-7803-4506-1") has ten digits rather than eight, it can only be an ISBN, not an ISSN, as the Board stated. http://www.isbn.org/about_ISBN_standard (last visited November 24, 2015); http://www.issn.org/understanding-the-issn/what-is-an-issn (last visited November 24, 2015).

[4] An ISSN "is a digital code without any intrinsic meaning" that "does not include any information about the origin or contents of the publication." http://www.issn.org/understanding-the-issn/what-is-an-issn (last visited November 24, 2015). Similarly, ISBNs include some information such as country and publisher, but they do not show that the article is trustworthy or its date of publication. http://www.isbn.org/faqs_general_questions#isbn_faq15 (last visited November 24, 2015); http://www.isbn.org/faqs_general_questions#isbn_faq17 (last visited November 24, 2015).

1355-56 (7th Cir. 1995); *American Prairie Const. Co. v. Hoich*, 560 F.3d 780, 797 (8th Cir. 2009).

The Board's ruling lacks evidence and is highly implausible. Whether the scientific and technical communities rely on copyright notices in IEEE publications to determine when the articles were made publicly available (as that term is used in patent law) is disputable. Indeed, the Board failed to state for what purpose the scientific communities rely on IEEE copyright dates. There are many possible purposes, most of which have little or no relevance to question of public availability: when date the paper was written, when it was submitted to the publisher, when it was accepted by the publisher, and when it was printed, are just a few purposes.

The Board's resort to official notice was also procedurally infirm. Rule 201 and the Administrative Procedure Act require notice and opportunity to be heard. Fed. R. Evid. 201(e); *American Prairie* at 797; 5 U.S.C. § 556(e) (official notice); *Sykes v. Apfel*, 228 F.3d 259, 272 (3rd Cir. 2000). The Board provided neither to Intellectual Ventures: it took official notice *sua sponte* after the briefs were filed and oral argument was held.

For this reason as well, the Board's application of the market-report exception was contrary to law.

33

### b. The Board legally erred in ruling that Stadler's copyright notice is admissible hearsay under the residual exception.

As an alternative ground, the Board invoked the residual exception to hearsay, which allows hearsay to be admitted if all of the following are shown:

> (1) [it] has equivalent circumstantial guarantees of trustworthiness;
>
> (2) it is offered as evidence of a material fact;
>
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807.

The residual hearsay exception is "meant to be reserved for exceptional cases"; it does not "confer a broad license on trial judges to admit hearsay statements that do not fall within one of the other exceptions." *Conoco*, 99 F.3d at 392 (internal quotations omitted); *see also Pozen Inc. v. Par Pharmaceutical, Inc.*, 696 F.3d 1151, 1174, n.6 (Fed. Cir. 2012). "Congress intended the residual hearsay exception to be used very rarely, and only in exceptional circumstances, and it applies only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1279 (11th Cir. 2009) (internal quotations omitted).

This is not the rare case with exceptional circumstances. Proving the publication date of a reference purportedly published is a routine occurrence handled by parties in patent cases. Nonetheless, the Board applied the very narrow exception here. A11-12. The Board's finding on the trustworthiness, more-probative, and interests-of-justice prongs were all unreasonable and unsupported by evidence.

> **i.    The Board's finding that a copyright line is a trustworthy indicator of the publication date is contrary to law, unreasonable, arbitrary, and unsupported by any evidence.**

This Court has already held as a matter of law that a copyright date alone does not provide proof of public availability. *Lister*, 583 F.3d 1317; *see also Apple*, IPR2015-00369, A2588-89 at 11-12 (refusing to consider a hearsay date stamp from the MIT library because by itself, it does not establish public availability). It does not have the equivalent guarantees of trustworthiness of, for example, a date stamp automatically affixed to a web page archived by the Internet Archive's web crawlers. *SDI Techs. v. Bose Corp*, IPR2013-00350, A2616-48 at 15-17 (November 7, 2014).

In finding that the copyright line has "equivalent circumstantial guarantees of trustworthiness" as required by Rule 807, the Board relied on the 2014 IEEE Style Guide. A11; A597 (Petitioner's Opposition to Motion to Exclude). The 2014 Style Guide merely explains to an author or staff editor how to format a copyright

line on the document before it is published, and is not evidence of when the

document was distributed to the public. IEEE style manual at 3, 8.[5] It is not

"extraordinarily strong" corroborating evidence that would "render the hearsay

evidence sufficiently trustworthy to justify its admission" under the residual

exception. *See Rivers v. United States*, 777 F.3d 1306, 1316 (11th Cir. 2015)

(internal quotation omitted). Further, the 2014 Style Guide is not evidence of

record (37 C.F.R. § 42.64; A597; A614), and cannot be of any relevance Stadler—

the Style Guide is from 2014, sixteen years after Stadler's copyright date.

What is more, there is no evidence to support the notion that Stadler was

published in conformity with the 2014 Style Guide. For example, the 2014 Style

Guide "provides general editing guidelines for IEEE Transactions, Journals, and

Letters," but there is no evidence that Stadler is a Transaction, Journal, or Letter.

*See* 2014 Style Guide at 3 ("Purpose of Manual"). Stadler's title appears in all

caps, but the 2014 Style Guide requires titles be in first caps. *Id*. at 3 ("Paper

Title"). The 2014 Style Manual requires that "[a]ll paper must contain Index

Terms," but Stadler omits an Index Terms. *Id*. at 14 ("Index Terms"). And the

2014 Style Guide provides that the "abstract must be . . . without abbreviations,"

but Stadler's abstract contains several. *Id*. at 13 ("Abstract").

---

[5] The 2014 Style Guide, which is not part of the record, is available at http://www.ieee.org/documents/style_manual.pdf. A597.

The Board's ruling that Stadler's copyright date has equivalent circumstantial guarantees of trustworthiness is contrary to law and not supported by the evidence here. For this reason alone, this Court should reverse the Board's application of the residual hearsay exception.

> ii.    **The Board's finding that Stadler's copyright notice is more probative than any other evidence reasonably obtainable is clearly erroneous and not supported by any evidence.**

The Board stated that it "consider[ed] the publication date on the copyright line to be more probative on the point for which it is offered than any other evidence that Ericsson could have obtained through reasonable efforts," such as evidence from a library or the publisher of actual public availability. A11-12.

Contrary to the Board's statement, it is well-settled law that a copyright date alone is not enough to prove public availability. *Lister*, 583 F.3d at 1317. Accordingly, parties regularly obtain more probative, non-hearsay evidence such as a declaration from a librarian (*e.g.*, *Hall*, 781 F.2d at 899-900); a declaration from the publisher's records custodian (*e.g.*, *Voter Verified, Inc. v. Premier Election Solutions*, 698 F.3d 1374, 1380 (Fed. Cir. 2012)), or a freely available print out from the Internet Archive (*e.g.*, *SDI Techs. v. Bose Corp*, IPR2013-00350, A2631-33 at 16-18).

Ericsson's failure to make the reasonable effort to obtain such evidence (assuming it exists) does not warrant applying the residual exception. *United*

*Technologies Corp.*, 556 F.3d at 1279-80 ("UTC reasonably could have taken, but failed to take, reasonable steps to obtain Mazer's direct testimony.").

The Board's ruling that Stadler's copyright date is more probative than any other evidence reasonably obtainable is contrary to law and not supported by the evidence here. This Court should reverse the Board's application of the residual hearsay exception.

### iii. The Board's interests of justice finding is clearly unreasonable and contrary to law.

The Board stated that allowing "IPR Petitioners to rely on the IEEE publication date" serves the interests of justice in IPR proceedings because it will expedite IPR proceedings. A11-12. Although the Board's rules state that IPRs are to be "speedy and inexpensive," they must also be "just." 37 C.F.R. § 42.1.

The Board's one-sided view of justice impermissibly circumvented the burden Congress placed on petitioners to show that an issued patent is unpatentable. 35 U.S.C. § 316(e). Further, other Board panels regularly and correctly recognize that, when used to show public availability, a copyright date is inadmissible hearsay. *Standard Innovation*, IPR2014-00148, A2699-704 at 13-18; *ServiceNow*, IPR2015-00707, A2663-65 at 15-17; *Apple*, IPR2015-00369, A2588-89 at 11-12.

The Rules require the Board to adhere to the Federal Rules of Evidence except as otherwise provided in the Rules. 37 C.F.R. §§ 42.1, 42.62(a). The Board

did not point to any provision relaxing the requirement codified in the residual hearsay exception because there is none. That these proceedings are to be expedited and efficient does not justify side-stepping the Rule against hearsay, especially when other more probative evidence should be readily available if Stadler is in fact a prior-art printed publication.

The Board's ruling that use of Stadler's copyright date is in the interest of justice is contrary to law and not supported by the evidence here.

### C. Even if this Court affirms anticipation with respect to the independent claims, this Court should reverse the Board's finding that Stadler anticipates claims 3, 15, and 20.

To anticipate, a prior-art reference must disclose all of the claims elements "arranged as in the claim." *Net MoneyIN,* 545 F.3d at 1369. "[I]t is not enough that the prior art reference discloses part of the claimed invention, which an ordinary artisan might supplement to make the whole." *Id*. at 1371; *see also ResQNet.com v. Lansa*, 594 F.3d 860, 867 (Fed. Cir. 2010) (a reference does not disclose "the entirety of the invention claimed" even if a user would practice the missing method step).

Claims 3, 15, and 20 require using two different encryption algorithms, reciting that "the second security protocol comprises encryption according to a different encryption algorithm from the first security protocol." *E.g.*, claim 3.

Stadler does not disclose using two different encryption algorithms and therefore does not anticipate the claims.

In finding that these claims are anticipated by Stadler, the Board erred because it applied the wrong legal standard. Rather than find that Stadler discloses all of the claim elements arranged as in the claim, the Board found that Stadler is "very flexible and may be configured in several different manners" and that it is "not restricted" from having (or being configured to have) two different encryption algorithms as required by these claims. A22. The Board erred as a matter of law because it found that Stadler did not expressly or inherently disclose using two different encryption algorithms, but it still found anticipation.

Even assuming *arguendo* that Stadler's system is very flexible and is not restricted to using the same encryption algorithms in both security protocols, that is not sufficient for anticipation. Whether one of ordinary skill might have configured Stadler's system invokes obviousness, not anticipation. *Net MoneyIN*, 545 F.3d at 1371.

The Board filled the gap between Stadler's disclosure and the claims by concluding without any supporting evidence that "embodiments of Stadler would be practiced where the encryption algorithm over the wired segment differs from the encryption algorithm used over the wireless segments." A22. This, too, is

insufficient to show express or inherent disclosure of actually using different encryption algorithms. *ResQNet.com*, 594 F.3d at 867.

There is no evidence of record that would support a conclusion of anticipation. Ericsson did not identify any different encryption algorithms for the first or second security protocols in its petition, the only place it addressed this issue. A249. It cited Dr. Makowski's declaration at paragraph 52, but he, too, failed to identify any particular encryption algorithms. A1483-84. In fact, he did not address this aspect of claims 3, 15, and 20 at all. *Id*. Ericsson also did not argue or proffer any evidence showing that the algorithms in the different security protocols must be different (*i.e*., inherent anticipation).

Because Stadler unquestionably does not disclose using two different encryption algorithms, this Court should reverse the Board's erroneous determination that claims 3, 15, and 20 are anticipated by Stadler.

## III.    This Court should reverse the Board's decision that claims 1-22 are obvious over Rai and Davison.

The Board committed two reversible errors in deciding that the independent claims are obvious over Rai and Davison. First, the Board found that Rai's base station inherently performs the determining step without any evidence to support that finding. A33-34. Ericsson did not raise this argument until its reply brief and failed to offer any evidence on the issue. A258; A546-47. Because the issue was first raised in reply, Intellectual Ventures did not have an opportunity to brief this

issue or submit rebuttal evidence. But none is necessary on this record because the Board's and Ericsson's reasoning is legally flawed and not supported by any evidence.

Second, the Board's finding that Rai actually uses, or must use, an IEEE 802.11-1997-compliant MAC-layer protocol with the optional WEP security protocol implemented is unsupported by substantial evidence. Ericsson argued and proffered evidence showing that Rai is independent of any particular MAC-layer protocol and, at best, demonstrated that an 802.11-compliant protocol was one option available to persons of ordinary skill. A544-45. Intellectual Ventures responded with unrebutted evidence that the skilled artisan would not have used an 802.11-compliant protocol because such protocols would not allow Rai's wide-area base stations to have sufficient range. A504-06; A2021-22. The Board did not decide this dispute. Instead, it *sua sponte* decided without any supporting evidence of record and contrary to the arguments of both parties that Rai "entails" using the IEEE 802.11 standard with WEP enabled. A33.

### A.    The Court should reverse the Board's finding that the determining step is inherently performed by Rai's base stations because it is not supported by any evidence and is contrary to basic logic.

The claims recite that the base station "determin[es] that the first packet is targeted at the target device." *E.g.*, claim 1. The Board erred because it found—without any supporting evidence—that, to send a received packet to the target

42

device, Rai's "base station *must* make a determination that the packet is targeted." A33 (citing Reply at A545-46) (emphasis added). The Board cited only Ericsson's reply brief, which did not cite any evidence supporting Ericsson's inherency argument. A545-46.

Ericsson did not proffer any evidence that the claimed limitation is necessarily present in Rai. This failure is dispositive. Inherency "must be carefully circumscribed in the context of obviousness." *Par Pharm. v. TWi Pharms.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014). Inherency is not established by mere possibilities or probabilities; the limitation at issue must necessarily be present. *Id*. at 1195-96. Here, there is no evidence of record that Rai's base station must necessarily determine that the first packet is targeted at the target device.

Instead of offering evidence that Rai's base station must necessarily determine that the first packet is target, Ericsson quoted a single relevant line from Rai: "The base station . . . relays [the PPP frames] over the air link to the end system . . . ." A258 (quoting Rai, A799 at 8:32-34) (alterations in petition). Ericsson first argued in its reply, and the Board agreed, that this quote "alone makes it clear that the base station *must* make a determination that the received packet is targeted at the end system in order to send (relay) the packet to the end system." A545-46 (emphasis added). Ericsson did not cite any evidence and Intellectual Ventures did not have an opportunity to submit rebuttal evidence or

43

briefing. The Board agreed with Ericsson's attorney argument without further elaboration. A33-34.

"Attorney argument does not of itself constitute substantial evidence." *Yuni v. Merit Sys. Protection Board*, 784 F.2d 381, 387 (Fed. Cir. 1986); *see also Perfect Web Technologies, Inc. v. InfoUSA*, 587 F.3d 1324, 1332 (Fed. Cir. 2009) ("unsworn attorney argument . . . is not evidence"). Without evidentiary support, this Court should reverse the Board's conclusion that Rai's base station must necessarily determine that the packet is targeted at the targeted device when relaying it.

Further, as a matter of simple logic, the Board got it wrong. Rai's base station could simply broadcast all of the packets it receives over the air link, and the receiving devices could read the address of each broadcast packet and otherwise ignore the packet unless it is the intended recipient.

**B.    This Court should reverse the Board's *sua sponte* finding that Rai's system entails using an 802.11-compliant MAC-layer protocol with WEP enabled.**

Ericsson had the burden of showing that Rai discloses a base station that applies a second security protocol to the first packet. *See*, *e.g.*, claim 1 ("applying a second security protocol employed on the wireless network to the first packet.").

The Board went beyond Ericsson's arguments and evidence to find the claims obvious. It ignored Intellectual Ventures' unrebutted evidence to the

contrary (A2094-95; A996; A771, A778, A785; A2201-22; A801), and without any supporting evidence found that Rai uses (or must use) a MAC-layer protocol that follows the 802.11-1997 standard[6] with that standard's optional Wired Equivalency Privacy (WEP) security implemented. A32-33. Specifically, the Board concluded that "the 802.11 standard informs us as to what a person of ordinary skill in the art would understand Davison's [*sic*, presumably Rai's] disclosure of the MAC protocol entails" because Rai "disclose[s] that PPP frames are sent over the MAC and air link." A32-33; *see also* A35 ("[W]e find [that Rai's MAC-layer protocol] includes the WEP encryption algorithm of standard 802.11."). In short, the Board incorrectly presumed that Rai's MAC-layer protocol is 802.11-compliant because the 802.11 standard is a standard for MAC-layer protocols.

The Board's reasoning can hold only if Rai actually uses an 802.11-compliant protocol with its optional WEP security implemented, and not some other MAC-layer protocol or an 802.11-compliant protocol without the optional WEP algorithms implemented.

In reality, it is undisputed that (i) Rai does not mention the 802.11 standard, (ii) Rai does not mention any security protocols, and (iii) WEP is an optional

---

[6] Ericsson proffered the 802.11-1997 standard as evidence of the ordinary artisan's knowledge, not as a prior-art reference. A656.

component in 802.11-compliant devices. A32; A2094-95; A996.[7] The Board erred by finding that Rai actually uses (or must use) a MAC protocol layer. Indeed, the Board's finding is contrary to Rai's disclosure, Ericsson's expert testimony, and Ericsson's arguments.

> ### 1. No substantial evidence supports the Board's finding that Rai actually uses (or must use) a MAC-layer protocol that follows the 802.11 standard with the optional WEP security enabled.

The Board found that Rai does not expressly mention 802.11 but that one of skill would understand that Rai's disclosure "entails" the use of a MAC protocol that follows the 802.11 standard with the standard's optional WEP security implemented. A32-33. This was not Ericsson's position, and no substantial evidence supports the Board's conclusion.

As a preliminary matter, the Board's use of the word "entails" implies inherency, but the Board's reasoning does not support a finding that Rai inherently uses a 802.11-compliant protocol with WEP enabled. The Board's reasoning

---

[7] As to this last point, the Board misquoted the 802.11 standard in its decision, incorrectly suggesting an optional feature was necessary. The standard states that the 802.11 protocol includes "an *optional* encryption/decryption procedure," not "an *operational* encryption/decryption procedure" as the Board stated in its decision. A996; A32 (emphases added); *see also* A1012 (WEP is an "optional cryptographic confidentiality algorithm"); A1027 ("IEEE 802.11 specifies an optional privacy algorithm [wired equivalent privacy (WEP)] that . . . ." (brackets in original)); A1069 (implementation of the WEP algorithm in IEEE 802.11-compliant products "is optional").

focused on what one of skill would have understood from Rai's disclosure and did not address whether the missing limitation "necessarily must be present." *Par Pharm.*, 773 F.3d at 1195-96. Further, Ericsson stated that it "does not submit that a security protocol is inherent on the wireless link in Rai," and did not proffer any evidence to support inherency. A544.

In any event, there is no substantial evidence supporting the Board's finding that one of skill would understand that Rai discloses using (or must use) an 802.11-compliant MAC-layer protocol with the optional WEP algorithms implemented.

> ### a.     Dr. Makowski did not testify that Rai uses (or must use) an 802.11-compliant protocol optional WEP implemented.

In its final written decision, the Board found that Rai uses (or must use) an 802.11-compliant protocol. A32 (citing Ex. 1013, A1489-90 at ¶ 64). The Board relied solely on one statement from Dr. Makowski's declaration (that "Rai followed the 802.11 standard") isolated from his later explanation surrounding this statement ("maybe something totally different would have been also put in place with what Rai would have suggested") as support for this finding. *Id*. This was error. *Wade v. Dept. of Navy*, 829 F.2d 1106, 1108-09 (Fed. Cir. 1987) (single witness's conflicting testimony does not rise to the level of substantial evidence).

Ericsson's expert, Dr. Makowski, stated in his declaration that "[i]t would have been readily understood to a person of ordinary skill in the art that the use of

the MAC layer for a wireless LAN as shown in Rai followed the 802.11 standard."

A1489-90. He also stated: "The 802.11 standard includes the Wired Equivalency

Privacy (WEP algorithm), which includes security features such as authentication

and encryption." *Id*. Dr. Makowski later explained that he was *not* implying that

Rai actually uses an 802.11-compliant protocol with WEP implemented, but that

such a protocol is but one possible option:

> I think that the -- the intent of the sentence, if I may
> provide some additional insight here, was that if you
> have a MAC for a wireless LAN, especially around that
> time, when there were already other instantiations of the
> same idea, for example, in 802.11, and those clearly
> would have a security protocol attached to it. So by
> extension, one certainly would expect that perhaps the
> same protocol, the same security protocol or some
> variations thereof or maybe something totally different
> would have been also put in place with what Rai would
> have suggested.

A2093-95 (emphasis added).

Dr. Makowski's detailed explanation of his declaration testimony is

consistent with Rai's actual disclosure, which states that Rai is "independent of the

MAC and PHY (physical) layer of the air link." A798 at 6:14-17. Dr. Makowski's

later elaboration of his declaration is also consistent with the portions of Rai that

Ericsson relied on to make its case. Figures 7, 11, 17, 20, and 26, cited in

Ericsson's petition, consistently show Rai using the IEEE 802.3 standard

48

(Ethernet) for its wired MAC and PHY protocols, but no particular standard for the

wireless portion:





A259; A771, A778, A785; *see also* A772, A780.

Dr. Newman, Intellectual Ventures' expert, also testified that the 802.11

standard is for short-range base stations, while Rai expressly states that its base

stations use "a 5-channel reuse communication scheme" and provides "wide-area

wireless coverage" with starting at "around 1 km" and increasing to 2km and over. A2021-22 (quoting Rai, A801 at 11:25-26, 37-39). The evidence just does not support the Board's determination that Rai uses (or must use) an 802.11-compliant protocol.

### b.    Ericsson did not argue that Rai uses (or must use) an 802.11-compliant protocol.

Even Ericsson did not argue that Rai uses (or must use) an 802.11-compliant protocol. Relying on Dr. Makowski's testimony, Ericsson initially stated that "[i]t would have been understood by a person of ordinary skill in the art that the use of the MAC layer for a wireless LAN as shown in Rai followed the 802.11 standard and enabled wireless encryption." A256-57.

But like Dr. Makowski, Ericsson later explained that it was *not* contending that Rai's system *actually followed* the 802.11 standard. A544. Rather, Ericsson was proposing that one of ordinary skill would have *modified* Rai in view of the 802.11 standard: "it would have been obvious to have a security protocol applied to the wireless link in Rai in view of the teaching of the 802.11 standard." A544. According to Ericsson, the 802.11 standard is merely evidence "that it was well known at the time of the filing of the '674 patent to employ wireless encryption at the MAC layer over a wireless link." A545.

Ericsson confirmed as much at oral argument. A656 (arguing that 802.11 was well known at the time and therefore "it could be 802.11 to provide the second

security protocol in Rai."); A656-57 (the single reference Rai is "independent" of any particular MAC-layer protocol and "you can use the 802.11 standard as that sort of unspecified scheme"); *see also* A798 (Rai explaining that it "is independent of the MAC and PHY (physical) layer of the air link.").

> ### 2. Using the proper scope of Rai, there is no evidence that one of skill would have combined Rai and Davison with the 802.11 standard.

Ericsson failed to provide any evidence in its petition showing why one of skill would have combined Rai and Davison with the teachings of the 802.11 standard. A256-57, A259. At best, Ericsson provided attorney argument in its reply that "[t]he 802.11 standard makes it clear that . . . it was well known to employ wireless encryption at the MAC layer." A545.

But attorney argument in a reply is insufficient as a matter of law. 37 C.F.R. § 42.22(a) (petition must include "full statement of the reasons [for unpatentability], including a detailed explanation" of the significance of the art and evidence); *id.* § 42.104(b) (petition must identify "how the construed challenged claim is unpatentable under the statutory grounds"); *see also Liberty Mutual Ins. Co. v. Progressive Casualty Ins. Co.*, CBM2012-00003, Order Denying Grounds at 10, 14, Paper 8 (Oct. 25, 2012) (The Board "will address only the basis, rationale, and reasoning put forth by the Petitioner in the petition, and resolve all vagueness and ambiguity in Petitioner's arguments against the Petitioner."). A2600-15.

Further, even assuming that the 802.11-1997 standard was well-known, that is not enough to show it would have been obvious to modify Rai with its teachings. *InTouch Techs. v. VGO Commc'ns*, 751 F.3d 1327, 1347, 1352 (Fed. Cir. 2014) ("there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness"). Ericsson failed to meet its burden of proof and the obviousness finding relating to Rai and Davison must be reversed

**C.    Even if this Court affirms as to the independent claims over Rai and Davison, it should reverse as to claims 3, 15, and 20 because the Board impermissibly shifted the burden to Intellectual Ventures to controvert a position never taken by Ericsson.**

The Board faulted Intellectual Ventures for not "controverting Ericsson's position" that the encryption algorithm used by Rai's MAC protocol is different than the one used in Davison's IPsec. A34-35. But that was never Ericsson's position, and the Board impermissibly shifted the burden of proof to Intellectual Ventures.

The Board's errors are twofold. First, the Board erred as a matter of law by placing the burden on Intellectual Ventures to show patentability. 35 U.S.C. § 316(e) (petitioner bears burden of showing unpatentability). Ericsson did not allege, much less proffer any evidence, showing that Rai's "MAC (media access control) layer protocol" and "XTunnel protocol" use any encryption algorithms, much less different encryption algorithms.

Second, the Board erred when it rewrote Ericsson's petition. Contrary to the Board's decision, Ericsson did not argue that claims 3, 15, and 20 are unpatentable because Rai's MAC-layer protocol uses different encryption than Davison's IPsec. Rather, Ericsson argued that Rai's MAC-layer protocol is different than the XTunnel protocol. Intellectual Ventures cannot controvert a position that was not taken.

### 1.    Ericsson argued that Rai's MAC-layer protocol is different than Rai's XTunnel protocol.

Claims 3, 15, and 20 require using different encryption algorithms in the two security protocols. In its Petition, however, Ericsson argued:

> In Rai, the base station includes an access point 82 which applies a MAC (media access control) layer protocol, which is different than the XTunnel protocol, to the packets sent over the air link. See Figs. 7, 11, 17, 20, and 26.

A270. Ericsson made no other arguments and cited no other evidence as to these claims. The cited figures do not discuss encryption algorithms at all. For example, the relevant part of FIG. 17 shows:

53



A778; *see also* A771, A772, A780, A785. Intellectual Ventures responded that

Ericsson failed to meet its burden because it did not argue or show that the

encryption algorithms used by each protocol were different. A512.

### 2.    The Board erred because it faulted Intellectual Ventures for not showing that Rai's MAC-layer protocol uses different encryption that Davison's IPsec.

The Board departed from Ericsson's arguments, finding these claims

unpatentable because Intellectual Ventures' expert, Dr. Newman, "d[id] not

address the actual factual issue raised by the Petition, which is whether the MAC

protocol used over the wireless segment of Rai is different from the IPSec protocol

used over a wired network as disclosed by Davison." A34. The Board therefore

"observe[d] that there is an absence of persuasive evidence from Intellectual

Ventures controverting Ericsson's position" that "the MAC protocol of Rai . . . is different from the IPSec encryption algorithm of Davison." A34-35.

First, the Board just got it wrong: Ericsson pointed to Rai's XTunnel, not Davison's IPsec, as the other protocol, and Intellectual ventures cannot rebut a factual assertion that was never made. A270. Second, the burden is on Ericsson to show unpatentability, not Intellectual Ventures to show its claims are valid. Ericsson did not argue or provide any evidence showing that Rai's MAC layer protocol and XTunnel (or IPsec for that matter) use different encryption algorithms.

This Court should therefore reverse.

## CONCLUSION

This Court should reverse because the Board repeatedly applied the wrong legal standards—such as finding anticipation because the prior-art reference is not "patentably distinct" or "not restricted" from being configured as recited in the claims. The Board also unlawfully relied upon a hearsay copyright date to find public availability and faulted Intellectual Ventures for not disproving factual assertions never made by Ericsson. This Court should therefore reverse, or at a minimum, vacate and remand for application of the correct legal standards.

Dated: November 24, 2015

Respectfully submitted,

 /s/ Jonathan M. Strang
Jonathan M. Strang
Byron L. Pickard
Lori A. Gordon
Sterne Kessler Goldstein & Fox PLLC
1100 New York Ave., N.W.
Washington, DC 20005
202.371.2600

*Counsel for Appellee,*
*Intellectual Ventures II LLC*

## ADDENDUM TABLE OF CONTENTS

**ITEM**                                                                                                **PAGE**

Final Written Decision (Paper 41) ..................................................................A0001

U.S. Patent No. 7,496,674................................................................................A0045

Trials@uspto.gov
571-272-7822

Paper 41
Entered:  May 18, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

ERICSSON INC.,
Petitioner,

v.

INTELLECTUAL VENTURES I LLC,
Patent Owner.

———————

Case IPR2014-00527
Patent 7,496,674 B2

——————

Before JOSIAH C. COCKS, WILLIAM A. CAPP, and
DAVID C. McKONE, *Administrative Patent Judges.*

CAPP, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a)* and *37 C.F.R. § 42.73*

IPR2014-00527
Patent 7,496,674 B2

Ericsson Inc. ("Ericsson") filed a corrected Petition (Paper 8, "Pet.") requesting *inter partes* review of claims 1–22 of U.S. Patent No. 7,496,674 B2 (Ex. 1001, the "'674 patent"). We instituted an *inter partes* review of claims 1–22 of the '674 patent. Paper 11. After institution of trial, Intellectual Ventures I LLC ("Intellectual Ventures") filed a Patent Owner's Response (Paper 21, "PO Resp.") and Ericsson filed a Reply (Paper 28, "Reply").[1] This case is before the Board for a Final Written Decision following an Oral Hearing on the merits conducted April 15, 2015, the transcript for which is entered as Paper 40 ("Tr.").

After considering the evidence and arguments of counsel, we determine that Ericsson has met its burden of showing, by a preponderance of the evidence, that claims 1–22 of the '674 patent are unpatentable.

## I. BACKGROUND

### A. The '674 Patent (Ex. 1001)

The '674 patent, titled "System, Method, and Base Station Using Different Security Protocols on Wire And Wireless Portions of Network," relates to a method and apparatus for sending and receiving datagrams on wired and wireless portions of a network. Ex. 1001, claims 1, 13. The invention implements security protocols on transmissions over wired and wireless portions of the network. *Id.* A first security protocol is

---

[1] In its Patent Owner's Response, Intellectual Ventures asserts that Ericsson has failed to identify all real parties in interest. PO Resp. 2–3. This assertion is not supported by any evidence and, instead, merely alleges that we should draw an inference from the fact that Ericsson has named certain foreign affiliates as real parties in interest in other IPR proceedings. *Id.* Intellectual Ventures's contention is speculative in nature and will not be given further consideration in this Decision.

IPR2014-00527
Patent 7,496,674 B2

implemented on transmissions over the wired portion of the network.  *Id.*
A second and different security protocol is implemented over the wireless
portion of the network.  *Id.*

The invention employs a wireless base station.  *Id.*  The base station
interfaces with both the wired and wireless portions of the network.  *Id.*
Processing of datagrams to implement the first and second security protocols
is performed in the base station.  *Id.*

*B.  Challenged Claims*

Ericsson challenges claims 1–22.  Claims 1, 13, and 18 are
independent claims.  Claim 1 (with paragraph indentation added) is
reproduced below:

1. A method comprising:

receiving a first packet from a wired data network in a wireless
base station that is coupled to the wired data network,

wherein the first packet is protected according to a first security
protocol on the wired data network, and

wherein a target device of the first packet communicates with a
source of the first packet, at least in part, over a wireless
network on which the wireless base station communicates;

processing the first packet in the wireless base station according
to the first security protocol;

determining that the first packet is targeted at the target device,
wherein the determining is performed by the wireless base
station, and

wherein the first packet comprises a header coded with address
information identifying the target device; and

applying a second security protocol employed on the wireless
network to the first packet, wherein the second security
protocol is different from the first security protocol, and
wherein the applying is performed in the wireless base
station.

3

IPR2014-00527
Patent 7,496,674 B2

### C. The Asserted Grounds of Unpatentability

We instituted a trial on claims 1–22 of the '674 patent based on the alleged grounds of unpatentability set forth in the table below, as further supported by the Declaration of Armand M. Makowski, Ph.D. (Ex. 1013).

| References | Basis | Claims Challenged |
|---|---|---|
| Stadler (Ex. 1003)[2] | § 102 | 1–6 and 10–22 |
| Stadler and Davison (Ex. 1010)[3] | § 103 | 7–9 |
| Rai (Ex. 1004)[4] | § 103 | 1, 10–13, 17, 18, and 22 |
| Rai and Davison | § 103 | 2–9, 14–16, and 19–21 |

## II. CLAIM INTERPRETATION

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear. *See* 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1281–82 (Fed. Cir. 2015). Under the broadest reasonable interpretation standard, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).[5]

---

[2] J. Scott Stadler and Jay Gelman, *Performance Enhancement for TCP/IP On a Satellite Channel*, 1 IEEE MILITARY COMMUNICATIONS CONFERENCE 270–76 (Oct. 19–21, 1998).

[3] U.S. Patent No. 6,829,242 B2 to Davison et al., titled *Method and Apparatus For Associating PVC Identifiers With Domain Names of Home Gateways*, issued Dec. 7, 2004.

[4] U.S. Patent No. 6,414,950 B1 to Rai et al., titled *Sequence Delivery of Messages*, issued July 2, 2002.

[5] Citing *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

4

IPR2014-00527
Patent 7,496,674 B2

### 1. *"security protocol"*

The term "security protocol" appears in each independent claim.  In our Decision to Institute, we construed "security protocol" on a preliminary basis to mean a "protocol that provides protective measures for communications."  Paper 11, 6.  We explained that this construction is broad enough to encompass, but is not limited to, techniques for encryption, authentication, and other measures to protect the confidentiality of information.  *Id.*  At that time, we did not decide whether "tunneling" *per se* must be considered a "security protocol."  *Id.*

Intellectual Ventures insists that the following construction, which was previously proposed in Patent Owner's Preliminary Response, should be adopted.

<u>Intellectual Ventures's proposed construction</u>:

"a protocol that provides security measures," where "security" means a condition that results from the establishment and maintenance of protective measures that ensure a state of inviolability from hostile acts or influences.

PO Resp. 4–5; Prelim. Resp. 3, 5.  Apart from the claims, the term "security protocol" appears in the title of the '674 patent and appears only once in the specification in connection with a discussion of IPSec (Internet Protocol Security).  Ex. 1001, 46:17–41.  The term is not defined in the specification either expressly or by implication.[6]  Intellectual Ventures concedes that the term is broad enough to encompass authentication and encryption techniques.  PO Resp. 5.

---

[6] Intellectual Ventures concedes that the specification does not define "security protocol."  PO Resp. 5.

IPR2014-00527
Patent 7,496,674 B2

Intellectual Ventures's primary concern appears to be that "security protocol" does not encompass "tunneling" *per se*. PO Resp. 5–11. Intellectual Ventures supports its position with quotations from an industry publication and testimony from its expert. *Id.* (quoting Ex. 2005, 54–55; Ex. 2015 ¶ 37 (Newman)).

Ericsson argues that a tunneling protocol satisfies the security protocol limitation in claim 1 because it allows an encrypted message to be sent over the Internet without revealing the source address or the destination address. Reply 12. Ericsson also argues that a tunneling protocol provides a protective measure in that it allows a destination address to avoid being stored on a router. *Id.* at 13. Ericsson, however, does not explain how or why merely avoiding storage of a destination address on a router protects a communication. Ericsson's position is undermined by its own evidence. For example, the Kagan article states that:

> IPSec is the preferred solution for IP environments, because it has security built in. PPTP and L2TP are most appropriate for multiprotocol environments, but both require additional support to deliver data privacy, integrity, and authentication.

Ex. 1007, 269.[7]

A court may revisit and alter its construction of claim terms as the record in a case develops. *See Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd*, 599 F.3d 1308, 1322 (Fed. Cir. 2010). After receiving additional evidence and argument from the parties, we alter the preliminary construction of "security protocol" in our Decision to Institute to clarify that

---

[7] Richard S. Kagan, *Virtual Private Networks – New Strategies for Secure Enterprise Networking*, IEEE WESCON/98 CONFERENCE PROCEEDINGS 267–72 (Sept. 15–17, 1998) (Ex. 1007).

IPR2014-00527
Patent 7,496,674 B2

tunneling *per se* is not a security protocol.  We are persuaded by Intellectual Ventures's evidence that tunneling merely provides an unsecured conduit for allowing third party communications to be carried over a public network such as the Internet.  To the extent that tunneling is associated with secure communications, the security is provided by a feature or technique that may be used in conjunction with tunneling, such as encryption or authentication.  However, the fact that security protocols may be used in conjunction with tunneling does not indicate that tunneling *per se* provides security.  In other words, unsecure communication may occur via tunneling.  If the sender or recipient desires to make such communication secure, a security feature must be used in conjunction with tunneling.

### 2. *"packet"*

The term "packet" is used in each independent claim of the '674 patent.  Neither party proposed a construction for "packet" prior to our Decision to Institute.  In their respective Patent Owner's Response and Petitioner's Reply, the parties proposed the following constructions.

Intellectual Ventures's proposed construction:

a header and a payload.

PO Resp. 13.

Ericsson's proposed construction:

a packet does not require a header.

Reply 3.

A claim construction analysis begins with, and is centered on, the claim language itself.  *See Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).  In the claims, a packet is something that can be protected by a security protocol.  Ex. 1001, claim 1.  It can

7

**A0007**

IPR2014-00527
Patent 7,496,674 B2

comprise a header coded with address information identifying a target device. *Id.* It can be encrypted and decrypted. *Id.* at claim 2. It can be processed to authenticate its source. *Id.* at claim 3. It can be received from a wired data network. *Id.* at claim 18. It can be transmitted wirelessly. *Id.* at claim 10.

Claim terms generally are construed in accordance with the ordinary and customary meaning that they would have to one of ordinary skill in the art in light of the specification and the prosecution history. *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1329 (Fed. Cir. 2012).[8]  The person of ordinary skill in the art, through whose eyes a patent claim is construed, is deemed to read the claim term not only in the context of a particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. *Phillips*, 415 F.3d at 1313. The overall context in which "packet" is used in the '674 patent relates to communication over packet switched networks, an alternative technology to circuit switch networks. Ex. 1001, 3:48–64.

> Packet switching makes more efficient use of available bandwidth than does traditional circuit switching. Packet switching breaks up traffic into so-called "packets" which can then be transported from a source node to a destination for reassembly.

*Id.*

In the context of the specification of the '674 patent, a packet can be subjected to data compression algorithms (Ex. 1001, 44:13–22) and encryption (*Id.* at 46:15–29). Particularly with respect to Intellectual

---

[8] The Federal Circuit imposes a stringent standard for narrowing a claim term beyond its plain and ordinary meaning. *Id.* at 1330 (citing *Thorner v. Sony Computer Entm't Am. L.L.C.*, 669 F.3d 1362 (Fed. Cir. 2012)).

IPR2014-00527
Patent 7,496,674 B2

Ventures's contention that a "packet" should be construed as a header and a payload, the specification indicates that an entity referred to as a packet can be created and brought into existence prior to being assigned a header.

> Packet switching breaks a media stream into pieces known as, for example, packets, cells or frames. Each packet *can then be* encoded with address information for delivery to the proper destination and can be sent through the network.

Ex. 1001, 30:33–36 (emphasis added).

> The packet-switched network instead breaks a message into pieces known as packets of information. Such packets *can then be* encapsulated with a header which designates a destination address to which the packet must be routed.

Ex. 1001, 34:9–12 (emphasis added).

In view of the foregoing, we will construe a "packet" as a piece or segment of a data/media stream that serves as a unit of transmission over a packet switched network. To the extent that the "packet" of claims 1, 13, and 18 is required to have a header, such requirement is imposed by the express claim language "comprises a header" and is not imposed by virtue of the definition of "packet" *per se.*

## III.  MOTIONS TO EXCLUDE EVIDENCE

Intellectual Ventures moves the Board to exclude the following exhibits from evidence: Ex. 1003, 1007, 1020, and 1021.  Paper 32. Intellectual Ventures also moves to exclude excerpts from the cross-examination of its expert, Dr. Newman.  *Id.*  Ericsson opposes the motion. Paper 36.  Intellectual Ventures replied to Ericsson's opposition.  Paper 37.

9

IPR2014-00527
Patent 7,496,674 B2

A. *Exhibit 1003 (Stadler)*

Ericsson asserts Stadler, among other things, as an anticipation reference under 35 U.S.C. § 102 against claims 1–6 and 10–22. Pet. 18–31. Intellectual Ventures objected to Stadler on the grounds of hearsay and lack of authenticity. Ex. 2026. Intellectual Ventures now moves to exclude Stadler on such grounds. Paper 32.

1. *Hearsay*

On its face, Stadler appears to be a work that was sponsored by the Department of the Air Force. Ex. 1003, 1. In the lower left hand corner of the first page, it bears an IEEE copyright line. *Id.* The IEEE copyright line contains a publication date, a price, and what appears to be an ISSN code.[9]

Intellectual Ventures argues that Ericsson has not offered any admissible evidence that tends to establish that Stadler was available to the public before the filing date of the '674 patent. Paper 32, 1–2. Intellectual Ventures argues that the date information in Stadler is hearsay because it is submitted for its alleged truth. *Id.* at 3. Intellectual Ventures argues that Ericsson could have established a date of public availability through the submission of a librarian's declaration and, because Ericsson did not do this, we should presume that no admissible evidence exists that Stadler was publically available before the critical date.

Ericsson counters that the publication information provided by the IEEE establishes that Stadler was publically available in 1998. Paper 36, 5. We agree. We accept the publication information on the IEEE copyright

---

[9] Ex. 1003, 1 ("0-7803-4506-1/98/$10.00 © 1998 IEEE"). *See* IEEE Editorial Style Manual, IEEE Periodicals, © 2014 IEEE, page 8 (hereinafter "IEEE Style Manual").

IPR2014-00527
Patent 7,496,674 B2

line on page 1 of Stadler as evidence of its date of publication and public accessibility. IEEE is a well-known, reputable compiler and publisher of scientific and technical publications, and we take Official Notice that members in the scientific and technical communities who both publish and engage in research rely on the information published on the copyright line of IEEE publications. The information published on the copyright line of Stadler thus falls under an exception to the hearsay rule as lists, etc., generally relied on by the public or by persons in particular occupations. Fed. R. Evid. 803(17). [10]

As an alternative ground for admitting Exhibit 1003, we invoke the so-called "residual exception" of Federal Rule of Evidence 807. The copyright line of IEEE publications is added by IEEE as the publisher, not the author, and is added in accordance with the IEEE Style Manual. The assignment of a publication date in the copyright line of an IEEE publication has equivalent circumstantial guarantees of trustworthiness as with other exceptions to the hearsay rule. It is offered as evidence of a material fact, namely, whether Stadler predates the date of invention and is, therefore, prior art to the '674 patent. We consider the publication date on the copyright line to be more probative on the point for which it is offered than any other evidence that Ericsson could have obtained through reasonable efforts. In particular, we note our disagreement with Intellectual Ventures that a librarian's declaration would have been more probative of the publication date of Stadler than the publication date that IEEE published in

---

[10] We also note that the assignment of an ISSN or ISBN code by a publisher furnishes a circumstantial guarantee of trustworthiness sufficient to justify admission of otherwise hearsay evidence. *See* ADVISORY COMMITTEE NOTES to Fed. R. Evid. 803.

IPR2014-00527
Patent 7,496,674 B2

its copyright line on the face of Stadler.  Finally, admitting Stadler as prior art in view of the publication date on the IEEE copyright line will best serve the purpose of the Federal Rules of Evidence and the interests of justice.  An IPR proceeding may only be based on patents and "printed publications."  35 U.S.C. § 311(b).  Allowing IPR petitioners to rely on the IEEE publication date in an IPR proceeding, which is an administrative proceeding designed and intended to afford expedited and efficient relief, serves the interests of justice.

### 2.  Authenticity

Intellectual Ventures also challenges Stadler on the grounds of authenticity.  Intellectual Ventures argues that Stadler appears to be an improper collection of documents.  Paper 32, 5 (citing Fed. R. Evid. 1003).

Ericsson argues that Stadler is authenticated under Fed. R. Evid. 901(b), 902(6), or 902(7).  Paper 36, 12.  Ericsson argues that the standard for admissibility under Fed. R. Evid. 901(a) is slight.  *Id.* (citing *United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013)).

We are persuaded that Ericsson has laid a proper foundation for admission of Stadler.  We are able to discern that Stadler itself consists of pages 270 through 276.  *See* Ex. 1003.  We are also able to discern that the three pages of web printout material that Ericsson appended to Exhibit 1003 is merely for the purpose of laying a foundation for the admission of pages 270–76 of Stadler.

In this case, Ericsson has laid a sufficient foundation to establish that Stadler is authentic under Fed. R. Evid. 901(b)(4).  Copies of Stadler are immediately accessible to the public through IEEE's on-line library system.  Intellectual Ventures's counsel concedes that there is no reason to believe

IPR2014-00527
Patent 7,496,674 B2

that the copy of Stadler introduced into the record by Ericsson has been forged or altered.  Tr. 37–38.

For the foregoing reasons, Intellectual Ventures's motion to exclude Stadler is DENIED.

### B. Exhibit 1020

Exhibit 1020 appears to be an abstract for Stadler (Ex. 1003) obtained from the IEEE Explore on-line library.  It appears to be offered for no other reason than to establish a foundation for the admissibility of Stadler. Inasmuch as we have determined that Stadler is admissible apart from consideration of Exhibit 1020, we DENY Intellectual Ventures's motion to exclude Exhibit 1020 as MOOT.

### C. Exhibit 1021

Exhibit 1021 is a declaration of an employee from the Ericsson's counsel's law firm.  It appears to be offered for no other reason than to establish a foundation for the admissibility of Stadler.  Inasmuch as we have determined that Stadler is admissible apart from consideration of Exhibit 1021, we DENY Intellectual Ventures's motion to exclude Exhibit 1021 as MOOT.

### D. Kagan (Exhibit 1007)

Kagan, like Stadler, is an IEEE publication.  Like Stadler, Kagan contains an IEEE copyright line on the bottom left hand corner of the first page.  *See* Ex. 1007, 267.  Intellectual Ventures and Ericsson exchange similar arguments with respect to Kagan as we have considered previously

IPR2014-00527
Patent 7,496,674 B2

with respect to Stadler above.  For essentially the same reasons, we DENY Intellectual Ventures's motion to exclude Kagan.

### E.  Newman Deposition Testimony (Exhibit 1022: 39:13–40:8 and 43:10–44:3)

Intellectual Ventures moves to exclude portions of the cross-examination deposition testimony of its expert, Dr. Newman.  Paper 32, 11–14.  Intellectual Ventures argues that the testimony is excluded properly under Fed. R. Evid. 611(b) as outside the scope of direct examination.  *Id.*

Courts are admonished to exercise caution in limiting the cross-examination of a witness whose credibility could have an important influence on the outcome of the trial.  *See Harbor Ins. Co. v. Schnabel Co., Inc.*, 946 F.2d 930, 935 (D.C. Cir. 1991).  In the testimonial excerpts under consideration, Dr. Newman repeatedly admitted a lack of familiarity with the subject matter of the '674 patent.  *See, e.g.*, Ex. 1022, 39:16–17 ("I really haven't spent very much time looking at this . . . .").  This testimony goes to Dr. Newman's credibility and, therefore, does not exceed the proper scope of cross-examination.

Intellectual Ventures's motion to exclude the portions of the cross-examination testimony of Dr. Newman's deposition is DENIED.

## IV.  ANTICIPATION BY STADLER

To anticipate a patent claim under 35 U.S.C. § 102, "a reference must describe . . . each and every claim limitation and enable one of skill in the art to practice an embodiment of the claimed invention without undue experimentation."  *Am. Calcar, Inc. v. Am. Honda Motor Corp.*, 651 F.3d 1318, 1341 (Fed. Cir. 2011) (citing *In re Gleave*, 560 F.3d 1331, 1334 (Fed.

14

IPR2014-00527
Patent 7,496,674 B2

Cir. 2009)).  Anticipation of a patent claim is a question of fact.  *In re Montgomery*, 677 F.3d 1375, 1379 (Fed. Cir. 2012).  Ericsson contends that Stadler anticipates claims 1–6 and 10–22 of the '674 patent.

### A. Stadler (Ex. 1003)

Stadler discloses a Wireless IP Suite Enhancer (WISE) system that implements the TCP/IP (Transmission Control Protocol / Internet Protocol) suite in a wireless environment.  Ex. 1003, 273.  Figure 1 of Stadler is reproduced below:



Figure 1 depicts a communication system divided into three segments, with a wired communication connection from a Client computer to Gateway 1, a wireless connection from Gateway 1 to Gateway 2, and a wired connection from Gateway 2 to a Server.  *Id.*

In Stadler, the client-to-gateway and gateway-to-server segments use unmodified TCP/IP.  *Id.*  The client-to-gateway and gateway-to-server segments use IPSec as an encryption technique.  *Id*. at 270.  The gateway-to-gateway wireless segment uses a special Wireless Link Protocol ("WLP").  *Id.* at 273.  Communications are converted from TCP to WLP upon entering the wireless sub-network and back to TCP upon exiting.  *Id.*  Stadler

15

discloses that encryption can be used to protect communications from eavesdropping during the wireless segment. *Id.*

### B. Independent Claims 1, 13, and 18

#### 1. The "packet" limitations

Intellectual Ventures essentially argues that Stadler does not anticipate claim 1 because it fails to transmit a "first packet" from the client to the server. PO Resp. 14–21. Intellectual Ventures contends that after a "first packet" arrives from the client at gateway 1, it ceases to exist and is replaced by a new and different packet that is constructed to be compatible with the wireless protocol that is used between gateway 1 and gateway 2. *Id.* at 19. Thus, according to Intellectual Ventures, Stadler does not apply a "second security protocol" to the "first packet," because the "first packet" ceases to exist before any "second security protocol" can be applied to it.

Ericsson argues that the identity and integrity of the original packets received at the first WISE gateway are preserved such that the same packet of data that is received at the WISE gateway over the wired link is the same packet of data that is transmitted over the wireless link. Reply 4–7.

Intellectual Ventures's "first packet" theory is predicated on a narrow interpretation of "packet" that we do not endorse. The better interpretation of Stadler is that after a first packet is received from the client at gateway 1, the first packet, including the header thereof, merely undergoes a transformation of form to facilitate its transmission over the wireless segment of the communication system. The information that is transmitted is not "new and different" as argued by Intellectual Ventures, rather, it is essentially the same information targeted at the same addressee as the original packet. Ex. 2017, 38:13–20 (Makowski) ("the final information will

always be there . . . the final destination is always carried somewhere as part of the encapsulation process").

Claim 1 contemplates that a packet will be "processed" in the wireless base station according to a first security protocol. Ex. 1001, claim 1. The claim also contemplates that a second security protocol is applied to the first packet at the wireless base station. *Id.* Claim 2 contemplates that the processing of the first security protocol at the wireless base station in accordance with claim 1 may entail decryption. *Id.* at claim 2. Claim 3 contemplates that the second security protocol that is applied at the wireless base station in accordance with claim 1 may entail encryption. *Id.* at claim 3. Thus, claim 1 contemplates that a "packet" will undergo processing that transforms the form of the packet without destroying its identity as a "packet."

### 2. Fragmentation

Intellectual Ventures next argues that the payloads that are transmitted over Stadler's wireless segments are not the same payloads transmitted over the wired segment. PO Resp. 21. Intellectual Ventures characterizes Stadler's disclosure of fragmenting the original packets transmitted over the wired segment into fragments for transmission over the wireless segment as forming entirely "new packets." *Id.* Intellectual Ventures supports its position with declaration testimony from Dr. Newman. Ex. 2015 ¶¶ 55–57 ("The clear indication based on 'fragmentation' is that the WLP packets do not have the same payload as received TCP packets.").

Ericsson replies that Stadler's fragmentation technique is no different than the time division multiplexing technique disclosed in columns 53 and 54 of the '674 patent. Reply 6. On cross-examination, Intellectual

Ventures's expert, Dr. Newman, was unable to explain how the fragmentation technique in Stadler differed, in any patentably distinct manner, from the time division multiplexing technique taught in the '674 patent. Ex. 1022, 37:3–44:24.

### 3. Applying a Second Protocol to the First Packet

Intellectual Ventures argues that Stadler fails to apply a second protocol to the first packet within the meaning of claims 1, 13, and 18. PO Resp. 25. This position is predicated on Intellectual Ventures's earlier position that Stadler deconstructs packets at the wireless gateway and then constructs new and different packets for transmission across the wireless segment. *Id.* Thus, according to Intellectual Ventures to the extent that Stadler discloses application of a second security protocol, it would not be applied to the same "first packet" received from the wired network. *Id.*

In reply, Ericsson points to portions of Stadler that disclose application of encryption to the data that is transmitted over the wireless link. Reply 7 (citing Ex. 1003, 275–76). Stadler discloses that it is advantageous to encrypt wireless transmissions in bulk. Ex. 1003, 275–76. We are persuaded that such bulk encryption over the wireless segment is sufficiently distinct from the IPSec encryption utilized over the wired segment to constitute a second security protocol. *Id.*

### 4. Determining, at the Wireless Base Station, that the First Packet is Targeted at the Target Device

Intellectual Ventures argues that Stadler fails to satisfy the determining step of claim 1. PO Resp. 26. Intellectual Ventures argues that

IPR2014-00527
Patent 7,496,674 B2

the claim language requires an active step not something that occurs passively. *Id.* at 28.

In reply, Ericsson points to cross-examination testimony from Dr. Newman that essentially concedes that the determining step is satisfied by Stadler. Reply 9; Ex. 1022, 57:6–58:9. Ericsson also relies on the following passage from Stadler as satisfying the determining step.

> The system operation is as follows. IP packets not containing TCP segments (or whose TCP headers cannot be read) that arrive at the periphery of the wireless network will go up the protocol stack to the IP layer where the standard routing functions will be performed. The packet will go down the protocol stack through the LLLL and over the wireless link. Any errors encountered during transmission will be corrected by the two peer LLLL layers transparently to IP. TCP packets on the other hand, will pass all the way up the protocol stack to the WISE server. Here the TCP connection will be terminated and a virtual circuit will be set up through the LLLL to the WISE server on the other side of the wireless link. This will cause the receiving WISE server to establish a TCP connection to the intended recipient. Once the connections are all established the data is passed over the wireless link to the receiving WISE server where it is relayed (via the TCP connection) to the intended recipient.

Reply 8; Ex. 1003, 274–75. We agree with Ericsson that Stadler's disclosure that it "will cause the receiving WISE server to establish a TCP connection to the intended recipient," is sufficient to satisfy the determining step.

### *5. Findings of Fact Regarding Claims 1, 13, and 18*

To summarize the foregoing, the evidence presented by the parties supports the following findings of fact by a preponderance of the evidence:

19

1.  Stadler packetizes a media stream and transmits such over a combination of wired and wireless channels such that the media stream that is received by the server is essentially the same media stream that is transmitted by the client.

2.  Stadler's media stream packets arrive at and are received by a server that is an intended recipient or target device.

3.  The '674 patent contemplates that a "first packet" will undergo transformation in form while being processed and transmitted over a communications network comprised of wired and wireless segments such that a "first packet" does not lose its identity as the "first packet" merely because it undergoes such transformation.

4.  The change that a Stadler packet header undergoes in the process of being converted from a TCP/IP protocol over the wired segment to the WISE protocol over the wireless segment involves a mere transformation in form as evidenced by the fact that the addressee information remains sufficiently intact that the media stream ultimately is routed to the intended recipient or target device. Thus, while the information in the header is transformed at the wireless base station, it is not destroyed, thereby necessitating creation of a new and different header.

5.  Because Stadler's first packet is merely transformed, but not destroyed, at the wireless base station, Stadler applies a second protocol to the first packet as opposed to a different and newly created packet.

6.  The transformation in form that a first packet undergoes in the process of being transmitted from the client to server in Stadler is

not patentably distinct from the transformation in form that a first packet undergoes during transmission in accordance with the '674 patent.

7. Stadler's wireless base station determines that the first packet is targeted at the target device.

In view of the foregoing, we find that Ericsson has established, by a preponderance of the evidence, that Stadler anticipates claims 1, 13, and 18 of the '674 patent.

### C. Dependent Claims 2–6, 10–12, 14–17, and 19–22.

#### 1. Claims 2, 4–6, 10–12, 14, 16, 17, 19, 21, and 22.

Intellectual Ventures does not argue for the separate patentability of these claims apart from the arguments that we have considered above with respect to claims 1, 13, and 18. We have reviewed Ericsson's Petition and supporting evidence and find that Ericsson has established by a preponderance of the evidence that Stadler anticipates each of these claims. Pet. 26–32.

#### 2. Different encryption algorithm (Claims 3, 15, and 20)

Intellectual Ventures argues that Stadler fails to disclose a second security protocol that uses a different encryption algorithm from the first security protocol. PO Resp. 29–31. Intellectual Ventures's expert, Dr. Newman, testifies that, at the time of the invention, a variety of encryption algorithms were used with IPSec. Ex. 2015 ¶ 66. Dr. Newman characterizes Stadler as being silent on the specific algorithm used for encryption over the wireless segment. *Id.* Dr. Newman concludes that there is no way to know whether Stadler's wireless encryption is the same or

IPR2014-00527
Patent 7,496,674 B2

different from the encryption algorithm used over the wired segment.
*Id.* ¶ 67.

In the Petition, Ericsson relies on Stadler's disclosure of bulk
encryption techniques used over the wireless segment as satisfying the
limitation directed to a different encryption algorithm.  Pet. 27, 29, 31.
Ericsson's Petition is supported by declaration testimony from its expert,
Dr. Makowski, explaining that the protocol applied at the Stadler gateway is
a security protocol and that it is different from the IPSec protocol used over
the wired segment of Stadler.  Ex. 1013 ¶ 52.

After considering the evidence and argument presented by both
parties, we find that Ericsson's position is supported by a preponderance of
the evidence.  At the wireless base station, Stadler transforms incoming data
stream packets before they are transmitted over the wireless segment.  The
TCP/IP headers are replaced with a shorter WLP header.  Ex 1003, 273.  The
TCP/IP data undergoes data compression so that fewer bytes need to be sent
over the wireless segment.  *Id.*  The WISE architecture has the capability to
allow TCP connections to be compressed independently or in bulk.  *Id.* at
275.  Stadler discloses that it is advantageous, though not required, to
compress independently and encrypt in bulk.  *Id.*  The WISE system is
characterized as very flexible and may be configured in several different
manners depending on the type of encryption that will be used.  *Id.* at 273.
In other words, more than one single type of encryption is contemplated by
Stadler.  Given the foregoing description, we think that it is more likely than
not that a person of ordinary skill in the art would understand that Stadler is
not restricted to using the exact same encryption algorithm over both the
wired and wireless segments.  In other words, a person of ordinary skill in

22

IPR2014-00527
Patent 7,496,674 B2

the art would understand that embodiments of Stadler would be practiced where the encryption algorithm over the wired segment differs from the encryption algorithm used over the wireless segment.

Ericsson has shown, by a preponderance of the evidence, that claims 3, 15, and 20 are anticipated by Stadler.

## V. OBVIOUSNESS OVER STADLER AND DAVISON

Ericsson asserts that claims 7–9 are obvious over the combination of Stadler and Davison. A patent is invalid for obviousness:

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966). Courts must consider all four *Graham* factors prior to reaching a conclusion regarding obviousness. *See Eurand, Inc. v. Mylan Pharms., Inc. (In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.)*, 676 F.3d 1063, 1076–77 (Fed. Cir. 2012). As the party challenging the patentability of the claims at issue, Ericsson bears the burden of proving obviousness by a preponderance of the evidence. 35 U.S.C. § 316(e).

23
**A0023**

IPR2014-00527
Patent 7,496,674 B2

### A. Scope and Content of the Prior Art – Davison (Ex. 1010).

Davison describes a network in which a virtual private network may be provided. Ex. 1010, 1:33–37. Davison states that any protocol that allows tunneling or tunneling-like features may be used to initiate a tunnel session, such as L2TP, L2F, PPTP, or IPSec. *Id.* at 5:20–34. It explains that conventional tunneling protocol security features may be employed to prevent a home gateway from masquerading as a home gateway to a different network. *Id.* at 3:9–17.

### B. Differences Between the Prior Art and the Claimed Invention

We previously have found that Stadler discloses all of the limitations of claim 1, from which claims 7– 9 each depend. *See supra* Section IV. Claims 7–9 further require that the first security protocol is compliant with PPTP, L2F, and L2TP tunneling protocols, respectively. Ex. 1001. As set forth in Section V.A. *supra*, Davison discloses that any protocol that allows tunneling or tunneling-like features may be used to initiate the tunnel session, such as L2TP, L2F, PPTP, or IPSec. Ex. 1010, 5:20–34. Intellectual Ventures does not dispute that Davison discloses these tunneling protocols.

### C. Level of Ordinary Skill in the Art

Ericsson's Petition does not attempt to define or describe a level of ordinary skill in the art. Ericsson's expert, Dr. Makowski, assumes, based on information provided to him, that the level of skill in the art is evidenced by the prior art references. Ex. 1013 ¶ 6. Based on this assumption, Dr. Makowski testifies that a person of ordinary skill in the art at the time of

24

IPR2014-00527
Patent 7,496,674 B2

the invention was aware of techniques involved in translating security protocols in a communication system.  *Id.*

Intellectual Ventures's Patent Owner's Response does not define or describe a level of ordinary skill in the art.  Intellectual Ventures's expert, Dr. Newman, assumes, based on information provided to him, that a person of ordinary skill in the art is a person with a bachelor's degree in electrical or computer engineering with three to five years of experience analyzing and/or designing systems incorporating security protocols on telecommunication and cellular networks.  Ex. 2015 ¶ 28.  Although Dr. Newman testifies that he "agrees" with the position that Intellectual Ventures has taken on the level of ordinary skill, his testimony is not based on any underlying factual analysis.

Merely reciting a college degree and a number of years of experience provides little guidance as to the actual capabilities of a person of ordinary skill in the art.  Neither party presents a detailed evidentiary showing under the factors recited in *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–97 (Fed. Cir. 1983).[11]  Notwithstanding the scant evidence on skill level presented by the parties, the level of skill in the art often can be determined from a review of the prior art.  *See Litton Indus.*

---

[11] Factors pertinent to a determination of the level of ordinary skill in the art include: (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field.  Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case.  *See id.*  These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *See Daiichi Sankyo Co. Ltd., Inc. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

IPR2014-00527
Patent 7,496,674 B2

*Products, Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163–64 (Fed. Cir. 1985). Based on our review of the prior art, the applicable field of endeavor is telecommunication networking. The person of ordinary skill in this field would have been generally familiar with communication protocols used over the Internet. Ex. 1010, 5:20–34. The person of ordinary skill in the art also would have had some familiarity with using IPSec encryption over a TCP/IP protocol wired communications system. Ex. 1003, 275; Ex. 1010, 5:22; Ex. 1007, 268–269. The person of ordinary skill in the art also would have had familiarity with conventional tunneling protocol security features. Ex. 1010, 3:14–15; Ex. 1007. The person of ordinary skill in the art also would have had familiarity with wireless communication systems and using authentication and encryption as security features over wireless communication systems. Ex. 1009, iv.

### D. Secondary Considerations of Non-Obviousness

Evidence of secondary considerations of non-obviousness, when present, must always be considered en route to a determination of obviousness. *See Cyclobenzaprine*, 676 F.3d at 1075–76. However, the absence of secondary considerations is a neutral factor. *See Custom Accessories, Inc., Jeffrey-Allan Industries, Inc.*, 807 F.2d 955, 960 (Fed. Cir. 1986). Neither party introduced evidence on secondary considerations of non-obviousness. Consequently, we will focus our attention on the first three *Graham* factors.

IPR2014-00527
Patent 7,496,674 B2

### E. Whether the Prior Art Could Have Been Combined or Modified to Achieve the Claimed Invention

The evidence establishes that Stadler and Davison, together, disclose all of the limitations of claims 7–9, respectively.  However, Intellectual Ventures argues against the combinability of the two references and makes essentially the same argument with respect to each claim.  PO Resp. 31–35.  Essentially, Intellectual Ventures argues that Ericsson's stated reason for combining Stadler and Davison is flawed.  *Id.*  Intellectual Ventures characterizes Ericsson's proposed combination as substituting PPTP, L2F, and/or L2TP for IPSec because the respective tunneling protocols are known substitutes for IPSec.  *Id.*  Intellectual Ventures then argues that such a substitution would leave the proposed combination without a security protocol because PPTP, L2F, and L2TP merely provide unsecured tunneling conduits for communications.  *Id.*

Ericsson argues that it would have been obvious to modify the system of Stadler to use any of the PPTP, L2F, and L2TP tunneling procedures of Davison, respectively, in place of IPSec.  Pet. 33–34.  Ericsson asserts that such modification merely would have involved substituting one known element for another to yield a predictable result.  *Id.*

The Supreme Court instructs courts to take an expansive and flexible approach in determining whether a patented invention was obvious at the time it was made.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007).  The existence of a reason for a person of ordinary skill in the art to combine references is a question of fact.  *See In re Constr. Equip. Co.*, 665 F.3d 1254, 1255 (Fed. Cir. 2011).  A reason to combine may be found explicitly or implicitly in market forces; design incentives; the "interrelated

IPR2014-00527
Patent 7,496,674 B2

teachings of multiple patents"; "any need or problem known in the field of endeavor at the time of invention and addressed by the patent"; and the background knowledge, creativity, and common sense of the person of ordinary skill. *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1328–29 (Fed. Cir. 2009) (quoting *KSR*, 550 U.S. at 418–21).

Intellectual Ventures's argument mischaracterizes Ericsson's position as substituting PPTP, L2F, or L2TP for IPSec without using any security features in conjunction with the PPTP, L2F, or L2TP tunneling protocols. We do not interpret Davison as espousing unsecured transmission during tunneling sessions in lieu of using IPSec. Instead, Davison teaches secured transmissions using encryption and authentication techniques. Ex. 1010, 4:66–5:19. Davison also teaches the use of a tunneling protocol in conjunction with "conventional tunneling protocol security features." *Id.* at 3:13–17. Thus, taken in the proper context, Davison explains that such secure communication can take place using "any protocol that allows tunneling or tunneling-like features," including PPTP, L2F, and L2TP. *Id.* at 5:20–33.

As we understand Ericsson's proposed obviousness combination, Davison's communication that is secured using authentication, encryption or both and utilized with either PPTP, L2TP, or L2F tunneling protocols, is substituted for IPSec over Stadler's wired transmission segment. We have considered Ericsson's evidence and find it persuasive. Where "a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR*, 550 U.S. at 416. The Patent Owner Response provides neither evidence nor persuasive technical

28

IPR2014-00527
Patent 7,496,674 B2

reasoning to controvert Ericsson's persuasive position that such combination entails nothing more than substituting one known element for another to yield a predictable result.

### F. Ultimate Conclusion of Obviousness

After considering all of the underlying factual considerations, the ultimate conclusion of obviousness is a question of law. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). "[T]he great challenge of the obviousness judgment is proceeding without any hint of hindsight." *Star Scientific, Inc., v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011).

All things considered, Ericsson has carried its burden of proof that claims 7–9 of the '674 patent are unpatentable as obvious over Stadler and Davison.

### VI. OBVIOUSNESS OVER RAI AND DAVISON

Ericsson asserts that claims 2–9, 14–16, and 19–21 are unpatentable as obvious over the combination of Rai and Davison. Intellectual Ventures presents separate arguments for the patentability of claims 2, 14, and 19 (PO Resp. 44), claim 7 (*id*. at 45), claim 8, (*id*. at 46), claim 9 (*id*.), claims 3, 15, and 20 (*id*. at 47), and claims 5 and 6 (*id*.).

### A. Scope and Content of the Prior Art – Rai (Exhibit 1004)

Rai provides users with remote wireless access to the public Internet, private intranets, and Internet service providers. Ex. 1004, 2:31–33. Rai discloses base station 64 that is connected between wired network 38 and wireless network airlinks. *Id.* at Fig. 4, 10:29–11:58. Rai's base station

IPR2014-00527
Patent 7,496,674 B2

provides "computer users with remote access to the internet and to private intranets using virtual private network services over a high speed, packet switched, wireless data link." *Id.* at 4:64–66.

Rai's base station includes access point 82 that applies a MAC (media access control) layer protocol to packets sent over the air link. Ex. 1004, Figs. 7, 11. "PPP frames traveling from the end system to the IWF are sent over the MAC and air link to the base station." *Id.* at 8:21–23.

B. *Differences Between the Prior Art and the Claimed Invention*

1. *"first security protocol" – Rai (claims 1, 13, and 18)*[12]

Ericsson contends that the Xtunnel protocol disclosed in Rai satisfies the element in claim 1 directed to "the first packet is protected according to a first security protocol on the wired data network." Pet. 34. A similar contention is made with respect to claims 13 and 18. Pet. 37, 40. Ericsson's expert, Dr. Makowski, characterizes Rai's XTunnel protocol as the "first security protocol" of claims 1, 13, and 18, because a tunneling protocol performs an operation of securing a particular path for packets to travel from a source to its destination. Ex. 1013 ¶ 59.

Intellectual Ventures disputes that XTunnel protocol is a security protocol within the meaning of claims 1, 13, and 18. According to Intellectual Ventures, the XTunnel protocol merely ensures that PPP data frames that are sent are all received correctly and in the correct order and

---

[12] Each of claims 2–9, 14–16, and 19–21 ultimately depend from one of independent claims 1, 13, and 18. Claims 2–9, 14–16, and 19–21, thus, include a "first security protocol," which is required by the independent claims.

IPR2014-00527
Patent 7,496,674 B2

that the sender does not overwhelm the receiver causing data to be lost due to buffer overflow.  PO Resp. 37.  Intellectual Ventures's expert, Dr. Newman, testifies that such data delivery mechanisms have nothing to do with providing confidentiality or authenticity of the data or data frames.  Ex. 2015 ¶ 73.

After considering the evidence and arguments of the parties, we agree with Intellectual Ventures's position that the XTunnel protocol of Rai does no more than provide an unsecure conduit for communications which may be capable of use with actual security protocols.  However, XTunnel, by itself, is not a security protocol.  Ericsson not has carried its burden of establishing that Rai discloses a first security protocol over the wired data network.

### 2. "first security protocol" – Davison (claims 1, 2, 13, 14, 18, and 19)

Claims 2, 14, and 19 depend from claims 1, 13, and 18, respectively, and each add limitations that the first security protocol comprises encryption that is decrypted by the processing step.  Ex. 1001.  Ericsson concedes that Rai does not explicitly disclose that the XTunnel protocol includes encryption.  Pet. 43.  However, Ericsson relies on Davison as disclosing conventional tunneling protocol security features including IPSec.  *Id.* at 44; Ex. 1010, 3:9–17.  Ericsson relies on the disclosure of IPSec in Davison as satisfying the encryption limitation in claims 2, 14, and 19.  Pet. 43–44.

Intellectual Ventures does not dispute that Davison discloses the encryption limitation of claims 2, 14, and 19.  PO Resp. 44–45.  Based on the evidence provided, we find that Davison satisfies the encryption limitation of claims 2, 14, and 19.  We find further that Davison's disclosure

IPR2014-00527
Patent 7,496,674 B2

of conventional tunnel protocol security features including IPSec satisfies
the "first security protocol" limitation of claims 1, 13, and 18.

### 3. "second security protocol – Rai (claims 1, 13, and 18)

Ericsson contends that the MAC layer protocol disclosed in Rai
satisfies the element in claim 1 directed to "applying a second security
protocol employed on the wireless network." Pet. 36. A similar contention
is made with respect to claims 13 and 18. Pet. 39, 41. Ericsson's expert,
Dr. Makowski, testifies that it readily would have been understood to a
person of ordinary skill in the art that the use of the MAC layer for a
wireless LAN as shown in Rai followed the 802.11 standard. Pet. 33–34;
Ex. 1013 ¶ 64. Dr. Makowski testifies that the 802.11 standard includes the
Wired Equivalency Privacy (WEP) algorithm, which includes security
features such as authentication and encryption. Ex. 1013 ¶ 64.

Intellectual Ventures argues that Ericsson has not explained its
obviousness position adequately. PO Resp. 39. Intellectual Ventures argues
that Rai does not mention the 802.11 standard. *Id.* at 40.

Intellectual Ventures's arguments are not persuasive. The 802.11
standard informs us that:

> The medium access control (MAC) supports operation under
> control of an access point as well as between independent
> stations. The protocol includes *authentication*, association, and
> reassociation services, an operational *encryption/decryption*
> procedure, power management to reduce power consumption in
> mobile stations, and a point coordination function for time-
> bounded transfer of data.

Ex. 1009, iv (emphasis added). While Rai does not mention the 802.11
standard expressly, it does disclose that PPP frames are sent over the MAC
and air link. Ex. 1004, 8:21–23. An artisan must be presumed to know

IPR2014-00527
Patent 7,496,674 B2

something about the art apart from what the references disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962). Here, the 802.11 standard informs us as to what a person of ordinary skill in the art would understand Davison's disclosure of the MAC protocol entails. Thus, we are persuaded that Rai's reference to use of the MAC protocol is sufficient to inform a person of ordinary skill in the art that a security protocol is employed on the wireless network.

> *4. The "determining . . . target" element – Rai (claims 1, 13, and 18)*

Ericsson contends that the determining step of claims 1, 13, and 18 is satisfied by disclosures in columns 8, 9, and 17 of Rai. Pet. 35, 38, 40. Ericsson's position is supported by declaration testimony from Dr. Makowski. *Id.*; Ex. 1013 ¶ 62.

Intellectual Ventures argues that Ericsson's recited passages in Rai merely refer to assignment of an IP address, which Intellectual Ventures contends is different from determining that a packet is targeted at a target device as recited in the claims. PO Resp. 43. Intellectual Ventures argues that Ericsson neglects to explain how the determining step is performed by the wireless base station as opposed to being performed by another structure disclosed in Rai. *Id.*

In reply, Ericsson notes that Rai describes that the base station de-tunnels down link frames and relays them over the air link to the "end system," which Ericsson equates with the target device. Reply 14 (citing Ex. 1004, 8:32–34). Ericsson argues that the base station must make a determination that the packet is targeted at the end system in order to send the packet to the end system. Reply 14–15. We agree with Ericsson on this

IPR2014-00527
Patent 7,496,674 B2

point.  Ericsson has shown by a preponderance of the evidence that Rai
satisfies the determining element of claims 1, 13, and 18.

### 5.  *"different encryption algorithm" (claims 3, 15, and 20)*

Claims 3, 15, and 20, depend from claims 2, 14, and 18, respectively
and add limitations requiring that the second security protocol comprises
encryption according to a different encryption algorithm from the first
security protocol.  Ex. 1001.  In its Petition with respect to claims 2, 14,
and 20, Ericsson relies on Davison's disclosure of conventional tunneling
protocol security features, including IPSec, as the first security protocol.
Pet. 43–44.  Ericsson relies on the MAC layer protocol as the second
security protocol.  Pet. 47, 48, 49.  Dr. Makowski testifies that the MAC
layer protocol uses the Wired Equivalency Privacy (WEP) algorithm from
the 802.11 standard.  Ex. 1013 ¶ 64 (citing Ex. 1009, 62–70).  Dr. Makowski
describes the WEP algorithm as a second and different security protocol.  *Id.*

Intellectual Ventures argues that the Petition is insufficient to carry
Ericsson's burden of proof, because the Petition fails to identify the
encryption algorithm that is used on either the wired network or the wireless
network.  PO Resp. 47.  Intellectual Ventures presents supporting testimony
from Dr. Newman.  *Id.*; Ex. 2015 ¶ 84.  Dr. Newman's testimony, however,
does not address any similarities or differences between IPSec encryption
and WEP encryption.  Thus, Dr. Newman does not address the actual factual
issue raised by the Petition, which is whether the MAC protocol used over
the wireless segment of Rai is different from the IPSec protocol used over a
wired network as disclosed by Davison.

We determine that Ericsson's position has merit, and observe that
there is an absence of persuasive evidence from Intellectual Ventures

34

IPR2014-00527
Patent 7,496,674 B2

controverting Ericsson's position.  We find that Ericsson has met its burden of showing that the MAC protocol of Rai, which we find includes the WEP encryption algorithm of standard 802.11, is different from the IPSec encryption algorithm of Davison.

### C. Level of Ordinary Skill in the Art

We apply the same level of ordinary skill in the art for the grounds of unpatentability over the combination of Rai and Davison as described above for the combination of Stadler and Davison.

### D.  Secondary Considerations of Non-Obviousness

As with the grounds of unpatentability over Stadler and Davison, neither party introduced evidence on secondary considerations of non-obviousness.

### E.  Whether the Prior Art Could Have Been Combined to Achieve the Claimed Invention

The evidence establishes that Rai and Davison, together, disclose all of the limitations of claims 2–9, 14–16, and 19–21.  Nevertheless, Intellectual Ventures raises a number of arguments against the combinability of the two references with respect to various challenged claims.

#### 1. Claims 2, 14, and 19.

Intellectual Ventures argues that Ericsson's obviousness argument is conclusory and, therefore, insufficient.  PO Resp. 45.  Intellectual Ventures argues that even if IPSec could be substituted for XTunnel, Ericsson does not explain why one with ordinary skill in the art would make that substitution.  *Id.*

35

IPR2014-00527
Patent 7,496,674 B2

Intellectual Ventures presents testimony from Dr. Newman that the specifications for XTunnel contain requirements that IPSec cannot provide. *Id.*; Ex. 2015 ¶ 80. However, the features described in paragraph 80 of Dr. Newman's declaration as differences between XTunnel and IPSec do not appear to relate to the subject matter of claims 2, 14, and 19. The issue before us is whether the prior art renders the invention, as claimed, obvious, not whether unclaimed features in one reference must be included in the process of combining two references to achieve the claimed invention. *See* 35 U.S.C. § 103; *see also KSR*, 550 U.S. at 420 (in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle).

Ericsson contends that it would have been obvious to a person of ordinary skill in the art to modify Rai to replace the XTunnel protocol with the IPSec protocol. Pet. 44. According to Ericsson, a person of ordinary skill in the art would have done this in order to provide a tunnel that was secure. *Id.* Ericsson's position is supported by declaration testimony from Dr. Makowski. *Id.*; Ex. 1013 ¶¶ 65–67.

Intellectual Ventures previously argued that the XTunnel protocol fails to provide secure communications. PO Resp. 36. We are of the opinion that the prospect of obtaining security for communications by using IPSec is a sufficient reason to substitute IPSec for XTunnel. Ericsson has established, by a preponderance of the evidence, that a person of ordinary skill in the art would have combined Rai and Davison to achieve the invention of claims 2, 14, and 19 of the '674 patent.

### 2. Claims 3, 15, and 20

Intellectual Ventures does not argue against the combinability of Davison and Rai with respect to claims 3, 15, and 20, apart from the argument that the prior art fails to disclose two different encryption algorithms, an argument that we rejected in Section VI.B.5 above.  A person of ordinary skill in the art would have combined Rai and Davison to achieve these claims for essentially the same reason discussed in the preceding section with respect to claims 2, 14, and 19.

### 3. Claim 4

Claim 4 depends from claim 2 and adds a limitation that the first security protocol comprises authentication.  Ex. 1001.  Ericsson relies on Davison as satisfying the authentication element.  Pet. 47.  Intellectual Ventures does not challenge Ericsson's position on claim 4 apart from the arguments made opposing Ericsson's case with respect to claim 1.  PO Resp. 44.  We find that Ericsson has carried its burden of showing that a person of ordinary skill in the art would have combined Davison and Rai to achieve the invention of claim 4 for essentially the same reason discussed in preceding sections with respect to claims 2, 3, 14, 15, 19, and 20.

### 4. Claims 5 and 6

Claim 5 depends from claim 4 and claim 6 depends from claim 1.  Ex. 1001.  Each claim adds a limitation that the first security protocol is compliant with IPSec.  *Id.*  For each of claims 5 and 6, Ericsson relies on Davison as disclosing IPSec.  Pet. 48.  Intellectual Ventures argues that Ericsson provides no rationale for combining Davison and Rai.  PO Resp. 48.

IPR2014-00527
Patent 7,496,674 B2

As discussed previously with respect to claim 2 (*see* Section VI.E.1 above), Ericsson argues that it would have been obvious to a person of ordinary skill in the art to modify Rai to replace the XTunnel protocol with IPSec for the purpose of providing a secure tunnel.  Pet. 44.  Ericsson's position is supported by declaration testimony from Dr. Makowski.  *Id.*; Ex. 1013 ¶¶ 65–67.  In view of the similarity between claims 2, 5, and 6, Ericsson's rationale for combining Davison with Rai for claim 2 suffices for claims 5 and 6.

### 5.  *Claims 7–9*

Intellectual Ventures raises essentially identical arguments against Ericsson's proposed combination of Rai and Davison as rendering each of claims 7–9 unpatentable.  PO Resp. 45–47.  With respect to each claim, Intellectual Ventures argues that Ericsson's proposed substitution of PPTP, L2F, and L2TP tunneling protocols, respectively, for IPSec is flawed, because Rai does not mention IPSec.  *Id.*  Intellectual Ventures supports its position with testimony from Dr. Newman that a person of ordinary skill in the art would not have substituted PPTP, L2F, or L2TP tunneling protocols for IPSec because such a substitution of tunneling protocols would leave communications unsecured and vulnerable to hostile acts or influences.  Ex. 2015, ¶¶ 81–83.

Intellectual Ventures's arguments mischaracterize Ericsson's position.  Ericsson's Petition points out that the '674 patent acknowledges that the PPTP, L2P, and L2TP were well known before the date of the invention.  Pet. 45.  Ericsson further points out that the '674 patent acknowledges that these tunneling protocols were known substitutes for IPSec.  *Id.*  Ericsson relies on Davison as disclosing that, when using permanent virtual circuits,

IPR2014-00527
Patent 7,496,674 B2

conventional tunneling protocol security measures may be employed to prevent a home gateway from masquerading as a home gateway to a different network by providing an incorrect domain identifier. *Id.*; Ex. 1010, 3:9–17. Ericsson further relies on Davison as disclosing that any protocol that allows tunneling or tunneling-like features may be used to initiate a tunnel session. Ex. 1010, 5:20–34. Although Davison indicates that IPSec could be used as the tunneling protocol, it also indicates that PPTP, L2F, or L2TP could be used in lieu of IPSec. *Id.*

Thus, as we understand the Petition, Ericsson is not proposing to substitute unsecured PPTP, L2F, or L2TP tunnel communications for secure IPSec tunnel communications. Rather, we understand that Ericsson is relying on Davison's "conventional tunneling protocol security features" as a first security protocol to be used with PPTP, L2P, or L2TP tunneling communications in connection with claims 7–9, respectively. Pet. 45; Ex. 1010, 3:13–17.

We are unpersuaded by Intellectual Ventures's arguments and find that Ericsson has shown, by a preponderance of the evidence, that a person of ordinary skill in the art would have found it obvious to combine Davison with Rai to achieve the invention of claims 7–9.

### 6. *Claims 16 and 21*

Claim 16 depends from claim 14 and claim 21 depends from claim 19. Ex. 1001. Each claim adds a limitation that the first security protocol further comprises authentication. *Id.* For each of claims 16 and 21, Ericsson relies on Davison as disclosing authentication. Pet. 48–49. Ericsson's position is supported by declaration testimony of Dr. Makowski. *Id.*; Ex. 1013 ¶ 23.

IPR2014-00527
Patent 7,496,674 B2

Intellectual Ventures does not challenge Ericsson's position on claims 16 and 21 apart from the arguments made opposing Ericsson's case with respect to claim 1. PO Resp. 44. We find that Ericsson has carried its burden of showing that a person of ordinary skill in the art would have combined Davison and Rai to achieve the invention of claims 16 and 21 for essentially the same reason discussed in proceeding sections with respect to claims 2, 3, 14, 15, 19, and 20.

### F. Ultimate Conclusion of Obviousness

Upon consideration of all the evidence, it is our opinion that Ericsson has carried its burden of proof that claims 2–9, 14–16, and 19–21 of the '674 patent are unpatentable as obvious over Davison and Rai.

## VII. OBVIOUSNESS OVER RAI

Ericsson asserts that claims 1, 10–13, 17, 18, and 22 are unpatentable as obvious over Rai. Pet. 33–43. Intellectual Ventures presents separate arguments for the patentability of claims 1, 13, and 18. PO Resp. 36–43. In opposing the grounds of unpatentability with respect to claims 10–12, 17, and 22, each of which depends from either claims 1, 13, or 18, Intellectual Ventures relies on the arguments asserted with respect to claims 1, 13, and 18.

### A. Claims 1, 13, and 18

Claims 1, 13, and 18 are independent claims. Ex. 1001. Claims 2, 14, and 19 depend from claims 1, 13, and 18, respectively. *Id.* We previously have determined that each of claims 2, 14, and 19 is unpatentable as obvious. *See supra* Section VI.F.

40

IPR2014-00527
Patent 7,496,674 B2

Settled law maintains that a broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness. *See Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC,* 778 F.3d 1311, 1315 (Fed. Cir. 2015). In view of our determination that each of claims 2, 14, and 19 is unpatentable over Rai and Davison, we determine that each of claims 1, 13, and 18 also is unpatentable as obvious over those references.

### B. Claims 10–12, 17, and 22

Claim 10 depends from claim 1 and adds a limitation that the wireless base station wirelessly transmits the first packet. Ex. 1001. Ericsson argues that Rai satisfies this limitation. Pet. 41; Ex. 1004, 8:32–34. Intellectual Ventures does not challenge this assertion.

Claim 11 depends from claim 1 and adds a limitation that a second packet is wirelessly received in the wireless base station that is protected by a second security protocol. Ex. 1001. Ericsson argues that Rai satisfies this limitation. Pet. 42; Ex. 1004, 8:21–29, Figs. 7, 11, 17, 20, 26. Ericsson supports its position with declaration testimony from Dr. Makowski. Pet. 42; Ex. 1013 ¶ 64. Intellectual Ventures does not challenge this assertion.

Claim 12 depends from claim 11 and adds a limitation that the wireless base station transmits the second packet on the wired network. Ex. 1001. Ericsson argues that Rai satisfies this limitation. Pet. 42; Ex. 1004, 8:21–29, Fig. 11. Ericsson supports its position with declaration testimony from Dr. Makowski. Pet. 42; Ex. 1013 ¶ 64. Intellectual Ventures does not challenge this assertion.

IPR2014-00527
Patent 7,496,674 B2

Claim 17 depends from claim 13 and adds a limitation that the controller is configured to process a second packet received by the second interface and the controller is configured to process the second packet according to the second security and apply the first security protocol to the second packet. Ex. 1001. Ericsson argues that Rai satisfies this limitation. Pet. 42–43; Ex. 1004, 8:21–29, Figs. 7, 11, 17, 20, 26. Ericsson supports its position with declaration testimony from Dr. Makowski. Pet. 42; Ex. 1013 ¶ 64. Intellectual Ventures does not challenge this assertion.

Claim 22 depends from claim 18 and adds a limitation that the controller is configured to process a second packet received from the wireless network and the controller is configured to process the second packet according to the second security and apply the first security protocol to the second packet. Ex. 1001. Ericsson argues that Rai satisfies this limitation. Pet. 42–43; Ex. 1004, 8:21–29, Figs. 7, 11, 17, 20, 26. Ericsson supports its position with declaration testimony from Dr. Makowski. Pet. 43; Ex. 1013 ¶ 64. Intellectual Ventures does not challenge this assertion.

Thus, in opposing the grounds of unpatentability with respect to claims 10–12, 17, and 22, Intellectual Ventures relies solely on the arguments asserted with respect to claims 1, 13, and 18. We have reviewed the evidence submitted by Ericsson in support of its contentions with respect to claims 10–12, 17, and 22 and find it sufficient to establish the facts, as asserted. Under the circumstances, we find that Ericsson has carried its burden of showing, by a preponderance of the evidence, that claims 10–12, 17, and 22 are unpatentable as obvious over Rai.

IPR2014-00527
Patent 7,496,674 B2

## IV.  ORDER

In view of the foregoing, it is ORDERED as follows:

1.  Claims 1–6 and 10–22 of U.S. Patent No. 7,496,674 B2 have been shown to be unpatentable as anticipated by Stadler;

2.  Claims 7–9 of U.S. Patent No. 7,496,674 B2 have been shown to be unpatentable as obvious over Stadler and Davison; and

3.  Claims 1–22 of U.S. Patent No. 7,496,674 B2 have been shown to be unpatentable as obvious over Rai and Davison.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-00527
Patent 7,496,674 B2

PETITIONER:

Todd Baker
Robert Mattson
Sameer Gokhale
OBLON, MCCLELLAND, MAIER & NEUSTADT, L.L.P
cpdocketbaker@oblon.com
cpdocketmattson@oblon.com
cpdocketgokhale@oblon.com


PATENT OWNER:

Herbert Hart
Jonathan Sick
Steven
Hampton
MCANDREWS, HELD & MALLOY, LTD.
hhart@mcandrews-ip.com
jsick@mcandrews-ip.com
shampton@mcandrews-ip.com

James Hietala
Tim Seeley
INTELLECTUAL VENTURES MANAGEMENT
jhietala@intven.com
tim@intven.com



US007496674B2

(12) **United States Patent**
Jorgensen

(10) **Patent No.:**  **US 7,496,674 B2**
(45) **Date of Patent:**  **Feb. 24, 2009**

(54) **SYSTEM, METHOD, AND BASE STATION USING DIFFERENT SECURITY PROTOCOLS ON WIRED AND WIRELESS PORTIONS OF NETWORK**

(75) Inventor: **Jacob W. Jorgensen**, Folsom, CA (US)

(73) Assignee: **Van Drebbel Mariner LLC**, Los Altos, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/502,348**

(22) Filed: **Aug. 10, 2006**

(65) **Prior Publication Data**

US 2007/0038750 A1    Feb. 15, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 11/068,719, filed on Feb. 28, 2005, now Pat. No. 7,409,450, which is a continuation of application No. 09/349,477, filed on Jul. 9, 1999, now Pat. No. 6,862,622.

(60) Provisional application No. 60/092,452, filed on Jul. 10, 1998.

(51) **Int. Cl.**
*G06F 15/16*    (2006.01)

(52) **U.S. Cl.** ...................... **709/230**; 709/238; 709/224; 709/229; 713/160; 713/162

(58) **Field of Classification Search** ................. 709/230, 709/203, 223–225, 229, 238; 713/160, 162
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,472,801 A    9/1984  Huang

| 4,742,512 A | 5/1988 | Akashi et al. |
| 4,802,836 A | 2/1989 | Whissell |
| 4,907,224 A | 3/1990 | Scoles et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 2064975 | 7/1999 |

(Continued)

OTHER PUBLICATIONS

Notice of Preliminary Rejection issued by the Korean Intellectual Property Office for the application 10-2007-7003032, dated May 7, 2007 (with English language translation) pp. 4.

(Continued)

*Primary Examiner*—Philip B Tran

(57)    **ABSTRACT**

A method for providing quality of service (QoS) aware, wireless point to multi-point telecommunications in a telecommunications system. The telecommunications system includes: a wireless base station coupled to a first data network; one or more host workstations coupled to the first data network; one or more subscriber customer premise equipment (CPE) stations in wireless communications with the wireless base station over a shared bandwidth using a packet-centric protocol; one or more subscriber workstations coupled to each of the subscriber CPE stations over a second network. The method includes allocating shared bandwidth among the subscriber CPE stations in a manner to optimize end-user QoS. The method includes analyzing and scheduling IP flows over the shared wireless bandwidth. This includes identifying the IP flows; characterizing the IP flows; classifying the IP flows; and prioritizing the IP flows.

**23 Claims, 41 Drawing Sheets**



Ericsson Ex. 1001, pg 1

**US 7,496,674 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,231,634 A | 7/1993 | Giles et al. | |
| 5,282,222 A | 1/1994 | Fattouche et al. | |
| 5,337,313 A | 8/1994 | Buchholz et al. | |
| 5,420,851 A | 5/1995 | Seshadri et al. | |
| 5,442,625 A | 8/1995 | Gitlin et al. | |
| 5,444,718 A | 8/1995 | Ejzak et al. | |
| 5,487,061 A | 1/1996 | Bray | |
| 5,493,569 A | 2/1996 | Buchholz et al. | |
| 5,497,504 A | 3/1996 | Acampora et al. | |
| 5,499,243 A | 3/1996 | Hall | |
| 5,515,363 A | 5/1996 | Ben-Nun et al. | |
| 5,570,355 A | 10/1996 | Dail et al. | |
| 5,572,528 A | 11/1996 | Shuen | |
| 5,581,544 A | 12/1996 | Hamada et al. | |
| 5,583,914 A * | 12/1996 | Chang et al. | 455/466 |
| 5,594,720 A | 1/1997 | Papadopoulos et al. | |
| 5,602,836 A | 2/1997 | Papadopoulos et al. | |
| 5,610,910 A | 3/1997 | Focsaneanu et al. | |
| 5,613,198 A | 3/1997 | Ahmadi et al. | |
| 5,625,877 A | 4/1997 | Dunn et al. | |
| 5,638,371 A | 6/1997 | Raychaudhuri et al. | |
| 5,640,395 A | 6/1997 | Hamalainen et al. | |
| 5,644,576 A | 7/1997 | Bauchot et al. | |
| 5,648,969 A | 7/1997 | Pasternak et al. | |
| 5,684,791 A | 11/1997 | Raychaudhuri et al. | |
| 5,701,302 A | 12/1997 | Geiger | |
| 5,717,689 A | 2/1998 | Ayanoglu | |
| 5,724,513 A | 3/1998 | Ben-Nun et al. | |
| 5,729,542 A | 3/1998 | Dupont | |
| 5,732,077 A | 3/1998 | Whitehead | |
| 5,734,833 A | 3/1998 | Chiu et al. | |
| 5,742,847 A | 4/1998 | Knoll et al. | |
| 5,745,480 A | 4/1998 | Behtash et al. | |
| 5,745,551 A | 4/1998 | Strauch et al. | |
| 5,751,708 A | 5/1998 | Eng et al. | |
| 5,752,193 A | 5/1998 | Scholefield et al. | |
| 5,758,281 A | 5/1998 | Emery et al. | |
| 5,774,461 A | 6/1998 | Hyden et al. | |
| 5,787,077 A | 7/1998 | Kuehnel et al. | |
| 5,787,080 A | 7/1998 | Hulyalkar et al. | |
| 5,790,551 A | 8/1998 | Chan | |
| 5,793,416 A | 8/1998 | Rostoker et al. | |
| 5,802,465 A | 9/1998 | Hamalainen et al. | |
| 5,826,188 A | 10/1998 | Tayloe et al. | |
| 5,828,666 A | 10/1998 | Focsaneanu et al. | |
| 5,828,677 A | 10/1998 | Sayeed et al. | |
| 5,831,971 A | 11/1998 | Bonomi et al. | |
| 5,831,975 A | 11/1998 | Chen et al. | |
| 5,838,670 A | 11/1998 | Billstrom | |
| 5,841,777 A | 11/1998 | Cohen | |
| 5,864,540 A | 1/1999 | Bonomi et al. | |
| 5,872,777 A | 2/1999 | Brailean et al. | |
| 5,889,816 A | 3/1999 | Agrawal et al. | |
| 5,907,822 A | 5/1999 | Prieto, Jr. | |
| 5,909,550 A | 6/1999 | Shankar et al. | |
| 5,920,705 A | 7/1999 | Lyon et al. | |
| 5,930,472 A | 7/1999 | Smith | |
| 5,936,949 A | 8/1999 | Pasternak et al. | |
| 5,953,328 A | 9/1999 | Kim et al. | |
| 5,953,344 A | 9/1999 | Dail et al. | |
| 5,956,330 A | 9/1999 | Kerns | |
| 5,959,999 A | 9/1999 | An | |
| 5,960,000 A | 9/1999 | Ruszczyk et al. | |
| 5,966,378 A | 10/1999 | Hamalainen | |
| 5,970,059 A | 10/1999 | Ahopelto et al. | |
| 5,970,062 A | 10/1999 | Bauchot | |
| 5,974,078 A | 10/1999 | Ramakrishnan | |
| 5,974,085 A | 10/1999 | Smith | |
| 5,991,292 A | 11/1999 | Focsaneanu et al. | |
| 6,002,935 A | 12/1999 | Wang | |
| 6,005,868 A | 12/1999 | Ito | |
| 6,014,377 A | 1/2000 | Gillespie | |
| 6,016,311 A | 1/2000 | Gilbert et al. | |
| 6,018,516 A | 1/2000 | Packer | |
| 6,021,158 A | 2/2000 | Schurr et al. | |
| 6,021,439 A | 2/2000 | Turek et al. | |
| 6,028,842 A | 2/2000 | Chapman et al. | |
| 6,031,832 A | 2/2000 | Turina | |
| 6,031,845 A | 2/2000 | Walding | |
| 6,038,216 A | 3/2000 | Packer | |
| 6,038,230 A | 3/2000 | Ofek | |
| 6,038,451 A | 3/2000 | Syed et al. | |
| 6,038,452 A | 3/2000 | Strawczynski et al. | |
| 6,041,051 A | 3/2000 | Doshi et al. | |
| 6,046,980 A | 4/2000 | Packer | |
| 6,052,594 A | 4/2000 | Chuang et al. | |
| 6,058,114 A | 5/2000 | Sethuram et al. | |
| 6,064,649 A | 5/2000 | Johnston | |
| 6,072,790 A | 6/2000 | Neumiller et al. | |
| 6,073,029 A * | 6/2000 | Smith et al. | 455/555 |
| 6,075,787 A | 6/2000 | Bobeck et al. | |
| 6,075,792 A | 6/2000 | Ozluturk | |
| 6,081,524 A | 6/2000 | Chase et al. | |
| 6,081,536 A | 6/2000 | Gorsuch et al. | |
| 6,084,855 A | 7/2000 | Soirinsuo et al. | |
| 6,084,867 A | 7/2000 | Meier | |
| 6,091,959 A | 7/2000 | Souissi et al. | |
| 6,092,113 A | 7/2000 | Maeshima et al. | |
| 6,097,707 A | 8/2000 | Hodzic et al. | |
| 6,097,722 A | 8/2000 | Graham et al. | |
| 6,097,733 A | 8/2000 | Basu et al. | |
| 6,104,721 A | 8/2000 | Hsu | |
| 6,104,928 A * | 8/2000 | Waugh | 455/445 |
| 6,111,863 A | 8/2000 | Rostoker et al. | |
| 6,115,357 A | 9/2000 | Packer et al. | |
| 6,115,370 A | 9/2000 | Struhsaker et al. | |
| 6,115,390 A | 9/2000 | Chuah | |
| 6,131,012 A | 10/2000 | Struhsaker et al. | |
| 6,131,027 A | 10/2000 | Armbruster et al. | |
| 6,131,117 A | 10/2000 | Clark et al. | |
| 6,138,022 A * | 10/2000 | Strawczynski et al. | 455/445 |
| 6,151,300 A | 11/2000 | Hunt et al. | |
| 6,151,628 A | 11/2000 | Xu et al. | |
| 6,154,643 A | 11/2000 | Cox | |
| 6,154,647 A | 11/2000 | Dahlin et al. | |
| 6,154,776 A | 11/2000 | Martin | |
| 6,160,793 A | 12/2000 | Ghani et al. | |
| 6,163,532 A | 12/2000 | Taguchi et al. | |
| 6,175,860 B1 | 1/2001 | Gaucher | |
| 6,188,671 B1 | 2/2001 | Chase et al. | |
| 6,192,029 B1 | 2/2001 | Averbuch et al. | |
| 6,195,565 B1 | 2/2001 | Dempsey et al. | |
| 6,198,728 B1 | 3/2001 | Hulyalkar et al. | |
| 6,201,811 B1 | 3/2001 | Larsson et al. | |
| 6,205,120 B1 | 3/2001 | Packer et al. | |
| 6,208,620 B1 | 3/2001 | Sen et al. | |
| 6,215,769 B1 | 4/2001 | Ghani et al. | |
| 6,219,713 B1 | 4/2001 | Ruutu et al. | |
| 6,236,656 B1 | 5/2001 | Westerberg et al. | |
| 6,247,058 B1 | 6/2001 | Miller et al. | |
| 6,252,857 B1 | 6/2001 | Fendick et al. | |
| 6,256,300 B1 | 7/2001 | Ahmed et al. | |
| 6,262,980 B1 | 7/2001 | Leung et al. | |
| 6,263,209 B1 | 7/2001 | Reed | |
| 6,272,129 B1 | 8/2001 | Dynarski et al. | |
| 6,272,333 B1 | 8/2001 | Smith | |
| 6,282,208 B1 | 8/2001 | Bowcutt et al. | |
| 6,295,285 B1 | 9/2001 | Whitehead | |
| 6,304,564 B1 | 10/2001 | Monin et al. | |
| 6,310,886 B1 | 10/2001 | Barton | |
| 6,320,846 B1 | 11/2001 | Jamp et al. | |
| 6,324,184 B1 | 11/2001 | Hou et al. | |
| 6,327,254 B1 | 12/2001 | Chuah | |
| 6,330,244 B1 | 12/2001 | Swartz et al. | |

Ericsson Ex. 1001, pg 2

**US 7,496,674 B2**

Page 3

| | | | |
|---|---|---|---|
| 6,330,451 | B1 | 12/2001 | Sen et al. |
| 6,331,986 | B1 | 12/2001 | Mitra et al. |
| 6,331,987 | B1 | 12/2001 | Beser |
| 6,336,143 | B1 | 1/2002 | Diedrich et al. |
| 6,353,616 | B1 | 3/2002 | Elwalid et al. |
| 6,363,053 | B1 | 3/2002 | Schuster et al. |
| 6,377,548 | B1 | 4/2002 | Chuah |
| 6,377,782 | B1 | 4/2002 | Bishop et al. |
| 6,397,259 | B1 * | 5/2002 | Lincke et al.  ............... 709/236 |
| 6,400,722 | B1 | 6/2002 | Chuah et al. |
| 6,407,992 | B1 | 6/2002 | Pasternak et al. |
| 6,412,006 | B2 | 6/2002 | Naudus |
| 6,438,370 | B1 | 8/2002 | Einola et al. |
| 6,442,158 | B1 | 8/2002 | Beser |
| 6,449,251 | B1 | 9/2002 | Awadallah et al. |
| 6,449,647 | B1 | 9/2002 | Colby et al. |
| 6,452,915 | B1 | 9/2002 | Jorgensen |
| 6,459,682 | B1 | 10/2002 | Ellesson et al. |
| 6,466,651 | B1 | 10/2002 | Dailey |
| 6,512,751 | B1 | 1/2003 | Struhsaker et al. |
| 6,517,614 | B1 | 2/2003 | Klotz et al. |
| 6,546,016 | B1 | 4/2003 | Gerszberg et al. |
| 6,914,965 | B1 * | 7/2005 | Grob et al.  ............... 455/422.1 |
| 2002/0099949 | A1 | 7/2002 | Fries et al. |
| 2002/0163933 | A1 | 11/2002 | Benveniste |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 702 462 | 3/1996 |
| EP | 841 763 | 5/1998 |
| EP | 848 563 | 6/1998 |
| EP | 917 317 | 5/1999 |
| EP | 926 845 | 6/1999 |
| WO | WO 96/10320 | 4/1996 |
| WO | WO 98/37670 | 8/1998 |
| WO | WO 98/37706 | 8/1998 |
| WO | 99/05828 | 2/1999 |
| WO | 99/16266 | 4/1999 |
| WO | 9926430 | 5/1999 |
| WO | WO 99/26430 | 5/1999 |
| WO | WO 00/72626 | 11/2000 |
| WO | WO 00/79722 | 12/2000 |
| WO | WO 01/05098 | 1/2001 |
| WO | WO 01/08372 | 2/2001 |
| WO | WO 02/39710 | 5/2002 |

OTHER PUBLICATIONS

Kim et al. "The AT&T Labs Broadband Fixed Wireless Field Experiment", IEEE Communications Magazine, Oct. 1999, pp. 56-62.
Iera et al. "Wireless Broadband Applications: The Teleservice Model and Adaptive QoS Provisioning", IEEE Communications Magazine, Oct. 1999, pp. 71-75.
Celidonia et al. "A Wideband Two-Layer Radio Access Network Using DECT Technology in the Uplink", IEEE Communications Magazine, Oct. 1999, pp. 76-81.
Yoon et al. "A wireless Local Loop System Based on Wideband CDMA Technology", IEEE Communications Magazine, Oct. 1999, pp. 128-135.
Balakrishman et al. "Improving Reliable Transport and Handoff Performance in Cellular Wireless Networks", http://www.cs.berkeley.edu/~ss/papers/wune/html/winet.html, Computer Science Div., Dept. of Electrical Engineering and Computer Science, Univ. of California at Berkeley, CA 94720-1776, Nov. 1995, pp. 1-18.
Bianchi et al. "C-PRMA: A Centralized Packet Reservation Multiple Access for Local Wireless Communications" in IEEE Transactions on Vehicular Technology, vol. 46, No. 2, pp. 422-436, May 1997.
"A Cellular Wireless Local Area Network with QoS Guarantees for Heterogeneous Traffic", Author(s): Sunghyun Choi and Kang G. Shin, technical Report CSE-TR-300-96, Aug. 1996, 8 pages.

"The GSM System", Authors: Michel Mouly, Marie-Bernadette Pautet, pp. 272-277, XP-002154762.
"A Comparison of Mechanisms for Improving TCP Performance over Wireless Links" Authors(s): Hari Balakrishnan, Venkata N. Padmanabhan, Srinivasan Seshan, and Randy H. Katz; XF000734405 IEEE/ACM Transactions on Networking, vol. 5, No. 6, Dec. 1997, pp. 756-769.
Improving TCP/IP Performance Over Wireless Networks; Author(s): Hari Balakrishnan, Srinivasan Seshan, Elan Amire and Randy H. Katz; in Proc. 1st ACM Int'l Conf. on Mobile Computing and Networking (Mobicom), Nov. 1995, XP-002920962.
International Search Report; Date: Dec. 14, 2000; International Application No. PCT/US00/18531 for (36792-164878).
International Search Report; Date: Feb. 14, 2001; International Application No. PCT/US00/18584 for (36792-164879).
International Search Report; Date: Dec. 14, 2000; International Application No. PCT/US00/18585 for (36792-164880).
International Search Report; Date: Dec. 22, 2000; International Application No. PCT/US00/18666 for (36792-164881).
Cheng et al., "Wireless Intelligent ATM Network and Protocol Design for Future Personal Communication Systems", IEEE 1997.
Zahedi, A. et al. "Voice and Data Integration on TCP/IP Wireless Networks" Personal, Indoor and Mobile Radio Communication Sep. 1-4, 1997, vol. 2, pp. 678-682.
Madhow, U. "Dynamic Congestion Control and Error Recovery over a Heterogeneous Internet" Decision and Control, Dec. 10-12, 1997, vol. 3, pp. 2368-2374.
Kitchin, D. et al. "IEEE P802.11 Wireless LANs-Wireless Multimedia Enhancements (WME)" doc: IEEE 802.11-02/590r0, Sep. 11, 2002.
Jerry D. Gibson, "The Communications Handbook," CRC Press Inc. first edition, p. 630-631.
IEEE 802 Committee "Draft Supplement to Standard for Telecommunications and Information Exchange Between Systems-LAN/MAN Specific Requirements-Part 11: Wireless Medium Access Control (MAC) and Physical Layer (PHY) specifications: Medium Access Control (MAC Enhancements for Duality of Service (QoS)" IEEE Std. 802.11e/D3.3, Oct. 2002, (Draft Supplement to IEEE Std. 802.11, 1999 Edition).
Broadcom Corporation, "BCM3300 Product Brief, BCM3300 QAMLink Single-Chip DOCSIS Cable Modem", www.broadcom.com, Dec. 2, 1999.
Broadcom Corporation, "Broadcom, NetSpeak, and Telogy Networks Demonstrate Voice over IP Cable Modem Reference Design with Call Agent Interface at VON Show", www.broadcom.com, Apr. 14, 1999.
Broadcom Corporation, "Cable Modems Using Broadcom's TurboQAM BCM3348 Integrated Chip Archieve DOCSIS 2.0 Certification from CableLabs", www. broad.com, Dec. 19, 2002.
Broadcom Corporation, "Broadcom Announces World's First Single-Chip Cable Modem Solution", www.broadcom.com, Sep. 21, 1998.
Quigley, T. and Harman, D. Future Proofing, MCNS Data-Over-Cable Protocol, CED, Mar. 1998.
Cisco White Paper, "Policy-Based Routing", 1996 pp. 1-7.
European Examination Report issued for EP 00 947 079.0, dated Jan. 19, 2006.
Mahadevan, R., "Quality of Service Architectures for Wireless Networks: IntServ and DiffServ Models," Parallel Architectures, Algorithms, and Networks, Jun. 23, 1999, pp. 420-425.
Blake Torrent Networks Technologies, D Black, EMC Corporation, M Carlson, Sun Microsystems, Inc., E Davies, Nortel UK, Z Wang and Bell Labs Lucen, "An Architecture for Differentiated Services," IETF Standard, Internet Engineering Task Force, Dec. 1998.
European Search Report for Application No. 07 101 001.1, mailed Aug. 22, 2007.

* cited by examiner

Ericsson Ex. 1001, pg 3



FIG.1A

FIG.1B

FIG.1C

U.S. Patent

Feb. 24, 2009

Sheet 1 of 41

US 7,496,674 B2

Ericsson Ex. 1001, pg 4

U.S. Patent

Feb. 24, 2009

Sheet 2 of 41

US 7,496,674 B2



FIG.2A

Ericsson Ex. 1001, pg 5

A0049

U.S. Patent

Feb. 24, 2009

Sheet 3 of 41

US 7,496,674 B2



FIG.2B

Ericsson Ex. 1001, pg 6

U.S. Patent

Feb. 24, 2009

Sheet 4 of 41

US 7,496,674 B2



FIG.2C

Ericsson Ex. 1001, pg 7



FIG.2D

U.S. Patent

Feb. 24, 2009

Sheet 5 of 41

US 7,496,674 B2

Ericsson Ex. 1001, pg 8



FIG.3A

U.S. Patent

Feb. 24, 2009

Sheet 6 of 41

US 7,496,674 B2

Ericsson Ex. 1001, pg 9



FIG.3B

U.S. Patent    Feb. 24, 2009    Sheet 7 of 41    US 7,496,674 B2

Ericsson Ex. 1001, pg 10

U.S. Patent

Feb. 24, 2009

Sheet 8 of 41

US 7,496,674 B2



FIG.4

Ericsson Ex. 1001, pg 11

A0055

U.S. Patent

Feb. 24, 2009

Sheet 9 of 41

US 7,496,674 B2



FIG.5A

Ericsson Ex. 1001, pg 12

U.S. Patent

Feb. 24, 2009

Sheet 10 of 41

US 7,496,674 B2



FIG.5B

Ericsson Ex. 1001, pg 13

540
136a
142
302
542
Ingoing TCP Message
544
Parse TCP Outgoing Header Contents
546
Determine If Duplicate Acknowledgment Message
No
Yes
550
Determine Whether Subject Packet Was Successfully Transmitted
Yes
548
Allow TCP Message To Pass Through Without Modification
No
552
Suppress Transmission Of TCP Message
554
Wait For Successful Link Layer Re-Transmission Of Lost Packet
556
Upon Receipt Of Successful Link Layer Re-Transmission Acknowledgment Resume Normal TCP Messages

FIG.5C

U.S. Patent    Feb. 24, 2009    Sheet 12 of 41    US 7,496,674 B2



FIG.6

Ericsson Ex. 1001, pg 15



FIG.7

U.S. Patent

Feb. 24, 2009

Sheet 13 of 41

US 7,496,674 B2

Ericsson Ex. 1001, pg 16

U.S. Patent        Feb. 24, 2009        Sheet 14 of 41        US 7,496,674 B2



FIG.8A

Ericsson Ex. 1001, pg 17

U.S. Patent

Feb. 24, 2009

Sheet 15 of 41

US 7,496,674 B2



FIG.8B

Ericsson Ex. 1001, pg 18

U.S. Patent

Feb. 24, 2009

Sheet 16 of 41

US 7,496,674 B2



FIG.9

Ericsson Ex. 1001, pg 19

U.S. Patent

Feb. 24, 2009

Sheet 17 of 41

US 7,496,674 B2

1000



FIG.10

Ericsson Ex. 1001, pg 20

U.S. Patent    Feb. 24, 2009    Sheet 18 of 41    US 7,496,674 B2



FIG.11

Ericsson Ex. 1001, pg 21

U.S. Patent

Feb. 24, 2009

Sheet 19 of 41

US 7,496,674 B2



FIG.12A

Ericsson Ex. 1001, pg 22

U.S. Patent

Feb. 24, 2009

Sheet 20 of 41

US 7,496,674 B2



FIG.12B

Ericsson Ex. 1001, pg 23

U.S. Patent

Feb. 24, 2009

Sheet 21 of 41

US 7,496,674 B2



Downstream slots transmissions
(variable number per frame up to 16)

1212

1202

Transmitter
turnaround
time

1230    1206    1208    1210    1212a 1212b 1212c 1212d 1212e 1212f 1212g 1212h 1212i 1212j 1212k 1212l

| UAB | | ARB | FDB | DS₁ | DS₂ | DS₃ | DS₄ | DS₅ | DS₆ | DS₇ | DS₈ | DS₉ | DS₁₀ | DS₁₁ | DS_m | |

1232 CCB

Frame Descriptor Block for current frame

Acknowledgment Request Block – Acknowledgment of subscriber
requests for reservations requests from previous later frames

Upstream Acknowledgment Block – Acknowledgments from base
to subscribers for receipt of upstream slots in previous subframe

Command
and Control
Block –
OAM&P
commands
sequenced by
subscriber per
frame, and
frame sync

FIG.12C

Ericsson Ex. 1001, pg 24

U.S. Patent

Feb. 24, 2009

Sheet 22 of 41

US 7,496,674 B2



FIG.12D

Ericsson Ex. 1001, pg 25

U.S. Patent

Feb. 24, 2009

Sheet 23 of 41

US 7,496,674 B2



FIG.12E

Ericsson Ex. 1001, pg 26

U.S. Patent

Feb. 24, 2009

Sheet 24 of 41

US 7,496,674 B2



FIG.12F

Ericsson Ex. 1001, pg 27

U.S. Patent

Feb. 24, 2009

Sheet 25 of 41

US 7,496,674 B2



| MAC linked-list sequence number | Reservation request index number | Compressed IP-Flow Identifier | | Compressed IP-Flow Priority and Type | Slot Payload | CRC |
|---|---|---|---|---|---|---|
| 4 | 8 | 8 | | 4 | 512*8 | 16 |

FIG.12G

Ericsson Ex. 1001, pg 28

U.S. Patent

Feb. 24, 2009

Sheet 26 of 41

US 7,496,674 B2



FIG.12H

Ericsson Ex. 1001, pg 29

U.S. Patent

Feb. 24, 2009

Sheet 27 of 41

US 7,496,674 B2



Upstream slot transmissions
(variable number per frame up to 16)

1204

Transmitter
turnaround
time

Reservation Request Block – Requests from subscribers for
transmission reservations in later frames with dynamically adjustable
number of contention slots

Operations Data
Block–
OAM&P data
from subscribers
sequenced by
subscriber per
frame

Downstream Acknowledgment Block – Acknowledgments from subscribers
to base for receipt of downstream slots in previous downstream subframe

FIG.12I

Ericsson Ex. 1001, pg 30

U.S. Patent

Feb. 24, 2009

Sheet 28 of 41

US 7,496,674 B2



CPE Acknowledging Receipt of Slot Transmitted from Base

FIG.12J

Ericsson Ex. 1001, pg 31

U.S. Patent

Feb. 24, 2009

Sheet 29 of 41

US 7,496,674 B2



CPE Requesting a Reservation for Upstream Transmission of Slot

There are a variable number of contention slots available. CPE's randomly choose one of the available contention slots. Any collisions are detected by the Base, which then increments the number of available contention slots in the next upstream frame.

FIG.12K

Ericsson Ex. 1001, pg 32

A0076

U.S. Patent

Feb. 24, 2009

Sheet 30 of 41

US 7,496,674 B2



FIG.12L

Ericsson Ex. 1001, pg 33

A0077

U.S. Patent

Feb. 24, 2009

Sheet 31 of 41



Ericsson Ex. 1001, pg 34

A0078

U.S. Patent    Feb. 24, 2009    Sheet 32 of 41    US 7,496,674 B2



FIG.12N

Ericsson Ex. 1001, pg 35

U.S. Patent

Feb. 24, 2009

Sheet 33 of 41

US 7,496,674 B2



FIG.120

Ericsson Ex. 1001, pg 36

U.S. Patent        Feb. 24, 2009        Sheet 34 of 41        US 7,496,674 B2



FIG.13

Ericsson Ex. 1001, pg 37

U.S. Patent

Feb. 24, 2009

Sheet 35 of 41

US 7,496,674 B2



FIG.14

Ericsson Ex. 1001, pg 38



FIG.15A

142
Data Network
IP Flow System
320
1502
Packet Header Identification
1510
Packet Buffering
1520
Extract data from packet header fields
1526
Existing IP-Flow Identification Data Table
1522
Look for match with existing IP-Flow
YES
NO
1524
Analyze Packet Header fields
Look up source application type
Add IP-Flow identification data if new flow
Source Application
1504
Packet Characterization
1530
Determine if packet is too old if so, delete
1532
Look-up IP-Flow application's QoS requirements
1534
IP-Flow QoS
1536
Look-up Subscriber CPE ID associated with IP-Flow
1538
Subscriber CPE IP
1506
Packet Classification
1540
Associate packet with proper IP-Flow
1542
Classify packet into QoS-Class
1544
QoS Class
1508
IP-Flow Presentation
1500
602
1546
Add packet to IP-Flow Queue
1548
Initialize new IP-Flow
1550
Provide IP-Flow QoS-Class to Frame Scheduler
1552
Make IP-Flow
604
1562
IP-Flow QoS Class Queuing Processer
1579
1572
1570

FIG.15B

604
604
1560
Link Layer Acknowledgment (ARQ) Processor
1578
1576
MAC Downlink Subframe Scheduler
1566
Wireless Medium
Requests for retransmissions from CPE
292d
290d
1562
MAC Downlink Subframes
IP-Flow QoS Class Queues
Frame n 1568a
Frame n+1 1568b
Frame n+2 1568c
Frame n+3 1568d
Frame n+4 1568e
Frame n+5 1568f
Frame n+6 1568g
Frame n+7 1568h
Frame n+8 1568i
Frame n+9 1568j
Frame n+p 1568k
Class 1 1564a
Class 2 1564b
Class 3 1564c
Class 4 1564d
Class 5 1564e
Class m 1564f
RF Transceiver Subscriber Antenna
Wireless Access Point (WAP) Antenna
Completed Downlink Subframe sent to wireless modem for transmission
IP-Flow QoS Class Queuing Processor
1574
1574
Hierarchical Class-Based Priority Processor
CPE Subscriber Station
120d
Frames advance in this direction with passage of time
1572
1572
VPN DEN Data Table
CPE IP-Flow Queue Depth Status Processor
1582
294d
CPE IP-Flow Queue Depth Messages
1580
Subscriber Workstation
Service Level Agreement (SLA) Priority Data Table
1108
1570
Input data from OAM&P Module
OAM&P

1600
294d
CPE Subscriber Workstation
Subscriber Work-Station
120d
1602
Packet Header Identification
1610
Packet Buffering
1620
Extract data from packet header fields
1626
Existing IP-Flow Identification Data Table
1622
Look for match with existing IP-Flow
YES
NO
1624
Analyze Packet Header fields Look up source application type
Add IP-Flow identification data if new flow
1628
Source Application Packet Header Data Table
1604
Packet Characterization
1630
Determine if packet is too old if so, delete
1632
Look-up IP-Flow application's QoS requirements
1636
Look-up Subscriber CPE ID associated with IP-Flow
1634
IP-Flow QoS Requirement Table
1638
Subscriber CPE IP Address Table
1606
Packet Classification
1640
Associate packet with proper IP-Flow
1642
Classify packet into QoS-Class
1644
IP-Flow QoS Class Table
1608
IP-Flow Presentation
1646
Add packet to IP-Flow Queue
1648
Initialize new IP-Flow
1650
Provide IP-Flow QoS-Class to Frame Scheduler
1652
Make IP-Flow available to Frame Scheduler
632
634
1662
IP Flow QoS Class Queuing Proccessor
Uplink Frame Scheduler

FIG.16A

FIG.16B

632
1608
634
1650
IP-Flow Presentation
1646
Add packet to IP-Flow Queue
1650
Provide IP-Flow QoS-Class to Frame Scheduler
1652
Make IP-Flow available to Frame Scheduler
1662
IP-Flow QoS Class Queuing Processor
1666
MAC Uplink Subframe Scheduler (Scheduling first-time reservations and repeat reservations for lost packets)
IP- Flow QoS Class Queues
Class 1 1664a
Class 2 1664b
Class 3 1664c
Class 4 1664d
Class 5 1664e
Class m 1664f
1674
Hierarchical Class-Based Priority Processor
1674
1672
VPN DEN Data Table
1672
1670
Service Level Agreement (SLA) Priority Data Table
1670
CPE IP-Flow Queue Depth Status Processor
1682
1678
Link Layer Acknowledgment (ARQ) Processor
MAC Uplink Subframes
Frame n 1668a
Frame n+1 1668b
Frame n+2 1668c
Frame n+3 1668d
Frame n+4 1668e
Frame n+5 1668f
Frame n+6 1668g
Frame n+7 1668h
Frame n+8 1668i
Frame n+9 1668j
Frame n+p 1668k
Data messages about non-receipt of uplink transmission acknowledgments from CPE
Completed Uplink Subframe reservations sent to wireless modem for transmission
Frames advance in this direction with passage of time
290d
292d
Subscriber CPE Station
294d
Subscriber Workstation
CPE IP-Flow Queue Depth Messages
1680
1108
OAM&P
Input data from OAM&P Module



FIG.17

U.S. Patent    Feb. 24, 2009    Sheet 40 of 41    US 7,496,674 B2

Ericsson Ex. 1001, pg 43

A0087



FIG.18

U.S. Patent

Feb. 24, 2009

Sheet 41 of 41

US 7,496,674 B2

Ericsson Ex. 1001, pg 44

US 7,496,674 B2

**1**

# SYSTEM, METHOD, AND BASE STATION USING DIFFERENT SECURITY PROTOCOLS ON WIRED AND WIRELESS PORTIONS OF NETWORK

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 11/068,719, filed Feb. 28, 2005 now U.S. Pat. No. 7,409,450, entitled TRANSMISSION CONTROL PROTOCOL/ INTERNET PROTOCOL (TCP/IP) PACKET-CENTRIC WIRELESS POINT TO MULTI-POINT (PtMP) TRANS-MISSION SYSTEM ARCHITECTURE, which is a continuation of U.S. application Ser. No. 09/349,477, filed Jul. 9, 1999, entitled TRANSMISSION CONTROL PROTOCOL/ INTERNET PROTOCOL (TCP/IP) PACKET-CENTRIC WIRELESS POINT TO MULTI-POINT (PtMP) TRANS-MISSION SYSTEM ARCHITECTURE, which issued as U.S. Pat. No. 6,862,622, on Mar. 1, 2005, and which claims the benefit of priority from U.S. Provisional Patent Application No. 60/092,452, filed Jul. 10, 1998, the disclosures of each are incorporated herein by reference thereto.

The following applications of common assignee contain common disclosure:

U.S. patent application entitled "Quality of Service (QoS)—Aware Wireless Point to Multi-Point (PtMP) Transmission System Architecture," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/349,480, now abandoned.

U.S. patent application entitled "Method for Providing Dynamic Bandwidth Allocation Based on IP-Flow Characteristics in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/350,126, now abandoned.

U.S. patent application entitled "Method for Providing for Quality of Service (QoS)—Based Handling of IP-Flows in a Wireless Point to Multi-Point Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/350,118, now abandoned.

U.S. patent application entitled "IP-Flow Identification in a Wireless Point to Multi-Point Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/347,856, issued as U.S. Pat. No. 6,594,246.

U.S. patent application entitled "IP-Flow Characterization in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/350,150, issued as U.S. Pat. No. 6,590,885.

U.S. patent application entitled "IP-Flow Classification in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/350,156, issued as U.S. Pat. No. 6,452,915.

U.S. patent application entitled "IP-Flow Prioritization in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/349,476, now abandoned.

U.S. patent application entitled "Method of Operation for Providing for Service Level Agreement (SLA) Based Prioritization in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/350,170, now abandoned.

U.S. patent application entitled "Method for Transmission Control Protocol (TCP) Rate Control With Link-Layer Acknowledgments in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/349,481, now abandoned.

U.S. patent application entitled "Transmission Control Protocol/Internet Protocol (TCP/IP)—Centric QoS Aware

**2**

Media Access Control (MAC) Layer in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 350,159, now abandoned.

U.S. patent application entitled "Use of Priority-Based Scheduling for the Optimization of Latency and Jitter Sensitive IP Flows in a Wireless Point to Multi-Point Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/347,857, now abandoned.

U.S. patent application entitled "Time Division Multiple Access/Time Division Duplex (TDMA/TDD) Access Method for a Wireless Point to Multi-Point Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/349,475, now abandoned.

U.S. patent application entitled "Reservation Based Prioritization Method for Wireless Transmission of Latency and Jitter Sensitive IP-Flows in a Wireless Point to Multi-Point Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/349,483, issued as U.S. Pat. No. 6,628,629.

U.S. patent application entitled "Translation of Internet-Prioritized Internet Protocol (IP)-Flows into Wireless System Resource Allocations in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/349,479, now abandoned.

U.S. patent application entitled "Method of Operation for the Integration of Differentiated services (Diff-serv) Marked IP-Flows into a Quality of Service (QoS) Priorities in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/350,162, now abandoned.

U.S. patent application entitled "Method for the Recognition and Operation of Virtual Private Networks (VPNs) over a Wireless Point to Multi-Point (PtMP) Transmission System," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/349,975, issued as U.S. Pat. No. 6,680,922.

U.S. patent application entitled "Time Division Multiple Access/Time Division Duplex (TDMA/TDD) Transmission Media Access Control (MAC) Air Frame," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/350,173, now abandoned.

U.S. patent application entitled "Application—Aware, Quality of Service (QoS) Sensitive, Media Access Control (MAC) Layer," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/349,482, issued as U.S. Pat. No. 6,640,248.

U.S. patent application entitled "Transmission Control Protocol/Internet Protocol (TCP/IP) Packet-Centric Wireless Point to Point (PtP) Transmission System Architecture," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/349,478, now abandoned.

U.S. patent application entitled "Transmission Control Protocol/Internet Protocol (TCP/IP) Packet-Centric Cable Point to Multi-Point (PtMP) Transmission System Architecture," filed Jul. 9, 1999, assigned U.S. application Ser. No. 09/349,474, now abandoned.

U.S. patent application entitled "Method and Computer Program Product for Internet Protocol (IP)-Flow Classification in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Oct. 24, 2002, assigned U.S. application Ser. No. 10/241,454.

U.S. patent application entitled "Method for Providing Dynamic Bandwidth Allocation based on IP-Flow Characteristics in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Aug. 10, 2006, assigned U.S. application Ser. No. 11/502,331.

U.S. patent application entitled "Use of Priority-Based Scheduling for the Optimization of Latency and Jitter Sen-

Ericsson Ex. 1001, pg 45

US 7,496,674 B2

**3**

sitive IP Flows in a Wireless Point to Multi-Point Transmission System," filed Aug. 10, 2006, assigned U.S. application Ser. No. 11/502,583.

U.S. patent application entitled "Quality of Service (QoS)—Aware Wireless Point to Multi-Point (PtMP) Transmission System Architecture," filed Aug. 10, 2006, assigned U.S. application Ser. No. 11/502,596.

U.S. patent application entitled "Transmission Control Protocol/Internet Protocol (TCP/IP)—Centric QoS Aware Media Access Control (MAC) Layer in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Aug. 10, 2006, assigned U.S. application Ser. No. 11/502,599.

U.S. patent application entitled "Method of Operation for the Integration of Differentiated Services (DiffServ) Marked IP-Flows into a Quality of Service (QoS) Priorities in a Wireless Point to Multi-Point (PtMP) Transmission System," filed Aug. 10, 2006, assigned U.S. application Ser. No 11/502,101.

U.S. patent application entitled "Time Division Multiple Access/Time Division Duplex (TDMA/TDD) Transmission Media Access Control (MAC) Air Frame," Aug. 10, 2006, assigned U.S. application Ser. No. 11/502,601.

### FIELD OF THE INVENTION

The present invention relates generally to telecommunications and, more particularly, to a system and method for implementing a QoS aware wireless point-to-multi-point transmission system.

### BACKGROUND OF THE INVENTION

Telecommunication networks such as voice, data and video networks have conventionally been customized for the type of traffic each is to transport. For example, voice traffic is very latency sensitive but quality is less important, so voice networks are designed to transport voice traffic with limited latency. Traditional data traffic, such as, e.g., a spreadsheet, on the other hand is not latency sensitive, but error-free delivery is required. Conventional telecommunications networks use circuit switching to achieve acceptable end user quality of service (QoS). With the advent of new packet switching high bandwidth data networks, different types of traffic can be transported over a data network. Specifically, convergence of separate voice, data and video networks into a single broadband telecommunications network is enabled. To ensure end user satisfaction, a system is desired that provides QoS for various types of traffic to be transported.

Wireless networks present particular challenges over their wireline counterparts in delivering QoS. For example, wireless networks traditionally exhibit high bit error rates (BER) due to a number of reasons. Conventional wireless networks also implement circuit switched connections to provide reliable communications channels. However the use of circuit switched connections allocates bandwidth between communicating nodes whether or not traffic is constantly being transferred between the nodes. Therefore, circuit switched connections use communications bandwidth rather inefficiently.

Packet switching makes more efficient use of available bandwidth than does traditional circuit switching. Packet switching breaks up traffic into so-called "packets" which can then be transported from a source node to a destination for reassembly. Thus a particular portion of bandwidth can be shared by many sources and destinations yielding more efficient use of bandwidth.

A wireless broadband access telecommunications system is desired which can provide a QoS capability that is comparable to that delivered by wireline broadband access devices.

**4**

Conventionally, one of the barriers to the deployment of wireless broadband access systems has been the absence of acceptable QoS characteristics, while at the same time delivering bandwidth sufficient to qualify as broadband. Delivery of raw bandwidth over wireless media without acceptable QoS would not benefit end users. Likewise, the delivery of a high level of QoS at the cost of sufficient bandwidth would also not benefit end users.

Conventional efforts to provide wireless broadband access systems have not granted sufficient priority to QoS as a guiding principle in architecting the wireless systems, resulting in sub-optimal designs. With the rapid emergence of the Internet, the packet switching paradigm, and transmission control protocol/ internet protocol (TCP/IP) as a universal data protocol, it has become clear that a new wireless system design has become necessary.

What is needed then is an IP-centric wireless broadband access system with true QoS capabilities.

### SUMMARY OF THE INVENTION

The present invention is directed to a packet-centric wireless point to multi-point telecommunications system including: a wireless base station communicating via a packet-centric protocol to a first data network; one or more host workstations communicating via the packet-centric protocol to the first data network; one or more subscriber customer premise equipment (CPE) stations coupled with the wireless base station over a shared bandwidth via the packet-centric protocol over a wireless medium; and one or more subscriber workstations coupled via the packet-centric protocol to each of the subscriber CPE stations over a second network. The packet-centric protocol can be transmission control protocol/ internet protocol (TCP/IP). The packet-centric protocol can be a user datagram protocol/internet protocol (UDP/IP).

The system can include a resource allocation means for allocating shared bandwidth among the subscriber CPE stations. The resource allocation is performed to optimize end-user quality of service (QoS). The wireless communication medium can include at least one of: a radio frequency (RF) communications medium; a cable communications medium; and a satellite communications medium. The wireless communication medium can further include a telecommunications access method including at least one of: a time division multiple access (TDMA) access method; a time division multiple access/time division duplex (TDMA/TDD) access method; a code division multiple access (CDMA) access method; and a frequency division multiple access (FDMA) access method.

The first data network includes at least one of: a wireline network; a wireless network; a local area network (LAN); and a wide area network (WAN). The second network includes at least one of: a wireline network; a wireless network; a local area network (LAN); and a wide area network (WAN).

The system of claim **1** can include a resource allocator that allocates shared bandwidth among the subscriber CPE stations. The resource allocator optimizes end-user quality of service (QoS). The resource allocator can be application aware as well.

The cross-referenced applications listed above are incorporated herein by reference in their entireties.

### BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be described with reference to the accompanying figures, wherein:

Ericsson Ex. 1001, pg 46

FIG. **1**A is a block diagram providing an overview of a standard telecommunications network providing local exchange carrier services within one or more local access and transport areas;

FIG. **1**B depicts an exemplary network including workstations coupled to a data network;

FIG. **1**C illustrates a conventional video network, such as for example a cable television (CATV) network;

FIG. **2**A is a block diagram illustrating an overview of a standard telecommunications network providing both local exchange carrier and interexchange carrier services between subscribers located in different local access and transport areas;

FIG. **2**B illustrates a signaling network in detail;

FIG. **2**C illustrates an exemplary network carrying voice, data and video traffic over a data network;

FIG. **2**D depicts a network including a point-to-multipoint wireless network coupled via a router to a data network;

FIG. **3**A depicts an exemplary perspective diagram of a point-to-multipoint network;

FIG. **3**B depicts a block diagram further illustrating a wireless point-to-multipoint network;

FIG. **4** depicts a wireless Internet protocol network access architecture of the present invention;

FIG. **5**A depicts Internet protocol flows from a subscriber host to a wireless base station, and through a wireline connection to a destination host;

FIG. **5**B illustrates a functional flow diagram including an example functional description of a transmission control protocol adjunct agent performing an outgoing transmission control protocol spoof function;

FIG. **5**C illustrates a functional flow diagram including an exemplary functional description of a transmission control protocol adjunct agent performing an incoming transmission control protocol spoof function;

FIG. **6** illustrates a block diagram representing scheduling of mixed Internet protocol flows;

FIG. **7** illustrates packet header field information which can be used to identify Internet protocol flows and the quality of service requirements of the Internet protocol flows;

FIG. **8**A is a block diagram summarizing an exemplary downlink analysis, prioritization and scheduling function;

FIG. **8**B is a block diagram summarizing an exemplary uplink analysis prioritization and scheduling function;

FIG. **9** illustrates how a downlink flow scheduler can take into account a service level agreement in prioritizing a frame slot and scheduling resource allocation;

FIG. **10** depicts an embodiment of an inventive media access control hardware architecture;

FIG. **11** is an exemplary software organization for a packet-centric wireless point to multipoint telecommunications system;

FIG. **12**A illustrates an exemplary time division multiple access media access control air frame;

FIG. **12**B illustrates an exemplary structure for a time division multiple access/time division duplex air frame;

FIG. **12**C illustrates an exemplary downstream transmission subframe;

FIG. **12**D illustrates an exemplary upstream acknowledgment block field of a downstream transmission subframe;

FIG. **12**E illustrates an exemplary acknowledgment request block field of a downstream transmission subframe;

FIG. **12**F illustrates an exemplary frame descriptor block field of a downstream transmission subframe;

FIG. **12**G illustrates an exemplary downstream media access control payload data unit of a downstream transmission subframe;

FIG. **12**H illustrates an exemplary command and control block of a downstream transmission subframe;

FIG. **12**I illustrates an exemplary upstream transmission subframe;

FIG. **12**J illustrates an exemplary downstream acknowledgment block of an upstream transmission subframe;

FIG. **12**K illustrates an exemplary reservation request block of an upstream transmission subframe **1204**;

FIG. **12**L illustrates an exemplary media access control payload data unit of an upstream transmission subframe;

FIGS. **12**M, **12**N and **12**O illustrate an exemplary operations data block of an upstream transmission subframe;

FIG. **13** illustrates how an exemplary flow scheduler for the present invention functions;

FIG. **14** is an exemplary two-dimensional block diagram of an advanced reservation algorithm;

FIG. **15**A is an exemplary logical flow diagram for a downlink flow analyzer;

FIG. **15**B is an exemplary logical flow diagram for a downlink flow scheduler;

FIG. **16**A is an exemplary logical flow diagram for an uplink flow analyzer;

FIG. **16**B is an exemplary logical flow diagram for an uplink flow scheduler;

FIG. **17** illustrates Internet protocol flow in a downlink direction, including Internet protocol security encryption; and

FIG. **18** illustrates an uplink direction of Internet protocol security support.

In the figures, like reference numbers generally indicate identical, functionally similar, and/or structurally similar elements. The figure in which an element first appears is indicated by the leftmost digit(s) in the reference number.

## DETAILED DESCRIPTION OF THE INVENTION

### I. An Example Environment

The present invention is described in terms of an example environment. The example environment uses a fixed wireless point-to-multi-point (PtMP) connection to transmit packetized data information including for example, IP telephony, video, data, received from a telecommunications carrier. As used herein, a telecommunications carrier can include US domestic entities (see Definitions below at section II) such as, e.g., ILECs, CLECs, IXCs, NGTs and Enhanced Service Providers (ESPs), as well as global entities such as PTTs and NEs, recognized by those skilled in the art. In addition, as used herein a telecommunications system includes domestic systems used by entities such as, e.g., ILECs, CLECs, IXCs and Enhanced Service Providers (ESPs), as well as global systems recognized by those skilled in the art.

In the preferred embodiment, the traffic arrives from a wide area network (WAN) connection.

Data traffic is received from a data network through a network router and can be demodulated from internet protocol (IP) format to, for example, the point-to-point protocol (PPP). Network routers can include, for example, a general purpose computer, such as the SUN workstation running routing software or a dedicated routing device such as various models from CISCO of San Jose, Calif., ASCEND of Alameda, Calif., NETOPIA of Alameda, Calif., or 3COM of Santa Clara, Calif.

In the alternative, a virtual private networking protocol, such as the point-to-point tunneling protocol (PPTP), can be used to create a "tunnel" between a remote user and a corporate data network. A tunnel permits a network administrator

Ericsson Ex. 1001, pg 47

US 7,496,674 B2

**7**

to extend a virtual private network from a server (e.g., a Windows NT server) to a data network (e.g., the Internet).

Although the invention is described in terms of this example environment, it is important to note that description in these terms is provided for purposes of illustration only. It is not intended that the invention be limited to this example environment or to the precise inter-operations between the above-noted devices. In fact, after reading the following

**8**

description, it will become apparent to a person skilled in the relevant art how to implement the invention in alternative environments.

II. Definitions

Table 1 below defines common telecommunications terminology. These terms are used throughout the remainder of the description of the invention.

TABLE 1

| Term | Definition |
| --- | --- |
| access tandem (AT) | An AT is a class 3/4 switch used to switch calls between EOs in a LATA. An AT provides subscribers access to the IXCs, to provide long distance calling services. An access tandem is a network node. Other network nodes can include, for example, a CLEC, or other enhanced services provider (ESP), an international gateway or global point-of-presence (GPOP), or an intelligent peripheral (IP). |
| bearer (B) channels | Bearer (B) channels are digital channels used to carry both digital voice and digital data information. An ISDN bearer channel is 64,000 bits per second, which can carry PCM-digitized voice or data. |
| called party | The called party is the caller receiving a call sent over a network at the destination or termination end. |
| calling party | The calling party is the caller placing a call over any kind of network from the origination end. |
| central office (CO) | A CO is a facility that houses an EO homed. EOs are often called COs. |
| class 1 switch | A class 1 switching office, the Regional Center (RC), is the highest level of local and long distance switching, or "office of last resort" to complete a call. |
| class 3 switch | A class 3 switching office was a Primary Center (PC); an access tandem (AT) has class 3 functionality. |
| class 4 switch | A class 4 switching office was a Toll Center (TC) if operators were present or else a Toll Point (TP); an access tandem (AT) has class 4 functionality. |
| class 5 switch | A class 5 switching office is an end office (EO) or the lowest level of local and long distance switching, a local central office. The switch closest to the end subscriber. |
| competitive LEC (CLEC) | CLECs are telecommunications services providers of local services that can compete with ILECs. Interprise and Century 21 are examples. A CLEC may or may not handle IXC services as well. |
| competitive access providers (CAPS) | Teligent and Winstar are examples. |
| customer premises equipment (CPE) | CPE refers to devices residing on the premises of a customer and used to connect to a telephone network, including ordinary telephones, key telephone systems, PBXs, video conferencing devices and modems. |
| digitized data (or digital data) | Digitized data refers to analog data that has been sampled into a binary representation (i.e., comprising sequences of 0's and 1's). Digitized data is less susceptible to noise and attenuation distortions because it is more easily regenerated to reconstruct the original signal. |
| egress end office | The egress EO is the node or destination EO with a direct connection to the called party, the termination point. The called party is "homed" to the egress EO. |
| Egress | Egress refers to the connection from a called party or termination at the destination end of a network, to the serving wire center (SWC). |
| end office (EO) | An EO is a class 5 switch used to switch local calls within a LATA. Subscribers of the LEC are connected ("homed") to EOs, meaning that EOs are the last switches to which the subscribers are connected. |
| Enhanced Service Provider (ESP) | A network services provider. |
| equal access | 1+ dialing as used in US domestic calling for access to any long distance carrier as required under the terms of the modified final judgment (MFJ) requiring divestiture of the Regional Bell Operating Companies (RBOCs) from their parent company, AT&T. |
| global point of presence (GPOP) incumbent LEC (ILEC) | A GPOP refers to the location where international telecommunications facilities and domestic facilities interface, an international gateway POP. ILECs are traditional LECs in the US, which are the Regional Bell Operating Companies (RBOCs). Bell South and US West are examples. ILEC can also stand for an independent LEC such as a GTE. |
| ingress end office | The ingress EO is the node or serving wire center (SVC) with a direct connection to the calling party, the origination point. The calling party is "homed" to the ingress EO. |
| Ingress | Ingress refers to the connection from a calling party or origination. |
| integrated service digital network (ISDN) basic rate interface (BRI) line | An ISDN Basic Rate Interface (BRI) line provides 2 bearer B channels and 1 data D line (known as "2B + D" over one or two pairs) to a subscriber. |

Ericsson Ex. 1001, pg 48

US 7,496,674 B2

9                                                                                    10

TABLE 1-continued

| Term | Definition |
|------|------------|
| integrated services digital network (ISDN) | ISDN is a network that provides a standard for communications (voice, data and signaling), end-to-end digital transmission circuits, out-of-band signaling, and a features significant amount of bandwidth. |
| inter machine trunk (IMT) | An inter-machine trunk (IMT) is a circuit between two commonly-connected switches. |
| inter-exchange carrier (IXC) | IXCs are US domestic long distance telecommunications services providers. AT&T, MCI, Sprint, are examples. |
| internet protocol (IP) | IP is part of the TCP/IP protocols. It is used to recognize incoming messages, route outgoing messages, and keep track of Internet node addresses (using a number to specify a TCP/IP host on the Internet). IP corresponds to the network layer of OSI. |
| Internet service provider (ISP) | An ISP is a company that provides Internet access to subscribers. |
| ISDN primary rate interface (PRI) | An ISDN Primary Rate Interface (PRI) line provides the ISDN equivalent of a T1 circuit. The PRI delivered to a customer's premises can provide 23B + D (in North America) or 30B + D (in Europe) channels running at 1.544 megabits per second and 2.048 megabits per second, respectively. |
| local exchange carrier (LEC) | LECs are local telecommunications services providers. Bell Atlantic and US West are examples. |
| local access and transport area (LATA) | A LATA is a region in which a LEC offers services. There are over 160 LATAs of these local geographical areas within the United States. |
| local area network (LAN) | A LAN is a communications network providing connections between computers and peripheral devices (e.g., printers and modems) over a relatively short distance (e.g., within a building) under standardized control. |
| modified final judgment (MFJ) | Modified final judgment (MFJ) was the decision requiring divestiture of the Regional Bell Operating Companies (RBOCs) from their parent company, AT&T. |
| network node | A network node is a generic term for the resources in a telecommunications network, including switches, DACS, regenerators, etc. Network nodes essentially include all non-circuit (transport) devices. Other network nodes can include, for example, equipment of a CLEC, or other enhanced service provider (ESP), a point-of-presence (POP), an international gateway or global point-of-presence (GPOP). |
| new entrant (NE) | A new generation global telecommunications. |
| next generation telephone (NGT) | A new telecommunications services provider, especially IP telephony providers. Examples are Level 3 and Qwest. |
| packetized voice or voice over a backbone | One example of packetized voice is voice over internet protocol (VOIP). Voice over packet refers to the carrying of telephony or voice traffic over a data network, e.g. voice over frame, voice over ATM, voice over Internet Protocol (IP), over virtual private networks (VPNs), voice over a backbone, etc. |
| Pipe or dedicated communications facility | A pipe or dedicated communications facility connects an ISP to the internet. |
| point of presence (POP) | A POP refers to the location within a LATA where the IXC and LEC facilities interface. |
| point-to-point tunneling protocol (PPTP) | A virtual private networking protocol, point-to-point tunneling protocol (PPTP), can be used to create a "tunnel" between a remote user and a data network. A tunnel permits a network administrator to extend a virtual private network (VPN) from a server (e.g., a Windows NT server) to a data network (e.g., the Internet). |
| point-to-point (PPP) protocol | PPP is a protocol permitting a computer to establish a connection with the Internet using a modem. PPP supports high-quality graphical front ends, like Netscape. |
| postal telephone telegraph (PTT) | State regulated telephone companies, many of which are being deregulated. NTT is an example. |
| private branch exchange (PBX) | A PBX is a private switch located on the premises of a user. The user is typically a private company which desires to provide switching locally. |
| private line with a dial tone | A private line is a direct channel specifically dedicated to a customer's use between two specified points. A private line with a dial tone can connect a PBX or an ISP's access concentrator to an end office (e.g. a channelized T1 or PRI). A private line can also be known as a leased line. |
| public switched telephone network (PSTN) | The PSTN is the worldwide switched voice network. |
| regional Bell operating companies (RBOCs) | RBOCs are the Bell operating companies providing LEC services after being divested from AT&T. |
| signaling system 7 (SS7) | SS7 is a type of common channel interoffice signaling (CCIS) used widely throughout the world. The SS7 network provides the signaling functions of indicating the arrival of calls, transmitting routing and destination signals, and monitoring line and circuit status. |
| switching hierarchy or office classification | An office class is a functional ranking of a telephone central office switch depending on transmission requirements and hierarchical relationship to other switching centers. Prior to AT&T's divestiture of |

Ericsson Ex. 1001, pg 49

**A0093**

US 7,496,674 B2

11                                                    12

TABLE 1-continued

| Term | Definition |
|---|---|
| | the RBOCs, an office classification was the number assigned to offices according to their hierarchical function in the U.S. public switched network (PSTN). The following class numbers are used: class 1 = Regional Center (RC), class 2 = Sectional Center (SC), class 3 = Primary Center (PC), class 4 = Toll Center (TC) if operators are present or else Toll Point (TP), class 5 = End Office (EO) a local central office. Any one center handles traffic from one to two or more centers lower in the hierarchy. Since divestiture and with more intelligent software in switching offices, these designations have become less firm. The class 5 switch was the closest to the end subscriber. Technology has distributed technology closer to the end user, diffusing traditional definitions of network switching hierarchies and the class of switches. |
| telecommunications carrier | A LEC, a CLEC, an IXC, an Enhanced Service Provider (ESP), an intelligent peripheral (IP), an international/global point-of-presence (GPOP), i.e., any provider of telecommunications services. |
| transmission control protocol (TCP) | TCP is an end-to-end protocol that operates at the transport and sessions layers of OSI, providing delivery of data bytes between processes running in host computers via separation and sequencing of IP packets. |
| transmission control protocol/internet protocol (TCP/IP) | TCP/IP is a protocol that provides communications between interconnected networks. The TCP/IP protocol is widely used on the Internet, which is a network comprising several large networks connected by high-speed connections. |
| Trunk | A trunk connects an access tandem (AT) to an end office (EO). |
| wide area network (WAN) | A WAN is a data network that extends a LAN over the circuits of a telecommunications carrier. The carrier is typically a common carrier. A bridging switch or a router is used to connect the LAN to the WAN. |

III. Introduction

A. Quality of Service (QOS) in a Wireless Environment

The concept of quality of service (QoS) is one of the most difficult and least understood topics in data networking. Although a common term in data networking, there are many different usages and definitions for QoS, leading to confusion regarding an exact meaning in precise or quantitative terms. Even further confusion is had when attempts are made to measure or specify numeric quantities sufficient to allow comparison of equipment or network performance with respect to QoS.

The confusion about QoS in general data networking is transferred and magnified when applied to wireless data communications. Wireless transmission has a higher inherent bit error rate (BER) than does wireline transmission. The addition of, e.g., a point-to-multipoint (PtMP) topology for multiple users sharing a wireless medium makes it desirable that QoS be defined in a manner that specifically addresses the multiple complicating factors in wireless data communications.

To provide a non-ambiguous definition of QoS that applies to wireless data communications, the nature of the problem that QoS is meant to solve is helpful. Many of the problems of data communications over wireless are unique and distinct from those of wireline data communications, while some are in fact shared. For wireless broadband access systems, the problems of quality delivery are somewhat more complex than for the wireline analog. Like its wireline counterpart, the problems encountered in wireless delivery of data include, e.g., slow peripheral access, data errors, "drop-outs," unnecessary retransmissions, traffic congestion, out-of-sequence data packets, latency, and jitter. In addition to these problems, wireless delivery adds problems including, e.g., high inherent bit error rates (BERs), limited bandwidth, user contention, radio interference, and TCP traffic rate management. A QoS-aware wireless system is desired to address all these problems.

There are a number of ways in which users or subscribers to a data network experience difficulties. One network difficulty is due to a lack of network availability. Depending on the access technology being used, this can include a "modem no-answer" condition, "network busy" condition or a sudden unexpected "drop" of a network connection. These conditions would not be described as being consistent with high QoS. Once network connectivity is achieved, slow traffic caused by congestion, local access bottlenecks, and network failures can be experienced as slow web page loading, slow file transfers, or poor voice/video quality in streaming multimedia applications. Poor quality in streaming multimedia applications can instead result from high "jitter," or large and rapid variations in latency, leading to interruptions, distortion, or termination of session. Many different conditions can lead to actual data errors, which in some contexts can be catastrophic, such as in the file transfer of a spreadsheet. It is desirable that these problems of a data communications network be minimized or eliminated.

1. Quality

In data networking, quality usually implies the process of delivering data in a reliable and timely manner. What is reliable and timely is dependent on the nature of the traffic being addressed. These terms may include references to limitations in data loss, expectations of data accuracy, limitations of data latency variations (also known as jitter), and limitations of data retransmissions and limitations of data packet order inversions. Therefore, QoS is a complex concept, which can require a correspondingly complex mechanism to implement it.

QoS can be a relative term, finding different meanings for different users. A casual user doing occasional web browsing, but no file transfer protocol (FTP) file downloads or real time multimedia sessions may have different a different definition of QoS than a power user doing many FTP file downloads of large database or financial files, frequent H.323 video conferencing and IP telephony calls. Also, a user can pay a premium rate (i.e. a so-called service level agreement (SLA)) for high network availability, low latency, and low jitter, while another user can pay a low rate for occasional web surfing only, and on weekends only. Therefore, perhaps it is best to understand

Ericsson Ex. 1001, pg 50

A0094

US 7,496,674 B2

**13**

QoS as a continuum, defined by what network performance characteristic is most important to a particular user and the user's SLA. Maximizing the end-user experience is an essential component of providing wireless QoS.

2. Service

In data networking, a service can be defined as a type of connection from one end of a network to another. Formerly, this could have been further defined to be protocol specific, such as, e.g., IBM's systems network architecture (SNA), Novell's IPX, Digital's DECnet. However, it appears that TCP/IP (i.e. including user datagram protocol(UDP)) has evolved to become the overwhelming protocol of choice, and will continue to be in the foreseeable future. Therefore, service can be defined to be a particular type of TCP/IP connection or transmission. Such service types might include, e.g., FTP file transfers, e-mail traffic, hypertext transfer protocol (HTTP) traffic, H.323 videoconferencing sessions. It is desirable that a QoS mechanism deal with these differing types of service, in addition to dealing with the different types of quality as discussed previously.

3. QOS as a Mechanism

QoS can be thought of as a mechanism to selectively allocate scarce networking, transmission and communications resources to differentiated classes of network traffic with appropriate levels of priority. Ideally, the nature of the data traffic, the demands of the users, the conditions of the network, and the characteristics of the traffic sources and destinations all modify how the QoS mechanism is operating at any given instant. Ultimately, however, it is desirable that the QoS mechanism operate in a manner that provides the user with optimal service, in whatever manner the user defines it.

a. Circuit-Switched QoS

In legacy networks created primarily for voice traffic by telephone companies, data transmission was accomplished with reference to a circuit-centric definition of QoS. In this definition, QoS implied the ability to carry asynchronous (i.e. transmission of data through start and stop sequences without the use of a common clock) as well as isochronous (i.e. consistent timed access of network bandwidth for time-sensitive voice and video) traffic. Circuit-switched QoS was accomplished by dedicating an end-to-end circuit for each connection or service, whether it was voice (see FIG. 1A) or data. The circuit-centric QoS mechanism was simply the provision of this circuit for exclusive use by the user. Of course, this approach dedicates the circuit, all transmission channels associated with the circuit, and the transport media itself to a single user for the entire duration of the session, regardless of whether data is actually being transmitted every instant of the session. It was generally believed that only in this manner could true QoS be achieved. Therefore, traditional designs for wireless broadband access systems (see FIG. 2A) also used this approach, dedicating a wireless radio channel to each particular data connection, regardless of the application or whether indeed any data was being transmitted at any given moment. This circuit-centric approach to QoS is fairly expensive, in terms of the cost of the equipment, and the utilization factors for the transmission media itself.

b. Asynchronous Transfer Mode (ATM) QoS

With ATM networking, telephone companies could continue to provide a circuit-centric QoS mechanism with the establishment of permanent virtual connections (PVCs) (i.e. a virtual path or channel connection (VPC or VCC) provisioned for indefinite use) and switched virtual connections (SVCs) (i.e. a logical connection between endpoints established by an ATM network on demand based upon signaling messages received from the end user or another network) in an analogous manner to the legacy voice circuit mechanism.

**14**

However, several new concepts were needed, including admission policy, traffic shaping, and mechanisms such as, e.g., leaky-buckets, in order to handle traffic that was now categorized as variable bit rate (VBR), constant bit rate (CBR), and unspecified bit rate (UBR).

Virtual circuits were to be established for data transmission sessions, again regardless of the data application or whether data was being transmitted at any given moment. Although ATM provides QoS for broadband network traffic, the underlying assumptions of ATM design include the low BER characteristic of wireline networks, not the high BER of the wireless medium. Without a recognition of the characteristics of the traffic that is being carried by the ATM mechanism and the high inherent BER of wireless, true QoS can not be provided. ATM QoS mechanisms do not address the unique challenges associated with wireless communication.

c. Packet-Switched QoS

Packet-switching is revolutionizing data communications, so conventional circuit-switch and ATM networking concepts and their legacy QoS mechanisms are in need of update. With packet-switched data communications, one cannot dedicate a circuit to a particular data communications session. Indeed, a strength of packet-switching lies in route flexibility and parallelism of its corresponding physical network. Therefore, the QoS mechanism cannot work in the same manner as the legacy circuit-centric QoS mechanism did.

Simply providing "adequate" bandwidth is not a sufficient QoS mechanism for packet-switched networks, and certainly not for wireless broadband access systems. Although some IP-flows are "bandwidth-sensitive," other flows are latency-and/or jitter-sensitive. Real time or multimedia flows and applications cannot be guaranteed timely behavior by simply providing excessive bandwidth, even if it were not cost-prohibitive to do so. It is desirable that QoS mechanisms for an IP-centric wireless broadband access system recognize the detailed flow-by-flow requirements of the traffic, and allocate system and media resources necessary to deliver these flows in an optimal manner.

d. Summary—QoS Mechanisms

Ultimately, the end-user experience is the final arbiter of QoS. It is desirable that an IP-centric wireless broadband access system assign and regulate system and media resources in a manner that can maximize the end-user experience. For some applications such as an initial screen of a Web page download, data transmission speed is the best measure of QoS. For other applications, such as the download or upload of a spreadsheet, the best measure of QoS can be the minimization of transmission error. For some applications, the best measure of QoS can be the optimization of both speed and error. For some applications, the timely delivery of packets can be the best measure of QoS. It is important to note that fast data transmission may not be the same as timely delivery of packets. For instance, data packets that are already "too old" can be transmitted rapidly, but by being too old can be of no use to the user. The nature of the data application itself and the desired end-user experience then can provide the most reliable criteria for the QoS mechanism. It is desired that an IP-centric wireless broadband access system provide a QoS mechanism that can dynamically optimize system behavior to each particular IP flow, and can also adapt to changes with changing network load, congestion and error rates.

4. Service Guarantees and Service Level Agreements (SLAs)

Service guarantees can be made and service level agreements (SLAs) can be entered into between a telecommunications service provider and a subscriber whereby a specified level of network availability can be described, and access

Ericsson Ex. 1001, pg 51

**A0095**

US 7,496,674 B2

**15**

charges can be based upon the specified level. Unfortunately, it is difficult to quantify the degree of network availability at any given time, and therefore this becomes a rather crude measure of service performance. It is desired that data delivery rate, error rate, retransmissions, latency, and jitter be used as measures of network availability, but measuring these quantities on a real-time basis can be beyond the capability of conventional network service providers (NSPs).

Another level of service discrimination desired by network service providers is a service level agreement (SLA) that provides for differing traffic rates, network availability, bandwidth, error rate, latency and jitter guarantees. It is desired that an IP-centric wireless broadband access system be provided that can provide for SLAs, enabling service providers to have more opportunities for service differentiation and profitability.

5. Class of Service and Quality of Service

In order to implement a practical QoS mechanism, it is desired that a system be able to differentiate between types of traffic or service types so that differing levels of system resources can be allocated to these types. It is customary to speak of "classes of service" as a means of grouping traffic types that can receive similar treatment or allocation of system and media resources.

Currently, there are several methods that can be used in wireline network devices to implement differentiated service classes. Example methods include traffic shaping, admission control, IP precedence, and differential congestion management. It is desired that an IP-centric wireless broadband access system use all of these methods to differentiate traffic into classes of service, to map these classes of service against a QoS matrix, and thereby to simplify the operation and administration of the QoS mechanism.

B. QoS and IP-Centric Wireless Environment

In a point-to-multipoint (PtMP) wireless system like the present invention, it is desirable that the QoS mechanism cope not only with wireline networking considerations, but also with considerations particular to the wireless environment. As stated earlier, it is desired that the inherent BER of wireless be handled. The high BER can require that error detection, correction, and re-transmission be done in an efficient manner. It is desired that a BER handling mechanism also work efficiently with the re-transmission algorithms of TCP/IP so as to not cause further unnecessary degradation of bandwidth utilization. An additional challenge of wireless is contention among users for limited wireless bandwidth. It is desirable that the system handle service requests from multiple users in a radio medium subject to interference and noise, which can make efficient allocation of radio bandwidth difficult.

As discussed above, the change from circuit-switched and ATM data networks to packet-switched data networks has impacted the definition of QoS mechanisms. The present invention provides a novel QoS mechanism in a point-to-multi-point IP-centric wireless system for packet-switched network traffic. In order for the system to provide optimal QoS performance, it is desirable that it include a novel approach to QoS mechanisms. The use of QoS as the underlying guide to system architecture and design constitutes an important, substantial and advantageous difference of the IP-centric wireless broadband access system of the present invention over existing wireless broadband access systems designed with traditional circuit-centric or ATM cell circuit-centric approaches such as those used by Teligent and Winstar.

**16**

C. IP-Centric Wireless Broadband Access QoS and Queuing Disciplines

1. Managing Queues

Queuing is a commonly accepted tool required for manipulating data communications flows. In order for packet headers to be examined or modified, for routing decisions to made, or for data flows to be output on appropriate ports, it is desirable that data packets be queued. However, queuing introduces, by definition, a delay in the traffic streams that can be detrimental, and can even totally defeat the intent of queuing. Excessive queuing can have detrimental effects on traffic by delaying time sensitive packets beyond their useful time frames, or by increasing the RTT (Round Trip Time), producing unacceptable jitter or even causing the time-out of data transport mechanisms. Therefore, it is desired that queuing be used intelligently and sparingly, without introducing undue delay in delay-sensitive traffic such as real-time sessions.

In a wireless environment where time division multiple access (TDMA), forward error detection (FEC), and other such techniques can be necessary, it is desirable that queuing be used merely to enable packet and radio frame processing. However, in the case of real-time flows, the overall added delay in real-time traffic can preferably be held to below approximately 20 milliseconds.

The use of queue management as the primary QoS mechanism in providing QoS-based differentiated services is a simple and straight forward method for wireless broadband systems. However, wireless systems are usually more bandwidth constrained and therefore more sensitive to delay than their wireline counterparts. For this reason, it is desirable that QoS-based differentiated services be provided with mechanisms that go beyond what simple queuing can do. However, some queuing can still be required, and the different queuing methods are now discussed.

2. First in, First out (FIFO) Queuing

First in, first out (FIFO) queuing can be used in wireless systems, like wireline systems, in buffering data packets when the downstream data channel becomes temporarily congested. If temporary congestion is caused by bursty traffic, a FIFO queue of reasonable depth can be used to smooth the flow of data into the congested communications segment. However, if the congestion becomes severe in extent, or relatively long in duration, FIFO can lead to the discarding of packets as the FIFO queues are filled to capacity and the network is not capable of accepting additional packets causing discarding of packets, i.e. so-called "packet-tossing." Although this can have a detrimental effect on QoS in and of itself, the discarding of packets may cause future problems with traffic flow as the TCP protocol causes the retransmission of lost packets in the proper sequence, further exacerbating the problem. The problem of packet discards can be minimized by increasing the size of the FIFO buffers so that more time can pass before discards occur. Unfortunately, eventually the FIFO can become large enough that packets can become too old and the round-trip time (RTT) can increase to the point that the packets are useless, and the data connection is virtually lost.

In a wireless broadband environment, the requirement for FIFO queuing is partially dependent upon the type of RF access method being used. For time division multiple access/time division duplex (TDMA/TDD), it can be desirable that data be queued even for collecting enough data for the construction of data frames for transmission. Frequency division multiple access (FDMA) and code-division multiple access (CDMA) are not as "sequential" in nature as TDMA, and therefore have less of a requirement for FIFO queuing. However, generally for all wireless access techniques, noise and

Ericsson Ex. 1001, pg 52

**A0096**

interference are factors that can lead to retransmissions, and therefore further delays and consequent adverse effect on QoS.

Using FIFO queuing, shared wireless broadband systems can uniformly delay all traffic. This can seem to be the "fairest" method, but it is not necessarily the best method if the goal is to provide high QoS to users. By using different types of queue management, a much better base of overall QoS can be achieved.

3. Priority Queuing

The shared wireless broadband environment can include a constricted bandwidth segment as data is transmitted over the RF medium. Therefore, regardless of access technique, these systems can require some amount of queuing. However, using FIFO queuing can result in a constant delay to all traffic, regardless of the priority or type of traffic. Most data communications environments can consist of a mixture of traffic, with combinations of real time interactive data, file and data downloads, web page access, etc. Some of these types of traffic are more sensitive to delay, and jitter, than others. Priority queuing simply reorders data packets in the queue based on their relative priorities and types, so that data from more latency- and jitter-sensitive traffic can be moved to the front of the queue.

Unfortunately, if there is downlink data channel congestion, or congestion caused by an overabundance of high priority traffic, the condition of "buffer starvation" can occur. Because of the relative volume of high priority packets consuming a majority of buffer space, little room is left for lower priority packets. These lower priority packets can experience significant delays while system resources are devoted to the high priority packets. In addition to low priority packets being held in buffers for long periods of time, or never reaching the buffers, resulting in significantly delayed data flows for these packets, the actual applications corresponding to these low priority packets can also be disrupted, and stop working. Because of the nature of this queuing approach, overall latency and jitter and RTT for lower priority packets can be unpredictable, having an adverse effect on QoS.

If queue sizes are small, reordering data within the queues can have little beneficial effect on the QoS. In fact, processing required to examine packet headers in order to obtain the information necessary to reorder the queues may itself add significant delay to the data stream. Therefore, particularly for wireless broadband data environments, priority queuing can be not much better than FIFO queuing as a QoS mechanism.

4. Classed Based Queuing

By allocating queue space and system resources to packets based on the class of the packets, buffer starvation can be avoided. Each class can be defined to include of data flows with certain similar priorities and types. All classes can be given a certain minimum level of service so that one high priority data flow cannot monopolize all system resources. With the classification approach, because no data flow is ever completely shut off, the source application can receive information about the traffic rate, and can be able to provide TCP-mediated transmission rate adjustment supporting smooth traffic flow.

Although this approach can work better than FIFO queuing in wireless broadband systems, latency and jitter sensitive flows can still be adversely affected by high priority flows of large volume.

5. Weighted Fair Queuing

A weighted fair queuing method can attempt to provide low-volume flows with guaranteed queuing resources, and can then allow remaining flows, regardless of volume or priority, to have equal amounts of resource. Although this can prevent buffer starvation, and can lead to somewhat better latency and jitter performance, it can be difficult to attain stable performance in the face of rapidly changing RF downlink channel bandwidth availability.

Providing a high quality of service can require a QoS mechanism that is more sophisticated than simple queue management.

D. IP-Centric Wireless Broadband Access QoS and TCP/IP

1. TCP/IP

The TCP/IP protocol stack has become the standard method of transmitting data over the Internet, and increasingly it is becoming a standard in virtual private networks (VPNs). The TCP/IP protocol stack includes not only internet protocol (IP), but also transmission control protocol (TCP), user datagram protocol (UDP), and internet control message protocol (ICMP). By assuming that the TCP/IP protocol stack is the standard network protocol for data communications, the creation of a set of optimal QoS mechanisms for the wireless broadband data environment is more manageable. QoS mechanisms can be created that can span the entire extent of the network, including both the wireline and the wireless portions of the network. These mechanisms can integrate in a smooth and transparent manner with TCP rate control mechanisms and provide end-to-end QoS mechanisms that are adaptive to both the wireline and wireless portions of the network. Of course, segments of the wireline network that are congested or are experiencing other transport problems cannot be solved by a wireless QoS mechanism. However, a wireless QoS mechanism can optimize data flows in a manner that can enhance the end user experience when there is no severe wireline network congestion or bottleneck present.

2. Differentiation by Class

Data traffic can be handled based on classes of service, as discussed above. To differentiate traffic by class, data traffic (or a sequence of data packets associated with a particular application, function, or purpose) can be classified into one of several classes of service. Differentiation can be done on the basis of some identifiable information contained in packet headers. One method can include analyzing several items in, e.g., an IP packet header, which can serve to uniquely identify and associate the packet and other packets from that packet flow with a particular application, function or purpose. As a minimum, a source IP address, a source TCP or UDP port, a destination IP address, and a destination IP or UDP port can serve to associate packets into a common flow, i.e. can be used to classify the packets into a class of service.

By creating a finite and manageable number of discrete classes of service, multiple IP flows can be consolidated and handled with a given set of QoS parameters by the QoS mechanisms. These classes can be defined to provide common and useful characteristics for optimal management in the combined wireline and wireless network segments.

3. Per-Flow Differentiation

A finite and discrete set of classes of service, can enable QoS mechanisms to be less compute-intensive, to use less memory, fewer state machines, and therefore have better scaleability than having individual QoS mechanisms (or sets of parameters) for each individual IP flow. However, in a network access device such as, e.g., a point to multi-point (PtMP) wireless broadband access system, the total number of simultaneous IP flows typically will not exceed the range of 1000, and therefore the amount of processing overhead that could be required could permit a per-flow QoS differentiation without resorting to classes of service. However, class of

US 7,496,674 B2

| 19 | 20 |

service consolidation of IP flows provides advantages related to marketing, billing and administration.

Prior to the present invention, per-flow differentiation has not been used in a wireless environment (including radio frequencies transmitted over coaxial cables and satellite communications).

4. Using IP Precedence for Class of Service

IP precedence bits in a type of service (IP TOS) field, as described in Internet Engineering Task Force (IETF) 1992b, can theoretically be used as a means to sort IP flows into classes of service. IETF RFC1349 proposed a set of 4-bit definitions with 5 different meanings: minimize delay; maximize throughput; maximize reliability; minimize monetary cost; and normal service.

These definitions could add significantly to networks, routers and access devices in differentiating different types of flow so that resources could be appropriately allocated, resulting in improved QoS. However, the proposal has not been widely used. Several proposals in the IETF could make use of this field, along with resource reservation protocol (RSVP), to improve network handling of packets.

Although the type of service (TOS) field has been an integral component of the TCP/IP specification for many years, the field is not commonly used. Absent appropriate bits in the field being set by a source processor, the access devices, the network and network routers cannot implement QoS mechanisms.

5. TCP-Mediated Transmission Rate Mechanisms

The manner in which TCP governs transmission rate can be incorporated and managed by an IP-centric wireless QoS mechanism. If a TCP mechanism is not managed, any wireless QoS mechanism can be overwhelmed or countered by wireless bandwidth factors. Before addressing the specific wireless factors that can impact TCP transmission speed, a review of TCP transmission rate mechanism is needed.

TCP can control transmission rate by "sensing" when packet loss occurs. Because TCP/IP was created primarily for wireline environment with its extremely low inherent BER, such as those found over fiber optic lines, any packet loss is assumed by TCP to be due to network congestion, not loss through bit error. Therefore, TCP assumes that the transmission rate exceeded the capacity of the network, and responds by slowing the rate of transmission. However, packet loss in the wireless link segment is due primarily to inherently high BER, not congestion. The difference turns out to be not insubstantial.

TCP can initially cause the transmission rate to ramp-up at the beginning of a packet flow, and is called slow-start mode. The rate can be continuously increased until there is a loss or time-out of the packet-receipt acknowledgment message. TCP can then "back-off, can decrease the transmission window size, and then can retransmit lost packets in the proper order at a significantly slower rate. TCP can then slowly increase the transmission rate in a linear fashion, which can be called congestion-avoidance mode.

If multiple users share a wireless radio link as with the present invention, the inherently high BER of the medium could potentially cause frequent packet loss leading to unproductive TCP retransmission in congestion avoidance mode. Because wireless bandwidth can be a precious commodity, a IP-centric wireless QoS mechanism preferably provides for packet retransmission without invoking TCP retransmission and consequent and unnecessary "whipsawing" of the transmission rate. This, along with several other factors, makes desirable creation of an IP-centric wireless media access control (MAC) layer. One function of an IP-centric MAC layer can be to mediate local retransmission of lost packets without

signaling TCP and unnecessarily altering the TCP transmission speed. A primary task of the IP-centric wireless MAC layer is to provide for shared access to the wireless medium in an orderly and efficient manner. The MAC layer according to the present invention, Proactive Reservation-based Intelligent Multimedia-aware Media Access (PRIMMA) layer, available from Malibu Networks Inc., of Calabasas, Calif., can also schedule all packet transmissions across the wireless medium on the basis of, e.g., IP flow type, service level agreements (SLAs), and QoS considerations.

6. TCP Congestion Avoidance in an IP-Centric Wireless System

a. Network Congestion Collapse, Global Synchronization and IP-Centric Wireless TCP Congestion Avoidance

The inherently high bit error rate (BER) of wireless transmission can make an occurrence of problems known as congestion collapse or global synchronization collapse more likely than in a wireline environment. When multiple TCP senders simultaneously detect congestion because of packet loss, the TCP senders can all go into TCP slow start mode by shrinking their transmission window sizes and by pausing momentarily. The multiple senders can then all attempt to retransmit the lost packets simultaneously. Because they can all start transmitting again in rough synchrony, a possibility of creating congestion can arise, and the cycle can start all over again.

In the wireless environment, an occurrence of burst noise can cause packet loss from many IP streams simultaneously. The TCP transmission rate mechanisms of the TCP senders can assume that packet loss was due to congestion, and they can all back-off in synchrony. When the TCP senders restart, the senders can restart in rough synchrony, and indeed can now create real congestion in the wireless link segment. This cyclical behavior can continue for some time, and can possibly cause unpredictable system performance. This can be due in part to overflowing system queues which can cause more packets to be dropped and can cause more unproductive retransmissions. This can degenerate into a "race" state that could take many minutes before re-establishing stability; this can have an obvious negative impact on QoS.

In the wireline world, random early detection (RED) can be used to circumvent global synchronization. By randomly selecting packets from randomly selected packet flows before congestion collapse occurs, global synchronization can be avoided. Queues can be monitored, and when queue depth exceeds a preset limit, RED can be activated, activating asynchronously the TCP senders' transmission rate controllers. This can avoid the initial congestion which would otherwise result in collapse and then global synchronization.

Instead of purely random packet discards, the packets to be discarded can be done with consideration to packet priority or type. While still random, the probability of discard for a given flow can be a function of the by packet priority or type. In a wireless system, weighted random early detection (WRED) can be used without the concern of retransmission and TCP rate reset by preferentially selecting UDP packets of real time IP flows such as streaming audio, and H.323 flows with a more critical packet Time-to-Live parameter. These IP flows are more sensitive to latency and jitter, and less sensitive to packet loss.

In the wireless environment, with an appropriately designed MAC layer, packet loss due to BER that might otherwise trigger congestion collapse and global synchronization can best be managed with local retransmission of lost packets according to the present invention and without RED and the unnecessary retransmission of packets by the TCP sender and the resulting reset of TCP transmission rate. The

Ericsson Ex. 1001, pg 54

US 7,496,674 B2

**21**

IP-centric wireless system separately manages the TCP transmission window of the TCP sender remotely by transmitting a packet receipt-acknowledgment before the TCP sender detects a lost packet and initiates retransmission along with an unnecessary reset of the transmission rate. This IP-centric wireless system TCP transmission window manager communicates with the MAC layer in order to be aware of the status of all packets transmitted over the wireless medium.

b. The Effect of Fractal Self-Similar Network Traffic Characteristics vs. Poisson Distributions on Network Congestion

Conventionally, it has been believed that network traffic can be modeled with a Poisson distribution. Using this distribution leads to the conclusion, through system simulations, that the sum of thousands of individual traffic flows with Poisson distributions results in a uniform overall network traffic distribution. In other words, the overall network can "average-out" the burstiness of individual traffic flows. Using this model, network congestion behavior, burst behavior, and dynamic traffic characteristics have been used to create conventional congestion avoidance strategies, design queue buffer sizes in network devices, and traffic and capacity limitation predictions.

More recent studies have demonstrated that TCP/IP-based traffic causes networks to behave in a fractal, or self-similar fashion. With this model, when the burstiness of individual traffic flows is summed for the entire network, the entire network becomes bursty. The bursty nature of network traffic flow is seen over all time scales and flow scales of the network. This has huge implications both in design of an IP-centric wireless broadband system according to the present invention, and in the design of congestion avoidance strategies in the network as a whole. With this new perspective on network behavior, it has become clear that network routers, switches and transmission facilities in many cases have been "under-engineered." This under-engineering has led to a further exacerbation of the congestion behavior of the network.

The implications for IP-centric wireless system architecture and design range from queue buffer capacity to local congestion avoidance strategies. Because wireless systems have the added burden of a high inherent BER, the effect of network-wide congestion behavior on local (wireless media channel) congestion avoidance strategies must be properly gauged and countered. For this reason, it is desirable that congestion avoidance algorithms of the IP-centric wireless system be crafted to optimize traffic flow with new mathematical and engineering considerations that until very recently were not apparent or available to system designers.

With these considerations in mind, IP-centric wireless system design cannot be done with the conventional wireline system design approaches without resulting in very low system performance characteristics. With traditional design approaches of a circuit-centric wireless system, bandwidth utilization, real time multimedia quality, and overall system QoS provide for a dramatically lower end-user experience.

7. Application-Specific Flow Control in an IP-Centric Wireless System

With a range of data flows, each having different bandwidth, latency and jitter requirements, for the achievement of high QoS as perceived by the end user, it is desirable that the IP-centric wireless system be able to manage QoS mechanism parameters over a wide range, and in real time. The QoS mechanism must be able to alter system behavior to the extent that one or more data flows corresponding to specific applications be switched on and off from appropriate end users in a transparent manner. This approach is in contrast to other QoS mechanisms that seek to achieve high QoS by establishing circuit-centric connections from end to end without

**22**

regard for an underlying application's actual QoS requirements. By using the present invention, providing a QoS mechanism that is application-specific rather than circuit-specific, scarce wireless bandwidth can be conserved and dynamically allocated where needed by the QoS mechanisms associated with each application type.

B. QoS and IP-Centric Wireless Media Access Control

1. Proactive Reservation-Based Intelligent Multimedia-Aware Media Access (PRIMMA) MAC Layer

The present invention's proactive reservation-based intelligent multimedia-aware media access (PRIMMA) media access control (MAC) layer provides an application switching function of the IP-centric wireless QoS mechanism. Once the nature and QoS requirements of each IP stream are determined by other portions of the system, this information is communicated to the PRIMMA MAC layer so that the IP flows of each application can be switched to appropriate destinations in a proper priority order.

2. PRIMMA IP Protocol Stack Vertical Signaling

For IP streams that originate from a local user's CPE, application-level information about the nature of the application can be used by the system to assign appropriate QoS mechanism parameters to the IP stream. For IP streams that originate from a non-local host, information about the IP streams for use in configuring the appropriate QoS mechanism parameters can be extracted from packet headers. The information about the IP streams is communicated "vertically" in the protocol stack model from the application layer (i.e. OSI level 7) to the PRIMMA MAC layer (i.e. OSI level 2) for bandwidth reservation and application switching purposes. Although this violates the conventional practice of providing isolation and independence to each layer of the protocol stack, thereby somewhat limiting the degree of interchangeability for individual layers of the stack, the advantages far outweigh the negatives in an IP-centric wireless broadband access system.

3. PRIMMA IP Flow Control and Application Switching

Based on a specific set of QoS requirements of each IP application flow in the IP-centric wireless system, applications are switched in a "proactive" manner by appropriate reservations of bandwidth over the wireless medium. The wireless transmission frames in each direction are constructed in a manner dictated by the individual QoS requirements of each IP flow. By using QoS requirements to build the wireless transmission frames, optimal QoS performance can result over the entire range of applications being handled by the system. For example, latency and jitter sensitive IP telephony, other H.323 compliant IP streams, and real-time audio and video streams can be given a higher priority for optimal placement in the wireless transmission frames. On the other hand, hypertext transport protocol (HTTP) traffic, such as, e.g., initial web page transmissions, can be given higher bandwidth reservation priorities for that particular application task. Other traffic without latency, jitter, or bandwidth requirements such as, e.g., file transfer protocol (FTP) file downloads, email transmissions, can be assigned a lower priority for system resources and placement in the wireless transmission frame.

4. PRIMMA TCP Transmission Rate Agent

Wireless end users are separated from a high speed, low BER wireline backbone by a lower speed, high BER wireless segment which can be subject to burst error events. TCP/IP traffic that traverses the wireless segment can experience frequent packet loss that, without intervention, can create congestion collapse and global synchronization as previously discussed. Therefore, it is desirable that the present inven-

Ericsson Ex. 1001, pg 55

**A0099**

**23**

tion's IP-centric wireless system make use of a TCP transmission rate agent that can monitor packet loss over the wireless segment, and can manage the remote TCP transmission rate function by recreating and transmitting any lost packet acknowledgments. The PRIMMA MAC layer can itself retransmit any lost packets over the wireless medium.

The IP-centric wireless TCP transmission rate agent or "adjunct" can also flow-control the IP streams when necessary, and in accordance with the QoS requirements of the IP flows. All IP-centric wireless TCP transmission rate agent functionality can be transparent to both local and remote hosts and applications.

F. Telecommunications Networks

1. Voice Network

a. Simple Voice Network

FIG. 1A is a block diagram providing an overview of a standard telecommunications network **100** providing local exchange carrier (LEC) services within one or more local access and transport areas (LATAs). Telecommunications network **100** can provide a switched voice connection from a calling party **102** to a called party **110**. FIG. 1A is shown to also include a private branch exchange **112** which can provide multiple users access to LEC services by, e.g., a private line. Calling party **102** and called party **110** can be ordinary telephone equipment, key telephone systems, a private branch exchange (PBX) **112**, or applications running on a host computer. Network **100** can be used for modem access as a data connection from calling party **102** to, for example, an Internet service provider (ISP) (not shown). Network **100** can also be used for access to, e.g., a private data network. For example, calling party **102** can be an employee working on a notebook computer at a remote location who is accessing his employer's private data network through, for example, a dial-up modem connection.

FIG. 1A includes end offices (EOs) **104** and **108**. EO **104** is called an ingress EO because it provides a connection from calling party **102** to public switched telephone network (PSTN) facilities. EO **108** is called an egress EO because it provides a connection from the PSTN facilities to a called party **110**. In addition to ingress EO **104** and egress EO **108**, the PSTN facilities associated with telecommunications network **100** include an access tandem (AT) (not shown) at points of presence (POPs) **132** and **134** that can provide access to, e.g., one or more inter-exchange carriers (IXCs) **106** for long distance traffic, see FIG. **2A**. Alternatively, it would be apparent to a person having ordinary skill in the art that IXC **106** could also be, for example, a CLEC, or other enhanced service provider (ESP), an international gateway or global point-of-presence (GPOP), or an intelligent peripheral (IP).

FIG. 1A also includes a private branch exchange (PBX) **112** coupled to EO **104**. PBX **112** couples calling parties **124** and **126**, fax **116**, client computer **118** and associated modem **130**, and local area network **128** having client computer **120** and server computer **122** coupled via an associated modem **130**. PBX **112** is a specific example of a general class of telecommunications devices located at a subscriber site, commonly referred to as customer premises equipment (CPE).

Network **100** also includes a common channel interactive signaling (CCIS) network for call setup and call tear down. Specifically, FIG. **1** includes a Signaling System 7 (SS7) signaling network **114**. Signaling network **114** will be described further below with reference to FIG. **2B**.

b. Detailed Voice Network

FIG. **2A** is a block diagram illustrating an overview of a standard telecommunications network **200**, providing both

**24**

LEC and IXC carrier services between subscribers located in different LATAs. Telecommunications network **200** is a more detailed version of telecommunications network **100**. Calling party **102***a* and called party **110***a* are coupled to EO switches **104***a* and **108***a*, respectively. In other words, calling party **102***a* is homed to ingress EO **104***a* in a first LATA, whereas called party **110***a* is homed to an egress EO **108***a* in a second LATA. Calls between subscribers in different LATAs are long distance calls that are typically routed to IXCs. Sample IXCs in the United States include AT&T, MCI and Sprint.

Telecommunications network **200** includes access tandems (AT) **206** and **208**. AT **206** provides connection to points of presence (POPs) **132***a*, **132***b*, **132***c* and **132***d*. IXCs **106***a*, **106***b* and **106***c* provide connection between POPs **132***a*, **132***b* and **132***c* (in the first LATA) and POPs **134***a*, **134***b* and **134***c* (in the second LATA). Competitive local exchange carrier (CLEC) **214** provides an alternative connection between POP **132***d* and POP **134***d*. POPs **134***a*, **134***b*, **134***c* and **134***d*, in turn, are connected to AT **208**, which provides connection to egress EO **108***a*. Called party **110***a* can receive calls from EO **108***a*, which is its homed EO.

Alternatively, it would be apparent to a person having ordinary skill in the art that an AT **206** can also be, for example, a CLEC, or other enhanced service provider (ESP), an international gateway or global point-of-presence (GPOP), or an intelligent peripheral.

Network **200** also includes calling party **102***c* homed to CLEC switch **104***c*. Following the 1996 Telecommunications Act in the U.S., CLECs gained permission to compete for access within the local RBOCs territory. RBOCs are now referred to as incumbent local exchange carriers (ILECs).

i. Fixed Wireless CLECs

Network **200** further includes a fixed wireless CLEC **209**. Example fixed wireless CLECs are Teligent Inc., of Vienna, Va., WinStar Communications Inc., Advanced Radio Telecom Corp. And the BizTel unit of Teleport Communications Group Inc. Fixed wireless CLEC **209** includes a wireless transceiver/receiver radio frequency (RF) tower **210** in communication over an RF link to a subscriber transceiver RF tower **212**. Subscriber RF tower **212** is depicted coupled to a CPE box, PBX **112***b*. PBX **112***b* couples calling parties **124***b* and **126***b*, fax **116***b*, client computer **118***b* and associated modem **130***b*, and local area network **128***b* having client computer **120***b* and server computer **122***b* coupled via an associated modem **130***b*.

Network **200** also includes called party **110***a*, a fax **116***a*, client computer **118***a* and associated modem **130***a*, and cellular communications RF tower **202** and associated cellular subscriber called party **204**, all coupled to EO **108***a*, as shown.

EO **104***a*, **108***a* and AT **206**, **208** are part of a switching hierarchy. EO **104***a* is known as a class 5 office and AT **208** is a class 3/4 office switch. Prior to the divestiture of the regional Bell Operating Companies (RBOCs) from AT&T under the modified final judgment, an office classification was the number assigned to offices according to their hierarchical function in the U.S. public switched network (PSTN). An office class is a functional ranking of a telephone central office switch depending on transmission requirements and hierarchical relationship to other switching centers. A class 1 office was known as a Regional Center (RC), the highest level office, or the "office of last resort" to complete a call. A class 2 office was known as a Sectional Center (SC). A class 3 office was known as a Primary Center (PC). A class 4 office was known as either a Toll Center (TC) if operators were present,

Ericsson Ex. 1001, pg 56

**A0100**

US 7,496,674 B2

**25**

or otherwise as a Toll Point (TP). A class 5 office was an End Office (EO), i.e., a local central office, the lowest level for local and long distance switching, and was the closest to the end subscriber. Any one center handles traffic from one or more centers lower in the hierarchy. Since divestiture and with more intelligent software in switching offices, these designations have become less firm. Technology has distributed functionality closer to the end user, diffusing traditional definitions of network hierarchies and the class of switches.

ii. Connectivity to Internet Service Providers (ISPs)

In addition to providing a voice connection from calling party **102a** to called party **110a**, the PSTN can provide calling party **102a** a data connection to an ISP (i.e. similar to client **118b**).

Network **200** can also include an Internet service provider (ISP) (not shown) which could include a server computer **122** coupled to a data network **142** as will be discussed further below with reference to FIG. **1B**. The Internet is a well-known, worldwide network comprising several large networks connected together by data links. These links can include, for example, Integrated Digital Services Network (ISDN), T1, T3, FDDI and SONET links. Alternatively, an internet can be a private network interconnecting a plurality of LANs and/or WANs, such as, for example, an intranet. An ISP can provide Internet access services for subscribers such as client **118b**.

To establish a connection with an ISP, client **118b** can use a host computer connected to a modem (modulator/demodulator) **130b**. The modem can modulate data from the host computer into a form (traditionally an analog form) for transmission to the LEC facilities. Typically, the LEC facilities convert the incoming analog signal into a digital form. In one embodiment, the data is converted into the point-to-point protocol (PPP) format. (PPP is a well-known protocol that permits a computer to establish a connection with the Internet using a standard modem. It supports high-quality, graphical user-interfaces.) As those skilled in the art will recognize, other formats are available, including, e.g., a transmission control program, internet protocol (TCP/IP) packet format, a user datagram protocol, internet protocol (UDP/IP) packet format, an asynchronous transfer mode (ATM) cell packet format, a serial line interface protocol (SLIP) protocol format, a point-to-point (PPP) protocol format, a point-to-point tunneling protocol (PPTP) format, a NETBIOS extended user interface (NETBEUI) protocol format, an Appletalk protocol format, a DECnet, BANYAN/VINES, an internet packet exchange (IPX) protocol format, and an internet control message protocol (ICMP) protocol format.

iii. Communications Links

Note that FIGS. **1A**, **2A** and other figures described herein include lines which may refer to communications lines or which may refer to logical connections between network nodes, or systems, which are physically implemented by telecommunications carrier devices. These carrier devices include circuits and network nodes between the circuits including, for example, digital access and cross-connect system (DACS), regenerators, tandems, copper wires, and fiber optic cable. It would be apparent to persons having ordinary skill in the art that alternative communications lines can be used to connect one or more telecommunications systems devices. Also, a telecommunications carrier as defined here, can include, for example, a LEC, a CLEC, an IXC, an Enhanced Service Provider (ESP), a global or international services provider such as a global point-of-presence (GPOP), and an intelligent peripheral.

**26**

EO **104a** and AT **206** are connected by a trunk. A trunk connects an AT to an EO. A trunk can be called an inter machine trunk (IMT). AT **208** and EO **108a** are connected by a trunk which can be an IMT.

Referring to FIG. **1A**, EO **104** and PBX **112** can be connected by a private line with a dial tone. A private line can also connect an ISP (not shown) to EO **104**, for example. A private line with a dial tone can be connected to a modem bay or access converter equipment at the ISP. Examples of a private line are a channelized T1 or integrated services digital network (ISDN) primary rate interface (PRI). An ISP can also attach to the Internet by means of a pipe or dedicated communications facility. A pipe can be a dedicated communications facility. A private line can handle data modem traffic to and from an ISP.

Trunks can handle switched voice traffic and data traffic. For example, trunks can include digital signals DS1-DS4 transmitted over T1-T4 carriers. Table 2 provides typical carriers, along with their respective digital signals, number of channels, and bandwidth capacities.

TABLE 2

| Digital signal | Number of channels | Designation of carrier | Bandwidth in Megabits per second (Mbps) |
|---|---|---|---|
| DS0 | 1 | None | 0.064 |
| DS1 | 24 | T1 | 1.544 |
| DS2 | 96 | T2 | 6.312 |
| DS3 | 672 | T3 | 44.736 |
| DS4 | 4032 | T4 | 274.176 |

Alternatively, trunks can include optical carriers (OCs), such as OC-1, OC-3, etc. Table 3 provides typical optical carriers, along with their respective synchronous transport signals (STSs), ITU designations, and bandwidth capacities.

TABLE 3

| Optical carrier (OC) signal | Electrical signal, or synchronous transport signal (STS) | International Telecommunications Union (ITU) terminology | Bandwidth in Megabits per second (Mbps) |
|---|---|---|---|
| OC-1 | STS-1 | | 51.84 |
| OC-3 | STS-3 | STM-1 | 155.52 |
| OC-9 | STS-9 | STM-3 | 466.56 |
| OC-12 | STS-12 | STM-4 | 622.08 |
| OC-18 | STS-18 | STM-6 | 933.12 |
| OC-24 | STS-24 | STM-8 | 1244.16 |
| OC-36 | STS-36 | STM-12 | 1866.24 |
| OC-48 | STS-48 | STM-16 | 2488.32 |

As noted, a private line is a connection that can carry data modem traffic. A private line can be a direct channel specifically dedicated to a customer's use between two specified points. A private line can also be known as a leased line. In one embodiment, a private line is an ISDN/primary rate interface (ISDN PRI) connection. An ISDN PRI connection can include a single signal channel (called a data or D channel) on a T1, with the remaining 23 channels being used as bearer or B channels. (Bearer channels are digital channels that bear voice and data information.) If multiple ISDN PRI lines are used, the signaling for all of the lines can be carried over a single D channel, freeing up the remaining lines to carry only bearer channels.

iv. Telecommunications Traffic

Telecommunications traffic can be sent and received from any network node of a telecommunications carrier. A telecommunications carrier can include, for example, a LEC, a

Ericsson Ex. 1001, pg 57

US 7,496,674 B2

**27**

CLEC, an IXC, and an Enhanced Service Provider (ESP). In an embodiment, this traffic can be received from a network node which is, for example, a class 5 switch, such as EO **104***a*, or from a class 3/4 switch, such as AT **206**. Alternatively, the network system can also be, for example, a CLEC, or other enhanced service provider (ESP), an international gateway or global point-of-presence (GPOP), or an intelligent peripheral.

Voice traffic refers, for example, to a switched voice connection between calling party **102***a* and called party **110***a*. It is important to note that this is on a point-to-point dedicated path, i.e., that bandwidth is allocated whether it is being used or not. A switched voice connection is established between calling party **102***a* and EO **104***a*, then to AT **206** then over an IXC's network such as that of IXC **106***a* to AT **208** and then to EO **108***a* and over a trunk to called party **110***a*. In another embodiment, AT **206** or IXC **106***a* can also be, for example, a CLEC, or other enhanced service provider (ESP), an international gateway or global point-of-presence (GPOP), or an intelligent peripheral.

It is possible that calling party **102***a* is a computer with a data connection to a server over the voice network. Data traffic refers, for example, to a data connection between a calling party **102***a* (using a modem) and a server **122***b* that could be part of an ISP. A data connection can be established, e.g., between calling party **102** *a* and EO **104***a*, then to AT **206**, then to CLEC **214**, then over a fixed wireless CLEC **209** link to PBX **112***b* to a modem **130***b* associated with server **122***b*.

c. Signaling Network

FIG. 2B illustrates signaling network **114** in greater detail. Signaling network **114** is a separate network used to handle the set up, tear down, and supervision of calls between calling party **102** and called party **110**. Signaling network **114** in the given example is the Signaling System 7 (SS7) network. Signaling network **114** includes service switching points (SSPs) **236**, **238**, **240** and **242**, signal transfer points (STPs) **222**, **224**, **226**, **228**, **230** and **232**, and service control point (SCP) **234**.

In the SS7 network, the SSPs are the portions of the backbone switches providing SS7 functions. The SSPs can be, for example, a combination of a voice switch and an SS7 switch, or a computer connected to a voice switch. The SSPs communicate with the switches using primitives, and create packets for transmission over the SS7 network.

EOs **104***a*, **108***a* and ATs **206**, **208** can be respectively represented in SS7 signaling network **114** as SSPs **236**, **238**,

**28**

**240** and **242**. Accordingly, the connections between EOs **104***a*, **108***a* and ATs **206**, **208** (presented as dashed lines) can be represented by connections **254**,**256**,**258** and **268**. The types of these links are described below.

The STPs act as routers in the SS7 network, typically being provided as adjuncts to in-place switches. The STPs route messages from originating SSPs to destination SSPs. Architecturally, STPs can and are typically provided in "mated pairs" to provide redundancy in the event of congestion or failure and to share resources (i.e., load sharing is done automatically). As illustrated in FIG. 2B, STPs can be arranged in hierarchical levels, to provide hierarchical routing of signaling messages. For example, mated STPs **222**, **224** and mated STPs **226**, **228** are at a first hierarchical level, while mated STPs **230**, **232** are at a second hierarchical level.

SCPs provide database functions. SCPs can be used to provide advanced features in an SS7 network, including routing of special service numbers (e.g., 800 and 900 numbers), storing information regarding subscriber services, providing calling card validation and fraud protection, and offering advanced intelligent network (AIN) services. SCP **234** is connected to mated STPs **230** and **232**.

In the SS7 network, there are unique links between the different network elements. Table 4 provides definitions for common SS7 links.

Referring to FIG. 2B, mated STP pairs are connected by C links. For example, STPs **222**, **224**, mated STPs **226**, **228**, and mated STPs **230**, **232** are connected by C links (not labeled). SSPs **236**, **238** and SSPs **240**, **242** are connected by F links **262** and **264**.

Mated STPs **222**, **224** and mated STPs **226**, **228**, which are at the same hierarchical level, are connected by B links **270**, **272**, **244** and **282**. Mated STPs **222**, **224** and mated STPs **230**, **232**, which are at different hierarchical levels, are connected by D links **266**, **268**, **274** and **276**. Similarly, mated STPs **226**, **228** and mated STPs **230**, **232**, which are at different hierarchical levels, are connected by D links **278**, **280**, **246** and **248**.

SSPs **236**, **238** and mated STPs **222**, **224** are connected by A links **254** and **256**. SSPs **240**, **242** and mated STPs **226**, **228** are connected by A links **258** and **260**.

SSPs **236**, **238** can also be connected to mated STPs **230**, **232** by E links (not shown). Finally, mated STPs **230**, **232** are connected to SCP **234** by A links **250** and **252**.

For a more elaborate description of SS7 network topology, the reader is referred to Russell, Travis, *Signaling System #7*, McGraw-Hill, New York, N.Y. 10020, ISBN 0-07-054991-5, which is incorporated herein by reference in its entirety.

TABLE 4

| SS7 link terminology | Definitions |
|---|---|
| Access (A) links | A links connect SSPs to STPs, or SCPs to STPs, providing network access and database access through the STPs. |
| Bridge (B) links | B links connect mated STPs to other mated STPs. |
| Cross (C) links | C links connect the STPs in a mated pair to one another. During normal conditions, only network management messages are sent over C links. |
| Diagonal (D) links | D links connect the mated STPs at a primary hierarchical level to mated STPs at a secondary hierarchical level. |
| Extended (E) links, | E links connect SSPs to remote mated STPs, and are used in the event that the A links to home mated STPs are congested. |
| Fully associated (F) links | F links provide direct connections between local SSPs (bypassing STPs) in the event there is much traffic between SSPs, or if a direct connection to an STP is not available. F links are used only for call setup and call teardown. |

Ericsson Ex. 1001, pg 58

US 7,496,674 B2

**29**

**30**

d. SS7 Signaled Call Flow

To initiate a call in an SS7 telecommunications network, a calling party using a telephone connected to an ingress EO switch, dials a telephone number of a called party. The telephone number is passed from the telephone to the SSP at the ingress EO of the calling party's local exchange carrier (LEC). First, the SSP can process triggers and internal route rules based on satisfaction of certain criteria. Second, the SSP can initiate further signaling messages to another EO or access tandem (AT), if necessary. The signaling information can be passed from the SSP to STPs, which route the signals between the ingress EO and the terminating end office, or egress EO. The egress EO has a port designated by the telephone number of the called party. The call is set up as a direct connection between the EOs through tandem switches if no direct trunking exists or if direct trunking is full. If the call is a long distance call, i.e., between a calling party and a called party located in different local access transport areas (LATAs), then the call is connected through an inter exchange carrier (IXC) switch. Such a long distance call is commonly referred to as an inter-LATA call. LECs and IXCs are collectively referred to as the public switched telephone network (PSTN).

Passage of the Telecommunications Act of 1996, authorizing competition in the local phone service market, has permitted CLECs to compete with ILECs in providing local exchange services. This competition, however, has still not provided the bandwidth necessary to handle the large volume of voice and data communications. This is due to the limitations of circuit switching technology which limits the bandwidth of the equipment being used by the LECs, and to the high costs of adding additional equipment.

e. Circuit-Switching

Circuit switching dedicates a channel to a call for the duration of the call. Thus, using circuit switching, a large amount of switching bandwidth is required to handle the high volume of voice calls. This problem is compounded by the use of voice circuits to carry data communications over the same equipment that were designed to handle voice communications.

i. Time Division Multiplexed (TDM) Circuit Switching

TDM circuit switching creates a full-time connection or a dedicated circuit between any two attached devices for the duration of the connection. TDM divides the bandwidth down int fixed time slots in which there can be multiple time slots, each with its own fixed capacity, available. Each attached device on the TDM network is assigned a fixed portion of the bandwidth using one or more time slots depending on the need for speed. When the device is in transmit mode, the data is merely placed in this time slot without any extra overhead such as processing or translations. Therefore, TDM is protocol transparent to the traffic being carried. Unfortunately, however, when the device is not sending data, the time slots remain empty, thereby wasting the use of the bandwidth. A higher-speed device on the network can be slowed down or bottled up waiting to transmit data, but the capacity that sits idle cannot be allocated to this higher priority device for the duration of the transmission. TDM is not well suited for the bursts of data that are becoming the norm for the data needs in today's organization.

2. Data Network

FIG. 1B depicts an example network **148** including workstations **144** and **146** coupled to data network **142**. Data network **142** can act as a wide area network (WAN) for coupling a plurality of local area networks (LANs) together. Network **148** includes an example local area network including a plurality of host computers such as, e.g., client work-

station **138** and server **136**, coupled together by wiring including network interface cards (NICs) and a hub, such as, e.g., an Ethernet hub. The LAN is coupled to data network **142** by a network router **140** which permits data traffic to be routed to workstations **144** and **146** from client **138** and server **136**.

a. Packet-Switching

Unlike voice networks **100** and **200** described above with reference to FIGS. **1A** and **2A** which transport traffic over circuit-switched connections, data network **148** transports traffic using packet switching.

Currently, internets, intranets, and similar public or private data networks that interconnect computers generally use packet switching technology. Packet switching provides for more efficient use of a communication channel than does circuit switching. Packet switched networks transport packets of information which can include various types of data such as, e.g., digitized voice, data, and video. With packet switching, many different calls can share a communication channel rather than the channel being dedicated to a single call. During a voice call, for instance, digitized voice information might be transferred between the callers only 60% of the time, with silence being transferred the other 40% of the time. With a circuit switched connection, the voice call could tie-up a communications channel that could have 50% of its bandwidth, unused because of the silence. For a data call, information might be transferred between two computers only 10% of the time. With the data call, 90% of the channel's bandwidth may go unused. In contrast, a packet-switched connection would permit the voice call, the data call and possibly other call information to all be sent over the same channel.

Packet switching breaks a media stream into pieces known as, for example, packets, cells or frames. Each packet can then be encoded with address information for delivery to the proper destination and can be sent through the network. The packets can be received at the destination and the media stream is reassembled into its original form for delivery to the recipient. This process is made possible using an important family of communications protocols, commonly called the Internet Protocol (IP).

In a packet-switched network, there is no single, unbroken physical connection between sender and receiver. The packets from many different calls share network bandwidth with other transmissions. The packets can be sent over many different routes at the same time toward the destination, and can then be reassembled at the receiving end. The result is much more efficient use of a telecommunications network's bandwidth than could be achieved with circuit-switching.

b. Routers

Data network **142** can include a plurality of network routers **140**. Network routers are used to route information between multiple networks. Routers act as an interface between two or more networks. Routers can find the best path between any two networks, even if there are several different networks between the two networks.

Network routers can include tables describing various network domains. A domain can be thought of as a local area network (LAN) or wide area network (WAN). Information can be transferred between a plurality of LANs and/or WANs via network routers. Routers look at a packet and determine from the destination address in the header of the packet, the destination domain of the packet. If the router is not directly connected to the destination domain, then the router can route the packet to the router's default router, i.e. a router higher in a hierarchy of routers. Since each router has a default router to which it is attached, a packet can be transmitted through a

Ericsson Ex. 1001, pg 59

US 7,496,674 B2

**31**

series of routers to the destination domain and to the destination host bearing the packet's final destination address.

c. Local Area Networks (LANs) and Wide Area Networks (WANs)

A local area network (LAN) can be thought of as a plurality of host computers interconnected via network interface cards (NICs) in the host computers. The NICs are connected via, for example, copper wires so as to permit communication between the host computers. Examples of LANs include an ethernet bus network, an ethernet switch network, a token ring network, a fiber digital data interconnect (FDDI) network, and an ATM network.

A wide area network (WAN) is a network connecting host computers over a wide area. In order for host computers on a particular LAN to communicate with a host computer on another LAN or on a WAN, network interfaces interconnecting the LANs and WANs must exist. An example of a network interface is a router discussed above.

A network designed to interconnect multiple LANs and/or WANs is known as an internet (with a lower case "i"). An internet can transfer data between any of a plurality of networks including both LANs and WANs. Communication occurs between host computers on one LAN and host computers on another LAN via, for example, an internet protocol (IP) protocol. The IP protocol is used to assign each host computer of a network, a unique IP address enabling packets to be transferred over the internet to other host computers on other LANs and/or WANs that are connected to the internet. An internet can comprise a router interconnecting two or more networks.

The "Internet" (with a capital "I") is a global internet interconnecting networks all over the world. The Internet includes a global network of computers which intercommunicate via the internet protocol (IP) family of protocols.

An "intranet" is an internet which is a private network that uses internet software and internet standards, such as the internet protocol (IP). An intranet can be reserved for use by parties who have been given the authority necessary to use that network.

d. Switching vs. Routing

Routing is done at the middle network architecture levels on such protocols as IPX or TCP/IP. Switching is done at a lower level, at layer 2 of the OSI model, i.e. the media access control (MAC) layer.

e. TCP/IP Packet-Centric vs. ATM Circuit-Centric Data Networks

Asynchronous Transfer Mode (ATM) is a fixed-size cell switched circuit-centric data network. ATM implements virtual circuits (VCs), virtual paths (VPs) and transmission paths (TPs). A circuit-centric network like ATM sets up virtual circuits between source and destination nodes which provide QoS by dedicating the virtual circuit to a specific traffic type.

Some networks are packet-centric networks. Unlike a circuit-centric network, a packet-centric network does not use dedicated circuits through which to transfer packets. TCP/IP performs a packetization of user data to be sent between and among the various systems on the IP network. When a large file is sent down the protocol stack, the IP function is responsible for segmentation and packetization of the data. Then a header is placed on the packet for delivery to the data link. The routing and switching of this data is handled at the IP (i.e. network) layer. IP is in a sense a dumb protocol. When a packet is prepared for transmission across the medium, IP does not specifically route the call across a specific channel. Instead, it places a header on the packet and lets the network deal with it. Therefore, the outward bound packets can take various routes to get from a source to a destination. This

**32**

means that the packets are in a datagram form and not sequentially numbered as they are in other protocols. IP makes its best attempt to deliver the packets to the destination network interface; but it makes no assurances that data will arrive, that data will be free of errors, and that nodes along the way will concern themselves with the accuracy of the data and sequencing, or come back and alert the originator that something is wrong in the delivery mechanism. It is possible that in IP routing of a packet, the packet can be sent along the network in a loop, so IP has a mechanism in its header information to allow a certain number of "hops" or what is called "time to live" on the network. Rather than permit an undeliverable pack to loop around the network, IP has a counter mechanism that decrements every time the packet passes through a network node. If the counter expires, the node will discard the packet. Working together with IP is TCP which provides controls to ensure that a reliable data stream is sent and delivered. At the sending end, TCP puts a byte count header on information that will be delivered to the IP protocol layer and encapsulates it as part of the packet. The receiving end, when it gets packets is responsible for resequencing the packets and ensuring its accuracy. If all of the IP flow is not received correctly, the byte count acknowledgment or nonacknowledgment message can be sent back to the sending end, prompting the sending end to resend the bytes necessary to fill in the remaining portions of the packet flow. TCP buffers additional packets until after resending the nonacknowledged packet.

3. Video Network

FIG. **1**C illustrates a conventional video network **150** such as, e.g., a cable television (CATV) network. Video network **150** can include video network **160** coupled to various video capture, distribution links and video output monitors. Video input devices can include, e.g., conference cameras **154** and **158**. Video output devices can include, e.g., televisions **152** and **156**. Video network **160** can include a variety of head end (i.e. the serving end of the cable) and distribution link equipment such as, e.g., coaxial cable television (CATV) and national television standard code (NTSC) tuner equipment for multiplexing various video signals. Standard cable systems have an immense amount of bandwidth available to them.

It is important to note that CATV is a wireless communication method. The frequencies of many video signals are distributed along the cable at the same time. A television tuner selects a particular channel by tuning into a specific frequency or a "frequency band."

Although a cable television CATV video network often includes only one physical cable, a number of channels can simultaneously be present on the cable. This accomplished by sharing the frequency spectrum of the cable and assigning different frequency ranges to different channels using frequency division multiplexing (FDM). A broadband cable communications system can operate exactly like a CATV system. A counter to this FDM technique is division of the cable not divided into frequency bands but into time slots using time-division multiplexing (TDM). With TDM, each transmitting video station can grab the entire bandwidth of the cable, but only for a very short period of time. The cable is currently capable of carrying up to 750 MHz. FDM techniques can be used to divide the channels into a number of dedicated logical channels. Innovations have allowed a time division multiple access (TDMA) within an FDM channel.

A cable system can allow multiplexing on two separate dimensions to achieve data channels over a cable. The channels can be separated by FDM, and in a frequency band the channel can then be shared via TDMA among multiple users.

Ericsson Ex. 1001, pg 60

US 7,496,674 B2

**33**

The most common of the TDMA access methods on broadband cable is CSMA/CD developed by XEROX for Ethernet.

Using a single cable, a midsplit arrangement can accommodate two-way simultaneous transmission. Another way to accommodate this is to use a dual cable system.

Broadband is inherently an analog signaling method. Because video cameras, e.g., are also analog devices, a signal from a video camera (or video recorder) can be directly transmitted onto a broadband cable channel in red/green/blue (RGB) format.

G. Convergence of Voice/Data/Video Networks

Recognizing the inherent efficiency of packet-switched data networks such as the Internet, attention has recently focused on the digitization and transmission of voice, data, video and other information over converged packet-switched data networks. In order to deliver a high quality of service (QoS) end-user experience, the data networks attempt to provide mechanisms to deliver the different types of information timely and with appropriate bandwidth to provide an acceptable end-user experience.

FIG. **2**C illustrates an example network **286** carrying voice, data and video traffic over a data network. Network **286** includes calling party **102**b homed to EO **104**b, where EO **104**b is linked to a telephony gateway **288**b. Network **286** also includes called party **110**c homed to EO **108**c, where EO **108**c is linked to a telephony gateway **288**c. EOs **104**b and **108**c and telephony gateways **288**b and **288**c can be linked to signaling network **114**. Telephony gateways **288**b and **288**c can also be coupled to data network **142** via routers **140**b and **140**c, respectively.

Still referring to FIG. **2**C, telephony gateways **288**b and **288**c can be used to packetize voice traffic and signaling information into a form appropriate for transport over data network **142**. It would be apparent to those skilled in the art that telephony gateways **288**b and **288**c can include various computer devices designed for controlling, setting up and tearing down calls. Voice calls delivered over the data network can include, e.g., voice over packet (VoP), voice over data (VoD), voice over internet protocol (VoIP), voice over asynchronous transfer mode (VoATM), voice over frame (VoF). An example of a telephony gateway **288**b and **288**c is a media gateway control protocol (MGCP) compliant gateway available from various vendors such as, e.g., Lucent, of Parsippany, N.J., and CISCO of Palo Alto, Calif. It is important to note that other network devices such as a softswitch available from several member companies of the SoftSwitch Consortium, including Level 3 Communications of Louisville, Colo., could also be necessary to enable transport of, e.g., VoIP.

Network **286** is depicted to include other devices coupled to data network **142**. First, an H.323 compliant video-conferencing system **289** is illustrated including a camera **154**a and television **152**g and router **140**g. Second, a local area network (LAN) **128**a including a client workstation **138**a and a server **136**a are coupled to data network **142** via network router **140**a. Similarly, LAN **128**f having a client workstation **138**f and a server **136**f are coupled via network router **140**f to data network **142**.

Data Network **142** can provide for routing of packets of information through network routing devices from source locations to destination locations coupled to data network **142**. For example, data network **142** can route internet protocol (IP) packets for transmission of voice and data traffic from telephony gateway **288**b to telephony gateway **288**c. Data Network **142** represents any art-recognized packet centric data network. One well-known data network is the global

**34**

Internet. Other examples include a private intranet, a packet-switched network, a frame relay network, and an asynchronous transfer mode (ATM) circuit-centric network.

In an example embodiment, data network **142** can be an IP packet-switched network. A packet-switched network such as, e.g., an IP network, unlike a circuit-switched network, does not require dedicated circuits between originating and terminating locations within the packet switched network. The packet-switched network instead breaks a message into pieces known as packets of information. Such packets can then be encapsulated with a header which designates a destination address to which the packet must be routed. The packet-switched network then takes the packets and routes them to the destination designated by the destination address contained in the header of the packet.

Routers **140**a, **140**b, **140**c, **140**d, **140**e, **140**f and **140**g can be connected to one another via physical media such as, for example, optical fiber link connections, and copper wire connections. Routers **140**a-g transfer information between one another and intercommunicate according to routing protocols.

Data network **142** could be implemented using any data network such as, e.g., IP networks, ATM virtual circuit-centric networks, frame relay networks, X.25 networks, and other kinds of LANs and WANs. Other data networks could be used interchangeably for data network **142** such as, for example, FDDI, Fast Ethernet, or an SMDS packet switched network. Frame relay and ATM are connection-oriented, circuit-centric services. Switched multi-megabyte data service (SMDS) is a connection-oriented mass packet service that offers speeds up to 45 Mbps.

1. Example Data Networks

a. Asynchronous Transfer Mode (ATM)

ATM is a high-bandwidth, low-delay, fixed-sized cell-based multiplexing network technology. Bandwidth capacity is segmented into 53-byte cells, having a header and payload fields. ATM uses fixed-length cells with the belief that the fixed length cells can be switched more easily in hardware than variable size packets and thus should result in faster transmissions in certain environments.

The ATM environment sets up virtual circuits in a circuit-centric manner. Thus, ATM segments variable length IP packet flows into fixed size cells using a segmentation and resequencing algorithm (SAR).

Each ATM cell contains a 48-byte payload field and a 5-byte header that identifies the so-called "virtual circuit" of the cell. ATM is thought suitable for high-speed combinations of voice, data, and video services. Currently, ATM access can perform at speeds as high as 622 Mbps or higher. ATM has recently been doubling its maximum speed every year.

ATM is defined by a protocol standardized by the International Telecommunications Union (ITU-T), American National Standards Institute (ANSI), ETSI, and the ATM Forum. ATM comprises a number of building blocks, including transmission paths, virtual paths, and virtual channels. Asynchronous transfer mode (ATM) is a cell based switching and multiplexing technology designed to be a general purpose connection-oriented transfer mode for a wide range of telecommunications services. ATM can also be applied to LAN and private network technologies as specified by the ATM Forum.

ATM handles both connection-oriented traffic directly or through adaptation layers, or connectionless traffic through the use of adaptation layers. ATM virtual connections may operate at either a constant bit rate (CBR) or a variable bit rate (VBR). Each ATM cell sent into an ATM network contains a small header including information that establishes a virtual

Ericsson Ex. 1001, pg 61

**A0105**

US 7,496,674 B2

**35**

circuit-centric connection from origination to destination. All cells are transferred, in sequence, over this virtual connection. ATM provides either permanent or switched virtual connections (PVCs or SVCs). ATM is asynchronous because the transmitted cells need not be periodic as time slots of data are required to be in synchronous transfer mode (STM).

ATM uses an approach by which a header field prefixes each fixed-length payload. The ATM header identifies the virtual channel (VC). Therefore, time slots are available to any host which has data ready for transmission. If no hosts are ready to transmit, then an empty, or idle, cell is sent.

ATM permits standardization on one network architecture defining a multiplexing and a switching method. Synchronous optical network (SONET) provides the basis for physical transmission at very high-speed rates. ATM can also support multiple quality of service (QoS) classes for differing application requirements by providing separate virtual circuits for different types of traffic, depending on delay and loss performance. ATM can also support LAN-like access to available bandwidth.

Cells are mapped into a physical transmission path, such as the North American DS1, DS3, and SONET; European, E1, E3, and E4; ITU-T STM standards; and various local fiber and electrical transmission payloads. All information is multiplexed and switched in an ATM network via these fixed-length cells.

The ATM cell header field identifies cell type, and priority, and includes six portions. An ATM cell header includes a generic flow control (GFC), a virtual path identifier (VPI), a virtual channel identifier (VCI), a payload type (PT), a call loss priority (CLP), and a header error check (HEC). VPI and VCI hold local significance only, and identify the destination. GFC allows a multiplexer to control the rate of an ATM terminal. PT indicates whether the cell contains user data, signaling data, or maintenance information. CLP indicates the relative priority of the cell, i.e., lower priority cells are discarded before higher priority cells during congested intervals. HEC detects and corrects errors in the header.

The ATM cell payload field is passed through the network intact, with no error checking or correction. ATM relies on higher-layer protocols to perform error checking and correction on the payload. For example, a transmission control protocol (TCP) can be used to perform error correction functions. The fixed cell size simplifies the implementation of ATM switches and multiplexers and enables implementations at high speeds.

When using ATM, longer packets cannot delay shorter packets as in other packet-switched networks, because long packets are separated into many fixed length cells. This feature enables ATM to carry CBR traffic, such as voice and video, in conjunction with VBR data traffic, potentially having very long packets, within the same network.

ATM switches take traffic and segment it into the fixed-length cells, and multiplex the cells into a single bit stream for transmission across a physical medium. As an example, different kinds of traffic can be transmitted over an ATM network including voice, video, and data traffic. Video and voice traffic are very time-sensitive, so delay cannot have significant variations. Data, on the other hand, can be sent in either connection-oriented or connectionless mode. In either case, data is not nearly as delay-sensitive as voice or video traffic. Data traffic, as e.g., spread sheet data requires accurate transmission. Therefore, ATM conventionally must discriminate between voice, video, and data traffic. Voice and video traffic requires priority and guaranteed delivery with bounded delay, while data traffic requires, simultaneously, assurance of low loss. In a converged data network, data traffic can also carry

**36**

voice traffic, making it also time-dependent. Using ATM, in one embodiment, multiple types of traffic can be combined over a single ATM virtual path (VP), with virtual circuits (VCs) being assigned to separate data, voice, and video traffic.

A transmission path can include one or more VPs. Each VP can include one or more VCs. Thus, multiple VCs can be trunked over a single VP. Switching can be performed on a transmission path, VPs, or at the level of VCs.

The capability of ATM to switch to a virtual channel level is similar to the operation of a private or public branch exchange (PBX) or telephone switch in the telephone world. In a PBX switch, each channel within a trunk group can be switched. Devices which perform VC connections are commonly called VC switches because of the analogy to telephone switches. ATM devices which connect VPs are commonly referred to as VP cross-connects, by analogy with the transmission network. The analogies are intended for explanatory reasons, but should not be taken literally. An ATM cell-switching machine need not be restricted to switching only VCs and cross-connection to only VPs.

At the ATM layer, users are provided a choice of either a virtual path connection (VPC) or a virtual channel connection (VCC). Virtual path connections (VPCs) are switched based upon the virtual path identifier (VPI) value only. Users of a VPC can assign VCCs within a VPI transparently, since they follow the same route. Virtual channel connections (VCCs) are switched upon a combined VPI and virtual channel identifier (VCI) value.

Both VPIs and VCIs are used to route calls through a network. Note that VPI and VCI values must be unique on a specific transmission path (TP).

It is important to note that data network **142** can be any of a number of other data-type networks, including various packet-switched data-type networks, in addition to an ATM network.

b. Frame Relay

Alternatively, data network **142** can be a frame relay network. It would be apparent to persons having ordinary skill in the art, that a frame relay network could be used as data network **142**. Rather than transporting data in ATM cells, data could be transported in frames.

Frame relay is a packet-switching protocol used in WANs that has become popular for LAN-to-LAN connections between remote locations. Formerly frame relay access would top out at about 1.5 Mbps. Today, so-called "high-speed" frame relay offers around 45 Mbps. This speed is still relatively slow as compared with other technology such as ATM.

Frame relay services employ a form of packet-switching analogous to a streamlined version of X.25 networks. The packets are in the form of frames, which are variable in length. The key advantage to this approach it that a frame relay network can accommodate data packets of various sizes associated with virtually any native data protocol. A frame relay network is completely protocol independent. A frame relay network embodiment of data network **142** does not undertake a lengthy protocol conversion process, and therefore offers faster and less-expensive switching than some alternative networks. Frame relay also is faster than traditional X.25 networks because it was designed for the reliable circuits available today and performs less-rigorous error detection.

c. Internet Protocol (IP)

In an embodiment, data network **142** can be an internet protocol (IP) network over an ATM network. It would be apparent to those skilled in the art, that an internet protocol (IP) network over various other data link layer network such

Ericsson Ex. 1001, pg 62

**A0106**

US 7,496,674 B2

**37**

as, e.g., Ethernet, could be used as data network **142**. Rather than transporting data in fixed length ATM circuit-centric cells, data could be transported in variable length IP datagram packet-centric packets as segmented by TCP. The IP data network can lie above any of a number of physical networks such as, for example, a SONET optical network.

2. Virtual Private Networks (VPNs)

A virtual private network (VPN) is a wide area communications network operated by a telecommunications carrier that provides what appears to be dedicated lines when used, but that actually includes trunks shared among all customers as in a public network. Just as a VPN can be provided as a service through a wireline network, a VPN can be provided in a wireless network. A VPN can allow a private network to be configured within a public network.

VPNs can be provided by telecommunications carriers to customers to provide secure, guaranteed, long-distance bandwidth for their WANs. These VPNs generally use frame relay or switched multi-megabyte data service (SMDS) as a protocol of choice because those protocols define groups of users logically on the network without regard to physical location. ATM has gained favor as a VPN protocol as companies require higher reliability and greater bandwidth to handle more complex applications. VPNs using ATM offer networks of companies with the same virtual security and QoS as WANs designed with dedicated circuits.

The Internet has created an alternative to VPNs, at a much lower cost, i.e. the virtual private Internet. The virtual private Internet (VPI) lets companies connect disparate LANs via the Internet. A user installs either a software-only or a hardware-software combination that creates a shared, secure intranet with VPN-style network authorizations and encryption capabilities. A VPI normally uses browser-based administration interfaces.

3. H.323 Video Conferencing

The H.323 Recommendation for video conferencing will now be briefly overviewed. The H.323 standard provides a foundation for, for example, audio, video, and data communications across IP-based networks, including the Internet. By complying with the H.323 Recommendation, multimedia products and applications from multiple vendors can interoperate, allowing users to communicate without concern for compatibility. H.323 promises to be the foundation of future LAN-based products multimedia applications.

H.323 is an umbrella recommendation from the International Telecommunications Union (ITU) that sets standards for multimedia communications over Local Area Networks (LANs) that do not provide a guaranteed Quality of Service (QoS). These networks dominate today's corporate desktops and include packet-switched TCP/IP and IPX over Ethernet, Fast Ethernet and Token Ring network technologies. Therefore, the H.323 standards are important building blocks for a broad new range of collaborative, LAN-based applications for multimedia communications.

The H.323 specification was approved in 1996 by the ITU's Study Group 16. Version 2 was approved in January 1998. The standard is broad in scope and includes both standalone devices and embedded personal computer technology as well as point-to-point and multipoint conferences. H.323 also addresses call control, multimedia management, and bandwidth management as well as interfaces between LANs and other networks.

H.323 is part of a series of communications standards that enable videoconferencing across a range of networks. Known as H.32X, this series includes H.320 and H.324, which address ISDN and PSTN communications, respectively.

**38**

The H.323 architecture defines four major components for network-based communications, including terminals, gateways, gatekeepers, and multipoint control units (MCUs).

Terminals are client endpoints on the LAN that provide real-time, two-way communications. All terminals support voice communications; video and data are optional. H.323 specifies the modes of operation required for different audio, video, and/or data terminals to work together. H.323 is the standard of next generation Internet phones, audio conferencing terminals, and video conferencing technologies.

All H.323 terminals also support H.245, which is used to negotiate channel usage and capabilities. Three other components are required: Q.931 for call signaling and call setup, a component called Registration/Admission/Status (RAS), which is a protocol used to communicate with a gatekeeper; and support for RTP/RTCP for sequencing audio and video packets.

Optional components in an H.323 terminal are video codecs, T.120 data conferencing protocols, and MCU capabilities.

A gateway is an optional element in an H.323 conference. An H.323 gateway can provide many services, the most common being a translation function between H.323 conferencing endpoints and other terminal types. This function includes translation between transmission formats (i.e. H.225.0 to H.221) and between communications procedures (i.e. H.245 to H.242). In addition, a gateway also translates between audio and video codecs and performs call setup and clearing on both the LAN side and the switched-circuit network side.

In general, the purpose of the H.323 gateway is to reflect characteristics of a LAN endpoint to an SCN endpoint and vice versa. The primary applications of gateways are likely to be establishing links with analog PSTN terminals, establishing links with remote H.320 compliant terminals over ISDN-based switched-circuit networks, and establishing links with remote H.324-compliant terminals over PSTN networks.

Gateways are not required if connections to other networks are not needed, since endpoints may directly communicate with other endpoints on the same LAN. Terminals communicate with gateways using the H.245 and Q.931 protocols.

With the appropriate transcoders, H.323 gateways **5806** can support terminals that comply with H.310, H.321, H.322, and V.70.

Many gateway functions are left to the designer. For example, the actual number of H.323 terminals that can communicate through the gateway is not subject to standardization. Similarly, the number of SCN connections, the number of simultaneous independent conferences supported, the audio/video/data conversion functions, and inclusion of multipoint functions are left to the manufacturer. By incorporating H.323 gateway technology into the H.323 specification, the ITU has positioned H.323 as the means to hold standards-based conferencing endpoints together.

The gatekeeper is the most important component of an H.323 enabled network. It can act as the central point for all calls within its zone and provides call control services to registered endpoints. In many ways, an H.323 gatekeeper acts as a virtual switch.

Gatekeepers perform two important call control functions. The first is address translation from LAN aliases for terminals and gateways to IP or IPX addresses, as defined in the RAS specification. The second function is bandwidth management, which is also designated within RAS. For instance, if a network manager has specified a threshold for the number of simultaneous conferences on the LAN, the gatekeeper can refuse to make any more connections once the threshold is reached. The effect is to limit the total conferencing band-

Ericsson Ex. 1001, pg 63

**A0107**

**39**

width to some fraction of the total available; the remaining capacity is left for e-mail, file transfers, and other LAN protocols. A collection of all terminals, gateways, and multipoint control units which can be managed by a single gatekeeper are known as an H.323 Zone.

An optional, but valuable feature of a gatekeeper is its ability to route H.323 calls. By routing a call through a gatekeeper, it can be controlled more effectively. Service providers need this ability in order to bill for calls placed through their network. This service can also be used to re-route a call to another endpoint if a called endpoint is unavailable. In addition, a gatekeeper capable of routing H.323 calls can help make decisions involving balancing among multiple gateways. For instance, if a call is routed through a gatekeeper, that gatekeeper can then re-route the call to one of many gateways based on some proprietary routing logic.

While a gatekeeper is logically separate from H.323 endpoints, vendors can incorporate gatekeeper functionality into the physical implementation of gateways and MCUs.

A gatekeeper is not required in an H.323 system. However, if a gatekeeper is present, terminals must make use of the services offered by gatekeepers. RAS defines these as address translation, admissions control, bandwidth control, and zone management.

Gatekeepers can also play a role in multipoint connections. To support multipoint conferences, users would employ a gatekeeper to receive H.245 control channels from two terminals in a point-to-point conference. When the conference switches to multipoint, the gatekeeper can redirect the H.245 Control Channel to a multipoint controller, the MC. A gatekeeper need not process the H.245 signaling; it only needs to pass it between the terminals or between the terminals and the MC.

LANs which contain gateways could also contain a gatekeeper to translate incoming E.164 addresses into Transport Addresses. Because a Zone is defined by its gatekeeper, H.323 entities that contain an internal gatekeeper can require a mechanism to disable the internal, function so that when there are multiple H.323 entities that contain a gatekeeper on a LAN, the entities can be configured into the same Zone.

The Multipoint Control Unit (MCU) supports conferences between three or more endpoints. Under H.323, an MCU consists of a Multipoint Controller (MC), which is required, and zero or more Multipoint Processors (MP). The MC handles H.245 negotiations between all terminals to determine common capabilities for audio and video processing. The MC also controls conference resources by determining which, if any, of the audio and video streams will be multicast.

The MC does not deal directly with any of the media streams. This is left to the MP, which mixes, switches, and processes audio, video, and/or data bits. MC and MP capabilities can exist in a dedicated component or be part of other H.323 components.

The present invention supports multicast for wireless base station **302**, including providing: compatibility with RFC 1112, 1584; recognition and support of multicasting applications, including: multimedia, teleconferencing, database, distributed computing, real-time workgroups; support of broadcasting function over wireless link; preserves bandwidth, retains QoS latency performance; support of IPv6 IGMP and IPv4 IGMP multicast; group membership query, group membership report messages.

Approved in January of 1998, version 2 of the H.323 standard addresses deficiencies in version 1 and introduces new functionality within existing protocols, such as Q.931, H.245 and H.225, as well as entirely new protocols. The most sig-

**40**

nificant advances were in security, fast call setup, supplementary services and T.120/H.323 integration.

G. Packet-Centric QoS—Aware Wireless Point-to-Multi-Point (PtMP) Telecommunications System

1. Wireless Point-to-MultiPoint Telecommunications System

FIG. **2**D depicts network **296** including a point-to-multipoint (PtMP) wireless network **298** coupled via router **140**d to data network **142**. It is important to note that network **296** includes network **286** from FIG. **2**C, plus PtMP wireless network **298**. PtMP wireless network **298** enables customer premise equipment (CPE) at a subscriber location to gain access to the various voice, data and video resources coupled to data network **142** by means of wireless connectivity over a shared bandwidth. The wireless PtMP network **298** is a packet switched network which is TCP/IP packet-centric (i.e. no dedicated circuit is created in delivering a communication IP flow) and QoS aware.

Specifically, PtMP wireless network **298** includes a wireless access point (WAP) **290**d coupled to router **140**d by, e.g., a wireline connection. A wireless access point **290**e can be similarly coupled to router **140**e by a wireline connection. WAP **290**d is in wireless communication, such as, e.g., radio frequency (RF) communication, with one or more wireless transceiver subscriber antennae **292**d and **292**e. It would be apparent to those skilled in the art that various wireless communication methods could be used such as, e.g., microwave, cellular, spread spectrum, personal communications systems (PCS), and satellite.

In an alternative embodiment, RF communication is accomplished over cable television (CATV) coaxial cable. As those skilled in the relevant art will understand, a coaxial cable functions as a waveguide over which RF waves propagate. Accordingly, it is possible for the communications link between RF transceiver subscriber antenna **292**d and WAP **290**d to be a coaxial cable. Therefore, a coaxial cable connection is analogous to a wireless connection, and is referred to as an alternative form of wireless connection in the present invention.

In another alternative embodiment, RF communication is accomplished over a satellite connection, such as, e.g., a low earth orbit (LEO) satellite connection or a high earth orbit satellite. Taking the example of an LEO satellite connection, WAP **290**d and RF transceiver subscriber antenna **292**d function as satellite gateways, with the additional functionalities described in the present invention.

As would be apparent to those skilled in the art, although the present invention has been described in the context of a point-to-multi-point network, the invention is equally applicable to a point-to-point network environment.

Referring to FIG. **3**A, in an embodiment of the invention, WAPs **290**d and **290**e can be coupled to a wireless base station **302** where "IP flow" traffic can be queued, analyzed, characterized, classified, prioritized and scheduled, as described more fully below with reference to the ensuing figures.

Referring to FIG. **3**B, one embodiment of the invention, antennae **292**d and **292**e are coupled to subscriber customer premise equipment (CPE) stations **294**d and **294**e, respectively (also referred to as CPEs **294**d, **294**e). Subscriber CPE stations **294**d and **294**e are coupled to various other CPE equipment via wireline or wireless connections. For example, CPE stations **290**d and **290**e can be coupled to voice calling parties **124**d, **124**e, **126**d and **126**e, fax machines **116**d and **116**e, video conferencing equipment including video monitors **152**d and **152**e, and cameras **154**d and **154**e, host computers including client computers **120**d and **120**e and servers

Ericsson Ex. 1001, pg 64

**A0108**

US 7,496,674 B2

41

122d and 122e. Various legacy devices such as PBXs can be coupled to CPEs 294d and 294e. In addition, next generation technologies such as Ethernet phones available from Selsius, a subsidiary of CISCO Systems from San Jose, Calif. and other Internet appliances can be coupled via LAN connections to CPEs 294d and 294e. Other video conferencing equipment as well as H.323 compliant conferencing equipment can also be coupled to CPEs 294d and 294e.

In an embodiment of the invention, either of antennae 292d and 292e can communicate with both WAPs 290d and 290e for alternate or backup wireless communications paths.

Returning to FIG. 3A, it depicts an example perspective diagram 300 of a PtMP network of the present invention. Diagram 300 includes a wireless base station 302 shown in wireless communication with subscriber locations 306a, 306b, 306c, 306d, 306e, 306f, 306g, 306h, 306i and 306j. Specifically, wireless base station 302 communicates via wireless access point 290d to subscriber antennae 292a-j of subscriber locations 306a-j.

Wireless base station 302 is coupled at interface 320 to network router 140d by, e.g., a wireline connection. Network router 140d is coupled to data network 142 which includes various other network routers 140b for routing traffic to other nodes on data network 142 such as, e.g., telephony gateway 288b.

Returning to FIG. 3B, it depicts block diagram 310 further illustrating the wireless PtMP of the present invention. Diagram 310 includes wireless base station 302 coupled at interface 320 to data network 142. Also coupled to data network 142 are router 140d and telephony gateway 288b which is in turn coupled to a class 5 central office (CO) switch at EO 104b. IP telephony gateway 288b can terminate telephony traffic to PSTN facilities by, e.g., translating packets into time domain multiplexed (TDM) standard telephone signals. Wireless base station 302 is in communication with wireless CPE 294d at subscriber location 306d via antenna WAP 290d and 292d. It would be apparent to those skilled in the art that other configurations of CPE 294d are possible, such as, e.g., one or more host computers with no telephone devices, one or more telephones with no host computers, one or more host computers and one or more telephone devices, and one or more H.323 capable video-conferencing platforms which could include a host computer with monitor and camera.

CPE 294d is shown with several telephone devices 124d and 126d, e.g., analog phones, and host computers, client 120d and server 122d. Client 120d and server 122d can be coupled to CPE 294d via a LAN connection such as, e.g., an Ethernet LAN, or via a legacy V.35 bus 322d providing a high speed data connection. Other Internet appliances capable of attachment to a data network can also be coupled to CPE 294d.

2. Networking Protocol Stack Architecture—Wireless IP Network Access Architecture (WINAAR)

FIG. 4 depicts the wireless IP network access architecture (WINAAR) 400 of the present invention. Architecture 400 illustrates the networking protocol stack which is a version of a TCP/IP protocol stack enhanced to support IP-centric, QoS over a packet switched, shared bandwidth, wireless PtMP connection. The networking protocol stack will be described in terms of the Open Systems Interconnect (OSI) 7 layer networking protocol stack standard which includes physical layer (OSI layer 1) 402, data link layer (OSI layer 2) 404, network layer (OSI layer 7) 406 and 408, transport layer (OSI layer 4) 410 and applications layer (OSI layer 7) 412.

a. Physical Layer

In an example embodiment, physical layer 402 can be implemented using several wireless application specific inte-

42

grated circuits (wASICs), an off-the-shelf 16 QAM/QPSK 416 ASIC; an Interference Mitigation and Multipath Negation (IMMUNE)/RF 418 algorithm ASIC for minimizing and/or eliminating harmful interference; and a frequency hopping (FH) 419 ASIC for providing dynamic and adaptive multi-channel transmission that optimizes data link integrity by changing frequency levels depending on the noise level of a given frequency. Physical layer 402 can include the radio frequency (RF) signal 415.

b. Data Link Layer

Data link layer 404 lies on top of physical layer 402. Data link layer 404 can include a media access control (MAC) layer 414 which is depicted graphically in diagram 400 as MAC layer portion 414a and proactive reservation-based intelligent multi-media access (PRIMMA) technology portions 414b and 414c. Arrows 426, 428 and 430, respectively, illustrate that MAC layer 414 can read header information from data and multimedia applications 425, TCP/UDP 427 and IP 429 layers to analyze and schedule an IP packet of an "IP flow." IP packets of the IP flow are identified by analyzing the header information to determine QoS requirements of the IP flow, so that the IP flow can be characterized, classified, presented, prioritized and scheduled.

c. Network Layer

1. Internet Protocol (IP)

Network layer 408 is the Internet protocol (IP) 429. As will be discussed further below and as already discussed above with reference to data network 142, IP is a standard protocol for addressing packets of information. Referring now to FIG. 7, IP header fields 702 can include, e.g., source and destination IP addresses, IP type of service (TOS), IP time to live (TTL), and protocol fields. IP is a datagram protocol that is highly resilient to network failures, but does not guarantee sequence delivery. Routers send error and control messages to other routers using the Internet control message protocol (ICMP). ICMP can also provide a function in which a user can send a "ping" (echo packet) to verify reachability and round trip delay of an IP-addressee host. Another OSI layer 3 protocol is address resolution protocol (ARP) which can directly interface to the data link layer. ARP maps a physical address, e.g., an Ethernet MAC address, to an IP address.

2. Internet Protocol (IP)v4 and IPv6

IP 429 of network layer 408 can be, e.g., an IP version 4 (IPv4) or an IP version 6 (IPv6). IPv6 (sometimes called next-generation internet protocol or IPng) is a backward-compatible extension of the current version of the Internet protocol, IPv4. IPv6 is designed to solve problems brought on by the success of the Internet (such as running out of address space and router tables). IPv6 also adds needed features, including circuiting security, auto-configuration, and real-time services similar to QoS. Increased Internet usage and the allocation of many of the available IP addresses has created an urgent need for increased addressing capacity. IPv4 uses a 32-byte number to form an address, which can offer about 4 billion distinct network addresses. In comparison, IPv6 uses 128-bytes per address, which provides for a much larger number of available addresses.

3. Resource Reservation Protocol (RSVP)

IP 429 of network layer 408 can have RSVP enhancement. Developed to enhance IPv4 with QoS features, RSVP is supposed to let network managers allocate bandwidth based on the bandwidth requirements of an application. Basically, RSVP is an emerging communications protocol that is hoped to signal a router to reserve bandwidth for real-time transmission of data, video, and audio traffic.

Resource reservation protocols that operate on a per-connection basis can be used in a network to elevate the priority

Ericsson Ex. 1001, pg 65

**A0109**

US 7,496,674 B2

**43**

of a given user temporarily. RSVP runs end to end to communicate application requirements for special handling. RSVP identifies a session between a client and a server and asks the routers handling the session to give its communications a priority in accessing resources. When the session is completed, the resources reserved for the session are freed for the use of others.

RSVP unfortunately offers only two levels of priority in its signaling scheme. Packets are identified at each router hop as either low or high priority. However, in crowded networks, two-level classification may not be sufficient. In addition, packets prioritized at one router hop might be rejected at the next.

Accepted as an IETF standard in 1997, RSVP does not attempt to govern who should receive bandwidth, and questions remain about what will happen when several users all demand a large block of bandwidth at the same time. Currently, the technology outlines a first-come, first-served response to this situation. The IETF has formed a task force to consider the issue.

Because RSVP provides a special level of service, many people equate QoS with the protocol. For example, Cisco currently uses RSVP in its IPv4-based internetwork router operating system to deliver IPv6-type QoS features. However, RSVP is only a small part of the QoS picture because it is effective only as far as it is supported within a given client/server connection. Although RSVP allows an application to request latency and bandwidth, RSVP does not provide for congestion control or network-wide priority with the traffic flow management needed to integrate QoS across an enterprise. Further, RSVP does not address the particular challenges related to delivering packets over a wireless medium.

The present invention supports RSVP by providing: (1) compatibility with RFC 2205; (2) recognition and support of RSVP messages, including: Path messages, Reservation (Resv), Path teardown messages, Resv teardown messages, Path error messages, Resv error messages, and Confirmation messages; (3) recognition and support of RSVP objects, including: Null, Session, RSVP_Hop, Time_Values, Style, Flowspec, Sender_Template, Sender_Tspec, Adspec, Error_ Spec, Policy_Data, Integrity, and Scope, Resv_Confirm; (4) configurable translation of RSVP Flowspecs for QoS resource allocation in wireless base station **302**.

The present invention provides support of DiffServ and RSVP/int-serv by providing: (1) support of RFC 2474 and 2475; (2) DiffServ in the core of Internet; (3) RSVP/int-serv for hosts and edge networks; (4) admission control capability for DiffServ compatibility; (5) differentiated services (DSs) (a field marking supported for use by DiffServ, and translation into a wireless base station **302** resource allocation); and (6) support for binding of multiple end-to-end sessions to one tunnel session.

4. Real-Time Transport Protocol (RTP) and Real-Time Control Protocol (RTCP)

TCP of transport layer **410** can have a RTP and RTCP enhancement. Real-time transport protocol (RTP) is an emerging protocol for the Internet championed by the audio/video transport workgroup of the IETF. Referring to FIG. **7**, RTP and RTCP header fields **708** can include several sub fields of information. RTP supports real-time transmission of interactive voice and video over packet-switched networks. RTP is a thin protocol that provides content identification, packet sequencing, timing reconstruction, loss detection, and security. With RTP, data can be delivered to one or more destinations, with a limit on delay.

RTP and other Internet real-time protocols, such as the Internet stream protocol version 2 (ST2), focus on the effi-

**44**

ciency of data transport. RTP and other Internet real-time protocols like RTCP are designed for communications sessions that are persistent and that exchange large amounts of data. RTP does not handle resource reservation or QoS control. Instead, RTP relies on resource reservation protocols such as RSVP, communicating dynamically to allocate appropriate bandwidth.

RTP adds a time stamp and a header that distinguishes whether an IP packet is data or voice, allowing prioritization of voice packets, while RSVP allows networking devices to reserve bandwidth for carrying unbroken multimedia data streams.

Real-time Control Protocol (RTCP) is a companion protocol to RTP that analyzes network conditions. RTCP operates in a multi-cast fashion to provide feedback to RTP data sources as well as all session participants. RTCP can be adopted to circumvent datagram transport of voice-over-IP in private IP networks. With RTCP, software can adjust to changing network loads by notifying applications of spikes, or variations, in network transmissions. Using RTCP network feedback, telephony software can switch compression algorithms in response to degraded connections.

5. IP Multi-Casting Protocols

IP **429** of network layer **408** can also support multi-casting protocols. Digital voice and video comprise of large quantities of data that, when broken up into packets, must be delivered in a timely fashion and in the right order to preserve the qualities of the original content. Protocol developments have been focused on providing efficient ways to send content to multiple recipients, transmission referred to as multi-casting. Multi-casting involves the broadcasting of a message from one host to many hosts in a one-to-many relationship. A network device broadcasts a message to a select group of other devices such as PCS or workstations on a LAN, WAN, or the Internet. For example, a router might send information about a routing table update to other routers in a network.

Several protocols are being implemented for IP multi-casting, including upgrades to the Internet protocol itself. For example, some of the changes in the newest version of IP, IPv6, will support different forms of addressing for uni-cast (point-to-point communications), any cast (communications with the closest member of a device group), and multi-cast. Support for IP multi-casting comes from several protocols, including the Internet group management protocol (IGMP), protocol-independent multi-cast (PIM) and distance vector multi-cast routing protocol (DVMRP). Queuing algorithms can also be used to ensure that video or other multi-cast data types arrive when they are supposed to without visible or audible distortion.

Real-time transport protocol (RTP) is currently an IETF draft, designed for end-to-end, real-time delivery of data such as video and voice. RTP works over the user datagram protocol (UDP), providing no guarantee of in-time delivery, quality of service (QoS), delivery, or order of delivery. RTP works in conjunction with a mixer and translator and supports encryption and security. The real-time control protocol (RTCP) is a part of the RTP definition that analyzes network conditions. RTCP provides mandatory monitoring of services and collects information on participants. RTP communicates with RSVP dynamically to allocate appropriate bandwidth.

Internet packets typically move on a first-come, first-serve basis. When the network becomes congested, Resource Reservation Protocol (RSVP) can enable certain types of traffic, such as video conferences, to be delivered before less time-sensitive traffic such as E-mail for potentially a premium price. RSVP could change the Internet's pricing structure by offering different QoS at different prices. Using SLAs, dif-

Ericsson Ex. 1001, pg 66

US 7,496,674 B2

**45**

ferent QoS levels can be provided to users at CPE location stations depending on SLA subscription level.

The RSVP protocol can be used by a host, on behalf of an application, to request a specific QoS from the network for particular data streams or flows. Routers can use the RSVP protocol to deliver QoS control requests to all necessary network nodes to establish and maintain the state necessary to provide the requested service. RSVP requests can generally, although not necessarily, result in resources being reserved in each node along the data path.

RSVP is not itself a routing protocol. RSVP is designed to operate with current and future uni-cast and multi-cast routing protocols. An RSVP process consults the local routing database to obtain routes. In the multi-cast case for example, the host sends IGMP messages to join a multi-cast group and then sends RSVP messages to reserve resources along the delivery paths of that group. Routing protocols determine where packets are forwarded. RSVP is concerned with only the QoS of those packets as they are forwarded in accordance with that routing. The present invention delivers QoS-aware wireless PtMP access to users over a shared wireless bandwidth, and can take into account priority information provided within packet headers of packets in IP flows received for transmission over the wireless base station's bandwidth.

d. VPN Networks (Example Optional Protocols) at Network Layer

Also at network layer **406** are depicted example optional virtual private network (VPN) protocols point to point protocol (PPP) **420** and IPsec **422**, discussed below.

A plurality of protocol standards exist today for VPNs. For example, IP security (IPsec), point-to-point tunneling protocol (PPTP), layer 2 forwarding protocol (L2F) and layer 2 tunneling protocol (L2TP). The IETE has proposed a security architecture for the Internet protocol (IP) that can be used for securing Internet-based VPNs. IPsec facilitates secure private sessions across the Internet between organizational firewalls by encrypting traffic as it enters the Internet and decrypting it at the other end, while allowing vendors to use many encryption algorithms, key lengths and key escrow techniques. The goal of IPsec is to let companies mix-and-match the best firewall, encryption, and TCP/IP protocol products.

IPsec is designed to link two LANs together via an encrypted data stream across the Internet.

1. Point-to-Point Tunneling Protocol (PPTP)

Point-to-point tunneling protocol (PPTP) provides an alternate approach to VPN security than the use of IPsec. Unlike IPsec, which is designed to link two LANs together via an encrypted data stream across the Internet, PPTP allows users to connect to a network of an organization via the Internet by a PPTP server or by an ISP that supports PPTP. PPTP was proposed as a standard to the IETF in early 1996. Firewall vendors are expected to support PPTP.

PPTP was developed by Microsoft along with 3Com, Ascend and US Robotics and is currently implemented in WINDOWS NT SERVER 4.0, WINDOWS NT WORKSTATION 4.0, WINDOWS 95 via an upgrade and WINDOWS 98, available from Microsoft Corporation of Redmond, Wash.

The "tunneling" in PPTP refers to encapsulating a message so that the message can be encrypted and then transmitted over the Internet. By creating a tunnel between the server and the client, can tie up processing resources.

2. Layer 2 Forwarding (L2F) Protocol

Developed by Cisco, layer 2 forwarding protocol (L2F) resembles PPTP in that it also encapsulates other protocols inside a TCP/IP packet for transport across the Internet, or any other TCP/IP network, such as data network **112**. Unlike PPTP, L2F requires a special L2F-compliant router (which

**46**

can require changes to a LAN or WAN infrastructure), runs at a lower level of the network protocol stack and does not require TCP/IP routing to function. L2F also provides additional security for user names and passwords beyond that found in PPTP.

3. Layer 2 Tunneling Protocol (L2TP)

The layer 2 tunneling protocol (L2TP) combines specifications from L2F with PPTP. In November 1997, the IETF approved the L2TP standard. Cisco is putting L2TP into its Internet operating system software and Microsoft is incorporating it into WINDOWS NT 5.0. A key advantage of L2TP over IPsec, which covers only TCP/IP communications, is that L2TP can carry multiple protocols. L2TP also offers transmission capability over non-IP networks. L2TP however ignores data encryption, an important security feature for network administrators to employ VPNs with confidence.

4. IPsec

IP flows using the security encryption features of IPsec **422** are supported by the present invention. The integration of IPsec **422** flows of WINAAR architecture **400** are described below in the downlink and uplink directions with reference to FIGS. **17**A and **17**B, respectively. Wireless base station **302** supports prioritization of IPsec encrypted streams by placing the firewall at the wireless base station and unencrypting the datastream and packet header information prior to identification analysis. Through the wireless transmission medium, the frame stream already includes encryption of the frame data and implements frequency hopping.

IPsec provides for secure data transmission for, e.g., VPNs and eCommerce security. IPsec is compatible with RFC 2401-2407. IPsec is supported with IPv4 and IPv6, and also IPsec tunnel mode. Wireless base station **302** security protocol support includes authentication header (AH) and encapsulating security payload (ESP). Wireless base station **302** supports IPsec authentication (MD5), encryption algorithms, and automatic key management (IKE and ISAKMP/Oakley). Wireless base station **302** provides for a choice of transport mode or tunnel mode and selectable granularity of security service, such as, e.g., providing a single encrypted tunnel for all traffic between two hosts, or providing separate encrypted tunnel for each TCP connection between hosts.

e. Transport Layer

1. Transmission Control Protocol/Internet Protocol (TCP/IP) and User Datagram Protocol/Internet Protocol (UDP/IP)

As already discussed, internet protocol (IP) has become the primary networking protocol used today. This success is largely a part of the Internet, which is based on the transmission control protocol/internet protocol (TCP/IP) family of protocols. TCP/IP is the most common method of connecting PCs, workstations, and servers. TCP/IP is included as part of many software products, including desktop operating systems (e.g., Microsoft's Windows 95 or Windows NT) and LAN operating systems.

The most pervasive LAN protocol to date, has been IPX/SPX from Novell's NetWare network operating system (NOS). However, IPX/SPX is losing ground to TCP/IP. Novell now incorporates native IP support into NetWare, ending NetWare's need to encapsulate IPX packets when carrying them over TCP/IP connections. Both UNIX and Windows NT servers can use TCP/IP. Banyan's VINES, IBM's OS/2 and other LAN server operating systems can also use TCP/IP.

Transport layer four **410** can include transmission control protocol (TCP) or user datagram protocol (UDP) **427** part of the standard TCP/UDP/IP protocol family suite of networking protocols. As will be discussed further below and as already mentioned briefly above with reference to data network **142**, TCP is a standard protocol for segmenting traffic

Ericsson Ex. 1001, pg 67

47

into packets, transmitting, reassembling and retransmitting packets of information between a source and destination IP address. Referring now to FIG. **7**, TCP header fields **706** can include, e.g., source and destination port numbers, window size, urgent pointer, flags (SYN, ISN, PSH, RST, FIN), and maximum segment size (MSS). Both TCP and UDP provide a capability for the TCP/IP host to distinguish among multiple applications through port numbers. TCP can provide for a reliable, sequenced delivery of data to applications. TCP can also provide adaptive flow control, segmentation, and reassembly, and prioritization of data flows. UDP only provides unacknowledged datagram capability. The recently defined real time protocol (RTP), RFC 1889, can provide real time capabilities in support of multimedia, applications, for example.

TCP uses a window-based flow control. Each TCP source has a dynamically changing transmit window that determines how many packets it can transmit during each successive round-trip time (RTT). The TCP source can continue increasing its transmit window if no packets were lost within the last RTT. Once congestion is detected, the source TCP throttles back its transmission, i.e. it "backs-off," via a multiplicative decrease. An increasing width of the so-called TCP window versus time corresponds to increasingly longer bursts of packets. TCP's window flow-controlled protocol exhibits this effect of increasing throughput and buffer utilization until terminated by loss, followed by a period of rapid backoff.

TCP works over IP to provide end-to-end reliable transmission of data across data network **142**. TCP controls the amount of unacknowledged data in transit by dynamically reducing either window size or segment size. The reverse is also true in that increased window or segment size values achieve higher throughput if all intervening network elements have low error rates, support the larger packets, and have sufficient buffering to support larger window sizes.

f. Application Layer

Applications layer seven **412** can include applications **426** such as, e.g., over TCP, hypertext transport protocol (HTTP), file transfer protocol (FTP), TELNET remote terminal login, and simple simple mail transfer protocol(SMTP); and over UDP, simple network management protocol (SNMP), RPC, NFS, and TFTP. Other applications can also run over the network stack such as, e.g., a world wide web browser such as NETSCAPE NAVIGATOR available from AOL of Reston, Va., a spreadsheet application program such as LOTUS 123 available from IBM of Armonk, N.Y. or a video teleconferencing program such as MS NetMeeting available from MICROSOFT of Redmond, Wash. Packets transmitted from such applications could require special handling and prioritization to achieve an appropriate end-user QoS.

3. PRIMMA-System IP Flow Prioritization

a. Scheduling of Mixed IP Flows

FIG. **6** illustrates block diagram **600** representing scheduling of mixed IP flows. Block diagram **600** shows the scheduling of wireless base station **302**. The functionality of block diagram **600** includes PRIMMA management of Internet, VPN, and realtime IP flows. Referring back to FIG. **3A**, wireless IP flows are coming from data network **142** via network router **140**d to interface **320** of wireless base station **302**. IP flows are then scheduled for transmission from wireless base station **302** via antenna **290**d through subscriber location **306**d via antenna **292**d.

Referring back to block diagram **600** of FIG. **6**, illustrated therein are the downlink and uplink flows between interface **320** and wireless base station antenna **290**d. An IP flow, as described herein, refers to a series of related packets of data transmitted from a source to a destination post computer. IP

48

flow **630** from data network **142** (over interface **320**) comprises Internet IP flows **608**, VPN IP flows **610**, and realtime IP flows **612**. IP flow **630** is in the downlink direction.

Downlink IP flow analyzer **602** (hereinafter downlink flow analyzer **602**) analyzes Internet IP flow **608**, VPN IP flow **610** and realtime IP flow **612**. IP flow analyzer **602** is described further below with reference to FIGS. **8A** and **15A**. IP flow analyzer **602** receives packets and analyzes packet header fields to identify new or existing IP flows. IP flow analyzer **602** can also characterize QoS requirements for the IP flow depending on packet header field contents. IP flow analyzer **602** can classify the IP flow and associate a given packet with other packets from an existing IP flow and can group together IP flows with similar QoS requirements. IP flow analyzer **602** can also present the IP flows to a flow scheduler.

Downlink PRIMMA MAC IP flow scheduler **604** (hereinafter downlink flow scheduler **604**) schedules received IP flows **608**, **610**, and **612** for transmission in the downlink direction. Downlink flow scheduler **604** can prioritize the different classes of IP flows. For example, scheduler **604** can reserve slots in downlink frames for latency sensitive IP flows; for FTP type IP flows **608**, downlink scheduler **604** can allocate large amounts of bandwidth for file transfer; and for e-mail type IP flows **608**, a lower priority can be given to packets. In prioritizing allocation of wireless bandwidth frame slots, downlink flow scheduler **604** can take into account the fact that an IP flow **630** is a VPN IP flow **610** from a virtual private network (VPN), such as, e.g., a remote branch office tieing into a corporate network. All traffic from a VPN can be given a higher priority or specific types of VPN traffic can request particular service levels. Downlink flow scheduler **604** can prioritize realtime IP flows **612** such that their arrival at CPEs **294** at CPE subscriber locations **306** will occur as required.

Downlink PRIMMA MAC segmentation and resequencing (SAR) and framer **606** (hereinafter downlink SAR and framer **606**) segments and frames the data packets of received IP flows into frames for transmission over the wireless medium to CPEs **294** at CPE subscriber locations **306**. For example IP flow **616**, **624** can be transmitted to CPE **294**d at CPE subscriber location **306**d, via base station antenna **290**d over a wireless medium to subscriber antenna **292**d and CPE **294**d at CPE subscriber location **306**d. In the present invention, the term wireless medium is used to broadly encompass not only propagation of RF transmissions over cellular communications, but also RF transmissions over satellite communications and cable (e.g., coaxial cable) communications.

In the uplink direction, IP flow **626** from CPE **294**d at CPE subscriber station **306**d is received at wireless base station antenna **290**d. IP flow **626** can include Internet IP flow **618**, VPN IP flow **620** and realtime IP flow **622**. Uplink IP flow analyzer **632** (hereinafter uplink flow analyzer **632**) analyzes Internet IP flow **618**, VPN IP flow **620** and realtime IP flow **622**. Uplink flow analyzer **632** is described further below with reference to FIGS. **8**B and **15**B. In one embodiment, the functionality of IP flow analyzer **632** occurs at the CPE **294**d at subscriber CPE location **306**d and sends a request to transmit data up to wireless base station **302**, including information about an IP flow for which CPE **294**d would like to schedule an uplink slot.

Uplink PRIMMA MAC IP flow scheduler **634** (hereinafter uplink flow scheduler **634**) can schedule the requested IP flow. In one embodiment, the functionality of scheduler **634** can be performed at CPE **294**d at subscriber CPE location **306**d. In another embodiment, the functionality of scheduler **634** can be performed at the wireless base station **302**. An advantage of placing uplink flow scheduler **634** at the wireless base station is that this provides efficiencies particularly

Ericsson Ex. 1001, pg 68

US 7,496,674 B2

**49**

in a point-to-multi-point architecture. It is more efficient to have one centralized scheduler at the base station **302** rather than to place multiple uplink flow schedulers **634** at CPEs **294** of subscriber CPE locations **306**.

Uplink PRIMMA MAC segmentation and resequencing (SAR) and framer **636** (hereinafter SAR and framer **636**) can segment and frame the data packets of IP flows into frames for transmission over the wireless medium from CPE **294** at CPE subscriber locations **306** to wireless base station **302** for further transmission over data network **142**. IP flow **626** from CPE **294***d* at CPE subscriber location **306***d* can be transmitted to base station antenna **290***d* over a wireless medium such as, e.g., RF communication, cable modem and satellite communication, from subscriber antenna **292***d* coupled to CPE **294***d* at CPE subscriber location **306***d*.

b. Summary of Downlink and Uplink SubFrame Prioritization

Block diagram **800** of FIG. **8A** summarizes an exemplary downlink analysis, prioritization and scheduling function. Similarly, block diagram **830** of FIG. **8B** summarizes an exemplary uplink analysis prioritization and scheduling function. Block diagram **800** and **830** are more detailed views of the function of block diagram **600** of FIG. **6**.

Beginning with block diagram **800** (of FIG. **8A**), it depicts how IP flow prioritization and scheduling of a-shared wireless bandwidth is performed in the downlink path, from data network **142**—to router **140***d*—to interface **320**—to wireless base station **302**—WAP **290***d*—over a wireless medium—to wireless transceiver subscriber antenna **292***d*—to subscriber CPE station **294***d* at subscriber CPE location **306***d*.

IP flow analyzer **602** performs the function of identifying, characterizing, classifying, and presenting data packets to a downlink frame scheduler. The functions of identifying, characterizing, classifying and presenting the data packets are described with respect to FIG. **15A**.

During identification, it is determined whether a data packet of an incoming IP data flow is known to the system, i.e. is an "existing IP flow", or rather is the first data packet of a new IP data flow, based on fields in a packet header section. Identification can also include, e.g., determining the source of the packet in order to extrapolate the type of information in the packet payload.

During characterization, a new data packet (of a new IP data flow) previously unknown to the system is characterized based on the packet header information to determine the QoS requirements for the IP data flow, and to identify the subscriber CPE station that will receive the IP data flow.

During classification, the new IP data flow is classified into a communications priority class. Classification can also include grouping together packets from different IP flows having similar characteristics into a single class. Example class groupings of IP flows **630** are illustrated as IP classes **810***a*-810***g*.

During presentation, the new IP data flow is initialized and presented to a downlink flow scheduler **604**.

Downlink flow scheduler places the data packets of an IP data flow into a class queue based on class queue priorities, and using a set of rules, schedules the data packets for transmission over a wireless medium to a subscriber CPE station **294** at subscriber CPE location **306** with an advanced reservation algorithm. The rules are determined by inputs to the downlink flow scheduler based on, e.g., a hierarchical class-based prioritization, a virtual private network (VPN) directory enabled data priority (such as, for example, directory enabled networking (DEN)), and a service level agreement

**50**

priority. The advanced reservation algorithm for use in scheduling, e.g., isochronous traffic, is described with respect to FIG. **14** below.

SAR and framer **606** breaks up, sequences, and frames the data packets for wireless transmission from WAP **290***d* over the wireless medium to a wireless transceiver subscriber antenna **292**. Illustrated in block diagram **800** are a number of subscriber applications **820***a*-820***e* running on devices such as, e.g., subscriber workstation **120***d* (not shown), connected to subscriber CPE stations **294***a*-*e* (not shown) located at subscriber CPE locations **306***a*-306***e*. Each subscriber CPE location **306** can house one or more subscriber CPE stations **294**, and each subscriber CPE station **294** can receive and transmit one or more IP data flows to and from one or more subscriber workstations **120**. In fact, each application connected to a single CPE station can receive or transmit multiple IP data flows.

Referring to subscriber CPE location **306***a* of FIG. **8A**, a CPE SAR and framer **814***a* resequences the received data and transmits it through CPE flow scheduler **816***a*, and CPE IP flow analyzer **818***a*, to subscriber application **820***a*. CPE IP flow schedulers **816***a*-816***e* can perform the same function as downlink flow scheduler **604** for uplink traffic. Similarly, CPE IP flow analyzers **818***a*-818***e* perform the same function as downlink flow analyzer **602**.

In an embodiment of the invention, in downlink mode, CPE IP flow schedulers **816***a*-816***e* and CPE IP flow analyzers **818***a*-818***e* perform no function.

Block diagram **800** illustrates the logical functions performed on the downlink path, not necessarily the physical locations of these functions.

The functions of subscriber applications **820***a*-820***e*, and CPE SAR and framers **814***a*-814***e* can be performed in actual subscriber CPE stations **294** connected over a wireless connection to wireless base station **302**.

Block diagram **800** lists an exemplary set of priorities **812** used by downlink flow scheduler **604** to place received data packets into priority class queues. Listed are the following set of example priorities: latency-sensitive UDP priority **812***a*, high priority **812***b*, intermediate priority **812***c*, initial hypertext transfer protocol (HTTP) screens priority **812***d*, latency-neutral priority **812***e*, file transfer protocol (FTP), simple mail transfer protocol (SMTP) and other e-mail traffic priority **812***f* and low priority **812***g*. Persons skilled in the art will recognize that many different priority classes are possible, depending upon the QoS requirements of the end-users. Latency-sensitive UDP priority data can refer to data that has the highest priority because it is sensitive to jitter (i.e., time synchronization is important) and latency (i.e., the amount of time passage between IP data flows in reverse directions). High priority **812***b* can refer to, e.g., premium VPN service, and a high priority SLA service. Intermediate priority **812***c* can refer to, e.g., a value VPN service level and an intermediate level SLA service. HTTP screens priority **812***d* can refer to the download of HTTP data, for example, an initial HTTP screen, which is important for making an Internet user feel as if he has a great deal of bandwidth available for his Internet session. Latency-neutral priority **812***e* can refer to data that is neutral to latency, such as, e.g., e-mail traffic. FTP, SMTP priority **812***f* data includes data that is insensitive to latency and jitter, but requires a large amount of bandwidth to be downloaded accurately because of the size of a transmission. Finally, low priority data **812***g* can refer to data that can be transmitted over a long period of time, as when one network device transmits its status information to another network device on a 24 hour basis.

Ericsson Ex. 1001, pg 69

**A0113**

US 7,496,674 B2

**51**                                                                                      **52**

Block diagram **830** (of FIG. **8**B) depicts how IP flow analysis, prioritization and scheduling of the shared wireless bandwidth is performed in the uplink path, from subscriber CPE station **294***d*—to wireless transceiver subscriber antenna **292***d*—over the wireless medium—to WAP **290***d*—to wireless base station **302**—to interface **320**—to router **140***d*—to data network **140**.

Block diagram **830** includes uplink flow analyzer **632**, uplink flow scheduler **634** and uplink SAR and framer **636**. These components are similar in function to downlink flow analyzer **602**, downlink flow scheduler **604** and downlink SAR and framer **606**, but instead analyze, schedule and sequence and frame data packets being transmitted from subscriber workstations **120** of subscriber CPE stations **294** (at subscriber CPE locations **306***a*-**306***e*) over the wireless medium, and transmit the data packets to interface **320** for transmission to data network **142**.

Illustrated in FIG. **8**B are subscriber applications **820***a*-**820***e*, which are the same applications shown in FIG. **8**A. Also shown therein are CPE IP flow analyzers **819***a*-**819***e*, CPE IP flow schedulers **817***a*-**817***e*, and CPE SAR and framers **815***a*-**815***e*. These components function analogously to subscriber applications **820***a*-**820***e*, CPE IP flow analyzers **818***a*-**818***e*, CPE IP flow schedulers **816***a*-**816***e*, and CPE SAR and framers **814***a*-**814***e*. However, these components function to analyze, schedule and transmit IP flows in the uplink path, from subscriber CPE stations (at subscriber CPE locations **306***a*-**306***e*) to wireless base station **302** for routing to destination host workstations **136** (not shown).

As noted, multiple applications can be connected to one or more subscriber CPE stations at subscriber CPE locations **306***a*-**306***e*. To prevent collisions between multiple applications contending for a fixed number of bandwidth allocations for uplink communication, in one embodiment of the present invention a reservation scheduling system is used. The bandwidth allocations for data packets are called frame slots, and are described below with respect to FIGS. **12**A-**12**Q, **14**, **16**A and **16**B.

Block diagram **830** illustrates the logical functions performed on the uplink path, not necessarily the physical functions of these functions.

For example, in one embodiment, the analysis function of IP flow analyzer **632** which identifies a packet for uplink, characterizes and classifies the packet, can occur in a preferred embodiment in CPE IP flow analyzers **819***a*-**819***e* at the CPE subscriber stations **294***a*-**294***e* (not shown) at subscriber locations **306***a*-**306***e*.

Also, one embodiment, the functions of CPE IP flow schedulers **817***a*-**817***f* for scheduling uplinks subframe slots can be performed in wireless base station **302** for each of the subscriber CPE stations **294** connected over the wireless connection to wireless base station **302**.

In this embodiment, the scheduling function is performed at uplink flow scheduler **634** at wireless base station **302** based on classification information provided to the wireless base station **302** through an uplink IP flow reservation request from the CPE station. By placing all scheduling function at the wireless base station **302**, overall system quality of service can be optimized by centralizing the control of scheduling.

In another embodiment, however, their respective functions can be performed in the actual subscriber CPE stations.

In the reservation scheduling function of this embodiment, each subscriber CPE station requests the reservation of frame slots for its uplink transmissions using a reservation request block (RRB) of the TDMA airframe, described further below with reference to FIGS. **12**A-**12**O, before it is permitted to

communicate in the uplink path with interface **320**. After the reservation request, uplink flow scheduler **634** transmits, as indicated by line **640**, to the requesting subscriber CPE station **294** a description of one or more slots which the CPE station **294** can use to transmit its uplink data packets from source subscriber workstations **120**, over the wireless medium, which are directed toward destination host workstations **136**, over data network **142**.

c. Service Level Requests

FIG. **9** illustrates how PRIMMA MAC IP flow scheduler **604** can also take into account a Service Level Agreement in prioritizing frame slot scheduling and resource allocation. FIG. **9** depicts SLA-mediated IP flow management diagram **900** including prioritization of uplink traffic being transmitted to wireless base station **302** from CPE subscriber locations **306***a*, **306***b*, **306***c* and **306***d*. For example, suppose subscribers of telecommunications services have subscribed to one of four SLA levels, P1 **902***a*, P2 **904***a*, P3 **906***a* and P4 **908***a*. In the illustrated example, suppose IP flows **902***b* are being sent to a subscriber at CPE location **306***a* and have an SLA priority level of P1 **902***a*. Similarly, IP flows **904***b*, **906***b* and **908***b* are being sent to subscribers at CPE locations **306***b*, **306***c* and **306***d* and have SLA priority levels of P2 **904***a*, **906***a* and **908***a*, respectively. PRIMMA MAC scheduler **604**, **634** of wireless base station **302** can take into account SLA-based priorities in allocating available bandwidth to the subscriber CPE IP flows **902***b*, **904***b*, **906***b* and **908***b*. In the example illustration, IP flow **902***b* can be allocated frame slot **902***c* based on SLA priority **902***a*. Frame slots **904***c*, **906***c* and **908***c* can be similarly scheduled taking into account SLA priorities. Uplinked IP flow traffic can then be transmitted on to data network **142**.

SLA-based prioritization can provide a valuable means for a telecommunications provider to provide differentiated services to a variety of customers. For example, it is possible that low priority traffic from a subscriber who has purchased a premium SLA service agreement, can be scheduled at a higher priority than high priority traffic from a subscriber which has only signed up for a value level or low cost SLA service priority.

d. Identification of Headers

FIG. **7** illustrates packet header field information **700** which can be used to identify IP flows and the QoS requirements of the IP flows. Specifically, IP header fields **702** can include, e.g., source and destination IP addresses, helpful in providing application aware preferential resource allocation; IP type of service (TOS), a useful field for assisting PRIMMA MAC in classifying a packet or IP flow; IP time to live (TTL), a useful field for anticipating application packet discards; and protocol fields which can be used in identifying IP flows.

Packet header information **700** also includes UDP header fields **704**. Included in UDP packet header fields **704** are source and destination port numbers.

Packet header information **700** also includes TCP header fields **706**. Included in TCP. packet header fields **706** are source and destination port numbers; TCP sliding window size; urgent pointer; SYN, ISN, PSH, RST and FIN flags; and maximum segment size (MSS).

Packet header information **700** also includes realtime protocol RTP and RTCP header fields **708**.

It would be apparent to those skilled in the art that other packet header fields could be useful in identifying an IP flow. The fields have been given by way of example and are not intended to be an exhaustive list of useful packet header fields. Other fields, such as, e.g., fields from IPv6 relating to differentiated services (DIFF SERV) could also be useful to IP flow analyzer **602** and **632** of wireless base station **302**.

Ericsson Ex. 1001, pg 70

US 7,496,674 B2

**53**

e. TDMA MAC Air Frame

FIGS. **12A-12O** illustrate an exemplary time domain multiple access (TDMA) media access control (MAC) transmission air frame. The fields described herein merely refer to one embodiment for the present invention, and are not limiting to the numerous implementations of the present invention.

FIG. **12A** illustrates an entire TDMA MAC transmission air frame. Air frame **1202** includes downstream transmission subframe **1202** and upstream transmission subframe **1204**.

The TDMA MAC air frame of FIG. **12A** includes upstream acknowledgment block (UAB) **1206**, acknowledgment request block (ARB) **1208**, frame descriptor block (FDB) **1210**, data slot (DS)$_1$ **1212a**, DS$_2$ **1212b**, DS$_3$ **1212c**, DS$_4$ **1212d**, DS$_5$ **1212e**, DS$_6$ **1212f**, DS$_7$ **1212g**, DS$_8$ **1212h**, DS$_9$ **1212i**, DS$_{10}$ **1212j**, DS$_{11}$ **1212k**, DS$_m$ **1212l**, downstream acknowledgment block (DAB) **1214**, reservation request block (RRB) **1216**, UA$_1$ **1218a**, UA$_2$ **1218b**, UA$_3$ **1218c**, UA$_4$ **1218U**, UA$_5$ **1218e**, UA$_6$ **1218f**, UA$_7$ **1218g**, UA$_8$ **1218h**, UA$_9$ **1218i**, UA$_{10}$ **1218j**, UA$_{11}$ **1218k**, UA$_{12}$ **1218l**, and UA$_n$ **1218m**.

In the embodiment described herein, the type of TDMA used is TDMA/time division duplex (TDMA/TDD). In TDMA/TDD, for one interval of time, transmission is from a CPE station **294** to a wireless base station **302**, and in another instance of time, it is from a wireless base station **302** to a CPE station **194**. Any number of slots can be used for the uplink or for the downlink. The number of slots is dynamically assigned for both the uplink and the downlink. However, because the downlink data rate is usually higher than the uplink data rate, more slots are assigned to the downlink. Although distribution of slots between the downlink and uplink is dynamically assigned, the total number of slots for a frame is fixed in this embodiment.

**54**

FIG. **12B** is a symbolic illustration of an exemplary TDMA/TDD air frame **1220** of the present invention. TDMA/TDD air frame structure **1220** depicts a frame of frame size **1228**, which can be, e.g., 16 slots or 32 slots. It would be apparent to those skilled in the art that frame structures **1220** having other numbers of slots could be used without departing from the spirit and scope of the invention. Frame structure **1220** includes, e.g., various TDMA slots **1222a**, **1222b**, **1222c** and **1222d**. Within each TDMA slot **1222a-c**, can be included a data slot **1224a**, **1224b**, **1224c** and **1224d** which in turn can contain a control packet **1226a**, or a data packet **1226b-d**, respectively.

In the present embodiment the sum of all TDMA slots **1222** within a frame of frame size **1228** is fixed. However, as noted, using the resource allocation methodologies of the present invention it is possible to dynamically allocate a subset of the entire number of TDMA slots **1222** to an uplink direction, where all the uplink TDMA slots are known collectively as an uplink subframe or an upstream transmission subframe **1204**, and to dynamically allocate a subset of the entire number of TDMA slots **1222** to a downlink direction, where all the downlink TDMA slots are known collectively as a downlink subframe or an downlink transmission subframe **1202**. Using the resource allocation method of the present invention, it is possible to allocate all TDMA slots **1222** to a given upstream or downstream direction. It is further possible to allocate all data slots **1224** to a single CPE station. The wireless base station **302** has a state machine, and knows the state of each CPE station **294** having a connection therewith (i.e., having an IP flow recognized by the wireless base station **294**).

Downstream transmission subframe **1202** and upstream transmission subframe **1204** are described in detail below.

TABLE 5

| MAC Air Frame | Slots | Block/SubFrame | Name | Description |
|---|---|---|---|---|
| 0 | 1-8 | DAB/Upstream | Downstream Acknowledgment Request Block | Acknowledgments from subscribers CPE stations to wireless base station of receipt of downstream slots in previous downstream subframe |
| 0 | 1-8 | RRB/Upstream | Reservation Request Block | Requests from subscriber CPE stations for transmission reservations in later frames with dynamically adjustable number of contention slots |
| 0 | up to 16 | US$_1$-US$_{16}$/Upstream | Upstream Slot Transmissions | Data slots in the upstream subframe, which is a variable number per frame (up to 16 in one embodiment) |
| 0 | 1-3 | ODB/Upstream | Operations Data Block | OA&MP data from subscribers sequenced by a subscriber CPE station per frame |
| 0 | 0 | UAB/Downstream | Upstream Acknowledgment Block | Acknowledgments from wireless base station to subscriber CPE stations of receipt of upstream slots in a previous subframe |
| 0 | 0 | ARB/Downstream | Acknowledgment Request Block | Acknowledgments of subscriber CPE requests of having received reservation requests in a previous subframe |
| 0 | 0 | FD/Downstream | Frame Descriptor Block for current frame | Describes the contents of the downstream transmission subframe |
| 0 | up to 16 | DS$_1$-DS$_{16}$/Downstream | Downstream Slot Transmissions | Data slots in the downstream subframe, which is variable per frame (up to 16 in one embodiment) |
| 0 | 0 | CCB/Downstream | Command and Control Block | OA&MP commands sequenced by subscribers per frame and frame synchronization |

Ericsson Ex. 1001, pg 71

**A0115**

55

56

### 1. Downstream Transmission SubFrames

FIG. **12**C depicts an exemplary downstream transmission subframe **1202**. The downstream transmission subframe of FIG. **12**C includes transmitter turnaround time **1230**, UAB **1206**, ARB **1208**, FDB **1210**, a variable number of DSs per frame (e.g., 16) **1212**, and command and control block (CCB) **1232**. The DS transmissions **1212** include $DS_1$ **1212**$a$, $DS_2$ **1212**$b$, $DS_3$ **1212**$c$, $DS_4$ **1212**$d$, $DS_5$ **1212**$e$, $DS_6$ **1212**$f$, $DS_7$ **1212**$g$, $DS_8$ **1212**$h$, $DS_9$ **1212**$i$, $DS_{10}$ **1212**$j$, $DS_{11}$ **1212**$k$, and $DS_m$ **1212**$l$.

FIG. **12**D depicts an exemplary UAB **1206** of a downstream transmission subframe **1202**. The downstream transmission subframe of FIG. **12**D includes UAB **1206**, ARB **1208**, FDB **1210**, $DS_1$ **1212**$a$, $DS_2$ **1212**$b$, $DS_3$ **1212**$c$, $DS_4$ **1212**$d$, $DS_5$ **1212**$e$, $DS_6$ **1212**$f$, $DS_7$ **1212**$g$, $DS_8$ **1212**$h$, $DS_9$ **1212**$i$, $DS_{10}$ **1212**$j$, $DS_{11}$ **1212**$k$, $DS_m$ **1212**$l$, and CCB **1232**.

UAB **1206** includes subslots $UAB_1$ **1206**$a$, $UAB_2$ **1206**$b$, $UAB_3$ **1206**$c$, $UAB_4$ **1206**$d$, $UAB_5$ **1206**$e$, $UAB_6$ **1206**$f$, $UAB_7$ **1206**$g$, and $UAB_n$ **1206**$h$. $UAB_1$ **1206**$a$ includes a preamble **1234**$a$, subscriber ID **1234**$b$, IP-flow identifier **1234**$c$, slot sequence number **1234**$d$, and cyclical redundancy check (CRC) **1234**$e$.

The UAB field is an acknowledgment by a wireless base station **302** to a CPE station **294** that the slots (e.g., $US_1$-$US_{16}$) of an upstream transmission subframe have been received. The reader is referred to the discussion of the upstream transmission subframe below.

In subslot $UAB_1$ **1206**$a$ of ARB **1208**: preamble **1234**$a$ includes data used for link integrity purposes; subscriber ID **1234**$b$ identifies which CPE station **294** is making the reservation request; IP-flow identifier **1234**$c$ identifies the IP data flow; quality of service data class **1234**$a$ identifies the priority class of the IP data flow, if known to the CPE station **294**; IP-flow priority and type **1234**$b$ is an indicator of a new IP data flow; and CRC **1234**$e$, which stands for cyclic redundancy code, provides error checking bits for subslot $RRB_1$ **1216**$a$.

FIG. **12**E depicts an exemplary ARB **1208** of a downstream transmission subframe **1202**. The downstream transmission subframe of FIG. **12**E includes UAB **1206**, ARB **1208**, FDB **1210**, $DS_1$ **1212**$a$, $DS_2$ **1212**$b$, $DS_3$ **1212**$c$, $DS_4$ **1212**$d$, $DS_5$ **1212**$e$, $DS_6$ **1212**$f$, $DS_7$ **1212**$g$, $DS_8$ **1212**$h$, $DS_9$ **1212**$i$, $DS_{10}$ **1212**$j$, $DS_{11}$ **1212**$k$, $DS_m$ **1212**$l$, and CCB **1232**.

ARB **1208** includes subslots $ARB_1$ **1208**$a$, $ARB_2$ **1208**$b$, $ARB_3$ **1208**$c$, $ARB_4$ **1208**$d$, $ARB_5$ **1208**$e$, $ARB_6$ **1208**$f$, $ARB_7$ **1208**$g$, and $ARB_n$ **1208**$h$. $ARB_1$ **1208**$a$ includes a preamble **1234**$a$, subscriber ID **1234**$b$, IP-flow identifier **1234**$c$, slot sequence number **1234**$d$, and CRC **1234**$e$.

The ARB field is an acknowledgment by a wireless base station **302** to a CPE station **294** that the wireless base station **302** has received an upstream reservation request from the CPE station **294**. The reader is referred to the discussion of the upstream transmission sub frame below.

In subslot $ARB_1$ **1208**$a$ of ARB **1208**: preamble **1234**$a$ includes data used for link integrity purposes; subscriber ID **1234**$b$ identifies which CPE station **294** is making the reservation request; IP-flow identifier **1234**$c$ identifies the IP data flow; quality of service data class **1234**$a$ identifies the priority class of the IP data flow, if known to the CPE station **294**; IP-flow priority and type **1234**$b$ is an indicator of a new IP data flow; and CRC **1234**$e$, which stands for cyclic redundancy code, provides error checking bits for subslot $RRB_1$ **1216**$a$.

FIG. **12**F depicts an exemplary FDB **1210** of a downstream transmission subframe **1202**. The downstream transmission subframe of FIG. **12**F includes UAB **1206**, ARB **1208**, FDB **1210**, $DS_1$ **1212**$a$, $DS_2$ **1212**$b$, $DS_3$ **1212**$c$, $DS_4$ **1212**$d$, $DS_5$

**1212**$e$, $DS_6$ **1212**$f$, $DS_7$ **1212**$g$, $DS_8$ **1212**$h$, $DS_9$ **1212**$i$, $DS_{10}$ **1212**$j$, $DS_{11}$ **1212**$k$, $DS_m$ **1212**$l$, and CCB **1232**.

The FDB includes detailed information pertaining to the slots (e.g., $DS_2$-$DS_{16}$) of the downstream transmission subframe.

FDB **1210** includes a preamble subslot **1236**$a$, number of downstream slots subslot, **1236**$b$, IP-flow ID for upstream reservation **1** subslot **1236**$c$, IP-flow ID for upstream reservation **2** subslot **1236**$d$, IP-flow ID for upstream reservation n subslot **1236**$e$, and contention slot count for next upstream sub frame subslot **1236**$f$.

In FDB **1210**, the fields are defined as follows: preamble subslot **1236**$a$ includes data used for link integrity purposes; number of downstream slots subslot **1236**$b$ includes the number of downstream slots (DSs), IP-flow ID for downstream reservation subslot **1236**$c$ includes an IP flow identification for $DS_1$; IP-flow ID for downstream reservation subslot **1236**$d$ includes a second IP flow identification for $DS_2$; IP-flow ID for downstream reservation n subslot **1236**$e$ includes another IP flow identification for $DS_n$; contention slot count for next upstream subframe subslot **1236**$f$ provides a count for the next available upstream subframe.

FIG. **12**G depicts an exemplary downstream MAC payload data unit (PDU). The downstream MAC PDU includes information regarding the actual structure of the payload. The downstream MAC PDU of FIG. **12**G includes MAC linked list sequence number **1238**$a$ (the sequence, number of the MAC linked list), reservation request index number **1238**$b$ (an index to the downstream IP flow); compressed IP-flow identifier **1238**$c$, compressed IP-flow priority and type **1238**$d$ (identifying the priority and type of a compressed IP flow), slot payload **1238**$e$ (the amount of data in a downstream data slot), and CRC **1234**$e$ (error checking information).

FIG. **12**H depicts an exemplary CCB of a downstream transmission subframe **1202**. The CCB comprises OAM&P commands sequenced by subscriber CPE station **294** per frame and frame synchronization. CCB **1232** includes a mode command subslot **1240**$a$ (includes options of what mode the CPE station is to take), profile command subslot **1240**$b$ (includes specific system commands, such as a patch for a module), control data index subslot **1240**$c$ (including download locations and memory requirements or other information needed by the CPE stations to download data), datablock **1** subslot **1240**$d$ (includes specific system data), datablock **2** subslot **1240**$e$ (same), datablock n subslot **1240**$f$ (same), and CRC subslot **1234**$e$ (error checking information).

### 2. Upstream Transmission SubFrames

FIG. **12**I depicts an exemplary upstream transmission subframe **1204**. The upstream transmission subframe of FIG. **12**I includes transmitter turnaround time **1230**, DAB **1214**, RRB **1216**, a variable number of USs per frame, e.g., 16, **1218**, and operations data block (ODB) **1242**, consisting of OAM&P data from subscribers, sequenced by subscriber per frame. The US transmissions **1218** include $US_1$ **1218**$a$, $US_2$ **1218**$b$, $US_3$ **1218**$c$, $US_4$ **1218**$d$, $US_5$ **1218**$e$, $US_6$ **1218**$f$, $US_7$ **1218**$g$, $US_8$ **1218**$h$, $US_9$ **1218**$i$, $US_{10}$ **1218**$j$, $US_{11}$ **1218**$k$, $US_{12}$ **1218**$l$, and $US_n$ **1218**$m$.

FIG. **12**K depicts an exemplary RRB **1216** of an upstream transmission subframe **1204**. The upstream transmission subframe of FIG. **12**K also shows DAB **1214**, RRB **1216**, $US_1$ **1218**$a$, $US_2$ **1218**$b$, $US_3$ **1218**$c$, $US_4$ **1218**$d$, $US_5$ **1218**$e$, $US_6$ **1218**$f$, $US_7$ **1218**$g$, $US_8$ **1218**$h$, $US_9$ **1218**$i$, $US_{10}$ **1218**$j$, $US_{11}$ **1218**$k$, $US_{12}$ **1218**$l$, $US_n$ **1218**$m$, and ODB **1242**.

RRB **1216** includes subslots $RRB_1$ **1216**$a$, $RRB_2$ **1216**$b$, $RRB_3$ **1216**$c$, $RRB_4$ **1216**$d$, $RRB_5$ **1216**$e$, $RRB_6$ **1216**$f$, $RRB_7$ **1216**$g$, and $RRB_n$ **1216**$h$. $RRB_1$ **1216**$a$ includes a preamble

Ericsson Ex. 1001, pg 72

57

1234*a*, subscriber ID **1234***b*, IP-flow identifier **1234***c*, quality of service data class **1244***a*, IP-flow priority and type **1244***b*, and CRC **1234***e*.

A CPE station **294** uses one of the subslots (RRB₁ **1216***a*, RRB₂ **1216***b*, RRB₃ **1216***c*, RRB₄ **1216***d*, RRB₅ **1216***e*, RRB₆ **1216***f*, RRB₇ **1216***g*, and RRB₈ **1216***h*) of RRB **1216** to make a reservation request, which is a request by the CPE station **294** for bandwidth in a future uplink transmission subframe. If two CPE stations **294***d*, **294***e* attempt to access the same subslot in RRB **1216**, which can occur because their pseudo-random number generators select the same subslot, then a "collision" occurs and the data is not readable by wireless base station **302**. The two CPE stations **294***d*, **294***e* are required to try again.

Reservation request slots can be provided on an IP flow basis. Rather than allocate a reservation request slot to every CPE subscriber station, a default number (e.g., 5) are made available as contention slots. If collisions are detected by a greater number of requesting subscribers than the number of reservation request slots, then the slots allocated can be dynamically varied to provide additional RRB slots. (Collisions are analogous to CSMA/CD collisions in Ethernet, where colliding devices on an Ethernet network attempt to retransmit over the bus architecture by retrying at a random time.)

The radio contention method of the present invention builds upon aspects of the "Slotted Aloha" method developed by L. Roberts in 1972, as a refinement of the "Aloha" method developed by N. Abramson in the early 1970's, and so-called bit-mapped reservation protocols. Like the Slotted Aloha method, the present invention provides for discrete slots for transmission of data, rather than allowing the transmission of data at any point. However, instead of transmitting the actual "payload" of data, the present invention advantageously transmits only a "reservation request" describing the actual data payload contents. Also, the number of slots for reservation requests can advantageously be dynamically altered according to the frequency of detected collisions in the recent past.

Unlike various Carrier Sense Multiple Access (CSMA) techniques previously used in wireless, both persistent and non-persistent, the present method advantageously does not require that subscriber CPE station **294***d* "sense" the carrier (the radio channel) before transmission. Instead, a subscriber CPE station **294***d* selects a "subslot" to transmit through a pseudo-random number selection, without a prior carrier sense. If a collision is detected, the subscriber CPE station **294***d* will try again in the next frame using the pseudo-random number process.

Instead of using a bit-map protocol for the resolution of contention, as is used in some reservation protocols, the wireless base station can explicitly grant reservation requests. The standard bit-map protocol can require that all stations can receive signals from all other stations so that the subsequent order of transmission can be implicitly determined from the resulting bitmap pattern. The present method advantageously does not require the receipt of reservation request signals from other CPE subscriber stations **294***d*. This is advantageous because, at higher frequencies (such as, e.g., 2 GHz to 30 GHz) where there may be line-of-sight and distance constraints, the requirement for receipt of the transmissions of other CPE subscriber stations **294***d* could unduly constrain the topology, locations and distances of CPE subscriber stations.

Advantageously, by allowing the wireless base station **302** to explicitly grant the requested reservation, other factors such as relative or dynamic CPE subscriber station **294***d* (or

58

IP-flow) priority factors can be considered. Therefore, the present invention's reservation protocol with a dynamically adjustable number of contention subslots and explicit wireless base station reservation grants, allows a more optimal means of providing for the allocation of wireless, such as, e.g., radio, bandwidth in response to QoS requirements of IP-flows than any prior method.

As noted, RRB₁ **1216***a* includes the following fields: a preamble **1234***a*, subscriber ID **1234***b*, IP-flow identifier **1234***c*, quality of service data class **1244***a*, IP-flow priority and type **1244***b*, and CRC **1234***e*. In subslot RRB₁ **1216***a* of RRB **1216**: preamble **1234***a* includes data used for link integrity purposes; subscriber ID **1234***b* identifies which CPE station **294** is making the reservation request; IP-flow identifier **1234***c* identifies the IP data flow; quality of service data class **1234***a* identifies the priority class of the IP data flow, if known to the CPE station **294**; IP-flow priority and type **1234***b* is an indicator of a new IP data flow; and CRC **1234***e*, which stands for cyclic redundancy code, provides error checking bits for subslot RRB₁ **1216***a*. Optionally, an additional field can be provided in subslot RRB₁ **1216***a* which includes the number of data packets CPE station **294** will transmit in its IP data flow.

FIG. 12J depicts an exemplary DAB **1214** of an upstream transmission subframe **1204**, where a CPE acknowledges receipt of a slot from base. The DAB is an acknowledgment from a subscriber CPE station **294** to the wireless base station that downstream slots have been received in a previous subframe.

The DAB **1214** includes subslots DAB₁ **1214***a*, DAB₂ **1214***b*, DAB₃ **1214***c*, DAB₄ **1214***d*, DAB₅ **1214***e*, DAB₆ **1214***f*, DAB₇ **1214***g*, and DAB₈ **1214***h*. Subslot DAB₁ **1214***a* includes a preamble **1234***a*, subscriber ID **1234***b*, IP-flow identifier **1234***c*, slot sequence number **1234***d*, and CRC **1234***e*. (These fields have the same information as described with respect to the RRB.) FIG. 12L depicts an exemplary MAC PDU upstream slot. The MAC PDU upstream slot of FIG. 12L includes a CPE linked-list sequence number **1246**, reservation request index number **1236***b*, compressed IP-flow identifier **1238***c*, compressed IP-flow priority and type **1238***d*, slot payload **1238***e*, and CRC **1234***e*. The upstream MAC PDU is similar to the downstream MAC PDU, but is used instead for upstream subframe payload information.

FIGS. 12M, 12N and 12O depict an exemplary ODB **1242** in detail. This field is used to store information regarding the connection between the wireless base station **302** and the CPE station **294**. ODB **1242** includes preamble **1234***a* (including link integrity data), subscriber ID **1234***b* (identifies which CPE station **294** is making the reservation request), system state **1248***a* (information about the status of the CPE station **294**), performance data **1248***b* (how full the buffer statistics, cpe processor performance statistics, system state), antenna data **1248***c* (information pertaining to the antenna), CRC **1234***e* (error checking information) and synchronization pattern **1248***d* (error checking information).

Referring to FIG. 12M, system state subslot **1248***a* comprises system mode **1250***a* (the mode of the CPE station, e.g., command mode, operations mode, or initialization mode of the system), system status **1250***b* (the status of the CPE station), system resources **1250***a* (the mode of the CPE station), system power **1250***b* (the mode of the CPE station), system temperature **1250***a* (the temperature of the CPE station). The CPE stations **294** are required to take turns using ODB **1242** to transmit their information.

Referring to FIG. 12N, performance data **1248***a* comprises the number of comrepeats **1252***a* (the number of repeats of communication attempts), number of frameslips **1252***b* (the

Ericsson Ex. 1001, pg 73

**59**

number of frames that have slipped), waitstate index **1252***c* (an index to the waiting state).

f. Exemplary Class-Based Frame Prioritization

FIG. **13** shows block diagram **1300**, illustrating how an exemplary flow scheduler for the present invention functions to schedule products. Block diagram **1300** includes: flow scheduler **604**, **634** (which is a combination of downlink flow scheduler **604** and uplink flow scheduler **634**), downlink transmission sub frame **1202** (i.e., the next MAC downstream subframe), uplink transmission subframe **1204** (i.e., the current MAC upstream subframe). Block diagram **1300** also includes the following downstream components: downstream reservation first-in-first-out queue **1322**, class 1 downstream queue **1302**, class 2 downstream queue **1304**, and class 3 downstream queue **1306**. Block diagram **1300** also includes the following upstream reservation components: current upstream subframe **1344** (with the current upstream subframe **1204** about to be stored in it), previous upstream sub frames **1346**, **1348**, **1350**, class 1 upstream reservation request queue **1308**, class 2 upstream reservation request queue **1310**, and class 3 upstream reservation request queue **1312**.

In the downlink path, an IP flow QoS class queuing processor (described below with respect to FIGS. **15**A and **15**B) queues the received data packets into class 1 packet flow queues **1324**, **1326** and **1328**, class 2 packet flow queues **1330**, **1332**, **1334**, and class 3 packet flow queues **1336**, **1338**, **1340** and **1342**.

Based on inputs from a hierarchical class-based priority processor, a virtual private network (VPN) directory enabled (DEN) data table and a service level agreement (SLA) priority data table (described below with respect to FIGS. **15**A and **15**B), the class 1, class 2, and class 3 packet flow queues are respectively assigned to class 1 downstream queue **1302**, class 2 downstream queue **1304**, and class 3 downstream queue **1306**. Flow scheduler **604**, **634** schedules these downlink data packets onto the downlink transmission subframe **1202**.

In one embodiment, additional processing is used to minimize latency and jitter. For example, suppose the data packets of class 1 packet flow queue **1324** require jitter-free and latency-free delivery, i.e., delivery of packets must be at constant time intervals and in real-time. Class 1 downstream queue **1302** creates, e.g., 4 equal time spaced slot reservations in future frames, as shown in class 1 downstream queue **1302** and described with respect to FIG. **14** below. The reservations are fed to downstream reservation first-in-first-out queue **1322**, and are scheduled onto a future downstream frame **1202** by flow scheduler **604**, **634**.

In the uplink path, reservation requests for future upstream slots arrive at wireless base station **302** as part of the current upstream subframe **1204** received from CPE subscriber stations **294** over the wireless medium. Current upstream subframe **1344** can temporarily store reservation requests for analysis and scheduling of uplink packets in accord with the description of FIG. **8**B above. Previous upstream subframes **1346**, **1348**, **1350** include upstream reservation requests awaiting upstream frame slot allocations in future upstream sub frames **1204**. Reservation request blocks (RRBs), described further above with reference to FIG. **12** ***\****, include a request for a number of slots for a single IP flow with an IP flow identifier # and class of the flow. The upstream reservation requests (by IP flow and class) are queued onto class 1 upstream reservation request queue **1308**, class 2 upstream reservation request queue **1310**, and class 3 upstream reservation request queue **1312** by an IP flow QoS class queuing processor (described below with respect to FIGS. **16**A and **16**B). Flow scheduler **604** and **1566**, and **634**

**60**

and **1666**, uses these downstream reservations and upstream reservation requests to assign slots to data packets in the next downstream transmission subframe **1202** and upstream transmission sub frame **1204**, respectively.

FIG. **14** is an exemplary two-dimensional block diagram **1400** of the advanced reservation algorithm. FIG. **14** includes MAC subframe scheduler **1566**, **1666**, frames current frame, n **1402**, and future frames, n+1 **1404**, n+2 **1406**, n+3 **1408**, n+4 **1410**, n+5 **1412**, n+6 **1414** . . . n+x **1416**, representing frames of data packets to be transmitted at times n, n+1, n+2 . . . n+x. Each frame is divided into a variable length downlink subframe **1202** and a variable length uplink subframe **1204**. The lengths of downlink subframe **1202** and uplink subframe **1204** together comprise the length of an entire frame.

Each frame n **1402** includes a number of slots (**1418**-**1478**). Slots **1418**-**1446** comprise the downlink subframe **1202**, and slots **1448**-**1478** comprise the uplink subframe **1204**. In one embodiment, the slots are fixed in length, with each slot capable of storing a single data packet. The total number of frame slots in a frame remains constant. For example, if a given frame includes 64 frame slots, the slots can be allocated dynamically in either the uplink or downlink directions, such as, e.g., 32 up and 32 down, 64 up and 0 down, 0 up and 64 down. Block diagram **1400** can be thought of as a two dimensional matrix with each slot having a time value (i.e., a slot-to-slot time interval), e.g., 0.01 ms, and each frame having a total frame interval time value (i.e., a frame-to-frame time interval), e.g., 0.5 ms.

In the present invention, an advanced reservation algorithm assigns future slots to data packets based on the priority of the IP data flow with which the packet is associated. Exemplary priorities are described above with respect to FIGS. **8**A and **8**B. For calls that are sensitive to jitter, meaning calls that are time sensitive, it is important to maintain an isochronous (i.e., in phase with respect to time) connection. With such signals, it is important that the data be dispersed in the same slot between frames, or in slots having a periodic variation between frames. For example, vertical reservation **1480** shows a jitter sensitive signal receiving the same slot for downlink communications in each frame. Specifically, the signal is assigned slot **1422** in frames **1402**-**1416**. If the frame-to-frame interval is 0.5 ms, then a slot will be provided to the IP flow every 0.5 ms. As another example, diagonal reservation **1482** shows a jitter sensitive signal receiving a slot varying by a period of one between sequential frames. Specifically, the signal is assigned slot **1440** in frame **1402**, slot **1438** in slot **1404**, . . . slot **1426** in frame **1416**, to create a "diagonal." If the frame-to-frame interval is 0.5 ms and the slot-to-slot interval is 0.01 ms, then a slot can be provided to the IP flow every 0.5 minus 0.01, equals 0.49 mms. Thus, to decrease the frame interval, a diagonal reservation of positive slope can be used. To obtain an increased frame interval, a diagonal of negative slope such as, e.g., negative slope diagonal uplink reservation **1486**. The diagonal reservation **1482** can also be more pronounced (i.e., using a greater or lesser slope), depending on the period between sequential frames desired. Reservation patterns **1480**, **1482**, **1484** and **1486** are useful patterns for jitter sensitive communications. Also illustrated is a vertical reservation **1486**, similar to vertical reservation **1480**, useful for a jitter sensitive communication in the uplink direction.

For latency sensitivity, one or more slots can be guaranteed in each frame. For example, for a call that is latency sensitive, but not jitter sensitive, each frame can be assigned one (or more) slots for communications. However, the slot(s) need not be periodic between frames, as with jitter sensitive calls.

Ericsson Ex. 1001, pg 74

US 7,496,674 B2

**61**

The greater the number of slots allocated per frame to an IP flow, the greater total bandwidth per frame rate for the IP flow.

For calls that are less latency sensitive, fewer slots per frame can be assigned for the communication. For example, a communication that is less latency sensitive can receive a guaranteed bandwidth of one slot every four frames. A call that is even less latency sensitive can receive, e.g., a single slot every ten frames.

Using these principles, the advanced reservation algorithm can assign the slots from highest priority to lowest priority, exhausting the number of available slots in future frames. IP data flows that are both jitter and latency sensitive can be assigned slots with periodic patterns first (e.g., patterns **1480**, **1482**, **1484** and **1486**), followed by flows that are highly latency sensitive (but not jitter sensitive), et cetera, until the flows of lowest latency sensitivity are assigned to slots. Prioritization of different classes of IP flows by scheduler **604**, **634**, **1566**, **1666** is described further below with reference to FIGS. **15**A, **15**B, **16**A and **16**B.

g. Downlink SubFrame Prioritization

1. Overview

FIGS. **15**A and **15**B are exemplary logical flow diagrams for analysis and scheduling of the shared wireless bandwidth for the downlink direction. The logical flow pertains to IP packet flows arriving from data network **140**, at the wireless base station **302**, for transmission down to a subscriber CPE station **294**d over the wireless medium. FIG. **15**A is an exemplary logical flow diagram **1500** for downlink IP analyzer **602**. FIG. **15**B is an exemplary logical flow diagram **1560** for the downlink flow scheduler **604**.

The functional components for FIGS. **15**A and **15**B are explained by way of method modules, which can be viewed as physical units (e.g., comprising software, hardware, or a combination thereof) or logical vehicles (e.g., used for explanatory purposes only). Those skilled in the art will recognize that the modules are used only to explain an exemplary embodiment, and are not to be considered limiting.

The exemplary logical flow diagram **1500** for downlink IP flow analyzer of FIG. **15**A includes packet header identification component **1502**, packet characterization component **1504**, packet classification component **1506**, and IP flow presentation component **1508**. The functions of these components are explained in detail below.

In one embodiment, IP flow analyzer **602** is physically located in wireless base station **302**, although those skilled in the art will recognize that the same functionality can be located remotely from wireless base station **302**.

FIGS. **2**D, **3**A and **3**B are helpful to the reader for an understanding of the downlink IP flow analyzer.

2. Introduction

IP flow analyzer **602** performs the function of identifying, characterizing, classifying, and presenting data packets to a downlink frame scheduler **604**. The functions of identifying, characterizing, classifying and presenting the data packets are respectively performed by packet header identification component **1502**, packet characterization component **1504**, packet classification component **1506** and IP flow presentation component **1508** of downlink IP flow analyzer **602**.

Packet header identification component **1502** determines whether a data packet of an incoming IP data flow is part of an IP flow that is known to the system, or is the first data packet of a new IP data flow, based on the contents of fields of the packet header section. Packet header identification component **1502** also identifies, e.g., the source of the packet using the packet header field contents. Packet characterization component **1504** characterizes a new data packet (of a new IP data flow) to determine the QoS requirements for the IP data flow,

**62**

and identifies the subscriber CPE station associated with the subscriber workstation that will receive the IP data flow. Packet classification component **1506** classifies the new IP data flow into a communications priority class, grouping the packet together with similar type IP flows. IP data flow presentation **1508** initializes the new IP data flow and presents it to downlink flow scheduler **604**.

Downlink flow scheduler **604** places the data packets of an IP data flow into a class queue, and based on a set of rules, schedules the data packets for transmission over the wireless medium to a subscriber CPE station using, e.g., an advanced reservation algorithm. The rules can be determined by inputs to the downlink flow scheduler from a hierarchical class-based priority processor module **1574**, a virtual private network (VPN) directory enabled (DEN) data table **1572**, and a service level agreement (SLA) priority data table **1570**. The advanced reservation algorithm is described further above with respect to FIG. **14**.

3. Identification

Packet header identification component **1502** identifies the IP flow received from data network **142** at data interface **320** based on the packet header.

An IP flow packet stream from data network **142**, including packets from various IP flows (where each IP flow is associated with a single data "call") is received at packet header identification component **1502**. An IP flow can include packetized data including any type of digital information such as, e.g., packetized voice, video, audio, data, IP flows, VPN flows, and real time flows. The IP flow is transmitted over data network **142** from, e.g., a host workstation **136**d and arrives at interface **302** of wireless base station **320**. Interface **302** transmits the packets of the IP flow to packet header identification component **1502**. At module **1510**, the received packets are buffered into a storage area. At module **1520**, the contents of the packet header fields are extracted and parsed.

For IP flows known to the system, so-called "existing IP flows," there are entries in a table **1526**. An IP flow is in the system if there is an existing characterized IP data call. In module **1522**, it is determined if there is a match between the incoming packet and an existing IP flow call in an entry in existing IP flow identification table **1526**. If so, then the IP flow is" known to the system, and control passes to module **1530** of the packet characterization component **1504**.

If not, meaning that the IP flow is a new IP data flow, then control passes to module **1524**, where the packet header fields are analyzed. Module **1524** analyzes the packet header source field and determines from source application packet header data table **1528** the type of source application making the data call or transmitting the IP packet. The application can be any of the applications described with respect to FIG. **2**D, or known to those skilled in the art. Examples include a file transfer protocol (FTP) download from another client workstation **138**f, an IP voice telephony call (over telephony gateway **288**b), a voice telephony call from a caller **124**d (connected over a modem), an e-mail from a LAN **128**a attached host workstation **136**a, a fax machine call, and a conference call from multiple callers **124**d and **126**d (connected over a modem), to name a few. If the IP flow is not known to the system, then the IP flow is given an IP flow identifier number, and control passes to module **1526** where the IP flow identifier number is added to the existing IP flow identification table **1526**.

Once the type source application has been determined by packet header information or by another means, such as direct application identification, then control passes from module **1524** to module **1532** of the packet characterization component **1504**. In order to identify the type of source application

Ericsson Ex. 1001, pg 75

63

of the IP flow, any type of service (TOS) or differentiated service (DiffServ) field can also be analyzed.

4. Characterization

Packet characterization component **1504** characterizes new IP flows and passes them to packet classification component **1506** for classification.

For an existing IP flow, control passes to module **1530** from module **1522** of the packet header identification component **1502**. If in module **1522** it is determined that the IP data flow is known to the system, in module **1530** it is determined whether the packet is old (i.e., stale). This can include, e.g., determining from a time-to-live field (a field in the IP packet header) the age of the packet, and comparing the field to a threshold age value. If the packet is determined to be. stale, it can be discarded. Based on the age of the packet, client application discards can be anticipated. Otherwise, control can pass to module. **1540** of the packet classification component **1506**.

For a new IP flow, control passes to module **1532** from module **1524** of the packet header identification component **1502**. If in module **1524** it is determined that the IP flow is not known to the system, in module **1532** the QoS requirements for the application are determined using the source application information identified in modules **1524** and **1528**. Module **1532** performs this operation by looking up the QoS requirements for the identified source application in the QoS requirement table **1534**. Different applications have different QoS requirements in order to provide an acceptable end-user experience. For example, bandwidth allocation (i.e., allocating an appropriate amount of bandwidth) is important to an application performing FTP file transfer downloads, and not jitter (i.e., time synchronizing the received data) and latency (i.e., the amount of time passage between responses). On the other hand, jitter and latency are important to voice telephone and conference calls, while bandwidth allocation is not.

After processing by module **1532**, in module **1536** a destination CPE subscriber station ID lookup from subscriber CPE IP address table **1538**, is performed for the IP flow. Each subscriber CPE station **294***d* can have one or more applications, running on one or more subscriber workstations **120***d*, homed to it. Accordingly, the IP flows can be directed to one or more applications on one or more subscriber workstations of one or more CPE stations **294***d*. A subscriber workstation can be any device coupled to a subscriber CPE station **294***d*. Module **1536** looks up the IP flow in table **1538**, to determine the identity of the subscriber CPE station **294***d* that will receive the packets of the new IP flow from data network **142**. Control then passes from module **1536** to module **1542** of the packet classification component **1506**.

5. Classification

Packet classification component **1506** classifies the IP flow and passes it to IP flow presentation component **1508** for presentment.

For an existing IP flow, control passes to module **1540** from module **1530** of the packet characterization component **1504**. If in module **1530** it is determined that the packet is not stale, then in module **1540** the packet is associated with its existing IP flow. As illustrated in FIG. **15**A, the packet processed herein was determined to be a portion of an IP flow known to the system. Therefore, the QoS processing of modules **1532**, **1536** and **1542** are unnecessary, because the QoS requirements of the present packet are assumed to be the same as for its IP flow. In another embodiment, all packets are characterized and classified. From module **1540**, control can continue with module **1546** of IP flow presentation **1508**.

For the new IP flow, control passes to module **1542** from module **1536** of the packet characterization component **1504**.

64

In module **1542** the packet is classified into a QoS class by performing a table lookup into IP flow QoS class table module **1544**, where the types of QoS classes are stored depending on the QoS requirements for packets. Similar IP flows, (i.e., IP flows having similar QoS requirements) can be grouped together in module **1542**. In classifying packets and IP flows, QoS class groupings, any DiffServ priority markings, and any TOS priority markings can be taken into account. From the module **1542**, control passes to module **1548** of IP flow presentation component **1508**.

6. IP Flow Presentation

IP flow presentation component **1508** prepares and presents the IP flow packets to downlink flow scheduler **604**.

For existing IP flows, control passes to module **1546** from module **1540** of the packet classification component **1540**. In module **1546** the packet is added to the associated existing IP flow queue, which is the queue for the current IP flow. From module **1546**, control passes to IP flow QoS class queuing processor module **1562** of downlink flow scheduler **604**.

For the new IP flow, control passes to module **1548** from module **1542** of the packet classification component **1506**. In module **1548**, this new IP flow can be initialized for presentation to module **1552**. In module **1550**, the IP flow QoS class is presented to frame scheduler **604** to be placed in an appropriate class queue. Module **1552** presents the IP flow (in particular, the data packet),and IP flow identifier to IP flow QoS class queuing processor module **1562** of downlink flow scheduler **604**.

7. Downlink Flow Scheduler

The exemplary logical flow diagram **1560** for the downlink flow scheduler **604** of FIG. **15**B comprises IP flow QoS class queuing processor module **1562**, MAC downlink subframe scheduler module **1566**, hierarchical class-based priority processor module **1574**, VPN DEN data table module **1572**, SLA priority data table **1570**, CPE flow queue depth status processor **1582** and link layer acknowledgment processor module **1578**.

Downlink flow scheduler **604** of FIG. **15**B also includes QoS class queues as follows: class 1, **1564***a*; class 2, **1564***b*; class 3, **1564***c*; class 4, **1564***d*; class 5, **1564***e*; and class 6, **1564***f*; and MAC downlink subframes: frame n, **1568***a*; frame n+1, **1568***b*; frame n+2, **1568***c*; frame n+3, **1568***d*; . . . frame n+p, **1568***k*.

In one embodiment, downlink flow scheduler **604** is physically located in wireless base station **302**, although those skilled in the art will recognize that the same functionality can be located remotely from wireless base station **302**.

Downlink flow scheduler **604** is used to schedule the downlink subframe. An entire frame can be divided into an uplink portion (called an uplink subframe) for transmitting uplink frames, and a downlink portion (called a downlink subframe) for transmitting downlink frames.

Also illustrated on FIG. **15**B are WAP antenna, the wireless medium, **290***d*, RF transceiver subscriber antenna **292***d*, subscriber CPE station **294***d* and subscriber workstation **120***d*. WAP antenna **290***d* and RF transceiver subscriber antenna **292***d* respectively provide a wireless connection between wireless base station **302** (where downlink flow scheduler **604** resides in one embodiment) and subscriber CPE station **294***d*, which can transmit an IP flow to an application running on subscriber workstation **120***d*. WAP antenna **290***d* serves as a wireless gateway for data network **142**, and RF transceiver subscriber antenna serves as a wireless gateway for subscriber CPE station **294***d*. The connection is also illustrated in FIGS. 2D and 3B.

IP flow QoS class queuing processor module **1562** receives the packets from IP flow presentation component **1508**. Mod-

Ericsson Ex. 1001, pg 76

US 7,496,674 B2

65

ule **1562** then creates class queues **1564a-1564f**, which is a variable number of queues, and places the packets in these class queues **1564a-1564f** is determined by the inputs to module **1562**.

Module **1562** can receive inputs from hierarchical class-based priority processor module **1574**, VPN DEN data table **1572** and service level agreement (SLA) priority data table **1570**. The queuing function of module **1562** can be based on these inputs.

SLA priority data table **1570** can use predetermined service level agreements for particular customers to affect the queuing function. A customer can be provided a higher quality of telecommunications service by, for example, paying additional money to receive such premium service. An algorithm running on module **1562** can increase the queuing priority for messages transmitted to such customers.

Virtual private network (VPN) directory enabled networking (DEN) data table **1572** can provide prioritization for a predetermined quality of service for a VPN for a company that pays for the VPN function. A VPN is understood by those skilled in the relevant art to be a private network, including a guaranteed allocation of bandwidth on the network, provided by the telecommunications service provider. VPN DEN data table **1572** permits module **1562** to provide higher quality of service for customer-purchased VPNs. As with SLA priority data table **1570**, the queuing priority can be increased for such VPNs. For example, a platinum level VPN's lowest priority IP flow classes could also be given a higher priority than a high priority brass level VPN.

Both SLA priority data table **1570** and VPN DEN data table **1572** receive input from operations, administration, maintenance and provisioning (OAM&P) module **1108**. This is a module that is kept off-line, and includes storage and revision of administrative information regarding new customers, or updates of information pertaining to existing customers. For example, the SLA priority of the customers and VPN information is updated from OAM&P module **1108**.

Hierarchical class-based priority processor module **1574** is a module that operates under the principles of hierarchical class-based queuing. Hierarchical class-based queuing was created by Sally Floyd and Van Jacobson, considered early architects of the Internet.

Hierarchical class-based queuing classifies different types of IP flows using a tree structure at the edge access device routers. Each branch of the tree signifies a different class of IP flows, and each class is dedicated a set limited amount of bandwidth. In this manner, different classes of flows are guaranteed minimum bandwidth, so that no single IP data flow within a class, and no single class of IP flows, can use up all available bandwidth. The present invention adds a prioritization feature enabling class based priority reservations to be made using the hierarchical class queue concept, as discussed above with respect to FIGS. **13** and **14**.

MAC downlink subframe scheduler **1566** is a processor module that takes the packets queued in class queues **1564a-1564f**, and can make frame slot reservations to fill up subframes **1568a-1568k** based on priorities **1570**, **1572** and **1574**, which is a variable number of frames. In one embodiment, each subframe is scheduled (filled) with up to a predetermined number of packets from each of the classes **1564a-1564f** according to priorities **1570**, **1572** and **1574**. In another embodiment, the subframes are scheduled according to the inventive advanced reservation algorithm method described with respect to FIGS. **13** and **14** for isochronous reservations.

66

In yet another embodiment, the subframes are scheduled according to a combination of known methods and the advanced reservation algorithm method of the present invention.

The subframes can then be sent to WAP antenna **290d** for wireless transmission over the wireless medium to RF transceiver subscriber antenna **292d** coupled to subscriber CPE station **294d**, which in turn can send the packets contained in the subframes to subscriber workstation **120d** at CPE subscriber location **306d**. The subframes can be scheduled from highest priority to lowest priority.

Hierarchical class-based priority (HCBP) processor module **1574** receives as input the subframes that have been scheduled and transmitted from WAP antenna **290d**. By maintaining awareness of the status of the packets (i.e., by knowing which packets have been sent out), HCBP processor module **1574** knows which packets from which class queues **1564a-1564f** must yet be scheduled.

Every once in a while, a packet is lost through, e.g., noise. When this situation arises, the subscriber CPE station **294d** sends a retransmit request **1576** to WAP **290d**, which transmits the request to link layer acknowledgment (ARQ) processor **1578**. ARQ processor **1578** informs MAC downlink subframe scheduler **1566** of this condition, which in turn reschedules the requested packets from the appropriate class queues **1564a-1564f** for retransmission. Link layer acknowledgment ARQ processor **1578** also awaits positive acknowledgments from subscriber CPE station **294d**, to determine that the data packets-have been properly received. Only after receiving a positive receipt acknowledgment does MAC downlink subframe scheduler **1566** remove the packet from class queues **1564a-1564f**.

Each subscriber CPE station **294d** has a limited amount of memory available for received data packets in an IP flow. When, for example, the devices coupled to the subscriber CPE station **294d** (e.g., subscriber workstation **120d**) stop receiving IP data flows (e.g., subscriber workstation **120d** goes down), the CPE data packet queues in CPE subscriber station **294d** are quickly filled up. In this scenario, subscriber CPE station **294d** transmits a CPE IP flow queue depth message **1580** indicating that the queue is filled up, which can be received by CPE IP flow queue depth status processor **1582**. CPE queue depth processor **1582** informs MAC downlink subframe scheduler **1566** of this condition, which stops scheduling downlink sub frames directed to subscriber CPE station **294d**. Processor **1582** can also send messages to MAC downlink subframe scheduler **1566** to flush particular IP flows from class queues **1564a-1564f**.

h. Uplink SubFrame Prioritization

1. Overview

FIGS. **16**A and **16**B are exemplary logical flow diagrams for the uplink. The logical flow pertains to analysis and scheduling of shared wireless bandwidth to IP packet flows from a subscriber workstation **120d** coupled to a subscriber CPE station **294d**, being transmitted over the wireless medium up to the wireless base station **302**, and on to data network **142** for transmission to a destination host workstation **136a**. FIG. **16**A is an exemplary logical flow diagram **1600** for uplink IP flow analyzer **632**. FIG. **16**B is an exemplary logical flow diagram **1660** for the uplink flow scheduler **634**.

The functional components for FIGS. **16**A and **16**B are explained by way of method modules, which can be viewed as physical units (e.g., comprising software, hardware, or a combination thereof) or logical vehicles (e.g., used for explanatory purposes only). Those skilled in the art will recognize that the modules are used only to explain an exemplary embodiment, and are not to be considered limiting.

Ericsson Ex. 1001, pg 77

**A0121**

| 67 | 68 |

The exemplary logical flow diagram **1600** for uplink IP flow analyzer **632** of FIG. **16**A includes packet header identification component **1602**, packet characterization component **1604**, packet classification component **1606**, and IP flow presentation component **1608**. The functions of these components are explained in detail below.

In one embodiment, uplink IP flow analyzer **632** is physically located in wireless base station **302**, although those skilled in the art will recognize that the same functionality can be located remotely from wireless base station **302**. In a preferred embodiment of the present invention, the function of IP flow analyzer **632** is performed at a subscriber CPE station **294**d desiring an uplink reservation slot for uplinking a packet/IP flow up to base station **302**. A reservation request block (RRB) request detailing the IP flow identifier, number of packets and classification of the IP flow can be created then by IP flow analyzer **632** and can be uplinked via preferably a contention RRB slot for scheduling by uplink frame scheduler **634** in future uplink subframe slots up at wireless base station **302**.

FIGS. **2**D, **3**A and **3**B are helpful to the reader for an understanding of the uplink IP flow analyzer.

2. Introduction

IP flow analyzer **632** performs the function of identifying, characterizing, classifying, and presenting data packets to an uplink frame scheduler **634**. The functions of identifying, characterizing, classifying and presenting the data packets can be respectively performed by packet header identification component **1602**, packet characterization component **1604**, packet classification component **1606** and IP flow presentation component **1608** of uplink IP flow analyzer **632**.

Packet header identification component **1602** determines whether a packet of an incoming IP flow is known to the system (i.e. is an existing IP flow), or if it is the first data packet of a new IP data flow, and determines the source application based on fields in the header section of the packet. Identification **1602** can include buffering packets and extracting and parsing the header contents. Packet characterization component **1604** characterizes a new data packet (of a new IP flow) to determine the QoS requirements for the IP flow based on the source application, and to identify the subscriber CPE station that will receive the IP flow. Packet classification component **1606** classifies the new IP data flow into one of several priority classes. Classification **1606** can include, e.g., grouping packets having similar QoS requirements. IP data flow presentation component **1608** initializes the new IP data flow and presents it to uplink flow scheduler **634**.

Each time a subscriber CPE station **294**d attempts to communicate in the uplink direction with wireless base station **302**, it requests a reservation by inserting an RRB in the uplink subframe. Uplink frame scheduler **634** then schedules the reservation request in a future uplink subframe and notifies the CPE station **294**d of the reservation. In a downlink signal, uplink flow scheduler **634** located preferably at wireless base station **302**, transmits a reservation slot in a particular future frame for the requesting subscriber CPE station **294**d to transmit its uplink data. Uplink flow scheduler **634** assigns the reservation based on the same parameters as the downlink flow scheduler **604** uses in the downlink. In other words, uplink flow scheduler **634** determines the reservation slots based on the queue class priority and based on a set of rules, schedules the reservations for uplink transmissions from subscriber CPE station **294**d using, e.g., an advanced reservation algorithm. The rules are determined by inputs to the uplink flow scheduler **634** from a hierarchical class-based priority processor module **1674**, a virtual private network (VPN) directory enabled (DEN) data table **1672**, and a service level agreement (SLA) priority data table **1670**. The advanced reservation algorithm is described with respect to FIG. **14**.

3. Identification

Packet header identification component **1602** identifies the IP flow received from a subscriber CPE station **294**d based on the packet's header contents.

A stream of packets, also known as packets from several IP flows (i.e. each IP flow is associated with a single "call") is received at packet header identification component **1602**. The IP flow in one embodiment is transmitted to subscriber CPE station **294**d from one or more subscriber workstations **120**d for uplink to host computers **136**a coupled to wireless base station **302** by data network **142**. Subscriber CPE station **294**d can transmit the data packets of the IP flow to packet buffer module **1610** of packet header identification component **1602**. In one embodiment, packet header identification component is within CPE subscriber station **294**d. At module **1610**, the received packets are buffered in a storage area for transfer to header extraction module **1620**. At module **1620**, the packet header files are extracted and parsed to obtain the contents of the packet header fields.

Relevant fields can include, e.g., source, destination, type of service (TOS) and differentiated service (DiffServ) markings, if any exist.

For IP flows known to the system, there are entries in existing IP flow identification table **1626**. An IP flow is in the system if a previous packet of the IP flow of the existing IP data call has already been identified. In module **1622**, it is determined if there is a match between the incoming IP flow and an entry in table **1626**. If so, then the IP flow is known to the system, and control passes to module **1630** of the packet characterization component **1604**.

If the IP flow is not an existing flow known to the system, meaning that the IP flow is a new IP flow, then control passes to module **1624**, where the packet header fields are analyzed to identify the source application of the IP flow.

Packet header analysis module **1624** determines from source application packet header table **1628** the type of source application making the IP flow. The application can be any of the types of applications described with respect to FIG. **2**D or known to those skilled in the art. Examples include a file transfer protocol (FTP) download from another client workstation **138**f, a voice telephony call from a caller **124**d (connected over a modem), a fax machine call, and a conference call from multiple callers **124**d and **126**d (connected over a modem), to name a few. If the IP flow is a new IP flow, then the identification information about the new IP flow is added to table **1626**, and control passes from analysis module **1624** to module **1632** of the packet characterization component **1604**.

4. Characterization

Packet characterization component **1604** characterizes the IP flow and passes it to packet classification component **1606** for classification.

If the IP flow is an existing IP flow, control passes to module **1630** from module **1622** of the packet header identification component **1602**. If in module **1622** it is determined that the IP data flow is known to the system, in module **1630** it is determined whether the packet is old (i.e., stale). This can include determining from a time-to-live field (a field in the IP packet header) the age of the packet, and comparing the field to a threshold age value. If the packet is determined to be stale, it is discarded. Module **1630** can anticipate application packet discards. From module **1630**, control passes to module **1640** of the packet classification component **1606**.

If the IP flow is new, control passes to module **1632** from module **1624** of the packet header identification component

Ericsson Ex. 1001, pg 78

**69**

**70**

**1602**. If in module **1624** it is determined that the application associated with the IP flow application is not known to the system, in IP flow QoS requirements lookup module **1632** the QoS requirements for the application associated with the IP flow are determined. Module **1632** performs this operation by looking up the application in IP flow QoS requirement table **1634**. Different applications have different requirements. For example, bandwidth allocation (i.e., allocating an appropriate amount of bandwidth) is important to an application performing FTP downloads, and not jitter (i.e., time synchronizing the received data) and latency (i.e., the amount of time passage between responses). On the other hand, jitter and latency are important to voice telephony and conference calls, and bandwidth allocation is not.

After processing by module **1632**, control passes to module **163***b*. In CPE subscriber station identifier (ID) lookup module **1636** a subscriber CPE ID lookup is performed for the new IP data flow. Each subscriber CPE station **294***d* can have one or more applications, running on one or more subscriber workstations **120***d*, homed to it. Accordingly, one or many subscribers can generate or receive an IP flow directed from or at a subscriber CPE station **294***d*. A subscriber workstation **120***d* can be any device coupled to a subscriber CPE station **294***d*. Module **1636** looks up the CPE station identifier for the IP flow in table **1638**, to provide the CPE ID in the reservation request block (RRB). Control then passes from module **1636** to module **1648** of the packet classification component **1606**.

5. Classification

Packet classification component **1606** classifies the IP flow and passes it to IP flow presentation component **1608** for presentment.

For existing IP flows, control passes to module **1640** from module **1630** of the packet characterization component **1604**. If in module **1630** it is determined that the packet is not stale, then in module **1640** the packet is associated with its IP flow. As illustrated in FIG. **16**A, the packet processed herein was determined to be a portion of an IP flow known to the system. Therefore, the QoS processing of modules **1632**, **1636** and **1642** are unnecessary, because the QoS requirements of the present packet are the same as for its IP flow.

For new IP flows, control passes to module **1642** from module **1636** of the packet characterization component **1604**. In module **1642** the packet is classified or grouped into a QoS class by performing an IP flow QoS requirement table **1644** lookup where the QoS classes are stored depending on the QoS requirements for packets. From module **1642**, control passes to module **1648** of IP flow presentation component **1608**.

6. IP Flow Presentation

IP flow presentation component **1608** prepares and presents the IP data flow packets to flow scheduler **634**. In one embodiment of the uplink direction, a reservation request block (RRB) is created and uplinked via a contention slot to the wireless base station **302** for scheduling by IP flow scheduler **634**. In another embodiment, the scheduler is located at the CPE station **294***d* so no reservation request is needed.

For existing IP flows, control passes to module **1646** from module **1640** of the packet classification component **1606**. In module **1646**, the packet is added to the IP flow queue, which is the queue for the current existing IP flow. In one embodiment, this can include preparation of a RRB. From module **1646**, control passes to module **1662** of uplink flow scheduler **634**. In one embodiment, this can include uplink of the RRB from CPE **294***d* to wireless base station **302**.

For a new IP flow, control passes to module **1648** from module **1642** of the packet classification component **1606**. In initialize IP flow module **1648**, this new IP flow is initialized

for presentation to module **1652**. Module **1652** presents the IP data flow (in particular, the reservation request block data packet) to module **1662** of uplink flow scheduler **634**. In module **1650**, the QoS class for the IP flow is presented to scheduler **634**, preferably by inclusion in a RRB.

7. Uplink Flow Scheduler

The exemplary logical flow diagram for the uplink flow scheduler **634** of FIG. **16**B comprises IP flow QoS class queuing processor module **1662**, MAC uplink subframe scheduler module **1666**, hierarchical class-based priority processor module **1674**, VPN DEN data table module **1672**, SLA priority data table **1670**, CPE IP flow queue depth status processor **1682** and link layer acknowledgment processor module **1678**.

Uplink flow scheduler **634** of FIG. **16**B also includes QoS class queues for class 1, **1664***a*; class 2, **1664***b*; class 3 **1664***c*; class 4 **1664***d*; class 5, **1664***e*; and class 6, **1664***f*; and MAC uplink subframes: frame n **1668***a*; frame n+1, **1668***b*; frame n+2, **1668***c*; frame n+3, **1668***d*, . . . frame n+p, **1668***k*.

In one embodiment, uplink flow scheduler **634** is physically located in wireless base station **302**, although those skilled in the art will recognize that the same functionality can be located remotely from wireless base station **302**. For example, in another embodiment, uplink flow scheduler **634** can be located at CPE station **294***d* and is in communication with other CPE stations **294** and the wireless base station **302**.

Uplink flow scheduler **634** is used to schedule the uplink subframe. The entire frame is divided into an uplink portion (called an uplink subframe) for transmitting uplink frames, and a downlink portion (called a downlink subframe) for transmitting downlink frames.

Illustrated in FIG. **16**B are WAP antenna **290***d*, the wireless medium, RF transceiver subscriber antenna **292***d*, subscriber CPE station **294***d* and subscriber workstation **120***d*. WAP **290***d* and RF transceiver subscriber antenna **292***d* respectively provide a wireless connection between wireless base station **302** (where uplink flow scheduler **634** resides in one embodiment) and subscriber CPE station **294***d*, which can transmit upstream an IP flow from an application running on client computer **120***d*. WAP **290***d* serves as a wireless gateway for data network **142**, and RF transceiver subscriber antenna **292***d* serves as a wireless gateway for subscriber CPE station **294***d* to uplink the IP flow packet data.

Also illustrated in FIG. **16**B is data interface **320**, which provides a connection from uplink flow scheduler **634** for sending uplinked IP flow packets on to data router **140***d* of data network **142** and on to a destination host computer **136***a*. These connections are also illustrated in FIGS. 2D and 3B.

The previous frame includes an uplink reservation request which is received by the wireless base station from a subscriber CPE station **294***d*. At this point, the reservation request block has been identified, characterized, classified, and presented, preferably at the CPE station **294***d*, and has been transmitted to uplink flow scheduler **634** from uplink flow analyzer **632** at the CPE **294***d*. In particular, the reservation request block is presented to IP flow QoS class queuing processor module **1662** from module **1650**. Module **1662** informs MAC uplink subframe scheduler **1666** of the reservation.

In turn, MAC uplink subframe scheduler **1666** uses a slot in the subframe to acknowledge receipt of the request called the acknowledgment request block (ARB). An exemplary slot used to convey the frame, slot, and IP flow identifier for this reservation is described with respect to FIG. **12**. Scheduler **1666** transmits in this reservation slot the CPE identification data, along with which future slot(s) and frame(s) the request-

Ericsson Ex. 1001, pg 79

**71**

ing subscriber CPE station **294***d* is permitted to use for uplink of the requested data packet IP flow transmissions.

The future slot(s) in the future frame(s) are assigned, e.g., based on inputs from hierarchical class-based priority processor module. **1674**, VPN DEN data table **1672** and service level agreement (SLA) priority data table **1670**. These components function in a similar manner to hierarchical class-based priority processor module **1574**, VPN DEN data table **1572** and service level agreement (SLA) priority data table **1570**, described with respect to the downlink flow scheduler **604**.

When IP flow QoS class queuing processor module **1662** receives packets of an existing or new IP flow from IP flow presentation module **1608**, it then creates class queues **1664***a*-**1664***f*, which is a variable number of queues, and places the packets in these class queues. In a preferred embodiment there are between 3 and 10 classes. These queues hold reservation request packets for scheduling. Packets are placed in class queues **1664***a*-**1664***f* according to the contents of the reservation request block for input to module **1662**.

Module **1662** receives inputs from hierarchical class-based priority processor module **1674**, VPN DEN data table **1672** and service level agreement (SLA) priority data table **1670**. The queuing function of module **1662** is based on these inputs. These components function analogously to their counterparts in the downlink flow scheduling method. SLA priority data table **1670** and VPN DEN data table **1672** receive input from operations, administration, maintenance and provisioning (OAM&P) module **1108**. OAM&P module **1108** provides updates to priorities when, e.g., a subscriber modifies its service level agreement or a VPN subscription is changed.

MAC uplink subframe scheduler **1666** takes the requests queued in class queues **1664***a*-**1664***f*, and schedules reservations of slots in frames **1668***a*-**1668***k*, which is a variable number of frames. In one embodiment, each frame is scheduled with up to a predetermined number limit or percentage limit of packets from each of the classes **1664***a*-**1664***f*. The requests can be scheduled as shown in FIG. **13**, taking into account certain priorities. In another embodiment, the frames are scheduled according to the inventive advanced reservation algorithm method for scheduling isochronous type traffic described with respect to FIG. **14**. In yet another embodiment, the frames are scheduled according to a combination of known methods and the advanced reservation algorithm method of the present invention.

The reservation slot schedule can then be sent down to the CPE stations **294** using, e.g., FDB slots such as **1236***g* and **1236***h* of FIG. **12**F. The uplink slots can then be inserted by CPE station **294***d* into the uplink subframe as scheduled. The frame slots are then transmitted up from CPE station **294***d* to wireless base station **302** and are then sent on as packets to their destination addresses. For example, from wireless, base station **302** the packets can be transmitted over data network **142** to a host computer **136***a*.

After the uplink packets are received by the wireless base station **302**, the wireless base station **302** sends an upstream acknowledgment block (UAB) message back down to the transmitting subscriber CPE station **294***d*, to acknowledge receipt of the transmitted data packets.

Every once in a while, a packet is lost through noise or other interference in the wireless medium. When this situation arises, the subscriber CPE station **294***d* determines that it has not received a UAB data acknowledgment, so it sends a retransmit request requesting another uplink reservation slot to wireless base station **302** via WAP **290***d*, which transmits the request to link layer acknowledgment (ARQ) processor

**72**

**1678**. ARQ processor **1678** informs MAC uplink subframe scheduler **1666** of the need of retransmission (i.e. the need of a frame slot reservation for resending the uplink packet). CPE subscriber station **294***d* can also send to ARQ processor **1678**, other data messages about nonreceipt of uplink transmission acknowledgments. The ARQ **1678** can forward such messages on to the uplink subframe scheduler **1666**. The uplink subframe scheduler **1666** in turn reschedules the requested uplink reservation from the appropriate class queues **1664***a*-**1664***f*. Alternatively, in another embodiment, link layer acknowledgment processor **1678** can also send a positive UAB acknowledgment to the subscriber CPE station **294***d*, to indicate that the data packets have been properly received. Thus uplink scheduler **1666** in addition to scheduling first time reservations, also can schedule repeat reservations for lost packets.

Each subscriber CPE station **294***d* has a limited amount of memory space available for queuing packets received from subscriber workstations **120***d* awaiting reservation slots of uplink from the CPE **294***d* to wireless base station **302**. When, for example, the queue of subscriber CPE station **294***d* becomes full from a backup of packets awaiting upstream reservations, IP data flows can potentially be lost, or packets may become stale. In this scenario, subscriber CPE station **294***d* transmits a CPE IP flow queue depth message **1680** to the wireless base station **302** indicating that the queue is filled up, which can be received by CPE IP flow queue depth status processor **1682**. Processor **1682** can inform MAC uplink subframe scheduler **1666** of this condition, which can, e.g., increase temporarily the priority of IP flows at subscriber CPE station **294***d* to overcome the backlog or can, e.g., stop transmitting additional downlink packets to the CPE station **294***d* until the queue depth backlog is decreased to an acceptable level again. Processor **1682** can also send messages to MAC uplink subframe scheduler **1666** to flush reservation requests from the subscriber CPE station **294***d* in class queues **1664***a*-**1664***f*.

4. TCP Adjunct Agent

TCP is a reliable transport protocol tuned to perform well in traditional networks where congestion is the primary cause of packet loss. However, networks with wireless links incur significant losses due to bit-errors. The wireless environment violates many assumptions made by TCP, causing degraded end-to-end performance. See for example, Balakrishnan, H., Seshan, S. and Katz, R. H., "Improving Reliable Transport and Handoff Performance in Cellular Wireless Networks," University of California at Berkeley, Berkeley, Calif., accessible over the Internet at URL, http://www.cs.berkeley.edu/~ss/papers/winet/html/winet.html, dealing more directly with handoffs and bit errors in a narrowband wireless environment, the contents of which are incorporated by reference. Attempts to address this problem have modified TCP in order to overcome it. However, this is not a commercially feasible means of overcoming this challenge. It is impracticable to implement any solution that requires a change to the standard operation of TCP.

The present invention uses an enhanced MAC layer which interfaces with a TCP adjunct agent to intercept TCP layer requests to manipulate the TCP layers at either a source or destination end of a transmission, to modify TCP behavior at the source and destination of the TCP/IP transmission which includes an intermediary wireless link. Packets can be queued at the wireless base station awaiting receipt acknowledgment and the base station can perform local retransmissions across the wireless link to overcome packet loss caused by high bit-error rates. Communication over wireless links is characterized by limited bandwidth, high latencies, sporadic high

Ericsson Ex. 1001, pg 80

**A0124**

US 7,496,674 B2

73

bit-error rates and temporary disconnections which must be dealt with by network protocols and applications.

Reliable transport protocols such as TCP have been tuned for traditional wired line networks. TCP performs very well on such networks by adapting to end-to-end delays and packet losses caused by congestion. TCP provides reliability by maintaining a running average of estimated round-trip delay and mean deviation, and by retransmitting any packet whose acknowledgment is not received within four times the deviation from the average. Due to the relatively low bit-error rates over wired networks, all packet losses are correctly assumed to be caused by congestion.

In the presence of the high bit-error rates characteristic of wireless environments, TCP reacts to packet losses as it would in the wired environment, i.e. it drops its transmission window size before retransmitting packets, initiates congestion control or avoidance mechanisms (e.g., slow start) and resets its retransmission timer. These measures result in an unnecessary reduction in the link's bandwidth utilization, thereby causing a significant degradation in performance in the form of poor throughput and very high interactive delays.

The present invention maintains packets in class queues awaiting acknowledgment of receipt from the subscriber CPE stations. Unacknowledged data slots can then be resent by having the wireless base station perform local retransmissions to the subscriber CPE station. By using duplicate acknowledgments to identify a packet loss and performing local retransmissions as soon as the loss is detected, the wireless base station can shield the sender from the inherently high bit error rate of the wireless link. In particular, transient situations of very low communication quality and temporary disconnectivity can be hidden from the sender.

For transfer of data from a CPE subscriber host to a wireless base station host, missing packets are detected at the wireless base station and negative acknowledgments can be generated for them. The negative acknowledgments can request that the packet be resent from the CPE subscriber host (the sender). The CPE subscriber host can then process the negative acknowledgment and retransmit corresponding missing packets. Advantageously, no modifications to the sender TCP or receiver TCP is necessary, since the present invention places TCP aware functionality in the MAC layer.

FIG. 5A illustrates flow 500 depicting IP flows from a source TCP at a subscriber host, down a protocol stack for transmission through a CPE subscriber station, through a wireless medium to a wireless base station, up and through a protocol stack at the wireless base station having an example TCP adjunct agent, then through a wireline connection and through a protocol stack to a destination host. The adjunct TCP agent modifies operation of a TCP sliding window algorithm at the transmitting TCP and in cooperation with proactive reservation-based intelligent multi-media access technology (PRIMMA) media access control (MAC) enables local retransmission over the wireless medium in accord with the present invention.

Specifically, flow 500 illustrates IP packet flow from subscriber workstation 120d, through CPE subscriber station 294d at CPE subscriber location 306d, then over a wireless transmission medium to wireless base station 302, and eventually over a wireline link over data network 142 to host workstation 136a.

TCP adjunct agent 510e makes sure transport is reliable by modifying operation of the TCP sliding window algorithm at the transmitting TCP in a manner that optimizes the window for the wireless medium. TCP adjunct agent 510e advantageously is transparent to industry standard protocols as agent

74

510e does not require modification of the standard TCP/UDP layer of client subscriber workstation 120d or host workstation 136a.

Flow 500 includes IP flows from application layer 512a, down the protocol stack through TCP/UDP layer 510a, through IP layer 508a, then through point-to-point (PPP) layer 520a, then through data link Ethernet layer 504a, then through 10BaseT Ethernet network interface card (NIC) physical layer 502a, over a wire line connection to 10BaseT Ethernet NIC physical layer 502b of subscriber CPE 294d.

Subscriber CPE 294d flows packets coming in from NIC 502b, back up its protocol stack through Ethernet layer 504b, through PPP layers 520b and 520c, back down through PRIMMA MAC 504c to wireless physical layer 502c including antenna 292d, then over the wireless medium to antenna 290d of wireless base station 302.

Wireless base station 302 flows packet IP flows up from antenna 290d at physical layer 502d through PRIMMA MAC layer 504d, through PPP layer 520a, through IP layer 508d to TCP adjunct agent 510e, which can flow IP flows down through IP layer 508e, through PPP layer 520e, through wide area network (WAN) layer 504e, through wireline physical layer 502e, through interface 320, over routers 140d, through data network 142, via wireline connections to wireline layer 502f of WAN host workstation 136a.

Host workstation 136a flows IP flows from wireline layer 502f, up through its protocol stack through WAN layer 504f, through PPP layer 520f, through IP layer 508f, to TCP/UDP layer 51 0f and on to application layer 512f.

TCP/UDP layers 510a and 510f act to provide such transport functions as, e.g., segmentation, managing a transmission window, resequencing, and requesting retransmission of lost packet flows. Normally TCP layers 510a and 510f would send a window of packets and then await acknowledgment or requests for retransmission. A TCP sliding window algorithm is normally used to vary the transmission flow to provide optimized transport and to back off when congestion is detected by receipt of requests for retransmission. Unfortunately in the wireless environment, due to high bit error rates, not all packets may reach the destination address, not because of congestion, but rather because of high bit error rates, so as to prompt a retransmission request from the destination IP host to the source. Rather than slow transport, TCP adjunct agent 510e modifies operation of the TCP sliding window algorithm to optimize operation over wireless. PRIMMA MAC layer 504d interacts with TCP adjunct agent 510e permitting the agent to intercept, e.g., retransmission requests, from TCP layer 510a of subscriber workstation 120d intended for host 136a, and allowing the wireless base station to retransmit the desired packets or flows to subscriber workstation 120d rather than forwarding on the retransmission request to host 136a, since the packets could still be stored in the queue of PRIMMA 504d and would not be discarded until an acknowledgment of receipt is received from the subscriber CPE. Since retransmission can be performed according to the present invention at the PRIMMA MAC data link layer, i.e. layer 2, retransmission can occur from the base station to the CPE subscriber, rather than requiring a retransmission from all the way over at the transmitting source TCP which would cause TCP to backoff its sliding window algorithm. Thus, by having wireless base station 302 retransmit until receipt is acknowledged over the wireless link, the inherently high bit error rate can be overcome, while maintaining an optimal TCP window.

Recall, a TCP transmitter transmits a TCP sliding window block of packets and alters the size of the window upon detection of congestion. The TCP transmitter transports a

Ericsson Ex. 1001, pg 81

75

block of packets in a window, and then awaits acknowledgment from the receiver. If transmission is going smoothly, i.e. no congestion or lost packets occur, then the transmitter TCP ramps up the transmission rate. This increased transmission rate continues until the transmitting TCP detects congestion or packet loss. When notified of congestion, the transmitting TCP stops transmitting, backs off and sends a smaller block (i.e. a smaller window) of packets.

TCP adjunct agent modifies normal TCP operation by tricking the transmitting TCP and its transmitting window algorithm. The TCP adjunct agent prevents the transmitter from being notified of loss, i.e. receiving congestion notification, from the receiving TCP by, e.g., preventing duplicate retransmission requests. Since the transmitting TCP does not receive such notification, it does not modify the TCP sliding window and transmission continues at the higher rate.

In the event that real congestion occurs, i.e. if the TCP adjunct agent recognizes packets really were lost, then the TCP adjunct agent can let the retransmission request go through to the transmitting TCP. This is advantageously accomplished because the MAC link layer of the present invention is in communication with the higher protocol layers, it is application aware, transport aware and network aware. In this case, because the MAC layer is transport layer aware, PRIMMA MAC layer 504$d$ communicates with the TCP adjunct agent 510$e$ at layer 4. Since the MAC requires acknowledgment of receipt of wireless transmissions sent to the CPE subscriber station 294$d$ for every packet sent from the wireless base station 302, the MAC layer 504$d$ knows whether an inter-TCP layer communication, e.g., a request for retransmission, is sent from a client computer TCP at the CPE station is created because the lost packet was lost in wireless transmission, or because of real congestion.

If PRIMMA MAC 504$d$ does not receive an acknowledgment from 504$c$, then the PRIMMA MAC 504$d$ of wireless base station 302 can retransmit the contents of the lost packet to the subscriber CPE station 294$d$. If the PRIMMA MAC 504$c$ of the subscriber CPE station 294$d$ acknowledges receipt and still requests a retransmission, then real congestion could have occurred and the PRIMMA MAC 504$d$ of the wireless base station 302 can let the TCP adjunct agent 510$e$ know that it should allow the retransmission request to be sent to the transmitting TCP 510$f$ of host workstation 136$a$.

Thus, TCP adjunct agent 510$e$ of the present invention can modify operation of the TCP sliding window algorithm in a manner that is optimal for the wireless medium, without requiring any change to commercially available TCP layers 510$a$ and 510$f$ at the receiver and sender hosts. In an embodiment, TCP adjunct agent 510$e$ obviates the need for any modification of the TCP layers at either the sending (i.e. transmitting) host or client. In another embodiment the host and client TCP layers are unaware of the modification of operation by the TCP adjunct agent, i.e. it is transparent to source and destination TCP layers. In another embodiment, TCP adjunct agent 510$e$ intercepts retransmission requests between a TCP layer of the client computer coupled to the subscriber CPE station and the TCP layer of the host workstation coupled to the data network.

FIG. 5B illustrates functional flow diagram 522 including an example functional description of TCP adjunct agent 510$e$ performing an outgoing TCP spoof function. Referring to FIGS. 5B and 5A, diagram 522 assumes that a TCP layer 510$f$ at a transmitting host 136$a$ has transmitted a windowful of packet data to subscriber workstation 120$d$, and awaits acknowledgment. Diagram 522 illustrates receipt of an outgoing TCP message 524 in TCP adjunct agent 510$e$ at wire-

76

less base station 302 which has been sent from subscriber workstation 120$d$ via subscriber CPE station 294$d$.

In step 526, the TCP header contents of outgoing TCP message 524 is parsed in order to reveal the contents of the message being sent from subscriber workstation 120$d$ through the wireless network toward the transmitting host 136$a$.

In step 528, it is determined whether the TCP header contents includes a duplicate acknowledgment message from the CPE station. Receiving a duplicate acknowledgment request from the CPE subscriber location could be indicative of a lost message in the wireless medium, or a real congestion problem. If in step 528 the TCP packet is determined to be a duplicate acknowledgment message, then processing can continue with step 532, if not, then processing can continue with step 530.

In step 530, it is determined that there was real congestion, i.e., this was not a duplicate acknowledgment message caused by retransmission attempts at the wireless link layer. Thus, in step 530, the TCP message is permitted to pass through TCP adjunct 510$e$ without modification, and can continue through flow 500 to TCP layer 510$f$ of FIG. 5A.

In step 532, since there was a duplicate acknowledgment detected in step 528, it is determined whether the packet was successfully transmitted, or not. Step 532 is performed via intercommunication between TCP adjunct agent 510$e$ and PRIMMA MAC layer 504$d$. This is an example of the interactivity between PRIMMA MAC and higher layer protocols illustrated as line 428 in FIG. 4. PRIMMA MAC layer 504$d$ can identify whether a packet was successfully sent from wireless base station 302 to CPE station 294$d$ since, as illustrated in FIG. 5B, requests for retransmission 1576 are received from CPE station 294$d$ at link layer acknowledgment (ARQ) processor 1578 to MAC downlink subframe scheduler 1566 alerting the scheduler 1566 to retransmit the lost packet in a future frame 1568. If in step 532, it is determined that the packet was successfully transmitted, then processing can continue with step 530, as described above. If however it is determined that the packet was not successfully transmitted, then processing continues with step 534.

In step 534, since the packet was not successfully transmitted, TCP adjunct agent 510$e$ can suppress transmission of TCP message 524 since it can be assumed that the packet was lost in the wireless medium. Processing can continue with step 536.

In step 536, TCP adjunct agent 510$e$ can wait for notification from PRIMMA MAC 504$d$ that a successful link layer retransmission of the lost packet was received at link layer acknowledgment processor 1578. From step 536, processing can continue with step 538.

In step 538, upon receipt of acknowledgment of a successful PRIMMA MAC 504$d$ link layer retransmission, then normal TCP messages can be resumed.

In another step (not shown), TCP adjunct agent and PRIMMA MAC layers can set a limit of a threshold number of retransmission attempts, and if that threshold is reached, then processing can continue with step 530 to permit the TCP message to pass without modification.

FIG. 5C illustrates functional flow diagram 540 including an example functional description of TCP adjunct agent 510$e$ performing an incoming TCP spoof function. Referring to FIGS. 5C and 5A, diagram 540 assumes that a TCP layer 510$a$ at a transmitting subscriber workstation 120$d$ has transmitted a windowful of packet data to host 136$a$, and awaits acknowledgment. Diagram 544 illustrates receipt of an incoming TCP message 542 in TCP adjunct agent 510$e$ at wireless base station 302 which has been sent from host

Ericsson Ex. 1001, pg 82

US 7,496,674 B2

77

78

workstation 136*a* via data network 142 for transmission over the wireless medium to subscriber CPE 294*d* to subscriber workstation 120*d*.

In step 544, the TCP header contents of ingoing TCP message 542 is parsed in order to reveal the contents of the message being sent from host 136*a* through the wireless network toward the transmitting subscriber workstation 120*d*.

In step 546, it is determined whether the TCP header contents include a duplicate acknowledgment message from host 136*a*. Receiving a duplicate acknowledgment request from the host could be indicative of a lost message in the wireless medium, or a real congestion problem. If in step 546 the TCP packet is determined to be a duplicate acknowledgment message, then processing can continue with step 550, if not, then processing can continue with step 548.

In step 548, it is determined that there was real congestion, i.e., this was not a duplicate acknowledgment message caused by retransmission attempts at the wireless link layer. Thus, in step 548, the TCP message is permitted to pass through TCP adjunct 510*e* without modification, and can continue through flow 500 to TCP layer 510*a* of FIG. 5A.

In step 550, since there was a duplicate acknowledgment detected in step 546, it can be determined whether the packet was successfully transmitted, or not. Step 550 can be performed via intercommunication between TCP adjunct agent 510*e* and PRIMMA MAC layer 504*d*. This is an example of the interactivity between PRIMMA MAC and higher layer protocols illustrated as line 428 in FIG. 4. PRIMMA MAC layer 504*d* can identify whether a packet was successfully sent from CPE station 294*d* to wireless base station 302, as illustrated in FIG. 16B, requests for retransmission 1676 are received from CPE station 294*d* at link layer acknowledgment (ARQ) processor 1678 to MAC downlink subframe scheduler 1666 alerting the scheduler 1666 to retransmit the lost packet in a future frame 1668. If in step 550, it is determined that the packet was successfully transmitted, then processing can continue with step 548, as described above. If however it is determined that the packet was not successfully transmitted, then processing continues with step 552.

In step 552, since the packet was not successfully transmitted, TCP adjunct agent 510*e* can suppress transmission of TCP message 542 since it can be assumed that the packet was lost in the wireless medium. Processing can continue with step 554.

In step 554, TCP adjunct agent 510*e* can wait for notification from PRIMMA MAC 504*d* that a successful link layer retransmission of the lost packet was received at link layer acknowledgment processor 1678. From step 554, processing can continue with step 556.

In step 556, upon receipt of acknowledgment of a successful PRIMMA MAC 504*d* link layer retransmission, then normal TCP messages can be resumed.

In another step (not shown), TCP adjunct agent and PRIMMA MAC layers can set a limit of a threshold number of retransmission attempts, and if that threshold is reached, then processing can continue with step 548 to permit the TCP message to pass without modification.

5. Wireless QoS Aware PRIMMA Media Access Control (MAC) Hardware Architecture

FIG. 10 illustratively depicts an embodiment of PRIMMA MAC hardware architecture 1000. Architecture 1000 shows data network 142 coupled by a wireline bidirectional connection to WAN interface 320.

WAN interface 320 is bidirectionally linked to a bidirectional data frame FIFO 1002 which is bidirectionally coupled to both segmentation and resequencing (SAR) 1004 and QoS/SLA rules engine and processor 1008.

QoS/SLA rules engine and processor 1008 is also bidirectionally coupled to IP flow buffers 1014 and flash random access memory (RAM) 1010.

SAR 1004 is bidirectionally coupled to IP flow buffers 1014, flash RAM 1010, QoS/SLA rules engine and processor 1008 and PRIMA MAC scheduler ASIC 1012.

PRIMA MAC scheduler ASIC 1012 is also bidirectionally coupled to an RF interface 290, a static RAM (SRAM) radio cell buffer 1018 and IP blow buffer 1014.

6. Wireless Base Station Software Organization

FIG. 11 is an exemplary software organization for a packet-centric wireless point to multi-point telecommunications system. The software organization of FIG. 11 includes wireless transceiver and RF application specific integrated circuit (ASIC) module 290, IP flow control component 1102, WAN interface management component 1104, QoS and SLA administration component 1106, system and OAM&P component 1108, customer billing and logging component 1110, directory enabled networking (DEN) component 1112, and wireless base station 320.

IP flow control module 1102 includes transmission queuing control module 1102*a*, TCP rate control and class of service module 1102*b*, wireless PRIMMA MAC layer engine 1102*c* and IP flow identification and analysis module 1102*d*.

WAN interface management component 1104 includes WAN ingress/egress queuing control module 1104*a*, WAN interface ports (e.g., for T1, T3, OC3 ports) 1104*b*, firewall and security module 1104*c*, and WAN traffic shaping module 1104*d*.

The IP Flow control component 1102 and WAN interface management component 1104 represent the "core" of the system, where the packet processing, MAC layer scheduling, TCP proxy agent, and WAN I/F control functions are located. Much of the activities of the "non-core" components described above support and control these core components.

QoS and SLA administration component 1106 includes includes QoS performance monitoring and control module 1106*a*, service level agreements module 1106*b*, policy manager module 1106*c* and encryption administration module 1106*d*.

The QoS and SLA administration component 1106 provides the static data needed by the system in order to properly group particular IP-flows into QoS classes. Typically, during the provisioning phase of installing the system, the service provider will (remotely) download pertinent information about the subscriber CPE station 294, including the subscriber CPE stations's SLA, any policy-based information (such as hours of operation or peak data transmission rate allowance.). Encryption keys or "strengths" can also be downloaded, which may be subscriber CPE station or service provider specific.

System OAM&P component 1108 includes SNMP proxy client for WAP module 1108*a*, SNMP proxy clients for CPE module 1108*b*, and system operations, administration, management arid provisioning module 1108*c*.

The OAM&P component 1108 allows remote service personnel and equipment to monitor, control, service, modify and repair the system. System performance levels can be automatically monitored, and system traps and traces can be set. Subscriber complaints can be addressed with the use of remote test and debug services controlled by OAM&P component 1108. System capacity limits can be monitored, and proactive provisioning of additional WAN connectivity can occur, as the result of automatic trend analysis functions in OAM&P component 1108.

Customer billing and logging module 1110 includes account logging and database management module 1110*a*,

Ericsson Ex. 1001, pg 83

US 7,496,674 B2

**79**

transaction query and processing control module **1110***b*, billing and account control module **111***c*, and user authentication module **1110***d*.

The customer billing and logging component **1110** allows the service provider to receive account, billing and transaction information pertaining to subscribers in the system. For service providers who bill on the basis of usage, cumulative system resource utilization data can be gathered. For specific types of activities (e.g., video conferencing, multi-casting, etc.) there may be special billing data that is collected and transmitted to the service provider. This component also controls the availability of the system to subscribers through the operation of the subscriber authentication function. Once a subscriber is authorized to use the system, a new subscriber authentication entry is made (remotely) by the service provider. Likewise, a subscriber can be denied further access to the system for delinquent payment for services, or for other reasons. The service provider can also remotely query the system for specific account-related transactions.

Directory Enabled Networking (DEN) component **1112** includes DEN QoS **1112***a* module, DEN management and provisioning **1112***b* module, DEN IPSEC module **1112***c* and IP-based VPN control and administration module **1112***d*.

The DEN component **1112** allows the service provider the means to input into the system relevant information regarding the operation of DEN-based VPN's of subscribers. Subscriber VPNs need to be "initialized" and "provisioned" so that the system properly allocates system resources to subscribers with these VPNs, and provides for the recognition and operation of these VPNs. Data from DEN component **1112** are utilized by the system to apply the appropriate priorities to IP-flows of the subject subscribers.

The invention's packet-centric wireless base station supports directory enabled networking (DEN), a MICROSOFT, INTEL and CISCO standard for providing a standard structure for how distributed sites manage IP flows. The present invention prioritizes VPN traffic in a lightweight directory access protocol (LDAP)-compliant (LDAP is available from MICROSOFT of Redmond, Wash.) manner which allows remote administration, provisioning and management. The present invention is also LDAP version 2 compliant. The present invention also complies with the X.500 standard promulgated by the international telecommunications union/ telecommunications section (ITU/T), and with the RFC 1777.

In one embodiment, DEN provides policy-based network management, IPsec compatible network security, and IPsec based VPNs. The DEN of the wireless base station **302** is planned to be common information model (CIM) 3.0 compatible (once the specification is finalized). The wireless base station **302** can provide native DEN support and supports directory based DEN QoS mechanisms including reservation model (i.e. RSVP, per-flow queuing), and precedence/priority/differentiated model (i.e. packet marking). Wireless base station **302** can plan support of DEN network policy QoS, and until DEN is complete, can support internal QoS and network extensions.

6. IPsec Support

IPsec is introduced above with reference to FIG. **4**. IPsec provides a standard method of encrypting packets. In VPN tunnel mode, an entire header can be encoded, i.e. encrypted. In order for the present invention to be able to implement its packet-centric, QoS aware prioritization, during identification of a packet/IP flow, the wireless base station needs to be able to analyze the contents of header fields of the packets. Therefore, analysis of unencrypted packets is desirable.

The present invention already encrypts the data stream prior to transmitting frames over the wireless medium, so

**80**

IPsec does not really used to be used over the wireless link to provide for encrypted transmission. Where a service provider finds it desirable to use IPsec, IPsec can be used for authentication and secure encapsulation of the header and payload, or just the payload data. IPsec is normally integrated at a firewall. If a service provider desires to implement the present invention and IPsec, then the present invention should be implemented behind the firewall, i.e. the firewall can be moved to the wireless base station. This permits ending the IPsec stream at the base station which can provide the base station access to packet header fields.

FIG. **17** illustrates IP flow in the downlink direction including IPsec encryption. Similarly, FIG. **18** illustratively depicts an uplink direction of IPsec support of the present invention.

FIG. **17** illustrates downlink flow **1700** depicting downlink direction IP flows from a source host workstation **136***a*, down a protocol stack which supports IPsec, for transmission up and through wireless base station **302** which is coupled to data network **142**, through encryption layers, then through the wireless link to subscriber CPE **294***d*, up and through a protocol stack at the subscriber CPE **294***d*, then through a wireline connection to data network **142** and up through the protocol stack to the destination subscriber workstation **120***d* at subscriber location **306***d*.

Specifically, flow **1700** illustrates IP packet flow from host workstation **136***a*, through wireless base station **302**, then over a wireless transmission link to subscriber CPE **294***d*, and over a wireline link to subscriber workstation **120***d*.

Host workstation **136***a* flows IP flows down from application layer **1712***h*, down through TCP/UDP layer **1710***h*, through IP layer **1708***h*, through optional PPP layer **1706***h*, through Ethernet layer **1705***h*, down through 10BaseT layer **1702***h*, over data network **142** to 10BaseT layer **1702***g*, then up through Ethernet **1704***g*, up its protocol stack through optional PPP layer **1706***g* to IP layer **1708***g* and **1708***h*, back down through Internet firewall and IPsec security gateway **1706***f*, down through WAN layer **1704***f*, to wireline layer **1702***f* to data network **142** to wireline physical layer **1702***e*.

Wireline physical layer **1702***e* of wireless base station **302**, flows IP flows up the protocol stack through WAN layer **1704***e* through IPsec security gateway **1706***e* and firewall to IP network layer **1708***e* and **1708***d* and then down through encryption layer **1706***d*, PRIMMA MAC layer **1704***d* and down to wireless link to subscriber CPE **294***d*.

Subscriber CPE **294***d* flows packet IP flows up from antenna **292***d* at physical wireless layer **1702***c* up through MAC layer **1704***c*, through encryption layer **1706***c*, through IP layers **1708***b* and **1708***c*, then down through optional layer **1706***b* to Ethernet layer **1704***b* to 10BaseT connection **1702***b* to 10BaseT connection.

Subscriber workstation **120***d* flows IP flows up from 10BaseT layer **1702***a* up through its protocol stack through Ethernet layer **1704***a*, through optional PPP layer **1706***a*, through IP layer **1708***a*, to TCP/UDP layer **1710***a* and on up to application layer **1712***a*.

FIG. **18** illustrates uplink flow **1800** depicting uplink direction IP flows from a source TCP at subscriber workstation **120***d* at CPE location **306***d*, down a protocol stack for transmission through Ethernet coupled CPE subscriber station **294***d* through wireless medium to wireless base station **302**, up and through a protocol stack at the wireless base station **302** which supports IPsec, then through a wireline connection to data network **142** and through a protocol stack to a destination host.

Specifically, flow **1800** illustrates IP packet flow from subscriber workstation **120***d*, through subscriber CPE **294***d*, then

Ericsson Ex. 1001, pg 84

**A0128**

US 7,496,674 B2

**81**

over a wireless transmission medium to wireless base station **302**, and eventually over a wireline link to host workstation **136***a*.

Flow **1800** includes IP flows from application layer **1812***a*, down the protocol stack through TCP/UDP layer **1810***a*, through IP layer **1808***a*, then through optional point-to-point (PPP) layer **1806***a*, then through data link Ethernet layer **1804***a*, then through 10BaseT Ethernet, network interface card (NIC) physical layer **1802***a*, over a wire line connection to 10BaseT Ethernet NIC physical layer **1802***b* of subscriber CPE **294***d*.

Subscriber CPE **294***d* flows packets coming in from NIC **1802***b*, back up its protocol stack through Ethernet layer **1804***b*, through optional PPP layer **1806***b* to IP layer **1808***b* and **1808***c*, back down through an Internet firewall and IPsec security gateway **1806***c*, down through PRIMMA MAC **1804***c* to wireless physical layer **1802***c* including antenna **292***d*, then over the wireless medium, such as, e.g., RF communication, cable RF, and satellite link, to antenna **290***d* of wireless base station **302** at wireless physical layer **1802***d*.

Wireless base station **302** flows packet IP flows up from antenna **290***d* at physical wireless layer **1802***d* up through MAC layer **1804***d*, through IPsec layers **1806***d* and **1806***d*, which can encapsulate packets and encrypt them. From IPsec layer **1806***e*, IP flows can flow down through WAN layer **1804***e* and through wireline physical layer **1802***e* over data network **142**.

Wireline physical layer **1802***f* flows IP flows up the protocol stack through WAN layer **1804***f* through IPsec security gateway **1806***f* and firewall to IP network layer **1808***f* and **1808***g* and then down through optional PPP layer **1806***h*, Ethernet layer **1804***h* and down through 10BaseT layer **1802***g*, through interface **320**, over routers **140***d*, through data network **142**, via wireline connections to 10BaseT physical layer **1802***h* of host workstation **136***a*.

Host workstation **136***a* flows IP flows up from 10BaseT layer **1802***h* up through its protocol stack through Ethernet layer **1805***h*, through optional PPP layer **1806***h*, through IP layer **1808***h*, to TCP/UDP layer **1810***h* and on to application layer **1812***h*.

IV. Conclusion

While various embodiments of the present invention have been described above, it should be understood that they have been presented by way of example only, and not limitation. Thus, the breadth and scope of the present invention should not be limited by any of the above-described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

What is claimed is:

**1**. A method comprising:

receiving a first packet from a wired data network in a wireless base station that is coupled to the wired data network, wherein the first packet is protected according to a first security protocol on the wired data network, and wherein a target device of the first packet communicates with a source of the first packet, at least in part, over a wireless network on which the wireless base station communicates;

processing the first packet in the wireless base station according to the first security protocol;

determining that the first packet is targeted at the target device, wherein the determining is performed by the wireless base station, and wherein the first packet comprises a header coded with address information identifying the target device; and

**82**

applying a second security protocol employed on the wireless network to the first packet, wherein the second security protocol is different from the first security protocol, and wherein the applying is performed in the wireless base station.

**2**. The method as recited in claim **1** wherein the first security protocol comprises encryption, and wherein processing the first packet comprises decrypting the first packet.

**3**. The method as recited in claim **2** wherein the second security protocol comprises encryption according to a different encryption algorithm from the first security protocol, and wherein applying the second security protocol comprises encrypting the decrypted first packet according to the different encryption algorithm.

**4**. The method as recited in claim **2** wherein the first security protocol further comprises authentication, and wherein processing the first packet comprises authenticating the source.

**5**. The method as recited in claim **4** wherein the first security protocol is compliant with the internet protocol security (IPSec) standard.

**6**. The method as recited in claim **1** wherein the first security protocol is compliant with the internet protocol security (IPSec) standard.

**7**. The method as recited in claim **1** wherein the first security protocol is compliant with the point to point tunnelling protocol (PPTP) standard.

**8**. The method as recited in claim **1** wherein the first security protocol is compliant with the layer two forwarding (L2F) protocol standard.

**9**. The method as recited in claim **1** wherein the first security protocol is compliant with the layer two tunnelling protocol (L2TP) standard.

**10**. The method as recited in claim **1** farther comprising the wireless base station wirelessly transmitting the first packet.

**11**. The method as recited in claim **1** farther comprising:

wirelessly receiving a second packet in the wireless base station, wherein the second packet is protected by the second security protocol;

processing the second packet according to the second security protocol in the wireless base station; and

applying the first security protocol to the second packet.

**12**. The method as recited in claim **11** further comprising the wireless base station transmitting the second packet on the wired network.

**13**. A base station comprising:

a first interface configured to couple to a wired data network in use;

a second interface configured to transmit and receive on a wireless network in use; and

a controller coupled to the first interface and the second interface, wherein the controller is configured to process a first packet received by the first interface, wherein the controller is configured to process the first packet according to a first security protocol on the wired data network, wherein a target device of the first packet communicates with a source of the first packet, at least in part, over the wireless network, and wherein the first packet comprises a header coded with address information identifying the target device, wherein the controller is configured to determine that the first packet is targeted at the target device, and wherein the controller is configured to apply a second security protocol employed on the wireless network to the first packet, wherein the second security protocol is different from the first security protocol.

Ericsson Ex. 1001, pg 85

**A0129**

US 7,496,674 B2

83

**14**. The base station as recited in claim **13** wherein the first security protocol comprises encryption, and wherein the controller is configured to decrypt the first packet according to the first security protocol.

**15**. The base station as recited in claim **14** wherein the second security protocol comprises encryption according to a different encryption algorithm from the first security protocol, and wherein the controller is configured to encrypt the decrypted first packet according to the different encryption algorithm.

**16**. The base station as recited in claim **14** wherein the first security protocol further comprises authentication, and wherein the controller is configured to authenticate the source.

**17**. The base station as recited in claim **13** wherein the controller is further configured to process a second packet received by the second interface, wherein the controller is configured to process the second packet according to the second security and to apply the first security protocol to the second packet.

**18**. A system comprising:

one or more hosts coupled to a wired data network;

a base station coupled to the wired data network and configured to communicate on a wireless network, wherein the base station is configured to process a first packet received from the wired data network, wherein the base station is configured to process the first packet according to a first security protocol implemented on the wired data network, wherein a target device communicates with a source of the first packet, at least in part, over the wireless network, and wherein the first packet comprises a header coded with address information identifying the

84

target device, and wherein the base station is configured to determine that the first packet is targeted at the target device, and wherein the base station is configured to apply a second security protocol employed on the wireless network to the first packet, wherein the second security protocol is different from the first security protocol.

**19**. The system as recited in claim **18** wherein the first security protocol comprises encryption, and wherein the base station is configured to decrypt the first packet according to the first security protocol.

**20**. The system as recited in claim **19** wherein the second security protocol comprises encryption according to a different encryption algorithm from the first security protocol, and wherein the base station is configured to encrypt the decrypted first packet according to the different encryption algorithm.

**21**. The system as recited in claim **19** wherein the first security protocol further comprises authentication, and wherein the base station is configured to authenticate the source.

**22**. The system as recited in claim **18** wherein the base station is further configured to process a second packet received from the wireless network, wherein the base station is configured to process the second packet according to the second security and to apply the first security protocol to the second packet.

**23**. The system as recited in claim **18** further comprising one or more customer premises equipment (CPE) stations configured to wirelessly communicate with the base station on the wireless network, and wherein the target device is coupled to one of the CPE stations.

\*   \*   \*   \*   \*

Ericsson Ex. 1001, pg 86

# CERTIFICATE OF SERVICE

I, Jonathan M. Strang, hereby certify that a copy of **PRINCIPAL BRIEF FOR APPELLANT** was served by electronic mail via the CM/ECF system, addressed to:

Alexander B. Englehart
Robert C. Mattson
**Oblon, McClelland, Maier & Neustadt,**
**LLP**
1940 Duke Street
Alexandria, VA 22314
(703) 412-6225
(703) 413-2220 facsimile
AEnglehart@oblon.com
RMattson@oblon.com

*Attorneys for Appellee*

Dated: November 24, 2015             Respectfully submitted,

                                     /s/ Jonathan M. Strang
                                     Jonathan M. Strang
                                     **Sterne Kessler Goldstein & Fox PLLC**
                                     1100 New York Ave., N.W.
                                     Washington, DC 20005
                                     (202) 371-2600

                                     *Counsel for Appellant,*
                                     *Intellectual Ventures I LLC*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B). The brief contains 12,133 words, excluding the

parts of the brief exempted by Federal Rule of Appellate Procedure

32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of

Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally

spaced typeface using Microsoft® Word 2010 in 14 point Times New Roman.


 /s/ Jonathan M. Strang
Jonathan M. Strang
*Counsel for Appellant,*
*Intellectual Ventures I LLC*
November 24, 2015